UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-10154-NG

RODERICK DIAZ

v.

DAVID HIGGINS, Individually,
and, in his capacity as Director
of Central Fleet Maintenance,
City of Boston Department of
Public Works; and CITY OF BOSTON

**DEFENDANTS' LOCAL RULE 56.1**
**STATEMENT OF FACTS AND SUPPORTING DOCUMENTATION[1]**

Pursuant to L.R. 56.1, David Higgins ("Higgins") and the
City of Boston ("City"), (collectively referred to as
"Defendants"), submit the following statement of material facts
of record to which there is no genuine dispute.[2]  The Defendants
state the Plaintiff, Roderick Diaz ("Plaintiff"), cannot adduce
any evidence to support his claims of: (1) G. L. c. 151B, § 4;[3]
(2) G. L. c. 151B, § 4(4); (3) Title VI; (4) tortious contract
interference; and (5) violation of 42 U.S.C. § 1981.

1.    The Plaintiff is a black male, who was born in the
Republic of Trinidad and Tobago.  Exhibit B, *Defendant City of*

---

[1] All of the supporting documentation attached hereto and to the Affidavits
submitted in conjunction herewith are true and accurate copies.  See Exhibit
A, *Affidavit of Counsel*.
[2] These facts are deemed undisputed for purposes of Defendants' Motion for
Summary Judgment only.
[3] The Defendants are in no way conceding that these claims are properly before
this Court.  However, it will list all relevant facts in order to be able to
thoroughly argue the matter.

*Boston's Responses to Plaintiff's Requests for Admissions*,
Response No. 1.

2.    The Plaintiff moved to the United States in March 25,
1969, and became a U.S. citizen in August 1978.  Exhibit C,
*Roderick Diaz's Deposition* ("*Diaz Depo I*"), pg. 8:10-11; pg.
9:1-2, April 30, 2004.

3.    The Plaintiff started working for the City in December
31, 1986, as a Motor Equipment Repairman ("MER").  Ex. C, *Diaz
Depo I*, pg. 29:4; Exhibit D, *Roderick Diaz's Deposition* ("*Diaz
Depo II*"), pg. 15:4, November 22, 2006.

4.    Sometime after the Plaintiff was hired, he became a
Heavy Motor Equipment Repairman ("HMER").  Ex. D, *Diaz Depo II*,
pg. 15:8-13.

5.    The Plaintiff held a temporary provisional position at
the City of Boston until September 9, 1998, when it became
permanent.  Ex. C, *Diaz Depo I*, pgs. 35-36:21-10; Exhibit E,
*Affidavit of Kathleen Kelley*, ¶9, February 6, 2007.

6.    Central Fleet Maintenance is a section of the Public
Works Department of the City.  Ex. E, *Kelley Aff.*, ¶4; Exhibit
F, *Deposition of Kathleen Kelley*, pg. 20:17-22, February 25,
2004.

7.    Central Fleet Maintenance came into existence in 1997.
Ex. E, *Kelley Aff.*, ¶4; Exhibit G, *Affidavit of David Higgins*,
¶2, February 6, 2007; Exhibit H, *Deposition of David Higgins*

("*Higgins Depo I*"), pg. 54:7-9, February 25, 2004.

8.    In August of 1997, the City hired Higgins as Director of Central Fleet Maintenance.  See Ex. G, *Higgins Aff.*, ¶2.

9.    Higgins oversees the maintenance of and repair for City fleet vehicles.  Ex. H, *Higgins Depo I*, pg. 8:18-19.

10.    Higgins is the supervisor of all CFM employees.  He has five people who report directly to him.  Exhibit I, Deposition of *David Higgins* ("*Higgins Depo II*"), pg. 5:6-16, April 19, 2001.

11.    One of Higgins's duties as Director of CFM is to interview individuals and based on those interviews make recommendations to the Commissioner as to whom to appoint to those positions; Higgins does not have any appointing authority. Ex. G, *Aff. Higgins*, ¶4.

12.    In November 1999, the Plaintiff applied for the Motor Equipment Repair Foreman ("MERF") position in the light shop. Ex. E, *Kelley Aff.*, ¶¶ 11-12; Ex. G, *Higgins Aff.*, ¶¶ 6-7; Ex. D, *Diaz Depo II*, pg. 21:3-9.

13.    The Plaintiff was interviewed for the position by David Higgins, Robert Silvey, and Jeremiah Coughlin.  Ex. D, *Diaz Depo II*, pg. 21:14-16; Ex. G, *Higgins Aff.*, ¶8.

14.    All the questions asked were automotive and mechanic in nature.  Ex. D, *Diaz Depo II*, pgs. 21-22:20-1 and 22-23:23-2.

15.    The Plaintiff was asked fair questions.  Ex. D, *Diaz*

*Depo II*, pg. 23:6-7.

16. The panel used 3-fold criteria – education, experience and job knowledge. Ex. G, *Higgins Aff.*, ¶9; Ex. H, *Higgins Depo I*, pg. 51:18-23; Exhibit J, *Deposition of Jeremiah Coughlin*, pg. 16:10-24, March 27, 2001.

17. All of the applicants were asked the same questions. Ex. G, *Higgins Aff.*, ¶9.

18. Higgins created the 3-fold method prior to starting his employment with the City, and he reevaluates it each time he uses it to make sure it is up to date. Ex. I, *Higgins Depo II*, pg. 13:10-18.

19. He revised it prior to using it for the 1999 interviews for the MERF position. Ex. I, *Higgins Depo II*, pgs. 13-14:23-4.

20. The criteria was not weighed individually, rather they were weighed as a whole. Ex. I, *Higgins Depo II*, pg. 14:9-19; Ex. G, *Higgins Aff.*, ¶10.

21. Upon completion of the interviews, the interviewees were ranked according to their particular strengths and weaknesses with respect to the areas of the job knowledge, education and experience; Interviewees Timothy O'Leary and James Monaghan were ranked first and second respectively. The two were considered substantially equal based on the results of their interviews, but the Foreman position was given to Monaghan since

4

he had more seniority.  Exhibit K, *Affidavit of David P. Higgins*, ¶¶ 9-21, December 11, 2000.

22.  The Plaintiff was not awarded the MERF position; he was rated as the least qualified candidate for the position. Ex. C, *Diaz Depo I*, pg. 62:10-11; Ex. J, *Coughlin Depo*, pg. 25:13-19.

23.  When he did not get the 1999 MERF position, the Plaintiff filed a grievance.  Ex. C, *Diaz Depo I*, pg. 62:12-13.

24.  On or about July 18, 2000, the Plaintiff filed a Complaint at the Massachusetts Commission Against Discrimination ("MCAD") alleging that the City discriminated against him on the basis of race, age and national origin.  Exhibit L, *MCAD Complaint I*.

25.  The MCAD found Plaintiff's Complaint lacked probable cause and dismissed the matter.  Exhibit M, *MCAD Dismissal and Notification of Rights*.

26.  On June 30, 2004, MCAD affirmed the lack of probable cause finding.  Exhibit N, *MCAD Appeal Finding*.

27.  On July 17 2001, a job posting for MERF in the heavy shop was placed at CFM.  Exhibit O, *City of Boston Employment Opportunity Form*, Posting No. BK-1159.

28.  The Plaintiff applied for the position and was interviewed.  Ex. D, *Diaz Depo II*, pg. 40:20-22; Ex. E, *Kelley Aff.*, ¶¶ 14-15, Ex. G, *Higgins Aff.*, ¶¶ 12-13.

29.  Three other candidates were also interviewed for the position.  Ex. E, *Kelley Aff.*, ¶¶ 14-15, Ex. G, *Higgins Aff.*, ¶¶ 12-13.

30.  The interviews were conducted by Kathy Kelley, Maurice Smith, Robert Silvey, Jeremiah Coughlin and David Higgins.  Ex. E, *Kelley Aff.*, ¶ 17; Ex. G, *Higgins Aff.*, ¶ 14; Ex. C, *Diaz Depo I*, pg. 68:3-4; Ex. D, *Diaz Depo II*, pg. 41:5-7.

31.  The interview consisted of oral subjective and objective questions which sought information as to the candidates' job knowledge, experience and education.  All candidates were asked the same questions.  Ex. E, *Kelley Aff.*, ¶¶ 18-19; Ex. G, *Higgins Aff.*, ¶ 15.

32.  The Plaintiff was asked mechanic questions.  Ex. D, *Diaz Depo II*, pg. 41:8-9.

33.  The Plaintiff thought the questions were fair.  Ex. D, *Diaz Depo II*, pg. 41:15-18.

34.  The Plaintiff thought it was reasonable and necessary for the interviewers to ask questions with regard to out-of-service criteria.  Ex. C, *Diaz Depo I*, pgs. 60-61:18-2.

35.  The Plaintiff did not prepare for the 2001 interview because he had no problems with the type of interview as it was just on mechanic questions.  Ex. C, *Diaz Depo I*, pg. 67:6-17.

36.  The interview was oral.  Ex. D, *Diaz Depo II*, pg. 41:1-4.

37.    The criteria used to interview the candidates were weighed as a whole, and not individually.  Ex. E, *Kelley Aff.*, ¶20; Ex. G., *Higgins Aff.*, ¶16; Ex. H, *Higgins Depo I*, pg. 56:2-10.

38.    During the process, Higgins asked the panelists to write down their thoughts about each individual candidate.  When the interviews were completed, Higgins asked the panel to rate the candidates.  A discussion ensued, and afterwards, Higgins asked everyone to rate the candidates again.  The ratings were recorded.  Ex. H, *Higgins Depo I*, pg. 59:5-17; Ex. G, *Higgins Aff.*, ¶17.

39.    The Plaintiff was ranked by all panelists as the least qualified candidate.  Ex. G, *Higgins Aff.*, ¶18.

40.    The decision on who to recommend for the position was collective.  Ex. H, *Higgins Depo I*, pg. 60:5-7.

41.    The Plaintiff got twenty-one and a half questions wrong out of twenty-eight and two of his answers were not on point.  Ex. G, *Higgins Aff.*, ¶19.

42.    The candidate the panel agreed to recommend for the position only got three questions wrong out of twenty-eight. Ex. G, *Higgins Aff.*, ¶20.

43.    As a result, the Plaintiff was not recommended for the position, and subsequently was not appointed to it.  Ex. G, *Higgins Aff.*, ¶21.

44.   Paul Musto, a white male, was recommended and given the position; he had the same seniority date as Plaintiff.   Ex. B, *City's Admissions*, No. 22; Ex. D, *Diaz Depo II*, pg. 41:19-20; Ex. H, *Higgins Depo I*, pgs. 61:16-17, 62:11-14; Ex. E, *Kelley Aff.*, ¶16.

45.   On or about December 18, 2001, Higgins met with the Plaintiff to inform him that he was not recommended for the position because he was deficient in three areas: leadership skills, communicative skills and job knowledge.   Specifically, Higgins informed Plaintiff he lacked knowledge of basic skills, was unsure on how to relate to people reporting to him and lacked understanding of rules for out of service criteria. Higgins also told the Plaintiff that he would be willing to coach or school him.   Ex. G, *Higgins Aff.*, ¶22; Ex. H, *Higgins Depo I*, pg. 79:6-7; Ex. C, *Diaz Depo I*, pg. 72:6-23; Ex. D, *Diaz Depo II*, pgs. 47-48:18-17.

46.   On or about December 19, 2001, the Plaintiff filed a Complaint in MCAD alleging that the Defendants retaliated against him in violation of G. L. c. 151B, §4(4) and Title VII. Exhibit P, *MCAD Complaint*.

47.   The Plaintiff removed the case to Superior Court prior to receiving a decision from MCAD.   Exhibit Q, *Plaintiff's Complaint*, December 16, 2004.

48.   The Defendants removed the matter to Federal Court and

filed motions to dismiss, which were granted in part, and denied in part.  Exhibit R, *Judge Gertner's Decision*.

49.  During his tenure at the City, the Plaintiff belonged to the AFSCME union.  Ex. E, *Kelley Aff.*, ¶23.

50.  According to the union contracts between the City of Boston and AFCSME for the relevant years, an employee's seniority status is considered for purposes of hiring or promoting only if the qualifications and abilities of the employees are substantially equal.  Ex. E, *Kelley Aff.*, ¶24.

51.  According to the union contracts between the City of Boston and AFCSME for the relevant years, "[a]n employee who is performing, pursuant to assignment, temporary service in a position classified in a grade higher than the grade of the position in which he/she performs regular service, other than for the purpose of filling in for an employee on vacation, shall commencing with the sixth (6th) consecutive day of actual service in such higher position, be compensated for such service in such higher position at the rate to which he/she would have been entitled had he/she been promoted to such position."  Ex. E, *Kelley Aff.*, ¶25.

52.  The Plaintiff never reported to have served, pursuant to assignment, temporary service for six or more consecutive days in a position classified in a grade higher than the grade of the position in which he performed regular service.  Ex. E,

*Kelley Aff.*, ¶26; Ex. C, *Diaz Depo I*, pg. 43:19.

53.  CFM never reported the Plaintiff to have served, pursuant to assignment, temporary service for six or more consecutive days in a position classified in a grade higher than the grade of the position in which he performed regular service. Ex. E, *Kelley Aff.*, ¶27.

54.  During his tenure at the City of Boston, the Plaintiff was, therefore, never paid at a grade level higher than the position he held.  Ex. E, *Kelley Aff.*, ¶28; Ex. D, *Diaz Depo II*, pg. 32:10.

55.  The Plaintiff's seniority date was not a consideration for the 1999 and 2001 positions because seniority is only relevant if the qualifications and abilities of the employees are substantially equal.  Ex. G, *Higgins Aff.*, ¶23.

56.  CFM has never appointed foreman positions solely on the basis of seniority.  Ex. H, *Higgins Depo I*, pgs. 91-92:20-3; Ex. J, *Coughlin Depo*, pg. 28:11-17.

57.  All of the people who were appointed to any position in CFM went through the same interview process as the Plaintiff. Ex. H, *Higgins Depo I*, pg. 92:4-12; Ex. J, *Coughlin Depo*, pg. 24:1-4.

58.  After the 1999 interview, Higgins revised the interview process by adding more people to the interviewing committee, and making the interview completely oral since the

AFSCME union complained that some individuals were not comfortable writing.  Ex. H, *Higgins Depo I*, pg. 83:1-17.

59.  The Plaintiff claims the Defendants retaliated against him starting in 2000, when Al Young discontinued appointing him as acting foreman.  Ex. D, *Diaz Depo II*, pg. 32:5-7.

60.  The superintendent of a shop decides who to place in a temporary acting position.  Ex. H, *Higgins Depo I*, pg. 94:14-17.

61.  At all relevant times, Al Young was the person who would appoint the Plaintiff to the acting foreman position.  Ex. C, *Diaz Depo I*, pgs. 41-42:20-6.

62.  It was Fitzroy Prescott who told Plaintiff he was no longer acting foreman.  Ex. D, *Diaz Depo II*, pg. 36:14-19.

63.  Plaintiff alleges he was no longer assigned to the acting foreman position because the Defendants were retaliating against him for getting an attorney.  Ex. D, *Diaz Depo II*, pgs. 35:17-23, 37:15-19.

64.  No one at CFM or the City of Boston told Plaintiff that they knew he had obtained an attorney.  Ex. D, *Diaz Depo II*, pgs. 37-38:20-1.

65.  The Plaintiff did not tell anyone at CFM or the City he had an attorney.  Ex. D, *Diaz Depo II,* pg. 38:2-4.

66.  Plaintiff never told anyone, including Al Young, that he wanted to be appointed as acting foreman.  Ex. D, *Diaz Depo II*, pg. 38:15-19.

67.  Plaintiff did not talk to Al Young about his lawsuit. Ex. D, *Diaz Depo II*, pg. 39:3-7.

68.  Higgins has never said a racist comment to Plaintiff. Ex. D, *Diaz Depo II*, pg. 45:9-11.

69.  Plaintiff has never heard Higgins say a racist comment to anyone.  Ex. D, *Diaz Depo II*, pg. 45:12-14.

70.  Plaintiff believes Higgins is a racist because he did not appoint Plaintiff to the 1999 or the 2001 foreman positions. Ex. D, *Diaz Depo II*, pg. 45:18-22.

71.  After 2000, Plaintiff claims Higgins stopped greeting him.  Ex. D, *Diaz Depo II*, pg. 46:1-24.

72.  Plaintiff believes Higgins was being racist when he told Plaintiff he lacked communication skills.  Ex. D, *Diaz Depo II*, pg. 50:8-21.

73.  Plaintiff left the City in 2004 to go work for Massport.  At Massport Plaintiff makes more money than when he worked at the City and has better benefits.  Ex. D, *Diaz Depo II*, pgs. 55-56:15-5.

74.  After Plaintiff did not receive the promotion at the City in 1999, he did not apply to jobs outside the City.  Ex. D, *Diaz Depo II*, pgs. 56-57:22-1.

75.  After Plaintiff did not receive the 2001 promotion, he did not look for or apply to jobs outside the City.  Ex. D, *Diaz Depo II*, pg. 57:1-8.

76. During his entire tenure at the City of Boston, Plaintiff never heard anyone say any racist jokes. Ex. D, *Diaz Depo II*, pg. 61:11-16.

77. During his entire tenure at the City of Boston, Plaintiff never heard any racial slurs or comments. Ex. D, *Diaz Depo II*, pg. 61:17-19.

78. Plaintiff never heard anyone at the City call him a racist name. Ex. D, *Diaz Depo II*, pg. 61:20-21.

79. During his 1999 and 2001 interviews at the City, the Plaintiff was not asked any questions about his race or ethnicity. Ex. D, *Diaz Depo II*, pg. 67:9-13.

80. Overtime in the winter is equally divided. Ex. C, *Diaz Depo I*, pg. 87:5-7; Ex. D, *Diaz Depo II*, pg. 87:4-5.

81. At times Plaintiff would refuse to work overtime. Ex. C, *Diaz Depo I*, pgs. 107-108:22-7; Ex. D, *Diaz Depo II*, pg. 91:1-5.

82. Plaintiff did work overtime. Ex. C, *Diaz Depo I*, pg. 86:23-24.

83. Although Plaintiff could have asked for more overtime work, he never asked for it. Ex. C, *Diaz Depo I*, pg. 88:8-12, 24.

84. Minorities do get some overtime work. Ex. C, *Diaz Depo I*, pg. 89:5.

85. Plaintiff performed overtime during times other than

snow emergencies.  Ex. C, *Diaz Depo I*, pg. 107:17-21.

86.  Plaintiff believes that if you are living in the
United States, there is discrimination.  Ex. C, *Diaz Depo I*, pg.
112:9-12.

87.  To be a good supervisor, one needs good communication
skills.  Ex. D, *Diaz Depo II*, pgs. 105-106:21:4.

88.  After Plaintiff did not get the 1999 MERF position or
the 2001 position, he continued to eat in the communal
lunchroom, get to work 15-20 minutes early, watch TV with the
other HMERs and spend time with the other employees.  Ex. D,
*Diaz Depo II*, pgs. 58-61:16-10.


                              Respectfully submitted,

                              DEFENDANTS, DAVID HIGGINS, in
                              his official and individual
                              capacity and CITY OF BOSTON

                              William F. Sinnott
                              Corporation Counsel

                              By their attorney:

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy     /s/ Nicole Murati Ferrer
of the above document was served      Nicole Murati Ferrer
upon Winston Kendall by mail.         Assistant Corporation Counsel
                                      City of Boston Law Department
2/7/07  /s/ Nicole Murati Ferrer      1 City Hall Plaza, Room 615
Date    Nicole Murati Ferrer          Boston, MA 02201
                                      (617) 635-4045
                                      BBO# 661474

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

**CIVIL ACTION NO. 05-10154-NG**

RODERICK DIAZ

v.

DAVID HIGGINS, Individually,
and, in his capacity as Director
of Central Fleet Maintenance,
City of Boston Department of
Public Works; and CITY OF BOSTON

<u>**AFFIDAVIT OF NICOLE MURATI FERRER**</u>

I, Nicole Murati Ferrer, hereby state and depose as
follows:

1.   I am counsel of record for the Defendants in the
above-captioned matter, and make this affidavit on personal
knowledge in support of the *Defendants' Motion for Summary
Judgment*.

2.   I hereby certify that the exhibits attached to
*Defendants' Local Rule 56.1 Statement of Facts and Supporting
Documentation* are true and accurate copies.

3.   I hereby further certify that the exhibits attached to
the *Affidavit of David Higgins* and the *Affidavit of Kathleen
Kelley* are true and accurate copies.

Signed under the pains and penalties of perjury this 7th day of February 2007.

/s/ Nicole Murati Ferrer
Nicole Murati Ferrer

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-10154-NG

RODERICK DIAZ

v.

DAVID HIGGINS, Individually,
and, in his capacity as Director
of Central Fleet Maintenance,
City of Boston Department of
Public Works, and CITY OF BOSTON

DEFENDANT CITY OF BOSTON'S RESPONSES TO
PLAINTIFF'S REQUESTS FOR ADMISSIONS

*REQUEST NO. 1*: Plaintiff is a black male, who was born in the
Republic of Trinidad and Tobago, is a citizen of the
Commonwealth of Massachusetts and a member of the protected
class.

**RESPONSE NO. 1:**

The City of Boston admits only that the Plaintiff is a
black male, who was born in the Republic of Trinidad and Tobago,
and is a resident of the Commonwealth of Massachusetts.  The
remainder of the request is denied.

*REQUEST NO. 2*: Defendant City of Boston manages and operates
the Department of Public Works and its Central Fleet Maintenance
("CFM") and is responsible for its administration and the
enforcement of personnel practices, including but not limited to
personnel selection procedures.

**RESPONSE NO. 2:**

The City of Boston admits this request only to the extent
that as departments of the City of Boston, the Department of
Public Works and its Central Fleet Maintenance, are part of the

City of Boston and not separate legal entities.  To the extent
that any further response to this request is required, the
request is denied.


*REQUEST NO. 3*:  Defendant is a recipient of federal funds and is
required, as a condition of the receipt of said funds, to
maintain an Affirmative Action Plan/Program, including the
implementation of procedures to monitor adherence by supervisory
officials and managers, to its provisions, in the enforcement of
personnel procedures.

### *RESPONSE NO. 3*:

     Admitted.


*REQUEST NO. 4*:  Plaintiff began his employment with defendant,
in the Department of Public Works ("DPW") in 1986, and was
qualified for such employment.

### *RESPONSE NO. 4*:

     Admitted.


*REQUEST NO. 5*:  Plaintiff satisfactorily discharged the duties
of his initial position and of subsequent positions with
defendant.

### *RESPONSE NO. 5*:

     The City of Boston admits only that the plaintiff
satisfactorily discharged the duties of his initial position,
and denies the remainder of the request as plaintiff never held
any such subsequent positions.


*REQUEST NO. 6*:  At the inception of his employment, the
defendant provided plaintiff with an Employee Handbook which,
**inter alia**, contained a pledge that the defendant would adhere
to fair employment practices.

### *RESPONSE NO. 6*:

     Denied.

_REQUEST NO. 7_:  The representations made by the defendant in the Employee Handbook, including those with regard to its observance of fair employment practices, were sufficient to set forth the terms of a contract between defendant and plaintiff.

### _RESPONSE NO. 7_:

Denied.

_REQUEST NO. 8_:  Plaintiff relied upon the terms of the contract, as set forth in the Employee Handbook, in remaining in the employment with defendant.

### _RESPONSE NO. 8_:

Denied.

_REQUEST NO. 9_:  The defendant for a substantial period of time prior to 1999 maintained a seniority system at the DPW with regard to promotion to the position of foreman.

### _RESPONSE NO. 9_:

Denied.

_REQUEST NO. 10_:  The custom of making promotions to the position of foreman, on the basis of seniority, was approved by Joseph Cassazza, the Commissioner of the DPW and was the official policy of the department.

### _RESPONSE NO. 10_:

Denied.

_REQUEST NO. 11_:  Prior to 1999, the operation of a seniority system for the filling of vacancies in the position of foreman at the DPW resulted in the almost exclusive promotion of white males to fill such positions.

### _RESPONSE NO. 11_:

Denied.

*REQUEST NO. 12*:  At the time of his application for a position as Foreman in the Light Shop in 1999, plaintiff was the most senior qualified individual.

### *RESPONSE NO. 12*:

Denied.


*REQUEST NO. 13*:  Defendant awarded the position to a white male who was not as qualified as the plaintiff and who had less seniority than plaintiff.

### *RESPONSE NO. 13*:

The City of Boston admits only that the position was awarded to a white male.  The remainder of the request is denied.


*REQUEST NO. 14*:  The defendant relied on an entirely subjective selection procedure to fill the vacancy in the position of foreman and did not conduct any job validation exercise with regard to such selection procedure.

### *RESPONSE NO. 14*:

The City of Boston denies that it "relied on an entirely subjective selection procedure to fill the vacancy in the position of foreman."  As to the remainder of the request, the City of Boston cannot admit nor deny it because it is uncertain as to what the Plaintiff means by "conduct any job validation exercise with regard to such selection procedure."


*REQUEST NO. 15*:  The Commissioner of the DPW did not consult with the Director of the City's Office of Human Resources to determine whether the selection procedure which was used, comported with fair employment practice requirements of the EEOC; with the provisions of the Employee Handbook or whether it would produce a disparate impact on members of the protected class, of which plaintiff is a member.

### *RESPONSE NO. 15*:

The City of Boston admits only that the Commissioner of the DPW did not consult with the Director of the City's Office of

Human Resources to determine whether the selection procedure
which was used, comported with fair employment practice
requirements of the EEOC; with the provisions of the Employee
Handbook or whether it would produce a disparate impact on
members of the protected class.  The remainder of the request is
denied.


REQUEST NO. 16:  The result of the implementation of the non
job-validated selection procedure in the filling of the vacancy
in the foreman's position, in 1999, was that there was an
adverse impact on members of the plaintiff's protected class.

### RESPONSE NO. 16:

     Denied.


REQUEST NO. 17:  Plaintiff protested against and opposed the
discriminatory refusal of the defendant to appoint him as
foreman and did raise a grievance with the union.

### RESPONSE NO. 17:

     The City of Boston admits only that the Plaintiff raised a
grievance with the union.  The remainder of the request is
denied.


REQUEST NO. 18:  The defendant rejected the grievance and
repudiated the terms of the collective bargaining agreement
which require fair employment practices in all phases of the
employment.

### RESPONSE NO. 18:

     The City of Boston admits only that it denied the
grievance.  The remainder of the request is denied.


REQUEST NO. 19:  Plaintiff had served as an Acting Foreman on
various occasions at Central Fleet Maintenance ("CFM") prior to
his filing of the grievance over the discriminatory denial of
the promotion.

### RESPONSE NO. 19:

     Denied.

_REQUEST NO. 20_:  Subsequent to the plaintiff's retaining of counsel to challenge the discriminatory action, defendant removed plaintiff from the Acting position and refused to again place him in such a position.

### _**RESPONSE NO. 20**_:

Denied.


_REQUEST NO. 21_:  Plaintiff again made application for a position as foreman in 2001 and at the time of the application, was the most senior qualified individual.

### _**RESPONSE NO. 21**_:

The City of Boston admits only that in 2001, Plaintiff applied for a position as foreman.  The remainder of the request is denied.


_REQUEST NO. 22_:  Defendant again denied plaintiff's application, despite his qualifications and seniority, and awarded the position to a white male.

### _**RESPONSE NO. 22**_:

The City of Boston admits only that the position was awarded to a white male.  The remainder of the request is denied.


_REQUEST NO. 23_:  Plaintiff requested that the union present a grievance over the discriminatory and retaliatory denial of the promotion.

### _**RESPONSE NO. 23**_:

The City of Boston admits only that a grievance on behalf of the plaintiff was filed.  As to the remainder of the request, the City states that after reasonable inquiry, the information readily obtainable to it is insufficient to allow it to admit or deny this request.


_REQUEST NO. 24_:  The union failed to represent plaintiff fairly in connection with the presentation of the grievance and

exhaustion of the grievance procedure up to and including arbitration.

### *RESPONSE NO. 24*:

After reasonable inquiry, the information readily obtainable to the City of Boston is insufficient to allow it to admit or deny this request.

*REQUEST NO. 25*:  The defendant repudiated the grievance procedure in discriminatorily [sic] refusing to follow the collective bargaining process.

### *RESPONSE NO. 25*:

Denied.

*REQUEST NO. 26*:  The Commissioner of the DPW, again, relied on a decision making process which was entirely subjective and did not consult with the Director of Human Resources of the City to ascertain whether its use would have a disparate impact on the protected class.

### *RESPONSE NO. 26*:

Denied.

*REQUEST NO. 27*:  The use of an entirely subjective decisionmaking [sic] process in connection with the plaintiff's application in 2001, resulted in a disparate impact on members of plaintiff's protected class.

### *RESPONSE NO. 27*:

Denied.

*REQUEST NO. 28*:  The defendant's white supervisors, between 1986 and 2003, awarded overtime at the CFM on a discriminatory basis so that white employees received more overtime than black employees such as plaintiff.

**_RESPONSE NO. 28_**:

Denied.

**_REQUEST NO. 29_**:  The defendant has no payroll or other records which would demonstrate that it did not discriminatorily distribute overtime, during the period of the plaintiff's employment.

**_RESPONSE NO. 29_**:

Denied.

**_REQUEST NO. 30_**:  Defendant did not provide any written criteria to the white supervisors at CFM in connection with the award of overtime in the period 1986 to 2003.

**_RESPONSE NO. 30_**:

The Defendant admits only that from 1997 through 2003 no written criteria were provided to any supervisors at CFM in connection with the award of overtime.  The remainder of the request is denied in so far as CFM was not in existence prior to 1997.

**_REQUEST NO. 31_**:  The defendant did not conduct a fair and impartial investigation into plaintiff's charges that David Higgins engaged in invidious racial discrimination and retaliation in refusing to promote him to vacancies in the position of foreman.

**_RESPONSE NO. 31_**:

Denied.

**_REQUEST NO. 32_**:  Defendant did not subject David Higgins to disciplinary action or to any reprimand on account of his discriminatory and retaliatory actions toward the plaintiff.

**_RESPONSE NO. 32_**:

The City of Boston objects to this request on the basis that it assumes facts that are vehemently contested by it and

which the Plaintiff has yet to prove, and therefore, no response
is required.  To the extent that a response is required, the
request is denied.


REQUEST NO. 33:  Commissioner Cassazza of the DPW relied upon
the discriminatory and retaliatory recommendations made by David
Higgins that white males, Monaghan and Musto, be appointed to
fill vacancies in the position of foreman at CFM.


### RESPONSE NO. 33:


    The City of Boston admits only that Commissioner Cassazza
relied on David Higgins's recommendations that Monaghan and
Musto, who are white males, be appointed to fill vacancies in
the positions of foreman at CFM.  The remainder of the request
is denied.


REQUEST NO. 34:  Defendant did not promote Maurice Smith, a
black male, to a supervisory position until some time after
plaintiff had filed his first Charge of Discrimination at the
MCAD.

### RESPONSE NO. 34:


    Denied.


                    Respectfully submitted,

                    DEFENDANT, CITY OF BOSTON

                    By its attorneys,
                    William F. Sinnott, Corporation Counsel


                    /s/ Nicole Murati Ferrer_____
                    Nicole Murati Ferrer BBO# 661474
                    Kate Cook BBO# 650698
                    Assistant Corporation Counsels
                    City of Boston Law Department
                    Room 615, City Hall
                    Boston, MA 02201
                    (617) 635-4045 (Murati Ferrer)
                    (617) 635-4022 (Cook)

1                      VOLUME I

                     PAGES 1 TO 114

2                   EXHIBITS:  1

3      COMMONWEALTH OF MASSACHUSETTS

       COMMISSION AGAINST DISCRIMINATION

4

                     NO. 01-BEM-10929

5

     * * * * * * * * * * * * * * * * * * * * * * * * * * *

6                                      *

     RODERICK DIAZ,                    *

7                                      *

       Petitioner,                     *

8                                      *

                 vs.                   *

9                                      *

     CITY OF BOSTON DPW,               *

10   ET AL.,                           *

                                       *

11     Respondent.                     *

                                       *

12   * * * * * * * * * * * * * * * * * * * * * * * * * * *

13

14

15          DEPOSITION OF RODERICK L. DIAZ, a

16   witness called on behalf of the Respondent,

17   pursuant to the Massachusetts Rules of Civil

18   Procedure before Lisa Abdo, Certified

19   Shorthand Reporter and Notary Public in and

20   for the Commonwealth of Massachusetts, at the

21   offices of City of Boston, Law Department,

22   City Hall, Room 615, Boston, Massachusetts,

23   on Friday, April 30, 2004, commencing at

24   10:15 a.m.

Page 2

1  APPEARANCES:
2
3  Winston Kendall, Esq.
   136 Warren Avenue
4  Boston, Massachusetts 02119,
   for the Petitioner.
5
   City of Boston, Law Department
6  (by Tsuyoshi Fukuda, Esq.)
   City Hall, Room 615
7  Boston, Massachusetts 02201
   E-mail Tsuyoshi.Fukuda@cityofboston.gov,
8  for the Respondent.
9  ALSO PRESENT: Tracey Basler, Esq.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 3

1              I N D E X
2  DEPONENT:          DIRECT
3  Roderick L. Diaz
4    (by Mr. Fukuda)    4
5
6
7
8
9
              E X H I B I T S
10
   EX. NO.                    PAGE
11
    1      Written statement     101
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 4

1              P R O C E E D I N G S
2        MR. FUKUDA: The usual stipulations?
3        MR. KENDALL: All objections except
4  as to the form of the question are reserved
5  until the time of trial. And the complainant
6  will waive the reading and signing and filing
7  of the deposition.
8        MR. FUKUDA: Okay.
9              RODERICK L. DIAZ
10 a witness called for examination by counsel
11 for the Respondent, being first duly sworn,
12 was examined and testified as follows:
13              DIRECT EXAMINATION
14 BY MR. FUKUDA:
15 Q. Could you please state your name for the
16   record.
17 A. My name is Roderick L. Diaz.
18 Q. And could you spell that, please.
19 A. R-o-d-e-r-i-c-k, L. Diaz, D-i-a-z.
20 Q. My name is Tsuyoshi Fukuda, and I represent
21   the City of Boston. Have you ever been
22   deposed before?
23 A. No, sir.
24 Q. So basically what I'm going to do today is

Page 5

1  just ask you a bunch of questions regarding
2  this lawsuit. I'm sure that your lawyer has
3  already talked to you a little bit about the
4  process of a deposition.
5        As you can see, the court reporter
6  is here transcribing our conversation. If
7  you could make sure that you keep your voice
8  loud so that she can hear, that would make
9  things easier. If you can make sure to wait
10 until my question is complete before you
11 answer, that will make it easier. If you can
12 always remember to answer verbally rather
13 than shake your head in a yes or no manner,
14 that will make it easier for the court
15 reporter to transcribe that.
16        If you don't understand a question
17 that I'm asking, please let me know; and I'll
18 try to rephrase it for you, make it more
19 clear. And please don't reveal any private
20 conversations you've had with your attorney.
21        Do you have any questions at this
22 point?
23 A. No questions.
24 Q. Before you came here today, did you take any

2 (Pages 2 to 5)

<table>
<tr><td>

Page 6

1   medications that might affect your ability to
2   answer truthfully and accurately?
3 A. I did not take any medication.
4 Q. Okay. Did you do anything in the past few
5   days to prepare for this deposition?
6 A. I did not do anything in the past.
7 Q. So you didn't review any paperwork?
8 A. I did review -- not this week. I did review
9   two weeks ago.
10 Q. Okay. Two weeks ago. And what did you
11   review?
12 A. I read all the questions was sent to you.
13 Q. Okay. If you need to take a break for any
14   reason, if you need to use the restroom, if
15   you want to take a break to get something to
16   eat or what have you, please let me know; and
17   we can do that.
18     Do you have any more questions at
19   this point?
20 A. I don't want to take any break because I'd
21   like to get out of here. I've got to go to
22   work. And I'd like to get out by two
23   o'clock, so I won't take no break.
24 Q. Okay. What is your age and date of birth?

</td><td>

Page 8

1 A. My daughter is 26 years old.
2 Q. And what is her name?
3 A. Samayiah Diaz, S-a-m-a-y-i-a-h D-i-a-z.
4 Q. And who currently lives with you right now?
5 A. I live with my wife right now.
6 Q. Okay. Where were you born?
7 A. I was born in Trinidad and Tobago.
8 Q. In 1943?
9 A. 1943.
10 Q. And when did you come to this country?
11 A. I came to this country March 25, 1969.
12 Q. And why did you come to the United States?
13 A. To better my missions and, you know, for my
14   future.
15 Q. When you say "better my missions," what does
16   that mean?
17 A. Well, there's more opportunities in this
18   country than in Trinidad.
19 Q. And how old were you when you came?
20 A. I was 26 years old.
21 Q. Did you come here alone?
22 A. I came alone.
23 Q. Are you a U.S. citizen now?
24 A. I'm American citizen.

</td></tr>
<tr><td>

Page 7

1 A. My age is 61 years. I was born in 1943,
2   March 13th.
3 Q. And what's your Social Security number?
4 A. 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.
5 Q. And what is your current address?
6 A. My current address is 329 Granger Street,
7   Boston, Mass. 02132.
8 Q. And how long have you lived there?
9 A. I've lived there three years.
10 Q. What was your address prior to that?
11 A. My address was Van Winkle Street, Dorchester,
12   Massachusetts. 23 Van Winkle Street,
13   Dorchester, Massachusetts.
14 Q. And how long did you live there?
15 A. Eight years, nine years.
16 Q. Are you married?
17 A. I'm married.
18 Q. And how long have you been married for?
19 A. I've been married for eight years.
20 Q. And what's your wife's name?
21 A. My wife's name is Robin McCullum Diaz.
22 Q. And do you have any children?
23 A. One daughter.
24 Q. And how old is she?

</td><td>

Page 9

1 Q. And when did you become a U.S. citizen?
2 A. August of 1978.
3 Q. What's the official language of Trinidad and
4   Tobago?
5 A. English.
6 Q. Are there any other languages spoken in
7   Trinidad and Tobago?
8 A. They got something called broken French and
9   Hindi. The Indians speak this language,
10   Hindi. But the language is English.
11 Q. So what would you say your first spoken
12   language is?
13 A. English.
14 Q. Do you speak any other languages?
15 A. No other language.
16 Q. Was your wife born in the United States?
17 A. My wife was born in the United States.
18 Q. Where was she born?
19 A. Any wife was born in Baltimore, Maryland.
20 Q. And does your wife speak English?
21 A. Yes, my wife speak English.
22 Q. Does she speak any other languages?
23 A. I don't know.
24 Q. And where was your daughter born?

</td></tr>
</table>

3 (Pages 6 to 9)

Page 10

1  A.  My daughter was born in the United States of
2     America.
3  Q.  And your daughter speaks English?
4  A.  My daughter speak English.
5  Q.  Does she speak any other languages?
6  A.  No, my daughter don't speak no other
7     language.
8  Q.  So you speak English at home?
9  A.  I speak English at home.
10 Q.  And where did you go to elementary school?
11 A.  I went to school in Trinidad and Tobago.
12 Q.  Was that a public elementary school?
13 A.  That was a primary school, what they call a
14    primary school.
15 Q.  It was a primary school.  And how many years
16    of schooling did you have?
17 A.  Twelve years of schooling.
18 Q.  And did you go to high school?
19 A.  I wasn't educated in the United States.
20    Everything is different in Trinidad.
21 Q.  Could you explain how your education --
22 A.  I went to school in Trinidad when I was the
23    age of four, and I move up to 16 years old.
24    And you have to graduate at 16.  You have to

Page 11

1     leave at 16 years old.  To go to high school
2     at nighttime, you have to pay to go to high
3     school.  My parents could not afford for me
4     to go to high school.  But I have the
5     equivalent of high school because the
6     standard of education in Trinidad is higher
7     than in America.
8  Q.  So essentially your education that you
9     received in Trinidad is equivalent to a high
10    school degree?
11 A.  A high school degree, yes, high school in
12    United States.
13 Q.  Did you go to college in the United States?
14 A.  I did not go to college in the United States.
15 Q.  Okay.  After you graduated -- I'm sorry.
16    When you finished your schooling in Trinidad,
17    what was your first job?
18 A.  My first job is went to learn auto mechanic.
19 Q.  And where did you work?
20 A.  I worked at Julian Pierre in San Fernando,
21    Trinidad, West Indies.
22 Q.  And what kind of work was that?
23 A.  Learning to be an auto mechanic.
24 Q.  So was that a school, or was that --

Page 12

1  A.  That was a garage.  A garage.
2  Q.  Okay.  If you could just try to remember to
3     let me finish the question before you answer.
4     I'm sure you probably realize what the
5     question is going to be, so it's very easy
6     for you to answer.  But if you could just
7     wait --
8  A.  Yes, I understand.
9  Q.  So essentially at your first job, you were
10    learning to be an auto mechanic?
11 A.  Yes, I was.
12 Q.  And did you apply for that position?
13 A.  My parents send me to learn the trade.
14 Q.  Were you being paid at this job?
15 A.  I was paid to learn.
16 Q.  So it was similar to an apprenticeship?
17 A.  Yes.
18 Q.  Could you explain the process that had to
19    take place in order for you to become an
20    apprentice at -- did you say Julian Pierre?
21 A.  Julian Pierre garage.
22 Q.  Garage.
23 A.  I work there for two years.
24 Q.  Okay.

Page 13

1  A.  In the process of getting -- my folks took me
2     there and asked the owner if my son could
3     learn to be a mechanic.  And he said it was
4     fine.
5  Q.  There was no other application process for
6     this?
7  A.  No, no application process.
8  Q.  Did your family have a relationship with the
9     owner of this place?
10 A.  We have no relationship with the owner.
11 Q.  So other than just your parents asking the
12    owner if you could work there and learn to be
13    an auto mechanic, there was no other process?
14 A.  No other process.
15 Q.  And you said you worked there for two years?
16 A.  Two years.
17 Q.  And why did you leave?
18 A.  Well, I got something better to do --
19    something better to learn.
20 Q.  And where did you go after --
21 A.  I went to a big dealership.
22 Q.  Okay.  And what dealership did you go to?
23 A.  Neal Massey, Trinidad, West Indies.
24 Q.  Could you say that again.

4 (Pages 10 to 13)

Page 14

1  A. Neal, N-e-a-l, M-a-s-s-e-y, Massey, Trinidad,
2     West Indies.
3  Q. Is that an auto dealership?
4  A. That's a car dealership, a big dealership,
5     yes.
6  Q. And what kind of vehicles did they sell?
7  A. At the time, it was Vauxhall from England and
8     Bedford trucks from England.
9  Q. Bedford trucks?
10 A. Yes.
11 Q. And how do you spell Vauxhall?
12 A. V-a-u-x-h-a-l-l.
13 Q. Are those -- what kind of vehicles are those?
14 A. Those are English cars.
15 Q. Are they commercial vehicles?
16 A. Commercial trucks and private -- yes,
17    commercial, yes.
18 Q. And what did you do at the dealership?
19 A. I was an apprentice there.
20 Q. How did you get that position?
21 A. By applying.  Just going in every day and
22    checking to see if there's any vacancy.
23 Q. When you found that there was a vacancy, what
24    was the process of getting the position?

Page 15

1  A. Just get the job, because I was going there
2     regular every day trying to see if they have
3     any vacancy.
4  Q. Did you apply for the position?
5  A. I applied for the position.
6  Q. Did you give them a resume?
7  A. No, I did not give them a resume.
8  Q. Did you fill out any forms?
9  A. I did not fill out any form.
10 Q. Did you interview with anybody?
11 A. No, I cannot recall.
12 Q. So essentially you went to Neal Massey
13    dealership every day in order to look for
14    vacancies?
15 A. Yes.
16 Q. And when there was a vacancy, they just gave
17    you the job?
18 A. Just gave me the job.
19 Q. And you didn't have any application process?
20 A. No application.
21 Q. And who was your supervisor there?
22 A. I cannot recall.
23 Q. Okay.  And how long did you work there for?
24 A. I worked there for eight years.

Page 16

1  Q. What kind of vehicles did you work on mostly?
2  A. Mostly, there was Vauxhalls, MGs, Triumphs.
3     I cannot recall what else they had there.
4  Q. And why did you leave?
5  A. I leave to come to the United States.
6  Q. And did you have a job in the United States
7     before you left?
8  A. I had a job in the United States.
9  Q. What kind of job was that?
10 A. Auto mechanic.
11 Q. And how did you get that job?
12 A. A friend of mine got the job for me.
13 Q. And where was that?
14 A. 614 Beacon Street, Newton Centre.
15 Q. What was the name of the company?
16 A. Volvo Village.
17 Q. Who's your friend that got you that job?
18 A. Carl Allen.
19 Q. And how do you know Carl?
20 A. In Trinidad.
21 Q. So a friend growing up?
22 A. A friend growing up.
23 Q. When did he come to the United States?
24 A. He came to the United States in 1969.

Page 17

1  Q. Did you apply for that position at Volvo
2     Village?
3  A. Yes.  He had helped me get a job there.  He
4     had known someone there, and he helped me get
5     a job.
6  Q. Did you fill out any paperwork in order to
7     get -- before you got the job, did you fill
8     out any paperwork?
9  A. I cannot recall.
10 Q. Did you interview with anybody?
11 A. Yes, I did.
12 Q. And who did you interview with?
13 A. Frank McDonald.
14 Q. And who is Frank McDonald?
15 A. He was the service manager.
16 Q. Did you interview with him before you came to
17    the United States?
18 A. No, I did not.
19 Q. So you interviewed with him once you got
20    here?
21 A. Yes.
22 Q. Did you interview with anybody else?
23 A. No.
24 Q. Did Mr. McDonald ask you any questions?

5 (Pages 14 to 17)

Page 18

1  A. He did ask me questions.
2  Q. Okay. During the interview?
3  A. Interview.
4  Q. What kind of questions did he ask you?
5  A. Automotive.
6  Q. Do you know if he took any notes?
7  A. I cannot recall.
8  Q. Did this job require any supervisory skills?
9  A. No supervisory -- you have to be a mechanic.
10    That's it.
11  Q. So he asked you about mechanical questions?
12  A. Mechanical questions.
13  Q. Do you recall him asking you any other
14    questions?
15  A. No, I cannot recall.
16  Q. And how long did you work at Volvo Village?
17  A. I worked at Volvo Village for 12 years.
18  Q. Did your position ever change at Volvo
19    Village?
20  A. It never changed.
21  Q. What was the title of your position there?
22  A. My title was an auto mechanic.
23  Q. During those 12 years, did you ever supervise
24    anybody at Volvo Village?

Page 19

1  A. I never supervised anybody.
2  Q. And after Volvo Village, where did you go?
3  A. I went to South Shore Volvo.
4  Q. And what's the address there?
5  A. Address is Norwood, Mass. I cannot recall
6    the address there. Norwood, Massachusetts.
7  Q. And why did you leave Volvo Village?
8  A. I leave Volvo Village to go to South Shore
9    Volvo for more money.
10  Q. And did you apply to the position at South
11    Shore Volvo?
12  A. I did not apply. The job was offered to me.
13  Q. Explain how that happened.
14  A. How that happened? The service manager from
15    Volvo Village went to South Shore Volvo, and
16    he called me to work there.
17  Q. So Frank McDonald --
18  A. Frank McDonald.
19  Q. -- ended up getting a position at South Shore
20    Volvo and called you and asked you if you'd
21    come?
22  A. Yes.
23  Q. So there was no interview or anything like
24    that?

Page 20

1  A. No interview.
2  Q. How long were you at South Shore Village for?
3  A. Two years.
4  Q. I'm sorry. South Shore Volvo?
5  A. South Shore -- two years.
6  Q. And what was your position there?
7  A. Auto mechanic.
8  Q. Did you supervise anybody at South Shore
9    Volvo?
10  A. I did not supervise anybody at South Shore
11    Volvo.
12  Q. And Frank McDonald was your supervisor at
13    South Shore Volvo as well?
14  A. Yes.
15  Q. And why did you leave there?
16  A. I leave there to go to get another position,
17    extra -- more money and better condition.
18  Q. Why were conditions not good at South Shore
19    Volvo?
20  A. Well, the pay scale supposed to be good was
21    not good. And there was no guarantee because
22    I work piecework, job work as a mechanic.
23  Q. What does that mean?
24  A. Job work is they give you a certain amount of

Page 21

1    hours to do a car. If the job is six hours
2    and it take you four hours, you get paid six
3    hours. If the job is six hours and you take
4    12 hours, you still get six hours. And
5    sometimes you get a guarantee week, a 40
6    hours guarantee. And they had no guarantee
7    at the South Shore Volvo.
8  Q. Okay. Where did you go after South Shore
9    Volvo?
10  A. I went to Lee Volvo.
11  Q. Lee?
12  A. Lee Volvo.
13  Q. And where is that located?
14  A. Wellesley, Massachusetts.
15  Q. And that's L-e-e?
16  A. Yes.
17  Q. And did you apply for that position?
18  A. I did apply for that position.
19  Q. Did you fill out paperwork?
20  A. I cannot recall if I filled out paperwork.
21  Q. Did you submit a resume?
22  A. I heard they had a vacancy, and I applied for
23    it.
24  Q. Did you interview for that position?

6 (Pages 18 to 21)

Page 22

1   A.  I, yes, interviewed for that position.
2   Q.  Who interviewed you?
3   A.  I can't recall.
4   Q.  Who was your supervisor there?
5   A.  It's quite a while.  I cannot recall.
6   Q.  How long did you work there for?
7   A.  I didn't work there for very long.  I work
8       there for -- maybe I work four to five, six
9       months.
10  Q.  At the interview, do you remember being asked
11      questions?
12  A.  Asked questions about cars, Volvos.
13  Q.  Did they ask you specific questions about
14      mechanical --
15  A.  Just mechanical questions on Volvos only.
16  Q.  And why did you leave there?
17  A.  I don't like working there.
18  Q.  Why not?
19  A.  Because I went as a Volvo mechanic, and I was
20      getting Volvos to fix.  And I was getting MGs
21      and Triumphs which there was no parts.  And I
22      couldn't make any money, so I leave.
23  Q.  And where did you go after that?
24  A.  Boston Volvo.

Page 23

1   Q.  And where is that located?
2   A.  Mass. Avenue, Cambridge, Massachusetts.
3   Q.  How did you get that job?
4   A.  A friend of mine.
5   Q.  Did you have to apply?
6   A.  No.
7   Q.  Can you explain how you ended up getting --
8   A.  He talked to the boss about getting a job for
9       me.
10  Q.  Did you ever interview with the boss?
11  A.  I talked -- yes, a couple of -- yes.
12  Q.  Did he ask you questions about your
13      experience?
14  A.  He asked me questions about my experience.
15  Q.  Did he ask you questions about your
16      mechanical knowledge?
17  A.  He asked me mechanical knowledge on Volvos.
18  Q.  And do you remember what his name was?
19  A.  I cannot recall.
20  Q.  Do you remember who your supervisor's name
21      was at --
22  A.  I cannot recall.
23  Q.  And how long did you work at Boston Volvo?
24  A.  Two years.

Page 24

1   Q.  And who's the friend that got you that job?
2   A.  I cannot recall now.
3   Q.  You don't remember who --
4   A.  It's quite a while.  I cannot recall.
5   Q.  After Boston Volvo, where did you go?
6   A.  After Boston Volvo, I went to Somerville --
7       U-Haul Somerville.
8   Q.  Why did you leave Boston Volvo?
9   A.  I leave Boston Volvo -- why did I leave
10      Boston Volvo?  I just had enough working
11      piecework.  I did not want to work piecework
12      anymore.
13  Q.  And when you say "piecework," what does that
14      mean?
15  A.  Piecework is job work.  Like they give you
16      six hours to do a car and it take you ten,
17      you still get paid six hours.
18  Q.  Okay.  What you explained to me before?
19  A.  What I explained to you before.
20  Q.  So your next position, you said, was at
21      Somerville U-Haul?
22  A.  U-Haul Somerville.
23  Q.  And what kind -- I'm sorry.  Did you apply
24      for that position?

Page 25

1   A.  I applied for that position.
2   Q.  How did you apply?
3   A.  I went in and applied for the position.
4       There was a vacancy, and I went in and
5       applied for it.
6   Q.  Did you fill out paperwork?
7   A.  I did fill out the paperwork.
8   Q.  Did you submit a resume?
9   A.  I did not submit no resume.
10  Q.  Did you have an interview?
11  A.  I had interview.
12  Q.  And who interviewed you?
13  A.  I cannot recall.
14  Q.  Was it more than one person?
15  A.  One person.
16  Q.  Did that person ask you questions?
17  A.  The person asked me questions.
18  Q.  Did he ask you questions about your
19      mechanical experience?
20  A.  He had asked me questions on mechanical
21      skill.
22  Q.  Was this job in Somerville U-Haul, did it
23      involve supervising anybody?
24  A.  No, it did not.

Page 26

1  Q. What kind of vehicles did you work on at the
2      Somerville U-Haul?
3  A. It was trucks and mini-movers. I cannot
4      recall the name of the mini-movers now
5      because they do not exist anymore.
6  Q. How long did you work there for?
7  A. I must have worked there about -- I would say
8      three years.
9  Q. So you didn't work on Volvos at the U-Haul?
10 A. No Volvos.
11 Q. Do you remember what your supervisor's name
12     was there?
13 A. I cannot remember my supervisor's name.
14 Q. And after U-Haul Somerville, where did you
15     work?
16 A. City of Boston, Public Works Department.
17 Q. And how did you get that job?
18 A. A friend of mine got the job for me.
19 Q. What was the name of your friend?
20 A. My friend was Steven Coker.
21 Q. Could you spell his last name?
22 A. C-o-k-e-r, Steven Coker.
23 Q. Does he still work for the City?
24 A. He don't work for the City anymore.

Page 27

1  Q. Where does he work?
2  A. I don't know.
3  Q. Do you know why he left?
4  A. I don't know.
5  Q. Do you still see Steven?
6  A. Every once in a while.
7  Q. When is the last time you saw him?
8  A. I saw Steve Coker last year, August.
9  Q. And why did you see him?
10 A. I saw him at the West End Festival in Boston.
11 Q. What kind of festival?
12 A. The West End Festival.
13 Q. Is he from Trinidad as well?
14 A. He's from Trinidad.
15 Q. Was it coincidence you saw him there, or did
16     you meet with him?
17 A. Last year, August?
18 Q. Last year, August.
19 A. Everybody sees one another at the carnival,
20     the festival.
21 Q. Could you explain to me how your friend got
22     you the job at the City of Boston.
23 A. We had worked together in the past. And he
24     told me there was a vacancy at the City of

Page 28

1      Boston Public Works. And I applied for the
2      job.
3  Q. Where did you work with him before?
4  A. Boston Volvo.
5  Q. So when your friend told you that -- so when
6      Steven Coker told you that a vacancy existed
7      at the City of Boston, you then applied to
8      the City?
9  A. Yes, I did.
10 Q. Did you submit a resume?
11 A. I had to submit a resume.
12 Q. Did you fill in an application?
13 A. I fill in an application.
14 Q. Did you have an interview?
15 A. I had an interview.
16 Q. Who interviewed you?
17 A. Mr. Charlie Gately.
18 Q. Gately?
19 A. Gately.
20 Q. Was he your supervisor?
21 A. He was the director -- assistant director.
22 Q. Assistant director of?
23 A. Of Public works.
24 Q. Does he still work for the City of Boston?

Page 29

1  A. Mr. Charlie Gately is deceased.
2  Q. And what year did you begin at the City of
3      Boston?
4  A. December 31, 1986.
5  Q. And what was the title of your position?
6  A. My title was HMER, heavy motor equipment
7      repairman.
8  Q. During the interview, were you asked
9      questions?
10 A. He asked questions.
11 Q. And what kind of questions did he ask you?
12 A. He asked questions about automotive.
13 Q. Did he ask you about your past experience
14     in --
15 A. He did ask me about my past experience.
16 Q. Did he ask you about supervisory skills?
17 A. He did not ask about supervisory skills.
18 Q. Does the HMER position entail any supervisory
19     work?
20 A. Excuse me? Say that one more time.
21 Q. Does the HMER position require that you
22     supervise other individuals?
23 A. No, sir.
24 Q. Is that basically an auto mechanic position?

8 (Pages 26 to 29)

Page 30

1  A.  Auto mechanic position.
2  Q.  How did you get interested in auto mechanics?
3  A.  Something I learned when I was small.
4  Q.  So other than really on-the-job training and
5      some of the apprenticeships you had in
6      Trinidad, do you have any auto mechanic --
7      formal auto mechanic education?
8  A.  I have auto mechanic education.
9  Q.  Could you explain that, please.
10  A.  I went to school -- after five o'clock, I
11      went to night school they call it in
12      Trinidad, night school.  And I go 6:00 to
13      9:00.
14  Q.  And that was in Trinidad?
15  A.  That's in Trinidad.
16  Q.  And how long did that program last?
17  A.  The program last for three years.
18  Q.  Did you get a certificate or diploma?
19  A.  I get certificate.
20  Q.  And what kind of certificate was it?
21  A.  That's to show that you attend the classes.
22      You know, you get a test.
23  Q.  How many days a week was the class?
24  A.  About three days a week.

Page 31

1  Q.  And it was strictly automotive mechanic
2      skills that you learned?
3  A.  Strictly automotive.
4  Q.  Prior to your employment at the City of
5      Boston, did you ever apply for any position
6      and not get the job?
7  A.  All the position I apply for in this country
8      I get the job as auto mechanic.
9  Q.  That's a good record.
10  A.  Thank you.
11  Q.  Where do you currently work?
12  A.  I currently work at Massachusetts Port
13      Authority.
14  Q.  What is your title there?
15  A.  My title is MER.
16  Q.  And what does that stand --
17  A.  The same as -- it's auto mechanic.
18  Q.  MER stands for --
19  A.  Motor equipment repairman.
20  Q.  And when did you start working there?
21  A.  I start working there March 22, 2004.
22  Q.  And how did you come to find out about this
23      opportunity?
24  A.  The opportunity, it was on the Internet.

Page 32

1  Q.  And did you apply for this position?
2  A.  I applied for this.
3  Q.  Did you submit a resume?
4  A.  I did submit a resume.
5  Q.  Did you file a written application?
6  A.  I submit my resume and I was called for
7      interview.
8  Q.  And who did you interview with?
9  A.  My interview was with Mr. Ramon Domingo from
10      human resources.
11  Q.  Okay.  Anybody else?
12  A.  Herb Pewit.  I can't pronounce his last name,
13      and I cannot spell his last name.
14  Q.  Okay.  And what is his position?
15  A.  He's the supervisor of the garage.
16  Q.  Anyone else?
17  A.  Sharon Williams.
18  Q.  And who is she?
19  A.  She's supposed to be the director of the
20      garage.
21  Q.  Anyone else?
22  A.  Kathy -- Kathy -- I cannot recall the name.
23  Q.  And who is that?  Who is this Kathy?
24  A.  Kathy Felgram.  She's, I think, from human

Page 33

1      resources, too.  Yes.
2  Q.  Did you interview with anyone else?
3  A.  I did not interview with nobody else.
4  Q.  Did they interview you separately or in one
5      group?
6  A.  The interview you mean?  They was always
7      together.
8  Q.  Okay.  Did they ask you any questions?
9  A.  They did ask me questions.
10  Q.  And what kind of questions did they ask you?
11  A.  Auto mechanic questions, automotive.
12  Q.  And can you give me an example of what kind
13      of questions they asked.
14  A.  The questions they ask me about the brakes,
15      front end, engines, tune-ups.
16  Q.  This MER position at Mass Port, does that
17      include any supervisory responsibilities?
18  A.  No.
19  Q.  In the interview, did they ask you about your
20      supervisory skills?
21  A.  They did not ask me about supervisory skills.
22  Q.  Again, the questions all pertain to --
23  A.  All pertaining to cars and trucks.
24  Q.  Do you know how many applicants were --

Page 34

1    MR. KENDALL: Counselor, I hate to
2  interrupt you, but I fail to see the
3  relevance of how this information could lead
4  to discoverable information. And at this
5  point, I don't -- I don't see where this is
6  going. It has nothing to do with what
7  happened. The employment, that's the subject
8  of this litigation. So I'm just pointing it
9  out for the record, Counselor.
10 Q. Do you know how many other applicants there
11   were for this position?
12 A. I don't know.
13 Q. After the interview, did they offer you the
14   position on the spot?
15 A. They did not offer me the position on the
16   spot.
17 Q. How long did you have to wait?
18 A. Maybe a month. I'm not sure.
19 Q. Do you know what day they interviewed you?
20 A. I have no -- I cannot recall.
21 Q. Do you know what day you applied for the
22   position?
23 A. I cannot recall.
24 Q. Is there anything that would help you

Page 35

1  remember when you applied for this position?
2  A. No, I cannot recall right at this minute.
3  Q. But you started working there March 22 --
4  A. March 22, 2004.
5  Q. If you could just wait until I finish asking
6   my question before you answer, I think it
7   will help the court reporter out.
8       And you said you have no supervisory
9   responsibilities in this position?
10 A. No.
11 Q. When you first started working for the City
12   of Boston, your first job title there was
13   HMER?
14 A. HMER.
15 Q. And you said you started working there in
16   1986?
17 A. That is correct.
18 Q. And when did you become a permanent employee
19   for the City of Boston?
20 A. When did I become a permanent employee of the
21   City of Boston? I came in a temporary
22   position. I became a permanent employee -- I
23   was temporary provisional.
24 Q. And what does temporary provisional mean?

Page 36

1  A. I understand that temporary provisional is if
2   there's a layoff, if you're on a temporary,
3   you can get laid off.
4  Q. Okay. Do you know it to mean anything else?
5  A. I don't know.
6  Q. And did this position ever become permanent?
7  A. It did become permanent.
8  Q. And when did it become permanent?
9  A. It became permanent I recall 1998, around
10   there.
11 Q. How does it become -- how does your position
12   become permanent from temporary provisional?
13 A. The City of Boston made us permanent. I
14   don't know why. I cannot answer that.
15 Q. Since 1986, have you held any other positions
16   at the City of Boston?
17 A. Yes, I did held other position.
18 Q. Okay. What other positions did you hold?
19 A. I did held like a temporary foreman position,
20   acting foreman position.
21 Q. And how long did you hold that position for?
22 A. I hold that position for like two days in a
23   week, three days one time, two days, you
24   know.

Page 37

1  Q. Was that a permanent position?
2  A. That was not a permanent position.
3  Q. So since 1986, the only permanent position
4   that you held at the City of Boston was the
5   HMER position?
6  A. That's correct.
7  Q. And what were your job duties as an HMER?
8  A. HMER, repair the trucks: front end, brakes,
9   suspension, tune-ups.
10 Q. Okay. Day to day when you worked at the City
11   of Boston, when you arrived at work, could
12   you describe what you did typically during
13   the day.
14 A. I maintained the trucks.
15 Q. When you get to work, do you sign in?
16 A. When I get to work, I sign in.
17 Q. Okay. And who do you sign in with?
18 A. I sign in upstairs, the director's and the
19   assistant director's office upstairs.
20 Q. And once you sign in, what do you do next?
21 A. I change my clothes first, and then I sign in
22   ready to work.
23 Q. Okay. And after you sign in and you're ready
24   to work, what do you do next?

10 (Pages 34 to 37)

Page 38

1  A. What job comes to repair, I have to do it.
2  Q. Who tells you to do those jobs?
3  A. My foreman.
4  Q. Who's your foreman -- who was your foreman?
5  A. My last foreman before I left the job was
6     Paul Musto. And prior to that, it was Teddy
7     Myers.
8  Q. So you get to work, you change, you sign in;
9     and then you speak to Paul Musto or Teddy
10    Myers, and they inform you what work needs to
11    be done?
12 A. After I change my clothes, I stand in front
13    of my toolbox waiting to get a job.
14 Q. And how long do you usually wait?
15 A. Ten minutes, five minutes.
16 Q. Do you ever go to work and just go right to a
17    vehicle and start working on it, or do you
18    always have this same process?
19 A. I have the same process.
20 Q. If you felt that a certain job had to be
21    done, could you just go and do it?
22 A. No, I would not.
23 Q. And why not?
24 A. That's not my -- if it's my job, I would. If

Page 39

1     it's something left over, I would finish my
2     job before they come to me to give me another
3     job.
4  Q. Did you ever make a determination of what the
5     next job should be?
6  A. No, I did not.
7  Q. And that was always the foreman's position?
8  A. That's the foreman's position.
9  Q. Other than Paul Musto or Teddy Myers, did
10    anybody else tell you what to do?
11 A. No.
12 Q. If you ever have a problem making a repair,
13    who do you go to for advice?
14 A. If you have a problem, I'll fix it myself.
15    And if not, I'll just go through the process
16    by asking the foreman which -- I'll ask the
17    foreman.
18 Q. So you would ask either Paul Musto or Teddy
19    Myers?
20 A. Advise -- well, not advise. Tell them,
21    "Look, there's a problem with this truck."
22 Q. Do you ever direct anybody -- when you were
23    working at the City of Boston, did you ever
24    direct anybody in the work that they have to

Page 40

1     do?
2  A. Yes. I showed them sometimes. They come to
3     me for questions.
4  Q. And who came to you for questions?
5  A. Eric Gordon.
6  Q. What was his name?
7  A. Eric Gordon.
8  Q. Okay. Anybody else?
9  A. Paul Musto had came to me one time.
10 Q. Okay. You said Eric Gordon and Paul Musto
11    came to you once. Anybody else?
12 A. Joe Dorland will ask a question. Billy
13    Coughlin.
14 Q. Okay. Anyone else?
15 A. Lorn Cooper.
16 Q. Loran?
17 A. Lorn, L-o-r-n, Cooper.
18 Q. Okay. Anyone else?
19 A. I cannot recall the names right now.
20 Q. What kinds of questions did they ask you?
21 A. About how this is -- "I'm having a problem
22    with a truck," and I would go help them or
23    advise them what to do.
24 Q. If you're working on one of your vehicles

Page 41

1     that you were assigned to do and another
2     employee came to you and asked for advice on
3     working on the vehicle they were working on,
4     could you leave your post at your vehicle and
5     go to that person's vehicle and help them?
6  A. Yes, I could.
7  Q. Did you have to ask for permission to do
8     that?
9  A. No, I don't have to ask for permission.
10 Q. Did you ever direct any of these people on
11    the work that they do? Had you ever told
12    them, "Now that you've finished this
13    vehicle" -- or "this repair on this vehicle,
14    go work on this vehicle"?
15 A. No. No, I did not.
16 Q. So these people that you just listed
17    essentially asked you advice on mechanical
18    repair questions; is that correct?
19 A. Yes, that's correct.
20 Q. You said at one point you were -- at some
21    point you were the acting temporary foreman?
22 A. Temporary foreman.
23 Q. Did you apply for that position?
24 A. I did not apply for that position.

11 (Pages 38 to 41)

Page 42

1  Q. Now, how did you get that position?
2  A. Mr. Al Young put me in that position.
3  Q. Mister who?
4  A. Alan Young.
5  Q. Al Young?
6  A. Al Young.
7  Q. And explain to me how he put you in this
8     position.
9  A. He put me in that position because I was
10    senior qualified next in line, senior most
11    qualified.
12 Q. You say that it was a sporadic amount of time
13    you would be in a foreman position; every
14    once in a while, it would be two days here,
15    three days there a week. How did these
16    positions become available?
17 A. These positions became available when the
18    foreman was out on vacation on two days, one
19    sick day or two days sick.
20 Q. So if one of the foremen, Paul Musto or Teddy
21    Myers, was --
22 A. Teddy Myers at a time was out.
23 Q. And why was he out?
24 A. He may be out sick. He may have two days'

Page 43

1     vacation.
2  Q. So if Teddy Myers calls in sick, what would
3     typically happen in terms of you becoming --
4     you acting as the temporary foreman? How
5     would this interaction take place?
6  A. Mr. Al Young would call me -- he'd come
7     downstairs. His office is upstairs. He'd
8     call me and tell me, "Stay in the office and
9     supervise the shop. Give all the work."
10 Q. And what is Al Young's position?
11 A. He was the general foreman.
12 Q. So on these days where you're acting
13    temporary foreman, you would tell other
14    individuals what vehicles to work on and when
15    and how and so forth?
16 A. Yes, sir.
17 Q. How many times would you say you were an
18    acting temporary foreman?
19 A. At one time? I would say three days.
20 Q. About how many times while you were working
21    at the City of Boston were you assigned to be
22    an acting temporary foreman?
23 A. I would say at least -- at least two years.
24    Maybe more. I cannot recall. But I'm sure

Page 44

1     for about two years.
2  Q. Okay. You say that every once in a while
3     when Teddy Myers is sick or on vacation or
4     what have you, you would be asked to be the
5     acting temporary foreman. How many times
6     were you asked to do that?
7  A. Every time Teddy Myers was out, I was called
8     upon to do that job, to help do the job.
9  Q. During that time, was anybody else ever
10    asked --
11 A. Nobody else was ever asked to do that job.
12 Q. So when you were the acting temporary
13    foreman, did anyone ever direct you in
14    telling what other people should be doing?
15 A. Yes, someone did.
16 Q. Okay. Who told you?
17 A. Al Young.
18 Q. And could you explain how that happens.
19 A. He will come downstairs and tell me to give
20    out the jobs to be done. He will come
21    downstairs and tell me what job have to be
22    done. I will be assisting Mr. Al Young.
23    He's the general foreman. He will come
24    downstairs. He'll be downstairs there, and

Page 45

1     I'll be acting foreman.
2  Q. So who is the person who actually told the
3     other HMERs and assigned them work?
4  A. I would.
5  Q. Would Al Young tell you what jobs should be
6     done by each individual?
7  A. He would tell me that sometimes, yes.
8  Q. While you were an acting temporary foreman,
9     if somebody asked you, "I need to go home
10    early; I have a family situation," would you
11    have the authority to let them go?
12 A. I would not have the authority to let them
13    go.
14 Q. Who would they have to go to?
15 A. Have to go to Mr. Al Young.
16 Q. If someone said, "Look, I don't want to work
17    on this vehicle," what would happen?
18 A. I would go to Mr. Al Young.
19 Q. If someone says they have a problem with
20    working on a vehicle, could you assign them
21    to another vehicle without the authority of
22    Mr. Young?
23 A. I would help them finish the job because I
24    have the qualification and knowledge enough

12 (Pages 42 to 45)

Page 46

1    to how the job is being done, what should be
2    done.
3    Q. During the time Teddy Myers was out and you
4    were the acting foreman, if someone asked you
5    for a time off request or vacation request,
6    did you have the authority to grant them that
7    request?
8    A. I cannot grant no -- I cannot grant anyone
9    that.
10   Q. So would you characterize your -- would you
11   characterize when you were working as an
12   acting foreman a supervisory position?
13       MR. KENDALL: Objection to the form
14   of the question, but you may answer if you
15   can.
16   A. (No verbal response)
17   Q. Would you say you supervised people while you
18   were the acting foreman?
19   A. I would supervise people while I was acting
20   foreman.
21   Q. What kind of supervisory authority would you
22   have?
23   A. When the job have to be done on the truck, I
24   have to say "Look, I want this truck done

Page 47

1    this way. Repair this truck." Or a road
2    job, you'd have to go on a road job. I could
3    send them out on a road job.
4    Q. Would you need to get authority from Al Young
5    before that happened?
6    A. I would just mention to Mr. Al Young that I'm
7    sending a guy on a job, a road job.
8    Q. Could you send somebody on a road job without
9    telling Al Young?
10   A. I have to tell Al Young that. I would
11   not do that. I have to tell Mr. Al Young.
12   Q. So you have to tell Mr. Al Young if you were
13   going to send somebody on a road job?
14   A. Yes, I would.
15   Q. Would you have to tell Mr. Young who was
16   being assigned on what vehicle?
17   A. Sometimes I would.
18   Q. Which times?
19   A. Just about every time. I would tell him
20   what's going on in the shop. This one is
21   doing this job. This guy is doing this job.
22   Q. So did Al Young assign the people to the
23   vehicles, or did you assign the people to the
24   vehicles?

Page 48

1    A. I assigned the jobs.
2    Q. Did Al Young direct you in telling you which
3    people should be working on which vehicles?
4    A. Al Young did not tell me which people to be
5    working on. I did assign the job because I
6    know the guys in the shop, who could do what
7    and what could be done because I had been the
8    senior most-qualified auto mechanic in the
9    shop.
10   Q. Do you know what year Central Fleet
11   Maintenance came into being?
12   A. I don't recall.
13   Q. Who is the current superintendent in the
14   heavy shop?
15   A. The current superintendent in the heavy shop
16   is Mr. Silvey, Mr. Robert Silvey in the heavy
17   shop.
18   Q. Do you know what his responsibilities are?
19   A. He's the assistant -- he's the superintendent
20   of the shop.
21   Q. And what does he do?
22   A. He's over the general foreman and auto
23   mechanics.
24   Q. And what does he do?

Page 49

1    A. He will tell the general foreman what have to
2    be done.
3    Q. Do you know what else he does?
4    A. I don't know.
5    Q. And who is the current general foreman of the
6    heavy shop?
7    A. Paul Musto.
8    Q. And what are his responsibilities?
9    A. He's the general foreman. He will tell the
10   foreman what job to be done and what is going
11   on in the garage.
12   Q. Do you know what else his responsibilities
13   are?
14   A. I don't know.
15   Q. And who are the current working foremen in
16   the heavy job?
17   A. The current working foreman of heavy shop is
18   Scott Alther.
19   Q. A-l-t-h-e-r?
20   A. Yes, yes.
21   Q. Are there any other working foremen in the
22   heavy shop?
23   A. I don't know. I'm not there.
24   Q. Okay. Have there always been working foremen

Page 50

1   in the heavy shop at Central Fleet?
2   A. Excuse me?
3   Q. Have there always been working foremen in the
4      heavy shop at Central Fleet?
5   A. No, there's not. No.
6   Q. There have been times where there were no
7      working foremen?
8   A. When I was there, there was no working
9      foreman. Always foreman. Right now at this
10     time, they have a working foreman.
11  Q. What are the duties and responsibilities of
12     the working foreman in the heavy shop at
13     Central Fleet?
14  A. The duty of a working foreman is the same
15     duty as a regular foreman.
16  Q. And what are those?
17  A. To supervise the shop, give all the work.
18  Q. So would you say you generally know what the
19     duties and responsibilities are of the
20     working foreman?
21  A. I do.
22  Q. Who is the current superintendent of the
23     light shop?
24  A. Maurice Schmidt.

Page 51

1   Q. And do you know what his responsibilities
2      are?
3   A. The same as Mr. Silvey.
4   Q. Okay. Who's the general foreman currently in
5      the light shop?
6   A. The general foreman in light shop is Mr.
7      Maurice, M-a-u-r-i-c-e, Gracia, G-r-a-c-i-a.
8   Q. Okay. And what are his responsibilities?
9   A. He's the general foreman of the shop, light
10     shop.
11  Q. And what does he do?
12  A. He supervise the shop.
13  Q. And do you know who the current working
14     foremen are in the light shop?
15  A. I cannot recall.
16  Q. Would you say that you generally know what
17     the duties and responsibilities are of the
18     working foremen in the light shop?
19  A. Yes, I do. The same as the heavy shop.
20  Q. Does the City of Boston ever offer any
21     training opportunities for their employees
22     other than on-the-job training?
23         MR. KENDALL: Objection to the form,
24     but you may answer.

Page 52

1   A. We have training on the job, and I go to
2      training.
3   Q. What kind of training do you go to?
4   A. The trucks that came in, new trucks, you go
5      to school for a couple days. And something
6      new they want you to learn, you go to school
7      for that.
8   Q. Is this through the City of Boston, or is
9      it --
10  A. Through the City of Boston.
11  Q. Are these off-site training programs?
12  A. They come on the site or you go to the place.
13  Q. So some were on site; some were off site?
14  A. Yes.
15  Q. Are there any other training opportunities
16     available at the City of Boston?
17  A. I have no idea. I don't know.
18         MR. KENDALL: Counselor, just for
19     purposes of the record, you're using the
20     present tense. As you know, Mr. Diaz no
21     longer works for the City. So I'm not sure
22     if he's competent to testify in the present
23     tense with respect to training opportunities.
24  Q. When you were working at the City of Boston,

Page 53

1      were there any training opportunities
2      available to you?
3   A. Just what I recalled to you.
4   Q. When you were working at the City of Boston,
5      when was the last time that you participated
6      in one of these training opportunities?
7   A. Last year, August -- last year. I cannot
8      recall if it's -- last year.
9   Q. And what kind of training --
10  A. Electrical courses.
11  Q. Are these mandatory?
12  A. This is mandatory.
13  Q. And you said that -- these electrical courses
14     that you took last year, was there a truck
15     company or something that sponsored that?
16  A. Alco, S.E. Alco.
17  Q. During your time at the City of Boston
18     between 1986 and I guess 2004, how many
19     training programs did you participate in?
20  A. I cannot recall.
21  Q. Was it over ten?
22  A. I cannot recall.
23  Q. Do you have any certificates in automotive
24     training?

14 (Pages 50 to 53)

Page 54

1   A. I have certificates in automotive training.
2   Q. Okay. What certificates do you have?
3   A. I have from Volvo Village.
4   Q. Okay. Anything else?
5   A. And I have some from the City of Boston. All
6      the schools I've been, the courses I took.
7   Q. Do you have any other certifications other
8      than from Volvo Village?
9   A. I have one in Trinidad. I don't know if I
10     can find it now. It was when I was living in
11     Trinidad.
12  Q. And that's the course that you were taking in
13     the evenings?
14  A. Evenings, yes.
15  Q. Do you think that it's important to know
16     about computers as an auto mechanic now?
17  A. Yes, I do.
18  Q. And why is that?
19  A. Because everything now is computerized.
20  Q. Do you have any certificates in computers?
21  A. No, I don't.
22  Q. What's the difference between the heavy shop
23     and the light shop?
24  A. The heavy shop and the light shop? The heavy

Page 55

1      shop work on heavy equipment. The light shop
2      work on the cars.
3   Q. What are some of the heavy equipment vehicles
4      out there?
5   A. International trucks.
6   Q. So would a Ford F250 be a light truck or a --
7      I mean a light vehicle or a heavy vehicle?
8   A. They probably bring it in the heavy shop.
9   Q. What about like an F150?
10  A. I don't recall any F150.
11  Q. Okay. Do you think that it's important that
12     an auto mechanic in Central Fleet know
13     certain basic automotive abbreviations?
14         MR. KENDALL: I'm going to object to
15     the question as being vague.
16  A. Repeat the question once more.
17         MR. FUKUDA: As being -- excuse me?
18         MR. KENDALL: Vague.
19  Q. Do you think it's important for an auto
20     mechanic in Central Fleet Maintenance to know
21     what 4WD stands for?
22  A. I cannot answer the question.
23  Q. Why?
24  A. I just cannot answer the question.

Page 56

1   Q. Do you know what 4WD stands for?
2   A. I cannot answer the question, I said to you.
3   Q. Why is that?
4   A. I said I cannot answer the question.
5   Q. Do you know what ABS stands for?
6   A. Anti-locking brake system.
7   Q. Do you know what 2WD stands for?
8   A. I cannot -- I refuse to answer those
9      questions.
10  Q. Why is that?
11  A. I refuse to answer those questions.
12  Q. Do you think it's important for an automotive
13     mechanic in Central Fleet to know how many
14     defective brakes an SA dump truck can have
15     before it's placed out of service?
16  A. I would not answer those questions.
17  Q. Why?
18  A. I would not answer those questions.
19  Q. Do you know how many defective brakes an SA
20     truck -- dump truck --
21  A. I would not answer those questions.
22  Q. My first question was, do you think it's
23     important for an auto mechanic in Central
24     Fleet to know this out-of-service

Page 57

1      requirement?
2   A. He will have to know the service requirement.
3      It depends on what the truck is, if it's safe
4      equipment for the truck to go out on a run.
5   Q. Okay. And now I'm asking you if you know how
6      many defective brakes an SA dump truck can
7      have before it's placed out of service?
8   A. Those are questions irrelevant. I will not
9      answer that. If I'm a mechanic and I see the
10     truck has no brakes, I will tell the foreman,
11     "This truck cannot go." I will not go in
12     detail and answer about this question, about
13     how much percentage of the brakes have in it.
14     I refuse to answer those questions.
15  Q. Wouldn't you say that it's important to know
16     how many brakes that -- how many defective
17     brakes --
18  A. It would have to be -- yes. But I will not
19     go and answer all these questions about WD
20     and this and that. I refuse to answer those
21     questions.
22  Q. What does CMV stand for?
23  A. Excuse me?
24  Q. CMV, do you know what that stands for?

G & M COURT REPORTERS & ASSOCIATES
(617) 338-0030

Page 58

1  A. I don't know. I will not answer that
2     question. If I know, I would not answer it.
3  Q. Do you think it's important for an automotive
4     mechanic in Central Fleet to know if a CMV is
5     out of service if only one of the stoplights
6     is working?
7  A. If the stoplight is working -- he's supposed
8     to know the stoplight is not working. You
9     have someone step on the brakes and check it
10    for him.
11 Q. Let's say one of the stoplights is working
12    and one is not working. Is that vehicle safe
13    to go out on the streets?
14 A. That vehicle should -- that vehicle should
15    stay in the shop.
16 Q. If you're examining a truck to see whether or
17    not it's safe to go out on the road and you
18    look at the tread depth of the truck, how
19    would you know whether or not the tread depth
20    is safe or it should be out of service?
21 A. You put a gauge in it.
22 Q. And what would the gauge read when it's
23    unsafe?
24 A. 4/32.

Page 59

1  Q. Why is it important to know the
2     out-of-service criteria?
3  A. That's very important.
4  Q. Why is it so important?
5  A. Because you can go and kill somebody out
6     there with flat -- with tires that is bad
7     when you step on the brakes. That's very
8     important to me.
9  Q. Do you know what the four basic steps in a
10    pretrip inspection is?
11 A. I will not answer those questions.
12 Q. Why won't you answer these questions?
13 A. I refuse to answer those questions. I will
14    not answer those questions.
15 Q. Do you think it's important that a supervisor
16    in Central Fleet would know these things?
17 A. I don't know.
18 Q. You don't know if it would be important?
19 A. It would be important. But asking me
20    questions, no, I will not answer those
21    questions.
22 Q. Well, why would it be important to know what
23    the four basic steps in a pretrip --
24 A. I don't know. I won't answer the question.

Page 60

1  Q. Is it that you don't know --
2  A. I would not say. I refuse to answer those
3     questions.
4  Q. Let me just ask you this: Are you refusing
5     to answer because you don't know the answer,
6     or are you refusing because you don't want to
7     answer?
8  A. I would not answer those questions. That's
9     all. I would not answer those questions.
10 Q. Do you know the answer, though?
11 A. I will not say.
12 Q. You don't know whether or not you know the
13    answer to that question?
14 A. I will not say.
15 Q. But you do think that's it very important to
16    know out-of-service criteria?
17 A. Yes.
18 Q. During an interview for a foreman position,
19    do you think that it's unreasonable to ask
20    questions about -- specific questions about
21    out-of-service criteria?
22 A. He did ask it in the foreman position.
23 Q. I said do you think it's unreasonable to ask
24    those questions?

Page 61

1  A. No, it's not unreasonable. You're supposed
2     to ask that question.
3  Q. Do you think it's unreasonable to ask
4     questions for a foreman position how a
5     certain person or individual would supervise
6     other individuals?
7        MR. KENDALL: Objection to the form
8     of the question.
9  A. They could ask those questions.
10 Q. Do you think it's inappropriate to ask
11    supervisory questions during an interview?
12       MR. KENDALL: Objection to the form
13    of the question.
14 A. They could ask -- in the interview, they
15    could ask me questions.
16 Q. About how you would supervise people?
17 A. I would supervise people.
18 Q. In November of 1999, did you apply for a
19    working foreman position in the light shop?
20 A. I did not -- in 1999, I applied for a foreman
21    position in the light shop.
22 Q. Okay. And how did you find out about that
23    opening?
24 A. That was posted.

Page 62

1  Q. And were you offered an interview?
2  A. I offered interview.
3  Q. Okay. After you applied and the interview
4     was scheduled, did you do anything to prepare
5     for that interview?
6  A. I did not do anything to prepare for
7     interview.
8  Q. Did you get that job?
9  A. Excuse me?
10 Q. Did you get that job?
11 A. I did not get a job.
12 Q. And did you file a grievance?
13 A. I did file a grievance.
14 Q. And what was the basis of that grievance?
15 A. The basis for that grievance because I was
16    the senior most-qualified in the garage. I
17    did not get a job.
18 Q. Who makes the determination that you were the
19    senior most-qualified?
20 A. Who made the decision?
21 Q. Who would make that determination?
22 A. The City of Boston would make the decision or
23    the general foreman.
24 Q. Were you told by somebody that you were the

Page 63

1     senior most-qualified?
2  A. I was told that I was the senior
3     most-qualified.
4  Q. Who told you that?
5  A. Mr. Al Young.
6  Q. How did he communicate that to you?
7  A. He just told me that, "You'll be the next
8     foreman, Rod, right in line because you have
9     the most knowledge and you're the most
10    senior-qualified guy in the shop."
11 Q. After you didn't get the 1999 working foreman
12    position in the light shop and you filed a
13    grievance, was anybody else part of that
14    grievance?
15 A. Yes, they did.
16 Q. And who else was part of that grievance?
17 A. William Coughlin.
18 Q. Okay. Anyone else?
19 A. I cannot recall at this moment.
20 Q. And what was the outcome of that grievance?
21    What happened?
22 A. What happened to it? They gave it to a white
23    male.
24 Q. They gave the grievance to a white male?

Page 64

1  A. The job was posted. It was given to a white
2     male.
3  Q. Okay. I'm asking you about the grievance.
4  A. Nothing happened to the grievance. I went
5     through the steps of the grievance, and
6     nothing happened to the grievance.
7  Q. What was the determination? Do you know what
8     the determination of that grievance was?
9  A. I cannot recall at this moment what the
10    outcome of that grievance. I did not get a
11    job.
12 Q. Who got that job?
13 A. At this moment, I cannot recall his name
14    right now. It's not in my head right now to
15    remember his name.
16 Q. Did Al Young participate in the interview
17    process?
18       MR. KENDALL: For what position,
19    Counselor?
20       MR. FUKUDA: I'm sorry. Thank you.
21    For the 1999 working foreman position of the
22    light shop.
23 A. No, Al Young did not participate in that job.
24 Q. Does Al Young still work for the City of

Page 65

1     Boston?
2  A. Al Young, as I told you before, is retired.
3  Q. Do you know when he retired?
4  A. I cannot recall.
5  Q. In 1999, was he retired?
6  A. No. He was still working there in 1999.
7  Q. After you filed that grievance in 1999, did
8     the environment at Central Fleet change for
9     you?
10 A. Yes, it did change for me.
11 Q. How did it change?
12 A. I did not get any acting position no more.
13 Q. Al Young stopped giving you these
14    opportunities?
15 A. Al Young had -- at that time, Al Young had no
16    way -- no say in putting me as a foreman
17    again.
18 Q. And why is that?
19 A. I have no idea.
20 Q. Did it change in any other way?
21 A. That's the way it changed.
22 Q. Did you tell anybody about this?
23 A. Yes. It hurt me inside. And up to this day,
24    it's still hurting me.

17 (Pages 62 to 65)

Page 66

1  Q. And did you tell anybody about this?
2  A. Anybody like who?
3  Q. Like other people you worked with.
4  A. Yes. I told them what I feel about the job.
5  Q. And who did you tell?
6  A. I told that to William Coughlin, Joe Dorland,
7     Bob Williams, Cleo Bynoe, C-l-e-o B-y-n-o-e.
8  Q. And what did they tell you?
9  A. What they told me?
10 Q. Yes.
11 A. Well, they told me just fight it.
12 Q. Did you ever tell Al Young this?
13 A. I did tell Al Young that.
14 Q. And what did he say?
15 A. Well, he say they made a decision upstairs,
16    up in the office upstairs.
17 Q. And later, did another working foreman
18    position become available?
19 A. 1999, there was a foreman for the light shop.
20    In 2001, I recall there was another position
21    coming up. There was another position in
22    2001.
23 Q. Okay. In 2001. And was that for the light
24    shop as well?

Page 67

1  A. That was for the heavy shop.
2  Q. And did you apply for that position?
3  A. I did apply for that position.
4  Q. And were you granted an interview?
5  A. I did grant an interview.
6  Q. And did you prepare for that interview?
7  A. I did not have to prepare for that interview.
8  Q. Did you think that the interview process for
9     the 2001 position would be similar to the
10    interview process in the 1999 position?
11 A. It was similar.
12 Q. Prior to going into the second interview, the
13    2001 interview, did you think to yourself,
14    This is going to probably be similar to the
15    1999 interview process?
16 A. I have no problem with that. It's an
17    interview just on mechanic questions.
18 Q. And why didn't you prepare for the interview?
19 A. Because I know my stuff.
20 Q. Can you tell us everything that you can
21    remember about that interview in 2001.
22 A. I cannot remember that.
23 Q. Do you know who was in the room with you at
24    the interview?

Page 68

1  A. In the interview room was Dave Higgins.
2  Q. Anyone else?
3  A. Dave -- Kathy Kelly, Maurice Schmidt. And I
4     recall Bob Silvey. That's about it.
5  Q. And did they interview you individually or --
6  A. Individually.
7  Q. In the same room?
8  A. In the same room.
9  Q. Do you remember how you were sitting in
10    relation to the other people?
11 A. I was sitting more or less like this here.
12 Q. So you were sitting with -- in front of the
13    four people --
14 A. Yes.
15 Q. -- asking you questions?
16 A. Yes.
17 Q. Were you nervous?
18 A. No.
19 Q. Had you met Dave Higgins prior to this
20    interview?
21 A. I did not meet -- I did not meet Dave
22    Higgins.
23 Q. Did you know who Dave Higgins was?
24 A. I knew who Dave Higgins was.

Page 69

1  Q. Did you ever meet him informally during your
2     time at the City of Boston?
3  A. Oh, he come down and say hi. That's it.
4  Q. Did he ever treat you poorly prior to the
5     interview?
6  A. Yes, he did treat me poorly.
7  Q. How did he treat you so poorly?
8  A. How he treat me? The 2001 interview, I was
9     kicked out of the office as a temporary
10    foreman.
11 Q. Can you explain that.
12 A. Because I went and got a lawyer in
13    nineteen -- in 2000. I went and got a lawyer
14    June of 2000, and I was kicked out. When
15    they get the news I went for a lawyer, I was
16    kicked out of the office.
17 Q. You were told to go home that day?
18 A. I did not told to go home. They send someone
19    else to act as -- to do that position.
20 Q. The acting foreman position?
21 A. The temporary, yes, acting -- yes, sir.
22 Q. Okay. The temporary acting foreman position?
23 A. Yes.
24 Q. Prior to the 2001 interview, did you ever

18 (Pages 66 to 69)

Page 70

1    meet Kathy Kelly?
2    A. I did not meet Kathy Kelly.
3    Q. Do you remember how long that interview
4       lasted for?
5    A. I cannot recall.
6    Q. Was it a half hour?
7    A. Maybe half an hour. I'm not sure. Maybe, I
8       would say. It could be longer. I have no --
9       I don't know.
10   Q. Okay. How do you think you did in that
11      interview?
12   A. I think I did pretty good.
13   Q. When you left the interview room, did you
14      feel good about it?
15   A. I feel good about it.
16   Q. And you thought you were going to get the
17      job?
18   A. I thought I was going to get the job.
19   Q. After you left the interview room, did you
20      talk to anybody, any co-workers to tell them
21      how you felt?
22   A. No.
23   Q. Did you just go back to work?
24   A. I just went back to work.

Page 71

1    Q. Do you think that the questions that they
2       asked you that day, do you think that those
3       questions were fair?
4    A. It was fair.
5    Q. So would you say that generally the
6       experience -- the interview experience went
7       okay?
8    A. It went okay.
9           MR. KENDALL: I'm going to object to
10      that question.
11   Q. How did you feel that it went?
12   A. I feel it went pretty good. I had confidence
13      I was going to get the job.
14   Q. At the interview process itself, did you feel
15      that Kathy Kelly, Dave Higgins, Maurice
16      Schmidt, and Bob Silvey treated you fairly?
17          MR. KENDALL: Objection to the
18      question.
19   A. I cannot say.
20   Q. How would you say that they treated you in
21      the interview itself?
22   A. They just asked me the questions, and I
23      answered the questions.
24   Q. Who told you that you didn't get the job?

Page 72

1    A. When the posted -- who told me I didn't get
2       the job?
3    Q. Right.
4    A. Mr. Dave Higgins.
5    Q. And what did he tell you?
6    A. In 2001, Mr. Dave Higgins called me upstairs
7       and said, "Rod Diaz, what happened in the
8       past, don't take it personally. And I want
9       you to know I'm not racist. And you've been
10      here a long time, and you need to move up.
11      And Al Young is going to retire and there
12      will be more position hiring. But I want you
13      to know that you're lacking of communication
14      skill, and I want to school you. And I want
15      to school you, and I want you to know that
16      you was one of the candidate that did not get
17      the job."
18          I said to him, "Who was the
19      candidate who got the job?"
20          And he said, "Paul Musto." And as
21      he said "Paul Musto," I just got up from
22      where I was sitting down and I walked
23      outside. I said, "Thank you."
24   Q. When he said that he wanted to school you,

Page 73

1    what does that mean?
2    A. He think that I don't have no communication
3       skill. That's my way of I don't no determine
4       that. I'm not sure if it's a language
5       barrier. But that's what he told me: I
6       don't have no communication skill, and he
7       want to school me.
8    Q. Did he give you any other reasons?
9    A. He did not give me no other reasons. That's
10      all.
11   Q. Were you ever given any kind of written
12      reason for not receiving this job?
13   A. I never get no other reasons.
14   Q. Why do you think you were more qualified than
15      the other applicants for this position?
16   A. I think I was more qualified for that job
17      before the guy who got the job, because I
18      went to school and I can read and I can
19      write. And I have the knowledge and the
20      experience to be auto mechanic and to be --
21      to get a position.
22   Q. And you said that Paul Musto received that
23      position?
24   A. Paul Musto received that position.

Page 74

1  Q. Were you in the room when Paul Musto was
2     interviewed?
3  A. I was not in the room when Paul Musto was
4     interviewed.
5  Q. Do you know what Paul Musto's qualifications
6     are?
7  A. I don't know.
8  Q. Have you ever seen his resume?
9  A. I've never seen Paul Musto's resume.
10 Q. Have you ever talked to Mr. Musto about his
11    experiences?
12 A. I have never talked to Mr. Musto about
13    experience.
14 Q. How do you know that you were more qualified
15    than Mr. Musto?
16 A. Because I told you before, I could read and
17    write and I have knowledge.
18 Q. No. I understand that you can read and write
19    and have knowledge. But why were you more
20    qualified than Paul Musto?
21 A. In this field, you have to learn to read --
22    in other words, you have to read.
23 Q. When you originally applied for the 2001
24    position, did you fill out an application?

Page 75

1  A. I did have to fill out an application.
2  Q. And did you attach a resume?
3  A. I did attach my resume.
4  Q. And did you attach copies of the certificate
5     you received?
6  A. I did attach it.
7  Q. Do you know what Paul Musto's educational
8     experience is?
9  A. I have no -- I don't know.
10 Q. Do you know if he went to high school?
11 A. I don't know.
12 Q. Do you know where Mr. Musto worked before he
13    started at City of Boston?
14 A. I don't know.
15 Q. Do you know what Mr. Musto's supervisory
16    experience is?
17 A. I don't know.
18 Q. Have you ever read anything that Mr. Musto
19    has ever written?
20 A. I would say I would not answer the question.
21 Q. How can you evaluate Mr. Musto's writing
22    abilities if you've never read anything that
23    he's written?
24 A. Mr. Musto went to school with me as training

Page 76

1     at the Globe, the Boston Globe. We had
2     training there for the truck.
3  Q. What kind of training was that?
4  A. The new trucks, '99 trucks, I would recall.
5  Q. Were these the trucks that delivered the
6     newspapers?
7  A. The City of Boston trucks.
8  Q. Oh.
9  A. Excuse me. I'm sorry. The City of Boston
10    trucks.
11 Q. And it was taking place at the Boston Globe?
12 A. Yes, it was taking place at the Boston Globe.
13    They had an office there.
14 Q. Okay. And at this training, you had a chance
15    to read Mr. Musto's writing?
16 A. Yes. At that training there, I recall -- I'm
17    not sure how many mechanics was there. But
18    each mechanic have to read a paragraph. Each
19    mechanic have to read a paragraph.
20 Q. Okay. And each mechanic would have to read a
21    paragraph of what?
22 A. Yes. We have a book in front of us.
23 Q. Okay. So now we're talking about Mr. Musto's
24    reading abilities?

Page 77

1  A. Yes.
2  Q. And you read a paragraph?
3  A. Yes.
4  Q. And then Mr. Musto read a paragraph?
5  A. Yes, Mr. Musto read a paragraph.
6  Q. And he read that out loud?
7  A. He read it out load.
8  Q. To all the mechanics?
9  A. All the mechanics.
10 Q. And he couldn't read it?
11 A. Mr. Musto's turn, when he was supposed to
12    read, he look around and check the paragraph
13    and see when it's his time to read. And I
14    was sitting close to him, and I read the
15    paragraph for him. And he fumbled and said
16    it -- fumbled like trying to read.
17 Q. Did he end up reading it out loud?
18 A. He ended up reading it, but stumbling like --
19    stumbling the words.
20 Q. Was he stuttering?
21 A. He was like trying to grasp the word, doesn't
22    really know what he's doing, could hardly
23    read it.
24 Q. Other than that day at this training at the

20 (Pages 74 to 77)

Page 78

1    Boston Globe, did you ever hear Mr. Musto
2    read anything else?
3  A. No, I did not hear Mr. Musto read anything
4    else.
5  Q. So from that experience at the training at
6    the Boston Globe, are you saying that
7    Mr. Musto can't read?
8  A. I did not say he can't read. I said he could
9    hardly read.
10 Q. I'm sorry?
11 A. He could hardly read. In other words, his
12   reading is very poor. His reading is poor.
13   He could hardly read.
14 Q. And what about his writing? Have you ever
15   read anything that he wrote?
16 A. I have never read anything he wrote, but he
17   send me on a road job. I would recall -- I
18   don't know who he send me on the road job,
19   myself and another kid. And all he gave me
20   was the number of the street where the truck
21   was parked. And the truck was -- he gave me
22   five letters. In Massachusetts, there will
23   be 2025 or 1953 or 1964. There was five
24   numbers in there, and we could not find the

Page 79

1    truck.
2  Q. On the license?
3  A. On the house where the truck was parking.
4  Q. All right. I'm just a little bit confused.
5    If you could explain that one more time, I'd
6    appreciate it.
7  A. Mr. Musto send me and a tow truck driver on a
8    road job to pick up a truck which was, you
9    know, in the street. Somebody had -- you
10   know, a street truck. And the number he gave
11   me to go get this truck was five letters. In
12   other words, it's supposed to be like four
13   letters, like if it's 1964 or 2004 street
14   number. There was five. In Massachusetts, I
15   cannot recall there was five.
16 Q. Okay. I see what you're saying.
17 A. When I saw his handwriting, and I could
18   hardly make it out. I could hardly read it.
19   It was...
20 Q. So he has bad penmanship?
21 A. Excuse me. That's correct.
22 Q. And you're saying the house, the street
23   number was five digits long?
24 A. Five digits long. I keep that piece of paper

Page 80

1    for a while and throw it away.
2  Q. Other than this, have you ever written any --
3    I'm sorry. Other than this experience here
4    where he sends you out on the road to pick up
5    the truck, have you ever read anything else
6    that Mr. Musto has written?
7  A. I never read anything else.
8  Q. Do you know what Central Fleet's policy is in
9    hiring foremen?
10 A. I don't know.
11 Q. Have you ever heard that foremen's positions
12   are granted based solely on seniority?
13 A. I did that. That's the way it's been.
14 Q. So that's the policy?
15 A. That's the policy.
16 Q. Okay. Who told you about this policy?
17 A. From 1986 to 2004, I heard that.
18 Q. Do you remember anyone specifically telling
19   you that?
20 A. Yes, I remember somebody specifically telling
21   me.
22 Q. And who was that person?
23 A. The person was there -- who came before me,
24   Steve Coker, Fitz Roi Prescott.

Page 81

1  Q. Okay.
2  A. Lorn Cooper.
3  Q. Okay.
4  A. William Coughlin.
5  Q. If it's Central Fleet's policy to only hire
6    the most senior person for the foremen
7    positions, why would they take their time to
8    conduct interviews?
9       MR. KENDALL: Objection to your
10   question. You may answer if you can.
11 A. Why they take?
12 Q. Why would they interview somebody if they
13   were just going to hire the most senior
14   person?
15 A. In the past years, there was no interview.
16   White male was getting position by seniority.
17   And the black man now turn to come up, they
18   start giving the test and interview. In the
19   past, they never give no interview. All the
20   guys that have been foremen is white male.
21   No tests. Back man is to come next. They
22   give a test, an interview.
23 Q. Who's the -- since you've been working at
24   Fleet -- when you were working at Fleet

Page 82

1    Maintenance, can you name all the foremen?
2  A. Yes, I could. Just about all.
3  Q. Who are those people?
4  A. Al Young, white male; Teddy Myers, white
5     male; Jack Shipley, white male; John
6     Woofer --
7  Q. How do you spell his name?
8  A. John, J-o-h-n. Woofer, I cannot spell.
9     Woofer.
10       Paul Dimetier, white male; James
11    Parsons, white male; one black male, Fitz Roi
12    Prescott.
13 Q. Anyone else?
14 A. I cannot recall. There's more. I cannot
15    recall.
16 Q. How do you know none of these people were
17    interviewed?
18 A. Excuse me?
19 Q. How do you know these people were not
20    interviewed?
21 A. We all know there was no interview because we
22    talk about it all the time in the shop. You
23    just go upstairs, and you'll be next foreman.
24 Q. And were all these people foremen in Central

Page 83

1     Fleet, or were some of them --
2  A. At the time was not Central Fleet. It was
3     Public Works Department.
4  Q. And when you were working at the City of
5     Boston, were you in a union?
6  A. I was in a union.
7  Q. And what union do you belong to or did you
8     belong to?
9  A. ASME 445. ASME 445.
10 Q. And how long did you belong to that union?
11 A. Seventeen years.
12 Q. Does that union have a collective bargaining
13    agreement?
14 A. Yes, it does.
15 Q. Have you ever read that collective bargaining
16    agreement?
17 A. Some of it.
18 Q. Does the collective bargaining agreement
19    state that the hiring practice is based
20    solely on seniority?
21 A. I cannot recall that.
22 Q. After you were told that you were not
23    selected for the 2001 job, I guess that would
24    be the foreman for the heavy shop, did you

Page 84

1     file a grievance?
2  A. I did file a grievance.
3  Q. Okay. What was the basis of that grievance?
4  A. The basis of that grievance because I did not
5     get the job, I had to file a grievance again.
6  Q. What was the outcome of that grievance?
7  A. The grievance went through the first stage to
8     Dave Higgins. It went through the second
9     stage with Mr. Cazaza, the commissioner of
10    Public Works. And the third stage, they drag
11    their feet and they drag their feet. So I
12    would not meet with labor relation. Every
13    time I talk to union president, he would say
14    to me, "I didn't hear anything yet." And
15    when I did, the statute of limitation -- they
16    said we cannot do nothing because they drag
17    their feet too long.
18 Q. When was the first time you were retaliated
19    against?
20 A. The first time I was retaliated against was
21    in 2000 of -- June of 2000.
22 Q. What happened?
23 A. What happened? I was retaliated. I was
24    kicked out of the office, and I was no longer

Page 85

1     given no acting temporary working foreman
2     position up to this date. Excuse me. I
3     left.
4  Q. Now, I know you've said it before, but you
5     said in June of 2000 you were kicked out of
6     the office?
7  A. Yes.
8  Q. I'm trying to get an understanding of what
9     that means. Did they physically kick you out
10    of the office?
11 A. In 2000, I was sitting down at the foreman
12    desk like two days acting position, and I was
13    told they send another foreman from a
14    different department to -- "I'm in charge and
15    you have to go back on the floor."
16 Q. Okay. I see. Did that happen just once?
17 A. It happened. That's it. Once, and that's
18    it. No more temporary.
19 Q. Who told you that? Who kicked you out of the
20    office?
21 A. Well, Mr. Dave Higgins send one foreman in
22    there.
23 Q. Who did he send?
24 A. You want a name? He send Fitz Roi Prescott.

22 (Pages 82 to 85)

Page 86

1  Q. And how do you know Dave Higgins sent him?
2  A. He told me that.
3  Q. Dave Higgins told you that?
4  A. Fitz Roi Prescott told me they sent him --
5     Mr. Higgins told him to come in here.
6  Q. Fitz Roi came into the office and said --
7  A. In the heavy shop.
8  Q. And said to you --
9  A. "I'm in charge."
10 Q. Do you remember specifically what he said?
11 A. He said, "I'll be the foreman until the real
12    foreman come out of work."
13 Q. And that was the last time?
14 A. That was the last time. 2000 of, I would
15    say, June.
16 Q. And that was the last time that you were ever
17    asked to be a temporary foreman?
18 A. That was the last time I was ever put to act
19    as anything in that shop.
20 Q. How does overtime work at Central Fleet?
21 A. Overtime work is supposed to be divided
22    equally.
23 Q. Okay. Have you ever worked overtime?
24 A. I did work overtime.

Page 87

1  Q. You have?
2  A. I have worked overtime.
3  Q. How often would you say you worked overtime
4     when you were working at the City of Boston?
5  A. I would work overtime. In a snow emergency,
6     everybody would have to work overtime in a
7     snow emergency.
8  Q. When you say "divided equally," what does
9     that mean?
10 A. Everybody should get piece of the pie. In
11    other words, everybody should get some of the
12    overtime.
13 Q. And how is it divided equally? How does one
14    find out they have -- it's their turn to have
15    overtime?
16 A. They had a list. They used to go by a list.
17 Q. They used to go by a list?
18 A. They used to go by a list. The names from
19    the top of the -- yes.
20 Q. And when did that list stop being used?
21 A. They use the list or don't use the list.
22    They use the list sometimes. Sometimes they
23    don't use a list. They call -- the
24    supervisors call who they want to call to do

Page 88

1     the job. And most of the time, a white male
2     is called.
3  Q. On average, would you say that you worked
4     overtime once a week? Once a month?
5  A. I would say -- I cannot recall if it's once a
6     week, once a month. I cannot recall that
7     right now.
8  Q. Can you ever ask and volunteer for overtime
9     work?
10 A. Sometimes.
11 Q. Did you ever ask for more overtime work?
12 A. I would not ask for more overtime work. When
13    there's overtime work and a white male get
14    the job and they do not call me, I will go to
15    the union. And the union will slap in the
16    face. "Oh, next time you'll have it. The
17    next time we will put you in to get
18    overtime."
19 Q. While you were working at the City of Boston,
20    did you get any overtime work?
21 A. I did get overtime work.
22 Q. The times that you asked for overtime work,
23    did they say no?
24 A. I did not ask for overtime work.

Page 89

1  Q. Do other minorities ever get overtime work?
2  A. The minorities hardly get any overtime work.
3     Always an excuse for minorities there.
4  Q. But minorities do get some overtime work?
5  A. Minorities do get some overtime.
6  Q. If you were to hire somebody for an auto
7     mechanic position, what kinds of things would
8     you look for?
9        MR. KENDALL: Objection.
10 A. I would not hire anybody because I have no
11    garage. And I'm working for a company, so I
12    have no authorization to hire anybody.
13 Q. When you were working for the City of Boston,
14    did you have any health insurance?
15 A. I did have health insurance.
16 Q. Who's your health insurance carrier?
17 A. I was with Harvard, Harvard Community --
18    Harvard Community Health Center. Harvard
19    Community Health Center, yes.
20 Q. And was that an HMO?
21 A. It was H -- yes.
22 Q. Did you have a primary care physician?
23 A. I had a primary care physician.
24 Q. And what was your doctor's name?

Page 90

1  A.  His name is Dr. Roy Roubin.  R-o-y,
2     R-o-u-b-i-n, Roubin.
3  Q.  Is he still your primary care physician?
4  A.  My insurance at City of Boston is all gone.
5     As of today, it's gone.
6  Q.  As of today.  Okay.  Do you have health
7     insurance at MassPort?
8  A.  I have health insurance at MassPort.
9  Q.  And who's your health insurance carrier
10    there?
11 A.  I have to go -- I'm under my wife coverage,
12    and I have to go to get -- I have to go get a
13    doctor.
14 Q.  Did you experience anything -- any physical
15    problems in January of 2000?
16 A.  2000 of when?
17 Q.  Sometime in January of 2000, did you ever
18    start feeling physically bad?
19 A.  2004, I was sick.
20 Q.  Okay.  In 2004, you were sick?
21 A.  Yes.
22 Q.  What was your sickness?
23 A.  I had a pain in my stomach.
24 Q.  And did you see your doctor?

Page 91

1  A.  I went to the doctor.
2  Q.  Dr. Roubin?
3  A.  I could not see Dr. Roy Roubin because
4     Harvard Community Health Center -- Harvard
5     Community, you have to make an appointment to
6     see your doctor.  Every time you call to see
7     your doctor, you cannot get him.  You see a
8     nurse practitioner.
9  Q.  So you saw a nurse --
10 A.  A nurse practitioner, yes.
11 Q.  Okay.  So you saw a nurse practitioner for
12    this pain?
13 A.  Yes.
14 Q.  When in 2004 did you feel this pain?
15 A.  I've been having this pain for a while, but
16    it gets worse.  It gets worse to me in
17    January.  It gets worse and worse.  Since
18    they put another white male to act as another
19    temporary position, it act up on me and get
20    worse.
21 Q.  When was the first time you started feeling
22    any pain?
23 A.  The first time I feel pain was in January of
24    2000 when I did not get a job.

Page 92

1  Q.  And this pain lasted through January 2004?
2  A.  The pain is still there.  I still have the
3     pain.
4  Q.  In January 2000, did you see a doctor?
5  A.  2000 of when?  Four?
6  Q.  No.  2000, when you started feeling that
7     pain.
8  A.  I have the pain.  I told the doctor about the
9     pain.
10 Q.  In January of 2000?
11 A.  In 2000.
12 Q.  Did you tell Dr. Roy Roubin about the pain?
13 A.  A regular physical.  And I told him it's
14    stress.  You know, he told me, "Don't think
15    about the job.  Don't think about it.  Just
16    keep working."
17 Q.  Did he prescribe any medication for you?
18 A.  He did not -- I cannot recall he prescribed
19    medication.
20 Q.  Did you ever see a doctor specifically for
21    that stomach pain?
22 A.  No, I don't -- there's a lady, a nurse
23    practitioner I saw in January.  I cannot
24    recall her name.

Page 93

1  Q.  So in January 2004 was the first time you
2     went to the nurse practitioner specifically
3     to see what's going on with your stomach?
4  A.  The side of my stomach, the pain was there
5     from since 2000.  And in 2004 when I did not
6     get the next position and it went to a white
7     male, it really hurt me with this pain.
8  Q.  And what did the nurse tell you in 2004?
9  A.  She told me what to do.  Just don't think
10    about the job and to relax and don't think
11    about the job and just forget about the job.
12    And walk and get a punching bag and punch a
13    bag and just keep it down.  And I did that,
14    but still -- the pain is still there.
15 Q.  Did they diagnose you with anything?
16 A.  She did not diagnose me.
17 Q.  Did she prescribe any medication?
18 A.  No, she did not prescribe any medication.  I
19    don't think she prescribed any medication.  I
20    don't recall if she prescribed any.
21 Q.  Did she refer you to a specialist?
22 A.  She told me just to go home and don't think
23    about the job, keep forgetting about the job,
24    what happened.

24 (Pages 90 to 93)

Page 94

1    Q.  Did you have any other problems associated
2        with this stress?
3    A.  I have no other -- I have allergies.  That's
4        all.  Except for the allergies, that's it.
5    Q.  Okay.  Now the allergies have --
6    A.  I have pain.  The pain is still there.
7    Q.  Okay.
8    A.  The pain is still there.  I talk about the
9        job.  From day one, talk about the job home.
10       I get up at night and talk about the job.  My
11       wife is getting pissed off at me about the
12       job.  I get headache.  I can hardly sleep.  I
13       eat.  But every day is about the job.  When I
14       reach at the job, my head is fumbled.  I
15       don't want to go to the job anymore.  I reach
16       there, I don't want to go there anymore.  I
17       go there because I have to pay my bills.  So
18       all this discrimination and racial going on
19       at the job, I don't want to go there no more.
20   Q.  After January of 2000 --
21   A.  2000 when?
22   Q.  2000.  Just 2000.
23   A.  2000.
24   Q.  Were you unable to get a good night's sleep?

Page 95

1    A.  I sleep.  But I get up in the night and I
2        talking about the job, constantly talking
3        about the job over and over to my wife.  I
4        bring the job home all the time from work
5        to...
6    Q.  Did you meet with any other doctors --
7    A.  I did not meet with no other doctors.
8        Temporary -- when I meet my new physician, I
9        will explain my pain in my stomach.
10   Q.  So even though you have this new job at
11       MassPort, you still have these pains?
12   A.  I still have these pains.
13   Q.  Do you still talk about the job at the City
14       of Boston?
15   A.  Sometime I talk about the job, about how I
16       not get a job.
17   Q.  Did you ever see a psychiatrist?
18   A.  I do see a psychologist.
19   Q.  A psychologist?
20   A.  Psychologist, I think that's the name of it,
21       yes.
22   Q.  And who do you see?
23   A.  Dr. Johnnie Hamilton Mason.
24   Q.  Is that a man or a woman?

Page 96

1    A.  That's a woman.
2    Q.  In your interrogatories, you claim damages of
3        approximately half a million dollars in
4        emotional distress, trauma, and mental
5        anguish.  Can you describe your emotional
6        distress.
7    A.  My emotional distress?  My pain in my
8        stomach, my headache.  I cannot sleep.  I
9        don't eat well.  I think about the job all
10       the time, over and over about the job.  And
11       it hurts inside.
12   Q.  And what about the --
13   A.  After --
14   Q.  Go ahead.
15   A.  After, you know, you have the knowledge --
16       you have the knowledge, you have the
17       education, you can read, and you did not get
18       the position, it hurts inside.  And it still
19       hurts here.
20   Q.  How about trauma?  Can you describe the
21       trauma?
22   A.  Can you explain that to me, please, the
23       trauma.
24   Q.  In your interrogatories you answered that you

Page 97

1        have trauma.  So I'm asking you what you mean
2        by that?
3    A.  That's all part of it too, yes.
4    Q.  And your mental anguish, is that all part of
5        it, too?
6    A.  Yes.  Mental, yes.
7    Q.  So you're currently seeing a psychologist?
8    A.  I currently see the psychologist.
9    Q.  And this is Dr. Johnnie --
10   A.  Dr. Johnnie Hammond Mason.
11   Q.  Are you sure she's a psychologist?
12   A.  She's a Ph.D.
13   Q.  What does she have her doctorate in?
14   A.  All I know, she's a Ph.D.
15   Q.  So you don't know if she's a psychologist?
16   A.  She's a Ph.D. of psychology.
17   Q.  You're sure she's a Ph.D. of psychology?
18   A.  That's the title.
19   Q.  Okay.  And how did you meet Johnnie Hammond
20       Mason?
21   A.  How did I meet Johnnie Hammond Mason?
22   Q.  Yes.
23   A.  I keep talking to my wife, and my wife say to
24       me, "Go see a psychologist."  And we ask

Page 98

1   different people where could we go to find
2   one. And I was -- I can't recall who was the
3   person. I was recommended to see her.
4   Q. So you don't know who referred you to her?
5   A. I cannot recall.
6   Q. How often do you meet with her?
7   A. I meet her once a month.
8   Q. Where do you meet with her?
9   A. South end of Washington Street. Washington
10   Street in the south end of Boston.
11   Q. What's her address?
12   A. Washington Street. I don't know the number.
13   Washington Street, South End, Boston, Mass.
14   Q. Does your health insurance cover her costs?
15   A. My health insurance cover the costs.
16   Q. Has she ever prescribed any medication for
17   you?
18   A. She don't prescribe no medication to me.
19   Q. Do you meet with her alone or in a group?
20   A. I meet her alone.
21   Q. When was the first time you met with her?
22   A. I met with Johnnie Hamilton Mason, I would
23   recall -- I'm not sure -- of 2001 or maybe
24   2002. I'm not sure. I cannot remember that.

Page 99

1   Q. And on average, you meet with her about once
2   a month?
3   A. Once a month.
4   Q. Do you still meet with her now?
5   A. I still meet with her now.
6   Q. How long are your appointments for?
7   A. Just an hour and a half, an hour.
8   Q. So you meet with her once a month for about
9   an hour, hour and a half each time?
10   A. Each time.
11   Q. And you just talk about your stress and so
12   forth?
13   A. I talk about my stress.
14   Q. Do you feel better after meeting with her?
15   A. Well, she told me to walk and keep -- she
16   told me to walk. Don't think about the job.
17   Just forget about the job. But I cannot help
18   it.
19   Q. I'm sorry. Did you say she's telling you to
20   walk or work?
21   A. She tell me to walk. W-a-l-k, walk.
22   Q. Okay. I'm just making sure. How many times
23   total do you think you've met with her?
24   A. I cannot recall now from 2001. I cannot

Page 100

1   recall how much time. Every Monday, I go see
2   her. So I've got to figure that out.
3   Q. Okay. Other than the time you met with
4   Dr. Roubin during your physical in 2000 and
5   the time you met with the nurse practitioner
6   in 2004 and the times that you met with
7   Dr. Hamilton Mason, have you met with any
8   other doctors regarding these issues that you
9   have?
10   A. I never meet no other doctors but the one I
11   recall.
12   Q. And do you know who Alfonso Francisco is?
13   A. Alfonso Francisco was an employee working for
14   the City of Boston.
15   Q. Is he a friend of yours?
16   A. Alfonso is a co-worker.
17   Q. Do you remember an incident in 1997 -- I
18   think it was in April -- involving Francisco
19   and Al Young?
20   A. I remember this incident.
21   Q. I'm going to show you this written statement
22   here. And I'm going to just ask you to read
23   through the three pages -- I believe it's
24   three pages -- very carefully and let me know

Page 101

1   and you're finished.
2   A. These three pages, right?
3   Q. Yes.
4   A. "Dear Mr. Diaz, thank you for" --
5   Q. You can read it to yourself. That's okay.
6   A. I'm sorry.
7   Q. Just read it to yourself and let me know when
8   you're finished.
9   A. (Witness reviews document)
10       MR. KENDALL: Counselor, may I take
11   a short break if you don't mind?
12       MR. FUKUDA: Sure.
13       MR. KENDALL: Thank you.
14       (Recess taken)
15       MR. FUKUDA: Can we just mark this
16   as Exhibit 1.
17       (Document marked as Diaz
18       Exhibit 1 for identification)
19   BY MR. FUKUDA:
20   Q. Now, Mr. Diaz, have you had a chance to read
21   Exhibit 1 carefully?
22   A. I read this, yes.
23   Q. After reading it, would you say that that's
24   an accurate statement of what happened in

Page 102

1    April of 1997 between Al Young and Alfonso
2    Francisco?
3    A. I heard the yelling and screaming in the
4      garage.
5    Q. Right.
6    A. I did not hear -- I did not hear the "N" word
7      called because if somebody was -- the shop is
8      a big shop. And if someone was to call you
9      the "N" word, everybody will hear it. He
10     must have said it to himself easy, slowly to
11     himself. I did not hear the "N" word called.
12   Q. Just looking at the exhibit here after you've
13     read through it, would you say that that's an
14     accurate description of what happened?
15   A. I cannot answer that question because I did
16     not hear no "N" word called.
17   Q. Okay. I'm not asking about --
18   A. It happened.
19   Q. Okay. And this characterization that's in
20     Exhibit 1 is accurate?
21        MR. KENDALL: Objection.
22   Q. Would you say that it's accurate?
23   A. I won't say that's accurate.
24   Q. Okay. Do you remember reading this fax cover

Page 103

1      page at some point, the first page of Exhibit
2      1?
3    A. This page here?
4    Q. Yes.
5    A. If I recall that?
6    Q. Do you recall reading that?
7    A. I read it now.
8    Q. Do you recall reading that back in --
9    A. I cannot remember now.
10   Q. Did you ever speak with Attorney Fabiano and
11     tell him that the two pages underneath
12     Exhibit 1 were inaccurate?
13   A. I speak to -- I don't know the guy's name. I
14     speak to a guy. That's some years ago. I
15     did not know the guy's name. The guy called
16     me on the phone. I talk to guy. I think I
17     give him a statement.
18   Q. Okay. I have a few follow-up questions I
19     just wanted to ask you about. I think I
20     forgot to ask you whether or not -- or I'm
21     sorry -- why you left -- or why you decided
22     to leave U-Haul Somerville?
23   A. Why I left U-Haul Somerville?
24   Q. Yes.

Page 104

1    A. I came to this country to be valued and to
2      move up, to progress myself. So I found a
3      job which, you know, I feel more comfortable
4      working in. And I have insurance. All the
5      places I work for, you have to pay for your
6      own insurance. And the City of Boston at the
7      time was very cheap.
8    Q. Okay.
9    A. And it was a good job.
10   Q. Right. Okay. And you had mentioned you have
11     a 26-year-old daughter. Were you previously
12     married?
13   A. I was married before.
14   Q. Okay. What was your first wife's name?
15   A. My first wife name was Herminia,
16     H-e-r-m-i-n-i-a, Huggins, H-u-g-g-i-n-s,
17     Diaz, hyphen.
18   Q. And is she the mother of your 26-year-old
19     daughter?
20   A. She's the mother of my 26-year-old daughter.
21   Q. Were you divorced?
22   A. I was divorced.
23   Q. And does Herminia Huggins-Diaz still live in
24     the Boston area?

Page 105

1    A. She's not in Boston area.
2    Q. Where does she live?
3    A. I don't know.
4    Q. When did you get divorced?
5    A. I don't remember. Maybe 1995, '96. It's
6      quite a while.
7    Q. You had mentioned that back when you were in
8      Trinidad, you took a night course to get
9      certified in auto mechanics. You also
10     mentioned that some kind of a test was given.
11     Was that one large test at the end of the
12     course, or how did that work?
13   A. One large -- one large test at the end of
14     each year. You get -- you know.
15   Q. Like a final exam for each year?
16   A. Yes, like a -- yes.
17   Q. And what kind of things did they ask you to
18     do in these tests? Did they --
19   A. The questions in the test was theory.
20     Theory.
21   Q. Okay. Theory?
22   A. Theory, yes.
23   Q. Was there any practical application part of
24     the test?

27 (Pages 102 to 105)

Page 106

1  A. Excuse me?
2  Q. Was there any part of the test where they ask
3     you to apply the theory and your knowledge to
4     actually fixing something in a car?
5  A. It's about theory, written, yes.
6  Q. So essentially it was all written?
7  A. Written.
8  Q. And did they pass -- was it a pass/fail type
9     of test, or was it graded?
10 A. I think it was pass grade. I don't recall
11    now. That was 40-something years ago. I
12    don't know. I don't remember.
13 Q. Earlier, you mentioned a list of foremen who
14    apparently, to your knowledge, did not
15    interview to get the positions. Do you know
16    if those positions were posted positions?
17 A. I don't recall that. I don't recall that
18    position -- I don't recall that.
19 Q. The positions that you applied for in 1999
20    and 2001, were those posted?
21 A. The position in 1999 was posted.
22 Q. Okay. And was the position in 2001 posted?
23 A. The position in 2001 was posted.
24 Q. Do you know if they were internal postings

Page 107

1     only?
2  A. I don't know.
3  Q. Okay. And getting back to the overtime, I'm
4     just trying to quantify how much overtime you
5     got. And I understand that you don't
6     remember the exact amount of times you worked
7     overtime for the City. But I'm just trying
8     to get an idea of how much overtime you
9     received in comparison to other people.
10    Would you be able to kind of be a little more
11    specific about that?
12 A. I was specific about it. Only in the snow,
13    overtime. When there is a snow emergency,
14    everybody have to be there. When it's like a
15    regular overtime, like a parade, they would
16    call the white male.
17 Q. Were you ever asked, ever asked, to perform
18    overtime other than in a snow emergency?
19 A. Yes, I was -- I perform overtime.
20 Q. Other than when it was a snow emergency?
21 A. Yes, I did perform.
22 Q. Were you ever asked to do overtime and said
23    to them, "No, I can't do that today; I have
24    some conflict"?

Page 108

1  A. A couple of time I would say I have -- you
2     know, I would have something with my wife to
3     do. But if it's a snow emergency, I cannot
4     refuse it. I have to stay and work.
5  Q. Right. When it was not a snow emergency --
6  A. Sometime I may say, "Look, I have something
7     very important to do."
8  Q. Okay. Prior to 1999 and 2000, have you had
9     any other medical conditions or issues?
10 A. I have no medical -- no medical condition.
11 Q. Have you ever had surgery?
12 A. Never had -- I cannot recall I had surgery.
13    I don't remember having surgery.
14 Q. Did you ever break any bones as a child or
15    anything like that?
16 A. I never break no bones as a child.
17 Q. Did you ever break any bones as an adult?
18 A. Honest to God, I have never -- I don't recall
19    breaking any bone. I told you before, I
20    have -- I'm 61 years old. And the only
21    problem I have now is my pain, my pain and my
22    stomach hurting me and my allergies. And I
23    see my doctor every year. The pain is still
24    there with me.

Page 109

1  Q. Do you have high blood pressure?
2  A. I don't have high blood pressure.
3  Q. When did you decide to leave the City of
4     Boston?
5  A. When I decide to leave the City of Boston?
6  Q. Yes.
7  A. I've been trying to leave the City of Boston
8     from ever since I was retaliated. I couldn't
9     take it no more. I decided to get out of
10    that place.
11 Q. And what year was that, again?
12 A. I would say it really hurt me in 2000 when
13    the white male got a job. And it really hurt
14    me and the pain and suffering in 2001 when
15    they put Paul Musto to act as foreman that
16    came under me. It really hurts. And in the
17    past few months, my time spent here, they put
18    another white male to act -- a young white
19    male came after me to acting position,
20    temporary working position. The blacks have
21    no chance in the City of Boston.
22 Q. So is it fair to say that you decided to
23    leave the City of Boston sometime in 2000 and
24    2001?

28 (Pages 106 to 109)

Page 110

1  A. I've been seeing what's going on after that
2     1999 incident and the guy got a job in 2000.
3     I say, "Well, I will give it a shot again."
4     And I did give it a shot. And after giving
5     it a shot, I did not get a job. And it
6     really hurt. And I said, "It's time to get
7     out of there."
8          And a few months back, I was at the
9     shop. And it was posted, a temporary
10    position was posted to a white male. They
11    don't give no black male no acting position.
12    They give white male the acting position.
13    And when the job come, the white male have
14    the job.
15  Q. So between 2000, 2001 when you kind of in
16    your mind said, "I'm out of here; I'm not
17    working at the City anymore" and now -- well,
18    prior to your starting at MassPort, did you
19    apply to any other positions outside of the
20    City of Boston?
21  A. I was looking for a position, but it's not as
22    good as what I'm doing now.
23  Q. And what do you mean by that?
24  A. It's a better -- it's a better place to work.

Page 111

1     It's more money. And everything goes --
2     everything goes by -- it's a good union. It
3     goes by seniority.
4  Q. Now, did you apply to any positions between
5     the time you decided you wanted to leave in
6     2004?
7  A. I did not apply for no position. I was
8     looking for position, which I think would be
9     like a MassPort or the telephone company or
10    Boston Gas. I mean, you know, I don't want
11    to work no jobs fixing at garage. I'm
12    looking to move up the ladder. I came to
13    this country to move up. I'm not going to go
14    down.
15  Q. Prior to working for the City of Boston, did
16    you ever feel like you were ever being
17    racially discriminated against at any other
18    time?
19  A. If they did, I don't recall and -- if they
20    did, I don't recall.
21  Q. So you never felt --
22  A. Because the outside world and the garages I
23    work for is all piecework. And what you make
24    is what you get. And, yes, there will be

Page 112

1     discrimination. They'll give the white male
2     again better jobs than the black male.
3  Q. I'm sorry. Could you say that again.
4  A. In the outside world like for an automotive
5     dealership, there will be piecework. And
6     most of the time, the white male will
7     sometime get a better job than the black
8     male.
9  Q. So you're saying you have felt some sort of
10    discrimination in the past?
11  A. Yes. If you're living in the United States,
12    there's discrimination.
13  Q. Can I ask this question -- and please don't
14    take any offense of it. I have to ask this
15    question to everybody that I depose. But I
16    was wondering, have you ever been convicted
17    of a crime of misdemeanor in the past five
18    years?
19  A. Never. Never, no crime.
20  Q. And you've never been convicted of a felony
21    in the last ten years?
22  A. No.
23        MR. FUKUDA: I'm just going to step
24    out with Tracey right now, and we'll be back

Page 113

1     in a few minutes.
2          (Recess taken)
3          MR. FUKUDA: Okay. I just want to
4     put -- I have no more questions. I just want
5     to put on the record that Mr. Diaz was
6     unresponsive regarding the questions
7     concerning the specific mechanical questions
8     that I had asked earlier. I think that's it.
9     Do you have any questions?
10         MR. KENDALL: No, sir. Thank you.
11         MR. FUKUDA: Thank you.
12         (Whereupon, the deposition was
13         concluded at 12:50 p.m.)
14
15
16
17
18
19
20
21
22
23
24

29 (Pages 110 to 113)

Page 114

```
1    COMMONWEALTH OF MASSACHUSETTS)
2    SUFFOLK, SS.              )
3         I, Lisa Abdo, Certified Shorthand
4    Reporter and Notary Public in and for the
5    Commonwealth of Massachusetts, do certify
6    that pursuant to appropriate notice of taking
7    deposition, there came before me the subject
8    deponent, who was by me duly sworn; that said
9    deponent was thereupon examined under oath
10   and said examination reduced to writing by
11   me; and that the deposition is a true record
12   of the testimony given by the deponent.
13        I further certify that I am not a
14   relative or employee of or counsel or
15   attorney for any of the parties, or a
16   relative or employee of such counsel or
17   attorney, nor am I financially or otherwise
18   interested in the outcome of the action.
19        Witness my hand and official seal at
20   Boston, Massachusetts, this 18th day of May,
21   2004.
22        _____
23        Notary Public
24        My commission expires:  12/11/09
```

30 (Page 114)

Page 1

VOLUME:     I
PAGES:      1-109
EXHIBITS:   1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
05-10154-NG

\* \* \* \* \* \* \* \* \* \* \*
                                        \*
RODERICK DIAZ,                     \*
        Plaintiff,        \*
                                          \*
vs.                               \*
                                          \*
DAVID HIGGINS, ET AL,             \*
        Defendant.        \*
                                        \*
\* \* \* \* \* \* \* \* \* \* \*

DEPOSITION OF RODERICK DIAZ, taken on
behalf of the Defendant, pursuant to the
Massachusetts Rules of Civil Procedure, before
Melinda M. Piccirilli, Certified Shorthand
Reporter and Notary Public within and for the
Commonwealth of Massachusetts, at the City of
Boston Law Department, City Hall, Boston,
Massachusetts, on Wednesday, November 22, 2006,
commencing at 2:10 p.m.

Page 2

```
 1         A P P E A R A N C E S
 2   Winston Kendall, Esquire
     Law Offices of Winston Kendall
 3   136 Warren Street
     Roxbury, MA  02119
 4   For the Plaintiff
 5
     Kate Cook, Esquire
 6   Nicole Murati Ferrer, Esquire
     City of Boston Law Department
 7   City Hall, Room 615
     Boston, MA  02201
 8   For the Defendant
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 4

```
 1           P R O C E E D I N G S
 2        MS. COOK:  Do you want to do the
 3   usual stipulations?
 4        MR. KENDALL:  Yes.  All objections,
 5   except as to the form of the question, will
 6   be reserved until the time of trial.
 7        MS. COOK:  Sounds good.  And then do
 8   you want your client to have 30 days to read
 9   and sign?
10        MR. KENDALL:  No.  We'll waive
11   reading and signing.
12              *****
13        RODERICK DIAZ, a witness
14   called by counsel for the Defendant, having
15   been satisfactorily identified by the
16   production of his driver's license and
17   having been duly sworn, testified as
18   follows:
19         EXAMINATION BY MS. COOK
20   Q. Good afternoon, Mr. Diaz.
21   A. Good afternoon.
22   Q. As I said earlier, my name is Kate Cook.
23     And I know you had your deposition taken
24     before in this case, so I think you already
```

Page 3

```
 1            I N D E X
 2
     DEPONENT                    PAGE
 3   RODERICK DIAZ
 4   Examination by Ms. Cook        4
 5
 6
 7
           E X H I B I T S
 8
 9   NO.     DESCRIPTION        PAGE
10   1    Answers to Interrogatories   83
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 5

```
 1   know what we're here to do and how it works.
 2        I would just ask that you remember
 3   when I ask you a question to let me finish
 4   so she can take down your answer, we'll
 5   speak one at time, and to give verbal
 6   responses.
 7        Other than that, if you need to take
 8   a break or you want to confer with your
 9   attorney, that's just fine.  I just ask that
10   if I have a question on the table you answer
11   it first and then we can take a break.
12   A. Okay.
13   Q. But I don't think we'll be here very long.
14        Where do you currently live?
15   A. Boston.
16   Q. What's your residential address?
17   A. 329 Lagrange Street, West Roxbury.
18   Q. How long have you lived there?
19   A. I've lived there for five years.
20   Q. Who do you live there with?
21   A. I live there with my wife.
22   Q. What's her name?
23   A. Robin McCullum Diaz.
24   Q. Do you have any children with her?
```

2  (Pages 2 to 5)

Page 6

1  A. We have no children. I have a daughter. My
2     wife have a stepdaughter. I have a child in
3     the first marriage before.
4  Q. That's Samiya Diaz?
5  A. No. Samiya, S-A-M-I-Y-A. It's pronounced
6     Samiya.
7  Q. Where do you currently work?
8  A. I currently work for Massport Authority.
9  Q. What's your title there?
10 A. My title is HMER, heavy motor equipment
11    repairman.
12 Q. I only want to go though this a little bit,
13    because I think you've already been deposed
14    on this matter when there was a case before
15    the MCAD, the Massachusetts Commission
16    Against Discrimination, so I don't want to
17    ask everything all over again. But I just
18    want to review a few things.
19        What's the highest level of school
20    that you attended?
21 A. I went to school in Trinidad in Sebago, and
22    I reached seventh standard, which is
23    different from America, because it goes by
24    first standard, second standard. I reach

Page 7

1     seventh standard at age 16 and a half years,
2     something like that.
3  Q. After you completed seventh standard, did
4     you go to more school?
5  A. No. That's it. You graduate from there.
6  Q. After completing seventh standard, did you
7     go through any training where you received
8     any certificates?
9  A. I went to night classes, night school,
10    different courses and things to learn theory
11    and mechanics. Theory, T-H-E-O-R-Y. I
12    can't pronounce my T-H's. That's why I'm
13    saying it like that.
14 Q. That's fine.
15        Other than auto mechanics, did you
16    study anything else in these night classes?
17 A. I did not study. Just regular general
18    knowledge, geography, history, you know.
19 Q. Did you get a certificate or diploma from
20    your night school?
21 A. Yes, we get a diploma from that.
22 Q. What is it in? Is it in a particular
23    subject area?
24 A. It just say you graduate from these courses,

Page 8

1     all these courses you take.
2  Q. How many years did you do that night school?
3  A. Maybe about two years, around two years, I
4     would say.
5  Q. Did you get any special licenses or
6     anything?
7  A. No special licenses.
8  Q. After you completed the two-year program,
9     what did you do?
10 A. After I went to learn mechanic, auto
11    mechanic.
12 Q. Was that on any particular kind of cars or
13    just in general?
14 A. Cars in whole, cars, English cars, cars from
15    England.
16 Q. What brought you to the United States?
17 A. I came to United States to fill my ambition
18    to get more improvement here and you can
19    better yourself here.
20 Q. Have you found it to be doable? Have you
21    been able to better yourself here in the
22    United States?
23 A. Yes, ma'am.
24 Q. In what ways?

Page 9

1  A. Well, in Trinidad -- it's more money in
2     America and I wouldn't have be able to do
3     the things that I do in America here than in
4     Trinidad at the time, like buy a car. I own
5     a car here and I probably -- I don't know if
6     I would have owned a car in Trinidad. It
7     depends if I was living there still. I
8     don't know. Here is more opportunity here.
9     You can learn more things here in America,
10    what you want to.
11 Q. What year was it you moved to the United
12    States?
13 A. 1969.
14 Q. What was your first job here in 1969?
15 A. My first job here was in East Milton Square.
16 Q. Were you working in auto mechanics?
17 A. Auto mechanic.
18 Q. How long did you work there?
19 A. I work there for about five months, six
20    months.
21 Q. Then where was your next job?
22 A. My next job was 614 Beacon Street, Newton
23    Centre.
24 Q. What was the name of the --

3  (Pages 6 to 9)

Page 10

1  A. Volvo Village, Newton Centre, Massachusetts.
2  Q. You worked on Volvos for many years, right?
3  A. For many years.
4  Q. Do you own a Volvo?
5  A. I own a Volvo.
6  Q. In fact you worked at various Volvo places
7     until you came to the City of Boston; is
8     that right?
9  A. Yes.
10 Q. I guess you worked briefly for U-Haul?
11 A. Yes, I work U-Haul.
12 Q. For any of these jobs at Volvo Village,
13    South Shore Volvo, Lee Volvo, or Boston
14    Volvo, were you ever a supervisor?
15 A. No supervisor.
16 Q. At those jobs, at Volvo Village, South Shore
17    Volvo, Lee Volvo, and Boston Volvo, what was
18    your duties?
19 A. Auto mechanic, repairing Volvos, engine,
20    transmission, tune-ups, brakes, front end.
21 Q. Was it different what you did at Volvo
22    Village versus South Shore Volvo?
23 A. Same Volvo, same thing.
24 Q. And the same thing at Lee Volvo?

Page 11

1  A. Yes.
2  Q. The same thing at Boston Volvo?
3  A. Boston Volvo.
4  Q. When you applied for the job at Volvo
5     Village, what was the process for getting
6     the job?
7  A. What was the process? A friend of mine help
8     me get a job there. He said there was a
9     vacancy there, and I went there and they
10    interview me and I got the job.
11 Q. What kind of interview was it; was it one
12    person?
13 A. I recall it was one person.
14 Q. What kinds of questions did he or she ask
15    you?
16 A. He ask me about my past and my mechanic work
17    and been work on cars, automotive.
18 Q. Were there any written questions?
19 A. No written questions.
20 Q. How about at South Shore Volvo, what was the
21    process for getting that job?
22 A. The process at South Shore Volvo is the same
23    process because the guy who hire me in 1969
24    at Volvo Village, he went to South Shore

Page 12

1     Volvo and they were looking for a mechanic
2     and he called me and I went down there and
3     got the job.
4  Q. At Volvo Village did you ever apply for a
5     supervisory position?
6  A. No. I'll tell you why too.
7  Q. Okay.
8  A. This might be different for you. When
9     you're auto mechanic in this country, when
10    you're auto mechanic in America, we work
11    piece work. In other words, we work flat
12    rate.
13       That's where the money is. So nobody
14    want to be no supervisor really because you
15    make more than the supervisor because you do
16    flat-rate work and all -- most of the
17    mechanics that's what you do.
18       The supervisors is -- wasn't -- in
19    other words, we make a lot of money. My way
20    of saying it is I figure I want to be a
21    mechanic so I can make the money.
22 Q. So you never applied for a supervisor
23    position at any of the Volvo --
24 A. Never apply, no.

Page 13

1  Q. Because you could make more money as a
2     mechanic?
3  A. Yes.
4  Q. At Lee Volvo, what was the process for
5     getting that job?
6  A. For getting that job, I heard they want the
7     mechanic there and I applied for the job and
8     I got it.
9  Q. Was there an interview also?
10 A. Yes, he asked me questions.
11 Q. What kind of questions would they ask you?
12 A. About mechanic work, different things on
13    cars and what you can do on cars, on Volvos.
14 Q. Did they actually have you do something on a
15    car physically?
16 A. No. Because you might be on a three-month
17    probation or whatever. But in the time of
18    -- that was years ago. When you working for
19    Vovlo Village or, say, like a Cadillac
20    dealership, when you go for the job, then
21    the word is around, he came from a Cadillac
22    dealership, so they won't give you no test
23    or whatever, go ahead and do the job.
24 Q. When you say "three-month probation" --

4 (Pages 10 to 13)

## Page 14

1  A. They probably -- some places might be a
2    three months to see what you knows about a
3    car. But once you in the business and you
4    work for Volvo, they know you been there for
5    a while so they...
6  Q. At Boston Volvo, that's the last Volvo
7    dealership you worked at?
8  A. Yes.
9  Q. Do you remember what your salary was?
10 A. I don't recall. I don't remember my salary.
11 Q. You worked there until, is it 1986 when you
12   started working for the City of Boston?
13 A. '86.
14 Q. What made you decide to leave Boston Volvo?
15 A. Because it was better benefits in the City
16   of Boston. I probably could retire and get
17   a pension at the City, better benefits.
18   Medical and everything was better than the
19   dealership.
20 Q. Was the salary as good?
21 A. The salary was smaller but I was thinking
22   about the benefits for my future.
23 Q. At the time in 1986 were you married?
24 A. I was married in 1986. I was married at the

## Page 15

1    time.
2  Q. When you started working for the City of
3    Boston, what was your title in 1986?
4  A. My title was MER, motor equipment repairman.
5  Q. Tell me what that means.
6  A. That's the auto mechanic. In other words,
7    they have heavy and they have light. HMER
8    is heavy motor equipment repairman. When I
9    just started I was an MER, a motor equipment
10   repairman, repairing the trucks as usual.
11       And I think after six months or a
12   year -- I'm not sure -- you became a heavy.
13   I don't remember now. That's quite a while.
14 Q. Did you have a preference to work in the
15   heavy shop versus the light shop?
16 A. I prefer the heavy shop.
17 Q. Why?
18 A. Something different to learn about trucks.
19 Q. Do something different than the Volvos?
20 A. Yes.
21 Q. While you were working, you said after six
22   months you went from an MER to an HMER?
23 A. That was the policy then. I'm not sure.
24   But I start as MER, motor equipment

## Page 16

1    repairman. Then I move up to heavy
2    equipment repairman.
3  Q. Was that a promotion?
4  A. Yes, more money.
5  Q. That was approximately six months after you
6    started?
7  A. Probably around six months. I don't recall.
8  Q. Once you were promoted and you got a higher
9    salary doing the HMER position, what would
10   you do on a typical day? What time did you
11   arrive at work?
12 A. Seven o'clock.
13 Q. When did you stop working?
14 A. 3:30.
15 Q. When you got there at seven o'clock, walk me
16   through a day at work back when you were an
17   HMER.
18 A. I'll sign in, go to my sign-in reel and I
19   wait for a job. When I get a job, do the
20   work.
21 Q. How many HMER employees were there at that
22   time?
23 A. I can't recall exactly but it was maybe
24   about twelve mechanics at the time.

## Page 17

1  Q. How many out of those twelve mechanics were
2    people of color?
3  A. About four people of color maybe, three to
4    four people of color.
5  Q. You said you'd get an assignment. Would it
6    be just for you to work on one vehicle?
7  A. Yes, one vehicle.
8  Q. How long would that usually take, all day?
9  A. Depends on the job, what the job is. Could
10   be a brake job, could be a tune-up, could be
11   a front end, could be anything.
12 Q. Did you like the work?
13 A. I love my job.
14 Q. Was it very different than what you'd done
15   at Volvo?
16 A. Yes. It was heavier parts and everything,
17   heavy equipment.
18 Q. Is heavier equipment more complicated than
19   light equipment?
20 A. It's just heavier. It's heavier.
21 Q. Does that mean bigger?
22 A. Bigger stuff to lift up, but you get help.
23   If you want help you get help to lift
24   everything.

5 (Pages 14 to 17)

Page 18

1  Q. When you would get an assignment, was it
2    ever you and two other employees?
3  A. Sometimes they give you two guys on the job.
4    Depends on the job.
5  Q. Did you usually have a lunch break?
6  A. Lunch break.
7  Q. When would that be?
8  A. Eleven to 11:30.
9  Q. How would you describe the atmosphere there?
10   Did folks get along in the heavy shop?
11 A. Well, I just go to do my eight hours and I
12   did my job. That's it.
13 Q. Did you have any friend there that you --
14 A. I had friends there.
15 Q. Any friends there that you hung out with on
16   the weekends or after work?
17 A. No. Strictly business.
18 Q. Did you have any friends that worked there
19   before you came?
20 A. Yes.
21 Q. Who is that?
22 A. One guy name was Fitzroy Prescott and one
23   guy name was Stephen Coker.
24 Q. Is Fitzroy Prescott still there?

Page 19

1  A. Fitzroy Prescott is still there.
2  Q. How about the other guy?
3  A. Stephen Coker, he's no longer working the
4    City of Boston.
5  Q. Were they also in the heavy shop?
6  A. They was in the heavy shop.
7  Q. Other than being the heavy motor equipment
8    repair man, did you have any other titles
9    while you worked for the City of Boston?
10 A. No other title.
11 Q. Did you ever want to be in the light shop
12   after you had worked in the heavy shop for a
13   while?
14 A. I like the heavy shop.
15 Q. Did you like the people in the heavy shop
16   better too?
17 A. I just like my job. I just do my work and
18   that's it. I don't care -- I get along with
19   everybody, but I just mind my business and
20   do my job. I go there to work and that's
21   it, to make my eight hours.
22 Q. Do you have any certificates that you've
23   gotten since you've been in the United
24   States as an auto mechanic?

Page 20

1  A. Oh, yes.
2  Q. What are they?
3  A. Automotive, transmission, engines. It was
4    presented when I went for the interview.
5    Refrigeration. Just name it, I have it.
6  Q. Where did you get these certificates?
7  A. I get one certificate from Volvo. I used to
8    go to Volvo school in Seekonk, Mass., and I
9    went to school for Honda school in New
10   Jersey. And every time it changes -- every
11   time a new car come out and the different
12   changes, you have to learn about it. You
13   have to go to school to learn about it. And
14   same with the truck. The system, we used to
15   go to school, like a two days' course here
16   or they come and give the course there.
17 Q. They would do that at the City?
18 A. The City.
19 Q. Do you know basic automotive abbreviations?
20 A. Yes.
21 Q. Do you think employers can ask questions of
22   someone when he's applying for a job?
23 A. Yes.
24 Q. Can employers interview applicants for a

Page 21

1    job?
2  A. Yes.
3  Q. Let's talk about the foreman positions that
4    you're currently suing the City of Boston
5    because you didn't receive. First let's
6    start with the light shop foreman position
7    in 1999. Tell me about that application
8    process. I know it's been a long time.
9  A. I went up for the job.
10 Q. What did you have to do? Was there an
11   interview?
12 A. Interview and some questions.
13 Q. Who was at the interview?
14 A. The interview was Mr. Dave Higgins, Mr.
15   Robert Silvie, and Mr. Jerry Coughlin, and I
16   can't recall who else was there.
17 Q. Could there have been more people than just
18   Mr. Higgins, Mr. Silvie, and Mr. Coughlin?
19 A. I can't -- I don't know. I don't remember.
20 Q. What kinds of questions did they ask you?
21 A. In automotive.
22 Q. Anything not having to do with automotive
23   mechanics?
24 A. All is automotive. It's about automotive, I

6 (Pages 18 to 21)

Page 22

1    would say.
2    Q. Did they give you any written questions?
3    A. Yeah, it was -- I think it was written
4       questions, yes.
5    Q. Did they also ask you questions as well?
6    A. I think was -- all was written questions. I
7       think it was written question. Yes, written
8       questions.
9    Q. When you got these written questions, was it
10      just you alone in the room answering them,
11      or were you with the other applicants?
12   A. I'm not sure if all the applicants was
13      there, but I was in a room -- oh, one at a
14      time. That's what it was. I'm sorry. One
15      at a time.
16   Q. Do you remember what any of the questions
17      were?
18   A. It's quite a while. I don't know.
19   Q. Do you remember how many people applied for
20      that position?
21   A. I would say maybe five, six guys, maybe
22      more. I can't recall now.
23   Q. The questions that you were asked, the
24      written questions, were they all about

Page 23

1    mechanics?
2    A. Just about mechanics.
3    Q. Were they fair questions?
4       MR. KENDALL: Objection.
5    Q. You can answer.
6    A. It was fair questions. I would say it was
7       fair questions.
8    Q. Who got the position?
9    A. Mr. Moynahan.
10   Q. Tell me about him. Had he worked with you
11      in the heavy shop?
12   A. Mr. Moynahan came in from Boston
13      Transportation Department when we had just
14      merged, and Mr. Moynahan used to come there
15      when we were working overtime to learn about
16      the equipment, the heavy equipment. So we
17      used to show Mr. Moynahan how the heavy
18      equipment work.
19   Q. He used to come when there was overtime and
20      you had to show him --
21   A. Well, we was doing overtime at the City of
22      Boston for the winter overtime, and he was
23      -- they would send a couple guys to learn
24      about the equipment.

Page 24

1    Q. That's the only way you knew him?
2    A. That's the only way I knew Mr. Moynahan.
3    Q. Was he ever your boss?
4    A. He was not my -- he never my boss.
5    Q. Because you were in the heavy shop?
6    A. Yes.
7    Q. Do you know if the employees that were
8       supervised by Mr. Moynahan thought he was a
9       good supervisor?
10      MR. KENDALL: Objection.
11   A. I don't know.
12   Q. They didn't talk about it?
13   A. I don't know.
14   Q. Why do you think you didn't get that
15      position?
16   A. Because I'm black.
17   Q. Were there other people of color that
18      applied for that position?
19   A. No person of color apply for the position.
20   Q. Why do you think it's just because you're
21      black?
22   A. Because that's what I'm telling you, because
23      I'm black I did not get the position.
24   Q. After you didn't get the position, did you

Page 25

1    take any action to try to get it?
2    A. After I didn't get the position, I did by
3       the steps. I went to the union.
4    Q. What did they say?
5    A. The union, they went through the stages with
6       Mr. Casazo and -- they went through all the
7       stages.
8    Q. When you say you went to your union, did you
9       have your union attorney grieve it?
10   A. He grieve it. He grieve the job, yes.
11   Q. What was your union attorney's name?
12   A. The union attorney name was Attorney Cucuzo.
13   Q. Do you know how to spell that? I don't.
14      It's okay if you don't.
15   A. I cannot spell it. I don't know.
16   Q. How many times did you meet with him about
17      your grievance?
18   A. I must have meeted (sic) him about maybe
19      twice, I would say.
20   Q. Was there a hearing with the commissioner?
21   A. We had to go to arbitration. That's the
22      time...
23   Q. What happened in arbitration?
24   A. Well, I didn't get -- they turn it down or

7 (Pages 22 to 25)

Page 26

1    whatever. I didn't get it.
2    Q. When you say you didn't get it, you didn't
3      get the foreman position?
4    A. Yes.
5    Q. Do you think your union attorney did a good
6      job?
7         MR. KENDALL: Objection.
8    A. I don't know.
9    Q. Were you frustrated with him?
10   A. I did my best. I give him all the
11     information and he said what he have to
12     said. I cannot recall. I don't know.
13   Q. Did you have to testify at the arbitration?
14   A. I did have to testify, yes.
15   Q. What kinds of questions did they ask you?
16   A. I cannot recall the questions they ask me
17     now. There is -- the arbitrator, I cannot
18     recall the questions she asked me now.
19   Q. Was it Cathy Kelly?
20   A. No. The arbitrator was -- I forget the
21     arbitrator's name. I went in front of the
22     arbitrator.
23   Q. Was it around here in city hall in the sixth
24     floor?

Page 27

1    A. I'm quite sure it's up here somewhere. I
2      don't recall. I know it was at city hall.
3    Q. Did the arbitrator make a decision that day
4      or --
5    A. No, she did not made a decision that day.
6    Q. When did you find out about it?
7    A. I cannot recall but it took a while before I
8      got a reply. I don't know how long but it
9      wasn't that day.
10   Q. After the grievance process ended and the
11     arbitration decision, you still didn't get
12     the foreman position, did you do anything
13     else to try to get that light foreman
14     position?
15   A. After the foreman position and I went to
16     arbitration, I decide to get an attorney.
17   Q. Is that when you obtained --
18   A. No, that was not...
19   Q. Please don't tell me anything you ever told
20     either Mr. Kendall or any other attorney. I
21     just want to get dates.
22        So then you obtained an attorney?
23   A. I went and get an attorney.
24   Q. When was the first time that you got to fill

Page 28

1    in the position as acting foreman when
2      someone called in sick?
3    A. The first time I would recall -- I'm not
4      quite sure -- maybe '96, '97.
5    Q. Tell me how that happened.
6    A. Well, I was senior most qualified next in
7      line, and I was told to act as foreman.
8    Q. Who made that decision?
9    A. Mr. Al Young.
10   Q. Al Young, does he have a son that works for
11     DPW too?
12   A. Yes.
13   Q. I know the young Al Young but not his dad.
14        When Al Young came and told you that
15     you could be acting foreman, do you remember
16     what occasion it was?
17   A. When someone was sick.
18   Q. Do you remember who?
19   A. Teddy Meyers.
20   Q. How many days was Teddy Meyers out sick?
21   A. Sometimes two days, three days.
22   Q. You think this started in 1996?
23   A. Approximately 1996, around 1996.
24   Q. What was Al Young's position at the time?

Page 29

1    A. He was a general foreman.
2    Q. What was Teddy Meyers' position?
3    A. Teddy Meyers was a foreman.
4    Q. Did you say, okay, I'll do it?
5    A. I said, okay, I'll do it.
6    Q. What did you do when you were acting
7      foreman?
8    A. He will come down and tell me this is the
9      job that have to be done and this should be
10     the job to the mechanics.
11   Q. What were the responsibilities of the acting
12     foreman?
13   A. To make sure the job is done right, to give
14     out the work and make sure the job is done
15     right, the truck is being worked on.
16   Q. How many employees, when you were acting
17     foreman, did you assign work to?
18   A. I would say five to six.
19   Q. Did you enjoy it?
20   A. Yes, I enjoy it.
21   Q. Does a foreman make more money than an HMER?
22   A. Yes.
23   Q. And the job is different because they're
24     assigning work instead of doing the work?

8 (Pages 26 to 29)

**Page 30**

1  A. Well, you'll work too if -- you'll work.
2  Q. The foreman will also work on some of the
3    cars?
4  A. Yes, if he want to, but you're not supposed
5    to.
6  Q. He's not supposed to?
7  A. If he want to, he work on the cars -- I mean
8    on the trucks, if he want, to help assist
9    the mechanic.
10 Q. What, other than assigning work, are the
11   other responsibilities of a foreman or
12   acting foreman?
13 A. That's what I was doing there, giving out
14   the work and make sure the work is done
15   right.
16 Q. Let's say in the year of 1997, the whole
17   year, approximately how many days do you
18   think you filled the role of acting foreman?
19   Are we talking four days a month or --
20 A. For the whole year, I would say about maybe
21   a month off and on, like three days here,
22   four days here, that builds up, I would say.
23 Q. You mean 30 days over the course of a year?
24 A. I would say something like that. I don't

**Page 31**

1    recall now, but I mean, I was acting as
2    foreman more time.
3  Q. Out of the whole year, approximately you
4    think, plus or minus, 30 days you would work
5    as acting foreman?
6  A. I am not sure, but I have -- I cannot recall
7    how -- I cannot recall how many time. It's
8    a lot of times I've been there.
9  Q. Is there anyone else during, say, the year
10   1997 that Al Young, as far as you can
11   remember, would tell them that they were
12   acting foreman other than you?
13 A. I was the only one.
14 Q. How about in 1998, were you the only one
15   that was acting foreman if Ted Meyers was
16   sick?
17 A. Matter of fact, in the year 2000 of April,
18   I'm just giving April to May, I was kicked
19   out of the office.
20 Q. Right. I'm not there yet though. I was in
21   '98.
22 A. Okay.
23 Q. In 1998 were you the only one that Al Young
24   would tell should be acting foreman if Teddy

**Page 32**

1    Meyers was out sick?
2  A. Yes.
3  Q. The same with '99?
4  A. Yes.
5  Q. It wasn't until 2000 that they asked someone
6    else?
7  A. 2000.
8  Q. When you got to be acting foreman, did you
9    get paid more?
10 A. I did not get paid more.
11 Q. Because you didn't have that title yet?
12 A. Did not have the title.
13 Q. Do you think that in 1998, just like in '97
14   approximately -- I know we don't really know
15   -- but maybe there were approximately 30
16   days that you worked as acting foreman?
17 A. Probably around -- maybe around that.
18 Q. Was Teddy Meyers really sick?
19 A. I don't know his -- once you have a doctor
20   paper -- I cannot prove he was sick or
21   whatever. I don't know. He was out. I
22   don't know.
23 Q. The same with 1999, he was out approximately
24   30 days?

**Page 33**

1  A. I was there in the office acting as foreman,
2    filling in.
3  Q. I'm just trying to get a feel if it was the
4    same in '97, '98, and '99 about how much
5    time you were acting foreman when Teddy
6    Meyers was out sick.
7  A. Yes.
8  Q. It seems to you that it was the same all
9    three years?
10 A. Around the same, yes.
11 Q. What kind of authority did you have when you
12   were acting foreman?
13 A. There was no authority. It was an acting
14   position, and I just give out the jobs and
15   make sure the job is done right.
16 Q. What if someone acted out, could you
17   discipline them?
18 A. I cannot discipline them.
19 Q. If they didn't like the assignment you gave
20   them, could you give them a different task?
21 A. If I give them the job and they don't like
22   the job, they'll have to see Mr. Al Young.
23 Q. When Al Young would give you assignments to
24   give out, would he tell you, Rod, give this

Page 34

1    assignment to him?  You got to choose?
2    A. He just give out the job.
3    Q. So you could choose who to give the
4      assignments to?
5    A. Well, I could choose if I want to decided
6      because they're working in the shop, I know
7      who is faster than this and who know better
8      than this.
9    Q. So you got to make those decisions?
10   A. Yes.
11   Q. Did you get a lot of complaints?
12   A. No complaints.
13   Q. Did you get along with those guys?
14   A. I get along, just as, again, I doing my job.
15   Q. What made you decide to apply for the heavy
16     shop foreman in 2001?
17   A. I apply for the heavy shop foreman in '99
18     and I was turned down.
19   Q. I thought it was the light shop foreman in
20     '99?
21   A. Oh, yes.  I'm sorry.  '99 was light shop
22     foreman and I apply for the job, yes.
23   Q. In 2001 it was the heavy shop foreman?
24   A. I lost some years back.  I don't recall.

Page 35

1    Q. It is some years back.  Let me just
2      double-check my...
3          Either way, the 2001 foreman position
4      that you applied for, what made you decide
5      to apply again?
6    A. Because I think I was -- again, I was most
7      senior qualified and I should get the job.
8    Q. Earlier today you told me that in 2000 you
9      were kicked out of the foreman position.
10     Was it 2000 or 2001?
11   A. 2000.
12   Q. That was before you applied for the second
13     foreman position?
14   A. I was kicked out of the office in April, May
15     -- around April or May of 2000.
16   Q. Tell me about that.
17   A. Mr. Al Young tell me I can stay in the
18     office and act as foreman.  When I got an
19     attorney in the year 2000 and they knew I
20     got an attorney, and I was asking Mr. Al
21     Young, Can I go in the office and act as
22     foreman, I was kicked out of the office
23     then, like retaliating.  I was out of there.
24   Q. What I want you to do is just walk me

Page 36

1    through it, because I wasn't there.  What
2    exactly happened?  Did Al Young do it --
3    A. No.
4    Q. -- or someone else?  Where were you?  Who
5      was there?
6    A. I was in the office, sitting in the office,
7      and someone came by and said I be in charge
8      so you cannot be here.
9    Q. Was this a day that Teddy Meyers was out
10     sick?
11   A. Yes, he was out.
12   Q. You thought you were acting foreman?
13   A. I was acting foreman.
14   Q. And then someone came and told you that they
15     were acting foreman?
16   A. They were foreman.
17   Q. Who was it?
18   A. One gentleman by the name of Fitzroy
19     Prescott.
20   Q. Your friend?
21   A. Friend of mine, work friend, work associate.
22   Q. He came and told you that he was going to be
23     the foreman?
24   A. Yes.

Page 37

1    Q. Did he tell you you had to leave?
2    A. He said, Well, I be the foreman.  So what
3      that tell you, I have to leave.
4    Q. He did tell you that or --
5    A. He said, I'm the foreman here.
6    Q. That's what he said?
7    A. Yeah, I'm the foreman here.
8    Q. What did you say?
9    A. I said, Okay, and I walk out of the office.
10   Q. And then what?
11   A. That's it.  I went to my area.
12   Q. What made you think it had something to do
13     with you getting an attorney?
14   A. What made me feel like getting an attorney?
15   Q. No.  You told me earlier you thought they
16     kicked you out because you got an attorney.
17   A. Yes.
18   Q. And I'm asking you why.
19   A. Because that's -- they retaliate on me.
20   Q. Did anyone say to you, We know you have an
21     attorney; you've got to leave?
22   A. They did not say that, no.
23   Q. Did anyone tell you at all that they knew
24     you had an attorney?

10  (Pages 34 to 37)

## Page 38

1  A. They did not say that.
2  Q. Did you tell people at work that you had an
3     attorney?
4  A. I did not said anything to no one.
5  Q. How did you think they knew?
6  A. I have no idea.
7  Q. At that point had you filed a lawsuit?
8  A. Yes.
9  Q. That happened, you think, in April of 2000,
10    that you were kicked out of the shop?
11 A. April or May, somewhere that time.
12 Q. After that no one ever told you again that
13    you were acting foreman?
14 A. Yes.
15 Q. Did you ever tell anyone that you wanted to
16    be acting foreman again?
17 A. I did not mention anything to no one.
18 Q. You didn't talk to Al Young about it?
19 A. No, I did not say anything to him about it.
20 Q. Do you like Al Young? Was he a good boss?
21     MR. KENDALL: Objection. You may
22    answer.
23 A. I work with Al Young. That's it.
24 Q. But you never talked to him about how you

## Page 39

1     thought it was unfair that you were being
2     retaliated against?
3  A. I can't recall that. I can not recall that.
4  Q. Did you ever talk to Al Young about your
5     lawsuit?
6  A. No, I did not talk to Al Young about a
7     lawsuit.
8  Q. Did he ever try to talk to you about your
9     lawsuit?
10 A. People try to get into my business, but I
11    did not said anything.
12 Q. Did anyone at work ever approach you about
13    the fact that you weren't acting foreman any
14    longer?
15 A. I was harassed.
16 Q. Tell me about it.
17 A. People will say to me, Oh, you get kicked
18    out. I get kicked out.
19 Q. When you say you were harassed, who was
20    harassing you?
21 A. What I mean harasses is they say, Oh, Rod,
22    you get kicked out.
23 Q. Were they teasing you?
24 A. Well, I don't know if they was teasing me,

## Page 40

1     but they say, You got kicked out. What
2     could I say? Nothing.
3  Q. Were they telling you that they thought it
4     was unfair?
5  A. Oh, Rod, yeah, it's unfair. Rod, you get
6     kicked out.
7  Q. What did you say?
8  A. Nothing. What could I say? Nothing. I
9     keep to myself.
10 Q. What did Fitzroy Prescott say?
11 A. Nothing.
12 Q. Did he ever get to be permanent foreman?
13 A. He's a permanent foreman.
14 Q. After you were kicked out, you were still an
15    HMER?
16 A. Yes.
17 Q. So after that you were still doing the same
18    work?
19 A. Still doing the same work.
20 Q. And then in 2001 you applied for another
21    foreman position?
22 A. Yes.
23 Q. Tell me about that process.
24 A. I did not get the job.

## Page 41

1  Q. Tell me about the application process. Were
2     there written questions?
3  A. I'm quite sure this one is oral. This one I
4     don't recall. I'm quite sure it was oral.
5  Q. Who was there asking the oral questions?
6  A. Mr. Dave Higgins, Mr. Bob Silvie, Mr. Gerry
7     Coughlin, and Mr. Maurice Smith.
8  Q. What kinds of questions did they ask you?
9  A. Again, mechanic question.
10 Q. Were they the same questions that you had
11    been asked in '99?
12 A. I can't recall. Probably different
13    questions. I don't remember. I can't
14    recall.
15 Q. Did you think the questions were fair?
16     MR. KENDALL: Objection.
17 Q. You may answer.
18 A. I think it was fair.
19 Q. After that who got the position?
20 A. Mr. Paul Musto.
21 Q. Why do you think you didn't get the position
22    in 2001?
23 A. Because I'm black again. I'm black.
24 Q. For that position were there other people of

G&M Court Reporters
800-655-3663 - www.gmcourtreporters.com

Page 42

1  color applying?
2      MR. KENDALL: If you know.
3      MS. COOK: Obviously.
4  A. I cannot recall that. I can't recall.
5  Q. Do you how many people applied for the
6     position?
7  A. I can't recall how many guys apply for the
8     -- I think I was the only one of color apply
9     for the job.
10 Q. Do you know how many total?
11 A. No, I don't recall how many total.
12 Q. How did your work environment change after
13    you applied for that position and you didn't
14    get it?
15 A. I was depressed. I was sick, very sick; not
16    physically sick, mentally sick.
17 Q. Did anything change about the work
18    environment as far as the way that you were
19    treated by your boss?
20 A. I did my job but again, I was sick, very
21    sick, sick person.
22 Q. At that point did you grieve that position?
23 A. I did file a grievance again.
24 Q. Who was your union attorney for that matter?

Page 43

1  A. The union attorney I'm quite sure was -- I
2     think it was Mr. Cucuzo again.
3  Q. The same one?
4  A. Same one, yes.
5  Q. Do you think he did a good job for you?
6      MR. KENDALL: Objection.
7  A. I don't know. I just -- I don't know. I
8     guess he just -- I don't know.
9  Q. Was there an arbitration again?
10 A. To be honest to God, you want me to tell you
11    the truth?
12 Q. Yes, I do.
13 A. I will tell you the truth. I did not have
14    arbitration. They drag the feet and they
15    drag the feet and they drag the feet, and
16    when I went to the union, Oh, don't worry.
17    It will come up. And finally when we went
18    to the downtown to see about it, they said
19    it was too late. So I could not go in front
20    of the arbitrator.
21 Q. Was there even a hearing with Commissioner
22    Casazo?
23 A. No hearing. I'm quite sure there was no
24    hearing because there was no arbitration.

Page 44

1  They drag the feet. They drag the feet.
2  Every time I ask them when is the case, Oh,
3  not yet. Not yet. Not yet. Never had an
4  arbitration. The time was gone.
5  Q. Out of the other folks that you worked with
6     in HMER, was Paul Musto one of your
7     colleagues?
8  A. Paul Musto was there.
9  Q. Was he a good auto mechanic?
10 A. I would not comment on what kind of mechanic
11    Paul Musto was. I just concerned about
12    myself.
13 Q. Did you ever get an assignment with him
14    where the two of you were told to work on a
15    truck or --
16 A. Never.
17 Q. Did you ever watch his work?
18 A. Not really. Just do my job and that's it.
19 Q. Are you aware that you're suing not just the
20    City of Boston but David Higgins also?
21 A. Yes.
22 Q. Tell me about why you're suing David
23    Higgins.
24 A. Because Mr. David Higgins is a racist.

Page 45

1  Q. How do you know that?
2  A. Because he don't like black people.
3  Q. What makes you say that?
4  A. Because it's twice I went up for that
5     position and I was turned down.
6  Q. Has he ever said anything to you that's
7     racist?
8  A. Excuse me?
9  Q. Has Mr. Higgins ever said a racist comment
10    to you?
11 A. He never said no racist comment to me.
12 Q. Have you ever heard him say a racist comment
13    to someone else?
14 A. No.
15 Q. Has he ever said anything to you that would
16    make you that he thinks less of you because
17    you're a black person?
18 A. He did not mention anything about black
19    color, but I just know he was a racist.
20 Q. Tell me about that though. What makes you
21    know that?
22 A. Because he didn't give me the job.
23 Q. After you didn't get the position in 2001,
24    did you talk to Mr. Higgins about it?

12 (Pages 42 to 45)

Page 46

1  A. To be honest to God, Mr. Higgins was -- came
2     there and was saying, Hi. How is Rod today?
3     How is Rod today? And when I get an
4     attorney in 2000, Mr. Higgins could never
5     watch me in my face. He never said anything
6     to me no more.
7  **Q. So you're telling me, before you got an**
8     **attorney in 2000, he used to come in and ask**
9     **you how you were?**
10 A. How is Rod doing today? How is Rod doing
11    today?
12 **Q. So you thought he was nice?**
13       MR. KENDALL: Objection.
14 A. How was Rod doing today?
15 **Q. What would you say?**
16 A. I would say, Rod is doing fine.
17 **Q. Would you ask him how he's doing?**
18 A. I would say, How you doing, Mr. Higgins?
19    Fine too.
20 **Q. So it was polite?**
21 A. Yes.
22 **Q. And then in 2000 when you got an attorney,**
23    **you're saying he never asked you --**
24 A. He never said anything to me no more.

Page 47

1  **Q. When you got an attorney in 2000 and you**
2     **filed that first lawsuit, was it against Mr.**
3     **Higgins?**
4  A. It was City of Boston.
5  **Q. When did he first come to DPW?**
6  A. I recall -- I giving you a rough estimate,
7     Mr. Higgins came there in 1997, '98.
8  **Q. What was his title in '97, '98?**
9  A. He was a director of field maintenance.
10 **Q. Is that still his title?**
11 A. Still the title.
12 **Q. Other than when he used to ask you how you**
13    **were doing, what other conversations did you**
14    **have with him in the past?**
15 A. No other conversations.
16 **Q. Have you ever talked to him about work?**
17 A. Never talked to him about work.
18 **Q. Did you have a conversation with him after**
19    **the 2001 foreman decision was made and Paul**
20    **Musto was hired and you weren't --**
21 A. Yes.
22 **Q. About why you weren't hired?**
23 A. He came to me and say, Rod, what happened in
24    the past, I want you to know I'm not a

Page 48

1     racist. And I want you to know that you
2     have no communication skill and I want to
3     school you. And he said to me, I want you
4     to know you did not get that foreman
5     position. And I said -- I went in his
6     office. I said, Who got the foreman
7     position? And then he said to me, Paul
8     Musto. And when he said to me, Paul Musto,
9     I just leave the chair and I come
10    downstairs.
11 **Q. You went into his office after he came to**
12    **tell you you needed to be schooled?**
13 A. He came to me down -- I was told to go
14    upstairs to know who get the results of the
15    foreman position. That's when he told me I
16    have no communication skills and he want to
17    school me.
18 **Q. Was anyone else around when he said that?**
19 A. There was nobody around, wasn't there.
20 **Q. What did you think about that comment?**
21 A. He just said to me that I have no
22    communication skills and let me know, Oh,
23    you can't be a foreman. You don't know what
24    you're doing, something like that.

Page 49

1  **Q. Do you think you have good communication**
2     **skills?**
3  A. I have good -- very good communication
4     skills. I have good English skills. I came
5     from a foreign country and can speak good
6     English. Speak English in Trinidad.
7  **Q. Did you ask him what he meant by that?**
8  A. I did not ask him because I was mad and
9     angry and sick.
10 **Q. When you walked out of the room, did he try**
11    **to call after you?**
12 A. He did not call after me.
13 **Q. Have you ever talked to him again?**
14 A. He never said anything to me no more. He
15    stopped saying hi to me no more. He
16    couldn't even watch me in my face.
17 **Q. Did you still say hi to him?**
18 A. He did not say hi to me. I just pass by and
19    do my work.
20 **Q. Do you think that comment about you not**
21    **having good communication skills, did you**
22    **think that he was being a racist when he**
23    **said that?**
24 A. That was racist.

13 (Pages 46 to 49)

Page 50

1  Q. Why?
2  A. Because, again, he don't like no black
3     people.
4  Q. Why do you say that?
5  A. Because he didn't want to hire no blacks in
6     the office. He doesn't want to hire no
7     blacks there.
8  Q. Do you think the comment "you need to
9     improve your communication skills" is
10    racist?
11 A. He used the communication skills to say
12    that, oh, this guy won't make a -- he can't
13    speak English or he doesn't know what he's
14    doing. I take it like that, I don't have no
15    communication skill. That's the reason they
16    say, Oh, well, he won't be the foreman. He
17    can't be a foreman.
18 Q. I understand that that's how you interpreted
19    what he said, but I'm asking if you think
20    that comment in and of itself is racist?
21 A. It is racist.
22 Q. Can you tell me why?
23 A. Well, I would say it is racist because he
24    said it to make me feel like this guy don't

Page 51

1     have no communication -- he said it in a way
2     like that but he don't really mean it. He
3     mean it, he have no communication skill, but
4     again, he don't want no blacks in there.
5  Q. You think he was making an excuse?
6  A. Yes.
7  Q. After he said that comment to you, did you
8     do anything to improve your communication
9     skills?
10    MR. KENDALL: Objection.
11 A. I have good communication skill. He just
12    said so. I have good communication skill.
13 Q. You didn't go to any communication classes
14    or anything like that?
15 A. I hadn't to go to no communication classes.
16 Q. Is that a no?
17 A. I hadn't to -- no.
18 Q. What are the qualification that you think it
19    takes to be a good supervisor, just in
20    general, no matter where you're working?
21 A. To be -- to know the equipments and to get
22    along good with people.
23 Q. Anything else?
24 A. Get along good with people. You know, give

Page 52

1     out the work and get along good with people.
2  Q. What do you think is the skill set for a
3     foreman supervisor?
4  A. Excuse me?
5  Q. What skills does a foreman need in the heavy
6     shop to be a supervisor?
7  A. Just as a mechanic, you know your stuff, you
8     suppose to be give out -- do the job and
9     know what's wrong with the equipments and
10    that's it.
11 Q. Tell me about your Massport job. When did
12    you apply for it?
13 A. I apply for the Massport job in 2003.
14 Q. How did you get the job?
15 A. I apply for the Massport job in 2003. I
16    cannot recall what month. Maybe September,
17    August/September, and I did not get -- I
18    wasn't qual -- I did not get the job there.
19    And I went back in January and I get the
20    job.
21 Q. What was the job that you applied for in
22    2003 that you didn't get?
23 A. Massport job.
24 Q. But what was the title of the job?

Page 53

1  A. MER.
2  Q. Did you have an interview for that?
3  A. I had an interview for that.
4  Q. Was it with one person or many?
5  A. Many persons. I can recall the names too,
6     because I'm still there.
7  Q. How many people interviewed you?
8  A. I'll say it one by one. Mr. Clinton, Ms.
9     Sharon Williams, Hugh Pruitt, Herbert
10    Pruitt, and Mr. Domingo and Ms. Kathy
11    Felgram. About five people.
12 Q. Was that an interview with all five people
13    at once or individually?
14 A. One at a time will ask me questions.
15 Q. What kind of questions did they ask you?
16 A. They question -- the mechanic supervisor, he
17    ask me what mechanic work, and the other
18    people ask where did I work before and this
19    and that and why I want to come to Massport
20    and things like that.
21 Q. Do you know why you didn't get that
22    position?
23 A. I don't know why I didn't get the -- the
24    first position, I did not get it.

14  (Pages 50 to 53)

Page 54

1  Q. The position you applied for in 2004, was it
2     the same position, the MER also?
3  A. The first position was mechanic position,
4     MER, but it was like a lower grade, lower
5     standard. In other words, the step I
6     applied for would be less money. Someone
7     get it and they'll get less money than me.
8  Q. Then the position in 2004, what was the
9     title? .
10 A. MER.
11 Q. Did the same five people interview you?
12 A. Same five people interview me.
13 Q. Did they ask you the same questions?
14 A. I can't recall. Maybe different questions.
15    I don't recall but mechanic question was
16    probably...
17 Q. It was the same situation where you had all
18    five people in one room at one time?
19 A. Yes, one room, one time.
20 Q. You're still in the MER position?
21 A. Yes.
22 Q. What are your current responsibilities as
23    the MER for Massport?
24 A. Repair the trucks, cars.

Page 55

1  Q. Is it similar to the work you were doing for
2     the City of Boston?
3  A. No.
4  Q. Why not?
5  A. It's more equipment and the trucks. I got
6     cars, state trooper cars. I get vans. I
7     get lawn mowers. Name it, all equipments.
8  Q. How many people work with you? How many
9     MERs are there?
10 A. Eleven MER.
11 Q. Does everyone get along?
12 A. Everyone get along.
13 Q. Do you like it better than working at the
14    City of Boston?
15 A. I like my job. I like my job at Massport.
16    I like it better.
17 Q. When you left the City of Boston, what was
18    your salary back in 2004?
19 A. My salary was 856 a week plus $10 for tools
20    and $10 for CDL, so make it 876 a week.
21 Q. What was your salary when you started at
22    Massport in 2004?
23 A. My salary at Massport was about, I would say
24    offhand, $1,100 a week.

Page 56

1  Q. So you got a raise?
2  A. Yes.
3  Q. Are the benefits as good as they were at the
4     City of Boston?
5  A. The benefits are better.
6  Q. Who is your supervisor at Massport?
7  A. My supervisor is Herbert Pruitt.
8  Q. Since you've been at Massport, have you
9     applied for any promotions?
10 A. No promotion. I have not applied for no
11    promotions.
12 Q. Are you going to?
13 A. I don't know.
14 Q. Have there been any opportun --
15 A. There's no promotion there. There's no
16    promotion. Nobody leaves.
17 Q. If there was an opening, would you apply for
18    it?
19 A. If there was I would apply for it.
20 Q. Is that because there would be a raise?
21 A. More money.
22 Q. After you didn't get the foreman position in
23    1999, did you apply for any other jobs at
24    that point outside of the City of Boston?

Page 57

1  A. No, never. Didn't apply for no other job.
2  Q. How about after you didn't get the foreman
3     position in 2001, before the 2003 Massport
4     job did you apply for other positions?
5  A. I did not apply for no job, just stayed
6     here.
7  Q. Did you look?
8  A. I did not look.
9  Q. When you did decide that you wanted to leave
10    the City of Boston?
11 A. When I got sick, started getting sick. I
12    was getting sick of the place.
13 Q. When was that again?
14 A. After the time I didn't get the job in 2000
15    -- Martin Luther King's birthday was 2000 by
16    the time I start getting...
17 Q. You mean in 2000?
18 A. 2000.
19 Q. Around January 2000?
20 A. January 2000 I was getting sick.
21 Q. That's when you knew you wanted to leave?
22 A. I wanted to leave.
23 Q. But you didn't apply --
24 A. I did not apply for no job.

Page 58

1  Q. Why not?
2  A. Because -- I don't know. I did not apply
3     for no other job. I said let's see what's
4     going on in there. I'll probably apply
5     again for another job and see if I can get
6     it.
7  Q. You mean another promotion within the City?
8  A. Yes.
9  Q. When you say you were sick, did you take a
10    lot of sick days?
11 A. No.
12       MR. KENDALL: Objection.
13 Q. Did you take any sick days?
14 A. No sick days. I was mentally sick, sick of
15    the place.
16 Q. Tell me about when you would have your lunch
17    break, what would you do during lunch? Did
18    you go to your truck or did you eat -- was
19    there like a break area?
20 A. I'm not a truck guy. I bring my own food,
21    my lunch.
22 Q. Where would you eat?
23 A. In the garage in the lunchroom.
24 Q. Did everybody eat there?

Page 59

1  A. Yes, about.
2  Q. Did Paul Musto eat there?
3  A. Sometimes he would. Sometimes he'll stay in
4     his corner.
5  Q. Did Dave Higgins eat there?
6  A. No, he never eat there.
7  Q. But did most of the HMERs eat there?
8  A. Yes.
9  Q. Did people watch TV during lunch?
10 A. Just half an hour because half an hour for
11    lunch. That's it.
12 Q. Maybe read the paper?
13 A. Read the paper, whatever you -- that's it.
14 Q. What was on TV?
15       MR. KENDALL: Objection.
16 A. The news.
17 Q. During this time that you were sick, did you
18    ever tell any of your colleagues at work
19    that you were feeling mentally sick by the
20    work environment?
21 A. I just keep that to myself. I was
22    depressed, sick, keep it to myself.
23 Q. Did you ever come to work before seven
24    o'clock to hang out in the break area?

Page 60

1  A. I would get there early.
2  Q. What time?
3  A. I always early in the job. Maybe 15, 20
4     minutes before. Maybe half an hour before.
5  Q. What would you do during that half hour?
6  A. I would go to my area, sit down in my area
7     and wait for a job.
8  Q. Just by yourself?
9  A. Yeah. Couple -- one other guy might be
10    there, or two.
11 Q. Do people get together and have a cup of
12    coffee?
13 A. I would sit down and read the paper just
14    waiting for a job.
15 Q. Who would you sit with if anybody else sat
16    with you?
17 A. I can't recall now who was there. I can't
18    recall. Maybe Ellio Munoz.
19 Q. Do you know how to spell that?
20 A. E-L-L-I-O. He's Hispanic. M-U-N-O-Z,
21    Munoz.
22 Q. Is he still there?
23 A. No, he's not there no more.
24 Q. Anybody else that you would sit with in the

Page 61

1     morning?
2  A. No. I would stay by my -- I will be in my
3     area where my workbench will be, my work
4     area.
5  Q. At lunch did you have certain people you
6     usually ate with?
7  A. No. I would just eat there and people come
8     around. Couple of guys maybe around,
9     because my box was big enough so I eat on my
10    toolbox there.
11 Q. During lunch did people ever say racist
12    jokes?
13 A. I didn't hear any racist jokes.
14 Q. Did you hear any racist jokes ever while you
15    worked for the City of Boston?
16 A. I did not hear any racist joke.
17 Q. Did you ever hear any racist slurs or
18    comments?
19 A. No.
20 Q. Did anyone ever call you a racist name?
21 A. No, no one ever call me no racist name.
22 Q. Do you consider working at Massport higher
23    on the ladder than working at the City of
24    Boston?

16  (Pages 58 to 61)

Page 62

1  A. Yes.
2  Q. You mentioned that you started to feel
3     mentally sick around Dr. King's birthday in
4     2000, and at that point did you go see a
5     doctor?
6  A. I see my physician. I told my physician
7     what was going on.
8  Q. Who was that?
9  A. That was Dr. Roy Rubin.
10 Q. Was he your primary care physician?
11 A. It was my primary care physician.
12 Q. Is he still your PCP?
13 A. No, he's not.
14 Q. What years was Dr. Rubin your primary care
15    physician?
16 A. From 1986 to 2003.
17 Q. Pretty much the whole time you worked for
18    the City of Boston?
19 A. Yes.
20 Q. Where is Dr. Rubin's office?
21 A. His office is in Kenmore Square, Harvard
22    Community Health.
23 Q. That's where my primary care physician is.
24    You said you told Dr. Rubin that you

Page 63

1  were feeling sick. Was this at --
2  A. I go there once a year for my physical.
3     That's it.
4  Q. For your annual checkup?
5  A. Annual checkup.
6  Q. Do you remember what month that was in 2000?
7  A. I don't recall what month it was.
8  Q. What exactly did you tell Dr. Rubin you were
9     experiencing?
10 A. He examine me for my physical, and I tell
11    him about the job, I'm sick about the job.
12 Q. Did he give you a diagnosis?
13 A. No, he didn't give me no diagnosis.
14 Q. Did he refer you to --
15 A. I think he told me, Just don't worry about
16    the job, just keep on working, something
17    like that.
18 Q. At that point in January of 2000, had you
19    lost weight?
20 A. Yes, I did lose weight.
21 Q. You did?
22 A. Sure, I lose weight.
23 Q. You had a loss of appetite?
24 A. I wasn't eating right.

Page 64

1  Q. How much weight did you lose?
2  A. To be honest to God, I can tell you how much
3     my belt, I was making holes in my belt and
4     pants was falling down, coming down.
5  Q. Did you tell that to Dr. Rubin?
6  A. I mention it to Dr. Rubin.
7  Q. When other physical symptoms were you having
8     in January of 2000?
9  A. Just sick, mentally sick over the job and
10    sick inside.
11 Q. In 2000 were you having headaches?
12 A. Yes, I have headaches.
13 Q. Tell me about them. When would they happen?
14 A. When I think about the job, every time I
15    think about the job, I get a headache and I
16    get my stomach hurt. I wasn't eating right.
17    I wasn't sleeping right. I'm going home and
18    talking about the job to my wife,
19    aggravating her, getting pissed off --
20    getting mad at me.
21 Q. Does your wife cook for you?
22 A. My wife cook. I cook.
23 Q. Did she notice your loss of appetite?
24 A. She knows. She was sick too, because I'm

Page 65

1  sick and she get sick too. She sick of me
2  sick.
3  Q. Anything else? Were you having nightmares?
4  A. Yes, there were. I would sleep and I would
5     get up in the night, Oh, that job, that job.
6  Q. In the middle of the night?
7  A. Yes. And she would say, What happened? I
8     know -- it's still there.
9  Q. If you're thinking about it in your dreams,
10    what kind of dreams would you have?
11 A. I was thinking about how I was -- I did not
12    get the job and what was done to me, what
13    was said and done to me on the job.
14 Q. The comment about being schooled?
15 A. No. More than that.
16 Q. Tell me about it. What?
17 A. How would you like to know you're working in
18    the City of Boston and Mr. Moynahan will
19    come to me and say, You want to shake my
20    hands? I'll be the new foreman. I said,
21    The results didn't come out yet. How can
22    you be the new foreman? We didn't get the
23    results yet. And he said to me, You want to
24    shake my hands?

17  (Pages 62 to 65)

Page 66

1     And then he come at me twice, Where
2 is my grievance paper? Where is my
3 grievance paper? When he walk by, Where is
4 my grievance paper? How would you feel? I
5 was depressed. I was sick.
6 **Q. Were there any other people in 1999 that**
7   **grieved that position other than you?**
8 A. I don't know who grieve it. Yes, couple
9 people grieve it too, but I was more senior,
10 so they were probably working my case
11 before, attorney working one case for the
12 more senior qualified.
13 **Q. When Mr. Moynahan would say that to you, you**
14   **thought he was --**
15 A. Funny and racist also.
16 **Q. What was racist about it?**
17 A. Well, you figure, hey, they are no blacks in
18   there. That's what he had meant to.
19 **Q. At the 1999 or 2001 interviews that you had,**
20   **was anyone in that room that was asking**
21   **questions from the City of Boston a person**
22   **of color?**
23 A. Who applied for the job?
24 **Q. Yes, when you were interviewed?**

Page 67

1 A. I don't recall. I don't remember if anyone
2 of color was there, because I was the only
3 black in the heavy shop at the one time,
4 mechanic. Everybody was gone.
5 **Q. Now, were any of the questions anything that**
6   **would have to do with your race or**
7   **ethnicity?**
8 A. Excuse me?
9 **Q. Were any of the questions that were asked of**
10   **you in the interview about your race?**
11 A. No.
12 **Q. About your ethnicity?**
13 A. No.
14 **Q. So far you've told me that as far as the**
15   **mental sickness that you experienced**
16   **starting in January of 2000, you had**
17   **nightmares, loss of appetite, and headaches.**
18 A. Pain in my stomach too.
19 **Q. Did Dr. Rubin give you any medicine?**
20 A. No medicine.
21 **Q. Any prescription?**
22 A. No prescription.
23 **Q. Did he take any tests of what was going on**
24   **with your stomach?**

Page 68

1 A. I told him what was wrong with me.
2 **Q. Did he run any tests?**
3 A. He didn't run any tests. I tell him exactly
4   what I feel. I said, I'm mentally sick.
5 **Q. All he told you was just, Don't worry about**
6   **it?**
7 A. Yes. He told me to just forget about what's
8   going on and, you know...
9 **Q. Then did you see anyone else before your**
10   **next annual checkup about these symptoms?**
11 A. About my sickness?
12 **Q. Yes.**
13 A. I saw -- that was in 2000. Happen in 2002.
14 **Q. How about in 2001? Let's go year by year**
15   **first.**
16 A. 2001 I'm not sure if -- I'm not sure who
17   else I was seeing then. I know it was Dr.
18   Rubin still.
19 **Q. Between 2000 and 2001, did any of those**
20   **symptoms get worse?**
21 A. To me it's get worse because any time I
22   think about it, it's more pain.
23 **Q. It was more painful, but did you have more**
24   **nightmares or did you lose more weight?**

Page 69

1 A. Yes, the same thing again, over and over
2 getting up, thinking about the job, going
3 home to my wife talking about the job and
4 tell me, Get out of here and stop worrying
5 about the job. And she getting sick about
6 the job too with me getting sick.
7 **Q. It was the same thing for the second year?**
8 A. Yes.
9 **Q. You were about to tell me about in 2002.**
10   **Tell me about 2002; what happened that year?**
11 A. 2002 I talked to my attorney and I was -- I
12   talk to my wife, talk to my attorney, and I
13   went to see psychologist, a therapist.
14 **Q. Who was that?**
15 A. Dr. Hamilton-Mason.
16 **Q. Who gave you her name?**
17 A. I talked to my wife about it, and my
18   attorney give me the name.
19 **Q. When did you first go see Dr. Johnny**
20   **Hamilton-Mason?**
21 A. I saw Dr. Hamilton, I'm quite sure it was
22   2002, somewhere around 2002.
23 **Q. When you went to see her, tell me about how**
24   **your visits would work.**

18 (Pages 66 to 69)

## Page 70

1  A. I go to her once a month.
2  Q. What would you discuss?
3  A. I would discuss about my sickness, my
4     feelings on the job.
5  Q. You only went once a month?
6  A. Once a month.
7  Q. Did you ever submit any reports to her?
8  A. No, I don't -- I told her, already talked to
9     her on a monthly basis about my feelings and
10    my sickness and my eating.
11 Q. Did she ever ask you for any documents?
12 A. She didn't ask me for no documents. She
13    knows I was mentally sick.
14 Q. Did you ever give her any documents?
15 A. I did not give her no documents.
16 Q. Did you know that she made notes after every
17    meeting?
18 A. Yes.
19 Q. Have you ever seen them?
20 A. I've never seen the notes.
21 Q. Do you know whether or not she ever made a
22    diagnosis of your situation?
23 A. I did not know. She take notes.
24 Q. Did you ever ask her?

## Page 71

1  A. I did not ask her the notes. All I concern
2     is with my sickness.
3  Q. Did you ever ask her what she thought was
4     wrong with you?
5  A. Because I'm -- I don't recall, but she told
6     me that -- I told her exactly how I feel, my
7     headache and my nightmare, and she encourage
8     me to walk and exercise, and...
9  Q. Before you saw her, were you exercising?
10 A. I was walking.
11 Q. Before you saw her?
12 A. Before I saw her, yes.
13 Q. Then she told you to walk some more?
14 A. She told me to walk, but it still bothering
15    me. It didn't go away.
16 Q. Are you still seeing her today?
17 A. I've haven't seen a doctor for quite a while
18    now.
19 Q. As you sit here today, do you know whether
20    or not she ever made a diagnosis or reached
21    an opinion about what your mental health is?
22 A. She just keep writing notes and I'm telling
23    her what's wrong with me.
24 Q. You never asked her what she thought was

## Page 72

1     wrong with you?
2  A. She know what's wrong with me because I'm
3     sick of the job.
4  Q. What do you think your sickness is?
5  A. For what they did to me, City of Boston did
6     to me.
7  Q. Do you have an idea of what the medical term
8     is?
9  A. I've no idea what the medical term because I
10    know today I'm still a sick man.
11 Q. Do you feel better today than you did back
12    in 2000?
13 A. I feel the same when I think about the job.
14 Q. That same sickness you had at Dr. King's
15    birthday in 2000 is the same that you have
16    today in November 2006?
17 A. Yes.
18 Q. Did seeing Dr. Hamilton-Mason help you at
19    all?
20 A. She talked to me about different things,
21    what should I do with it, but it still -- I
22    leave there and be fine, and then again,
23    come back and thinking about the job again,
24    something will be there the rest of my life

## Page 73

1     until I die.
2  Q. You're not feeling better?
3  A. I'm feeling the same way.
4  Q. How do you feel?
5  A. I feel good now and I feel depressed and
6     aggravated about what is done to me.
7  Q. Had you ever experienced in other times of
8     your life feeling that you had been treated
9     differently because you're black?
10 A. Yes.
11 Q. Tell me about that.
12 A. How I feel about...
13 Q. Yes. Tell me about the other experiences
14    where you feel like you've been
15    discriminated against because you're black.
16 A. How I feel because I'm black?
17 Q. How you feel that you've been discriminated
18    against.
19 A. I feel very bad.
20 Q. No. Tell me about the experiences. What
21    other times in your life have you felt like
22    you didn't get a job or you weren't treated
23    the same way as another person because of
24    your race.

19 (Pages 70 to 73)

Page 74

1  A. That is only one time I feel that way, this
2     time.
3  Q. This is the only time?
4  A. This time, yes.
5  Q. Did you ever give Dr. Hamilton-Mason any
6     documents from the City of Boston?
7  A. I did not give her any documents, no. I
8     can't recall giving her any documents.
9  Q. Did she ever ask you for anything from the
10    City?
11       MR. KENDALL: Objection. Asked and
12    answered but you may answer.
13 A. She did not ask me for no documents.
14 Q. From the City of Boston?
15 A. From the City of Boston.
16 Q. Would you agree that there's two sides to
17    the story?
18       MR. KENDALL: Objection.
19 A. Excuse me?
20 Q. Would you agree that there's two sides to a
21    story?
22 A. If I grieve it?
23 Q. Would you agree that with any dispute
24    there's two sides to a story?

Page 75

1  A. No, I don't think there are two sides to the
2     story.
3  Q. You don't?
4  A. No.
5  Q. You think Dr. Johnny Hamilton-Mason knows
6     that there's another side to this story?
7        MR. KENDALL: Objection.
8  A. She knows the truth, what I'm telling her.
9     There is no other side to the story.
10 Q. She knows what you've told her?
11 A. Yes.
12 Q. You said you saw Dr. Johnny Hamilton-Mason
13    once a month?
14 A. Yes, once a month.
15 Q. I see from some notes that sometimes there
16    were gaps in your treatment. You would go
17    one or two or three months without seeing
18    her. Why is that?
19 A. Well, Dr. Mason have different appointment,
20    different schedule. Sometime she be on a
21    different assignment or maybe out of town.
22 Q. So when you wouldn't see her for three
23    months, it was because she wasn't available?
24 A. She wasn't available.

Page 76

1  Q. How are you paying for your appointments
2     with her?
3  A. I pay a co-pay charge payment.
4  Q. Do you know if you have any outstanding
5     medical bills with Dr. Johnny
6     Hamilton-Mason?
7  A. I don't know.
8  Q. Are you still seeing her?
9  A. I told you I haven't seen her for quite a
10    while. She's on a different assignment, on
11    a different -- I would probably make
12    arrangement to go and see her again, but I
13    have to call and make an appointment and
14    she's on different assignments and she's a
15    busy person on different assignments.
16 Q. The last time you saw her over the last four
17    years that you've been seeing Dr. Johnny
18    Hamilton-Mason, what do you talk about?
19 A. My feeling inside.
20 Q. Your feelings about what?
21 A. My stomach, my headache, I'm not eating
22    right.
23 Q. Do you talk about that in relationship to
24    the City of Boston?

Page 77

1  A. I talk to that the City of Boston too, how I
2     felt about the job, how I was sick about the
3     job.
4  Q. Do you talk about other things other than
5     your feelings about the depression, as you
6     say, that you had because you didn't get the
7     foreman position with the City of Boston?
8  A. All I talk about the City of Boston, how I
9     was treated, and how my pain in my stomach
10    here still today, my headache. I not eating
11    right.
12 Q. Do you talk to her about your retirement?
13 A. I cannot recall if I mention to her about my
14    retirement. I may have. I cannot recall.
15    I don't remember.
16 Q. Do you talk to her about your family?
17 A. She ask me about my wife and my daughter. I
18    got a daughter. Yes.
19 Q. But for the most part you talk about the
20    City of Boston?
21 A. A City of Boston and my sickness.
22 Q. Who brings up your past work at the City of
23    Boston?
24 A. Excuse me?

20 (Pages 74 to 77)

Page 78

1  Q. Who brings it up, you or Dr. Johnny
2     Hamilton-Mason?
3  A. I'm the one who's sick. I'm the one who be
4     talking. She can listen and taking notes.
5  Q. Tell me more about that. What do you tell
6     her about the City of Boston? You haven't
7     worked there for two years. What do you
8     tell her?
9  A. How it was a racist place, how they don't
10    like black people in there, how black people
11    be treated.
12 Q. Did you feel like it was racist place --
13 A. It is a racist place.
14 Q. Let me finish.
15       Did you feel like it was a racist
16    place before 1999 when you didn't get that
17    foreman position?
18 A. I cannot recall. I know it is racist in the
19    City of Boston.
20 Q. You started working there in 1986, right?
21 A. Yes.
22 Q. Did you feel like it was racist between '86
23    and '99?
24 A. It was hidden then. It wasn't like...

Page 79

1  Q. Was it hidden from you?
2  A. Well, to my way it's been there and they
3     probably didn't show it until the foreman
4     position come up.
5  Q. When's the last time you had nightmares
6     about the City of Boston?
7  A. Last week I was thinking about it to my wife
8     in my bed. I get up and thinking about that
9     job.
10 Q. What do you think about your nightmares and
11    this nightmare you had last week?
12       MR. KENDALL: Objection.
13 A. What is happen to me at the job, what it did
14    to me on the job.
15 Q. What did it do to you?
16 A. I told you before. The guy would come and
17    pass around and say, Where's my grievance
18    paper? You want to shake my hands? I'll be
19    the foreman. All that thing is bothering me
20    up to this day.
21 Q. When did that start that Moynahan was doing
22    the grievance papers?
23 A. Moynahan start doing the grievance paper, I
24    would say, when I get an attorney in 2000.

Page 80

1     After 2000. I get a attorney in 2000, April
2     or May, I can't recall, around that time,
3     and he'll be saying it.
4  Q. He worked in the light shop, right?
5  A. Yes. It was light and heavy across the
6     hallway.
7  Q. Other than nightmares, is your stomach still
8     bothering you today?
9  A. My stomach is still bothering me thinking
10    about the job, still bothering me.
11 Q. Who is your primary care physician now?
12 A. Dr. Barbara Crouse, C-R-O-U -- in Brookline.
13 Q. You see her for an annual checkup?
14 A. Once a year.
15 Q. Have you ever had any tests run on your
16    stomach?
17 A. No.
18 Q. Have you ever had any prescription
19    medication for your stomach due to this, due
20    to the City of Boston?
21 A. Right now -- right now all these stress and
22    thing I have, I'm taking some medicine for
23    that now.
24 Q. What is it?

Page 81

1  A. I'm taking high blood pressure -- I've never
2     yet had high blood pressure in my life until
3     this year. This year I start taking high
4     blood pressure pills.
5  Q. You mean in 2006?
6  A. 2006.
7  Q. You think it's because of the City of
8     Boston?
9  A. I think the City of Boston, stress.
10 Q. Are you stressed at your job at Massport?
11 A. I'm not stressed in my job at Massport. As
12    I say, I go to do my job and that's it, give
13    them eight hours.
14 Q. Are you stressed about anything in your
15    marriage?
16 A. It affecting my marriage, yes.
17 Q. Did either of your parents have high blood
18    pressure?
19 A. I can't recall. My mother may have. I
20    can't recall now.
21 Q. Do you know the name of that medicine that
22    you're taking?
23 A. I don't know. I have it. I don't know. I
24    have it at home. I don't know.

21 (Pages 78 to 81)

Page 82

1   Q. Other than the high blood pressure
2       medication, which you started taking in
3       2006, is there any other prescription
4       medication that you've taken which you claim
5       is related to the City of Boston work?
6   A. That's the only medicine I'm taking. Plus I
7       have allergies and it's just -- in the
8       spring I get allergies.
9   Q. That's not related to the City of Boston?
10  A. No.
11  Q. You never took any medicine --
12  A. In my 63 years, I've never had to take a
13      blood pressure pills and things -- what
14      happened in the City of Boston with all
15      those stress and worried, that probably
16      contribute to my high blood pressure now to
17      this day. I have to take it every day.
18      Every day I have to take my blood pressure
19      pills.
20  Q. Have you ever had any prescription
21      medication for your depression?
22  A. No.
23  Q. Did Dr. Johnny Hamilton-Mason ever talk to
24      you about taking any prescription drugs?

Page 83

1   A. No. She told me what to do is to keep
2       walking and exercising and forget about the
3       job and try to -- but what could I do? I
4       leave there and it's the same thing.
5   Q. Did you tell her, when she told you to go
6       for a walk, that you were already walking?
7   A. I already -- I been walking, yes.
8   Q. How often do you walk?
9   A. I try to walk at least twice a week, once a
10      week.
11  Q. Before you saw Dr. Johnny Hamilton-Mason,
12      how often did you walk?
13  A. Probably maybe once, twice, three times a
14      week.
15  Q. About the same?
16  A. Yes.
17  Q. How long do you walk?
18  A. I try to walk for about half an hour.
19  Q. That's good.
20  A. I try to.
21      MS. COOK: Can you mark this Exhibit
22  1.
23      (Answers to Interrogatories marked as
24      Exhibit No. 1)

Page 84

1   Q. I'm going to show you, Mr. Diaz, what's been
2       marked Exhibit 1, and you can take as long
3       as you want to look at them. They are
4       interrogatory answers in this case. In
5       particular I want to ask you about Question
6       4-A. Take your time.
7   A. 4-A?
8   Q. Yes. It's a long answer.
9   A. Yes.
10  Q. But I wanted to draw your attention to the
11      second-to-the-last sentence. It starts
12      with, "I estimate."
13  A. Okay.
14  Q. I'm going to read this sentence and I just
15      wanted to hear what you have to say about
16      it. It says, "I estimate that my damages
17      for emotional approximate (sic) $500,000.
18      These damages were caused by continuing
19      discriminatory conduct and retaliation of
20      respondents and by the cover-up of the facts
21      by the respondents."
22          I was wondering if you could tell me
23      how you come up with the sum of $500,000 for
24      your emotional --

Page 85

1   A. That's for my pain and suffering.
2   Q. How do you get at that number though?
3   A. That's not all of it. My pain and my
4       suffering and the denial of overtime, fair,
5       equal overtime.
6   Q. We'll talk about overtime in a minute, but
7       other than overtime and your pain and
8       suffering, is there anything else that you
9       think that 500,000 is representative of?
10  A. My medical bills and pain.
11  Q. Anything else?
12  A. I can't recall what else again, but I know
13      my pain and suffering, my medical bills.
14  Q. Other than Dr. Johnny Hamilton-Mason, do you
15      have some other medical bills related to
16      this case?
17  A. No.
18  Q. Have you seen any other doctors?
19  A. No other doctor.
20  Q. Does your current primary care physician
21      know that you're seeing Dr. Johnny
22      Hamilton-Mason?
23  A. Yes.
24  Q. Have you talked to her about your stomach

22  (Pages 82 to 85)

Page 86

```
 1    pain?
 2  A. No.
 3  Q. Why not?
 4  A. I don't recall talking to her about my
 5    personal -- about Dr. Mason.
 6  Q. You told Mr. Rubin, though, about your --
 7  A. I told him because I -- I told him it's
 8    mentally.
 9  Q. But you said you also --
10  A. What could you do?  It's not physical.
11  Q. You didn't want to tell your primary care
12    physician about your stomach hurting you or
13    your appetite loss?
14  A. I did not -- I can't recall talking about
15    it.  I don't remember talking about it.
16  Q. Let's talk about overtime.  How did overtime
17    work at the Department of Public Works?
18  A. Overtime work supposed to be equally
19    divided, equally.
20  Q. When you say that, who makes the decision
21    about overtime?  Was it Al Young?
22  A. Al Young, general foreman.
23  Q. What would Al Young do?  Say it's a winter
24    storm.  I know that's the biggest overtime.
```

Page 87

```
 1    It's a winter storm.  What does Al Young do
 2    when he needs to have a bunch of employees
 3    work overtime?
 4  A. In the wintertime everybody -- is a snow
 5    emergency, everybody be there to work.
 6    Other than a winter storm or no storm, they
 7    will call the white man in first before they
 8    call the black man.
 9  Q. Who is "they"?
10  A. The City -- Al Young.
11  Q. Was Al Young a person of color?
12  A. Al Young is a white man.
13  Q. How do you know that he'd always call a
14    white man before he called a person of
15    color?
16  A. Because there's a list alphabetical order
17    who work when and who work what.  They go by
18    the list.  They supposed to call the name by
19    the list.  Like my name is Roderick Diaz,
20    they'll go down the list and start from A.
21    Who is A, they call that person first.  If
22    that person don't respond, they come down
23    the list.  Many times they did not call.
24    And many times he call me and he say to me,
```

Page 88

```
 1    I call you, Rod.  I say, What number did you
 2    call?  He said, I called 288-8893.  He did
 3    not -- I went upstairs and look on the
 4    thing.  He call 288-88893 (sic).
 5  Q. You're saying he dialed the wrong number?
 6  A. Purposely.
 7  Q. How do you know he did it on purpose?
 8  A. Because he want one of his buddies to work.
 9  Q. His buddies were all white?
10  A. White male.
11  Q. Are there any women that work there?
12  A. Yes, one woman work there.
13  Q. Did she get overtime?
14  A. She's in the office.  I don't know if she
15    get -- I'm not there no more.
16  Q. It's your contention that when decisions
17    were made about overtime, people like
18    yourself, people of color, would get skipped
19    over, and it would go to white people?
20  A. That's right.
21  Q. Did you ever talk to anybody, any of your
22    coworkers there, and ask them if they
23    thought the same thing?
24  A. I went to the union.
```

Page 89

```
 1  Q. What did the union say?
 2  A. The union will say, Oh, you work the next
 3    overtime.  Make sure you work the next
 4    overtime.  The next they'll call you.
 5  Q. Did you grieve it?
 6  A. Yes, but the union no better than the City
 7    of Boston.  They didn't do nothing.
 8  Q. The union what?
 9  A. The union -- I talk to the union many times
10    about different things and nothing happened.
11    Oh, yeah, Rod, you'll work the next
12    overtime, and the same thing on the
13    overtime.
14  Q. Say they only need 15 people and they go A
15    through U, you know what I'm saying, if
16    they're going in alphabetical order and they
17    call those people?
18  A. Uh-huh.
19  Q. And then it's the next day, do they start at
20    "V" to exhaust the list?
21  A. They will start from "A."  If "A" doesn't
22    work, they come down the line "B," and "B"
23    doesn't work they come down the line to
24    reach your name or whatever.
```

23  (Pages 86 to 89)

Page 90

1  Q. But what if my last name starts with Z; I
2     never get called?
3  A. You on the bottom of the line.  It depends
4     on how much they got there.  You on the
5     bottom.  You will get your turn, the call.
6     You will get your turn if they call you.
7  Q. Did you ever tell Al Young, You're calling
8     the wrong number?
9  A. I say, You call the wrong number.  He say, I
10    tried to call you.  I said, You didn't try
11    to call me.  And it's not only happen with
12    me alone.
13  Q. It only happened with you?
14  A. No, it did not happen with me alone.
15  Q. Who else did it happen to?
16  A. I recall a friend of mine, a tow truck
17    driver.
18  Q. What's his name?
19  A. He was John Mills, a black guy, black man.
20    Many times he complain about overtime.  They
21    didn't call him and they said, We call you.
22  Q. When you say "call," you're already at home,
23    so the call would come to your home?
24  A. To your house.

Page 91

1  Q. Did you ever get a call for overtime and
2     tell them you didn't want to do it?
3  A. I call -- yes, sometimes you don't feel
4     good, say, I don't feel well, I got
5     something to do.
6  Q. How do you know how many times you were
7     skipped over for overtime?
8  A. Because you go by the list next day.  You go
9     by the list and you see this person work.
10  Q. Did you keep a list?
11  A. I keep a list.  I keep it in my head.
12  Q. Did you write it down?
13  A. On a piece of paper.
14  Q. Do you still have paper?
15  A. No.
16  Q. Did you ever keep any notes or a diary of
17    any of the things that happened to you at
18    the City of Boston?
19  A. I was keeping one time I was have notes.
20    One time I was keeping notes, how much time
21    I was skipped over for overtime.
22  Q. Do you still have them?
23  A. No.  I was skipped over overtime maybe just
24    before I got the job at Massport.  The

Page 92

1     foreman tell me that -- to go home, there's
2     no work.  Saturday early, two o'clock, three
3     o'clock, he said, Go home, Rod, wash up to
4     go home.  I went home.  Next Monday two
5     white male work who have less time than me
6     and their name was down the list.
7  Q. When you say "less time" than you, you mean
8     less seniority?
9  A. Less seniority than me.
10  Q. Was seniority supposed to be a factor in
11    whether you got to work overtime or not?
12  A. Well, it goes by the list again, but
13    sometimes it goes by the list.  Sometimes
14    they don't go by the list.  It's who they
15    want to work.
16  Q. Is there any written policy about overtime?
17  A. It's suppose to be a written policy about
18    the name.
19  Q. Have you ever seen it written down?
20  A. They have it on the wall written down.
21  Q. Did you ever make a complaint to anyone,
22    Paul Musto or one of the foremen?
23  A. I make a report to the union.  That when you
24    go by, the union.

Page 93

1  Q. Did you ever tell them you wanted to file a
2     grievance about it?
3  A. He will say to me, Don't worry.  Next time
4     you will get the next overtime.
5  Q. But you never said, No.  I want to file a
6     grievance now?
7  A. I can't recall.
8  Q. Did you ever talk to a union attorney about
9     it?
10  A. No, I did not talk to a union attorney about
11    it.
12  Q. Your friend that you said was a tow truck
13    driver, did you ever --
14  A. I don't know what he did.
15  Q. Do you know if he ever talked to the union
16    about it?
17  A. I don't know what he talked...
18  Q. Do you know any other people of color that
19    feel like they didn't get overtime?
20  A. Yes, I do.
21  Q. Who?
22  A. Steve Coker, Fitzroy Prescott, Lawrence
23    Cooper.
24  Q. The day that you got kicked out of the

24 (Pages 90 to 93)

Page 94

1    acting foreman position, you say that was
2    around 2000, January 2000?
3    A. No. It was around April or May 2000.
4    Q. That's when Fitzroy Prescott came in?
5    A. Came in there.
6    Q. He's a male of color?
7    A. He's a -- yes, he's a male of color.
8    Q. So if the City of Boston is racist, why did
9        they put another person of color in that
10       position?
11           MR. KENDALL: Objection. You may
12       answer.
13   A. The City of Boston put Fitzroy Prescott in
14       that job before Mr. Higgins came there, and
15       when Fitzroy Prescott was to get the job,
16       there was a foreman position coming up there
17       at the City of Boston and there was another
18       job open at street lighting, which is the
19       Division of Public Works which pay more
20       money, and Fitzroy Prescott, they say, Why
21       don't you go to street lighting? It's more
22       money.
23           Because they know this foreman job --
24       they was pushing him, the City of Boston,

Page 95

1    the employee, the supervisors was telling
2    him, Why don't you go for that job? He
3    said, No, I'm got going for the job. So he
4    wait there and he get the foreman position
5    because he was the most senior qualified.
6    Q. What's his race?
7    A. He's a black male.
8    Q. Fitzroy also felt like he wasn't getting
9        overtime?
10   A. That's right.
11   Q. Anyone else?
12   A. Stephen Coker.
13   Q. Anyone else?
14   A. Lawrence Cooper.
15   Q. Do you know, did any of them ever file a
16       lawsuit about it?
17   A. I don't know.
18   Q. As you sit here today, do you know how many
19       hours you think you didn't get in overtime
20       that you should have?
21   A. A whole lot hours. I cannot recall. A
22       whole lot.
23   Q. If you had to put a number on it, do you
24       have any idea?

Page 96

1    A. I cannot -- I don't know. I cannot add it
2        up. I don't know. A lot of overtime I
3        miss.
4    Q. When you first noticed this racism in the
5        way that overtime is assigned?
6    A. From day one it's happening.
7    Q. Starting in 1986?
8    A. From '86. They will call who they want --
9        the City of Boston will call who they want
10       to call for overtime. They'll mostly call
11       the white male for overtime all the time.
12   Q. Forgive me if I've already asked you this,
13       but I don't think I've quite asked you this
14       question: Did anyone ever say anything to
15       you that you perceived was discriminatory
16       while you were at the City of Boston?
17   A. Anybody say that to me?
18   Q. Yes.
19   A. No, I don't recall that.
20   Q. Do you feel like you were treated
21       differently because you were black?
22   A. I think that, yes.
23   Q. Tell me about that.
24   A. How I was treated differently?

Page 97

1    Q. Yes.
2    A. Just what they did to me I think I was
3        treated differently.
4    Q. When you say "what they did to me," you mean
5        the fact that you didn't get those two
6        foreman positions?
7    A. Yes.
8    Q. Let's talk about your retaliation claim.
9           Is it your claim that you were
10       retaliated against after you were denied the
11       2001 foreman position, or is it just about
12       the 1999 position?
13   A. Two position.
14   Q. I know there's two positions, but tell me
15       about the retaliation. When did it happen?
16   A. 2000.
17   Q. Who did it?
18   A. Mr. Dave Higgins.
19   Q. What did Dave Higgins do that was
20       retaliatory?
21   A. He send somebody to act as foreman while I
22       was acting as foreman. He send somebody in
23       there.
24   Q. That's Prescott?

25 (Pages 94 to 97)

Page 98

1   A. Fitzroy Prescott.
2   Q. What else did Dave Higgins do to you that
3      was discriminatory in 2000?
4   A. Mr. Dave Higgins wasn't speaking to me. He
5      could not look at me in my face.
6   Q. He wouldn't look at you?
7   A. He would not look at me.
8   Q. Would he talk to you?
9   A. He would not talk to me.
10  Q. Did your assignments change?
11  A. He did not assign me a job. The foreman
12     assign the job.
13  Q. At that point it was either Teddy Meyers or
14     when he was sick, Fitzroy Prescott that was
15     your supervisor, right?
16  A. Well, honest to God...
17  Q. Please.
18  A. Paul Musto.
19  Q. But that's not until 2002, right?
20  A. 2002 I understand he got -- I don't recall.
21     I think 2002 he must have got the job.
22  Q. Do you feel like anyone ever gave you bad
23     assignments or didn't give you as good of
24     assignments in the HMER because of your

Page 99

1      lawsuit or that you had an attorney?
2   A. Yes. Dave Higgins, I was treated
3      differently.
4   Q. Because he wouldn't talk to you?
5   A. He wouldn't talk to me.
6   Q. But he didn't give out your assignments?
7   A. He wouldn't give me my assignment.
8   Q. Did anyone give you different assignments
9      because of your lawsuit?
10  A. I don't recall.
11  Q. Did anyone else retaliate against you after
12     you got an attorney any time after the 1999
13     foreman position was given to Mr. Moynahan?
14  A. I -- no. He just -- he didn't speak to me
15     and just didn't give the job, and I was not
16     getting the -- that's it.
17  Q. Anyone other than Dave Higgins?
18  A. No.
19  Q. That's it?
20  A. That's it.
21  Q. So your retaliation claim after the 1999
22     foreman position is about Dave Higgins?
23  A. Dave Higgins.
24  Q. Prior to applying for that position, your

Page 100

1      relationship with Mr. Higgins was just, How
2      is Rod doing today?
3   A. That before retaliation.
4   Q. But that's the only difference?
5         MR. KENDALL: Objection.
6   A. Well, he would not to talk me. He would not
7      look at me in my face. And I didn't really
8      care.
9   Q. Let's talk about the second foreman position
10     you applied for in 2001. After that tell me
11     about the retaliation that you experienced
12     after you didn't get that position.
13  A. After I didn't get it, I was still depressed
14     and sick. What could I do?
15  Q. Were you retaliated against after that?
16  A. After that, no. I was kicked out of there
17     in 2000. I was kicked out of there.
18  Q. Other than Dave Higgins not talking to you
19     and then you getting kicked out in 2000,
20     that was January of 2000, right?
21  A. That was 2000 around June.
22  Q. Oh, June?
23  A. Around April, because I went and got an
24     attorney then.

Page 101

1   Q. You got an attorney around June of 2000?
2   A. To be honest to God, anywhere from April to
3      -- I can't recall. April to June, around
4      that time I went and got an attorney.
5   Q. That's when you feel like there was
6      retaliation?
7         MR. KENDALL: Objection.
8   A. When I feel the retaliation, yes.
9   Q. That's because why?
10  A. Why was retaliation?
11  Q. Yes.
12  A. Because I was kicked out.
13  Q. That happened between April and June of
14     2000?
15  A. I was kicked out in 2000 and that's the end
16     of it for me. I was never appointed foreman
17     again.
18  Q. I'm just trying to get all this straight.
19     I'm not trying to badger you.
20        You've mentioned to me, though, that
21     you started feeling sick around Dr. King's
22     birthday in 2000. That's in January. What
23     happened in January? Because at that point
24     you were still acting foreman until April or

26 (Pages 98 to 101)

## Page 102

1    June, right?
2    A. I start getting -- I start getting sick in
3    Martin Luther King birthday when they put
4    somebody -- a white male in there to act to
5    be a foreman who just came over there
6    younger than me, have no experience than me.
7    How would you feel? How would you feel?
8    You tell me. How would you feel?
9    Q. That's Mr. Moynahan?
10   A. Mr. Moynahan.
11   Q. I got it straight. I just got a little
12   confused.
13       Once you were kicked out of the
14   acting foreman position in April to June
15   2000, was there any other retaliation
16   against you at the City of Boston?
17   A. That's the only retaliation he did to me.
18   He just assign the work to me, did my job.
19   Q. I'm almost done.
20   A. That's all right. It's your job. You do
21   your job.
22   Q. How many times a year do you think you have
23   nightmares due to the City of Boston's
24   conduct?

## Page 103

1    A. I can't recall. A lot of times.
2    Q. Can you estimate? I mean, is it once a
3    week, once a month?
4    A. Probably every two week I think about the
5    job.
6    Q. What reminds you of it?
7    A. The past never go away, never leave me.
8    Q. Is there anything that you find yourself
9    afraid to do now that you could do before
10   you worked for the City of Boston?
11   A. Once more time.
12   Q. Do you have any new fears?
13   A. I'm still sick and just depressed.
14   Q. How often do you have headaches due to the
15   City of Boston's conduct?
16   A. Again, as I think about it, like a
17   flashback, come back to me, you know.
18   Q. Would you say it's once a month, once a
19   year?
20   A. Probably something like twice -- like once a
21   month, twice a month, something like that.
22   Q. Is there anything that you used to be able
23   to do before 1999 when you didn't get the
24   first foreman position --

## Page 104

1    A. I was a happy-go-lucky guy.
2    Q. That you can't do now, other than you were
3    happy-go-lucky and now you say you're not?
4    A. I still think I can do better than now, but
5    is that depression and everything -- that
6    depression and everything have me down. If
7    I was happy to get the job, I will be
8    happy-go-lucky. I'm not happy. Today I'm
9    not happy. I'll never be happy.
10   Q. Is there anything that could make you happy?
11       MR. KENDALL: Objection.
12   Q. About this case?
13   A. I will be still -- as long as I live, I'll
14   be still that way.
15       MS. COOK: I just want one minute to
16   confer with my colleague, and I think we're
17   about done.
18       (Recess)
19   Q. We're almost done, Mr. Diaz. I just have a
20   few more questions.
21       You said earlier, Mr. Diaz, that you
22   didn't get the foreman position at the City
23   of Boston because you're black. What do you
24   base that on for the 2001 foreman position?

## Page 105

1    A. Same thing too.
2    Q. And what is that?
3    A. Because I'm black again I didn't get the
4    job.
5    Q. That's the same for the 1999 position?
6    A. Yes.
7    Q. When did Fitzroy Prescott start working for
8    the City of Boston?
9    A. Fitzroy Prescott start working for the City
10   of Boston 1984.
11   Q. Was that with the Department of Public
12   Works?
13   A. Department of Public Works.
14   Q. So he worked there before you?
15   A. He work there before me.
16   Q. What was his position when he got promoted
17   to foreman?
18   A. He was an HMER.
19   Q. Same as you?
20   A. Same as me.
21   Q. Do you think you need good communication
22   skills to be a supervisor?
23       MR. KENDALL: Objection. You may
24   answer.

27  (Pages 102 to 105)

Page 106

1  A. If I need good communication skill? I have
2     good communication skill.
3  Q. Right. Not you personally --
4  A. Yes. Yes.
5  Q. During the time that you worked for the City
6     of Boston from 1986 to 2004, did any of the
7     HMER employees of color apply for promotions
8     other than yourself?
9  A. In the heavy -- in the public -- no.
10 Q. Do you know of any HMER --
11 A. From '86 to 2004?
12 Q. Yes.
13 A. I cannot recall. There's some -- couple
14    guys in the light shop. I don't know if
15    they apply for the job. I don't know.
16 Q. To your knowledge did any HMERs of color
17    ever get promoted while you were working
18    there?
19 A. Never get promoted.
20 Q. You mentioned earlier that your attorney
21    referred you to Dr. Johnny Hamilton-Mason.
22    Which attorney?
23 A. Attorney Winston Kendall.
24 Q. You mentioned a colleague by the last name

Page 107

1     of Munoz.
2  A. Munoz.
3  Q. Do you consider him a person of color?
4  A. He's Hispanic. He's a person of -- yeah.
5     He consider himself a person of color.
6  Q. When you said, for example, that people of
7     color didn't get overtime like white men,
8     were you referring to Hispanic --
9  A. Hispanic, people of color, yes.
10 Q. You mentioned to me that you had some papers
11    for a while, notes that you took about
12    overtime. What did you do with those
13    papers?
14 A. I kept those paper for a while. When I move
15    I must have destroyed it.
16 Q. Did you give them to your attorney?
17    MR. KENDALL: Objection.
18 A. I don't remember. I can't recall.
19 Q. Do you think that people sometimes see
20    racist bias when it's not there?
21    MR. KENDALL: Objection.
22 Q. You can answer.
23 A. When they see bias?
24 Q. Yes. Do you think people sometimes see

Page 108

1  things as being racist when it's not really
2  racist?
3     MR. KENDALL: Objection.
4  Q. You can answer.
5  A. I think they see it -- they see racist when
6     it's -- yes.
7  Q. And you think it's real?
8  A. It's real, for real.
9     MS. COOK: I'm all set. Thank you
10 very much.
11    THE WITNESS: Thank you.
12    (Whereupon, this deposition concluded
13 at 4:02 p.m.)
14
15
16
17
18
19
20
21
22
23
24

Page 109

1     C E R T I F I C A T E
2
3  COMMONWEALTH OF MASSACHUSETTS
4  MIDDLESEX, SS.
5
6        I, Melinda M. Piccirilli, a
7  Certified Shorthand Reporter and Notary Public
8  in and for the Commonwealth of Massachusetts,
9  do hereby certify that RODERICK DIAZ, the
10 witness whose deposition is hereinbefore set
11 forth, was duly sworn by me and that such
12 deposition is a true and accurate record, to
13 the best of my knowledge, skills and ability,
14 of the testimony given by such witness.
15    IN WITNESS WHEREOF, I have hereunto
16 set my hand and affixed my seal of office this
17 20th day of December, 2006.
18
19
20        Melinda M. Piccirilli, CSR
21           Notary Public
22 My Commission expires:
23 December 5, 2008
24

28 (Pages 106 to 109)

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-10154-NG

RODERICK DIAZ

v.

DAVID HIGGINS, Individually,
and, in his capacity as Director
of Central Fleet Maintenance,
City of Boston Department of
Public Works; and CITY OF BOSTON

## AFFIDAVIT OF KATHLEEN KELLEY

I, Kathleen Kelley, hereby state and depose as follows:

1.    I am the Principal Personnel Officer ("PPO") of the
Public Works Department ("PWD") for the City of Boston.

2.    I was appointed to this position in 1985 by
Commissioner Joseph Casazza.

3.    As PPO, I am in charge of all personnel matters for
the PWD.

4.    The Central Fleet Maintenance ("CFM") is a section of
the PWD.  CFM was organized and came into existence in 1997.

5.    I have access to all personnel records and information
pertaining to the positions within PWD.  At any point in time, I
may conduct a search within the personnel records of the
department to ascertain information about PWD employees and/or
positions.  Therefore, as custodian of the employees' PWD

records, I possess the personal knowledge or the ability to gain

it as to all personnel files and the contents therein in the

PWD.

6.   I have personal knowledge as to the facts and

circumstances surrounding this case.

7.   The Plaintiff obtained a provisional appointment at

CFM as Motor Equipment Repairman in December 31, 1986.

8.   Between that date and September 9, 1998, the Plaintiff

held various provisional non-permanent positions in CFM.

9.   On September 9, 1998, in accordance with Chapter 282

legislation, the Plaintiff was permanently appointed as Heavy

Motor Equipment Repairman.

10.   The Plaintiff's "longevity date" is December 31, 1986,

but his "seniority date" is September 9, 1998.

11.   In November 1999, a job posting for Motor Equipment

Repair Foreman ("MERF") in the light shop was placed at CFM.

12.   The Plaintiff applied for the position, and was

interviewed, along with seven other candidates, on or about

December 1999.

13.   Out of the eight candidates that applied and were

interviewed, the Plaintiff was not the most senior candidate.

He was tied in seniority with four other candidates, including

James Monaghan, who was ultimately appointed to the position.

Exhibit K1, *Applicant Listing Form*, attached hereto and made a

2

part hereof.

14.  On or about July 2001, a job posting for MERF in the heavy shop was placed at CFM.

15.  The Plaintiff applied for the position, and was interviewed along with three other candidates.

16.  The Plaintiff, along with two other candidates, including the one who obtained the position, Paul Musto, had the same seniority date, September 9, 1998.  The fourth candidate had a seniority date of May 19, 1999.  Exhibit K2, *Applicant Listing Form*, attached hereto and made a part hereof.

17.  The interviews were conducted by David Higgins, Maurice Smith, Robert Silvey, Jeremiah Coughlin and me.

18.  The interview consisted of oral subjective and objective questions which sought information as to the candidates' job knowledge, experience and education.

19.  Every applicant was asked the same question.

20.  The criteria used to interview the candidates were weighed as a whole, and were not rated individually.

21.  After conducting all of the interviews David Higgins asked the panelists to rank the candidates in order of preference as to who the panel thought was the most qualified candidate.

22.  The Plaintiff was ranked by all panelists as the least qualified candidate.

3

23. During his entire tenure at the City of Boston, the Plaintiff belonged to the AFSCME union.

24. According to the union contracts between the City of Boston and AFCSME for the relevant years, an employee's seniority status comes into play if the qualifications and abilities of the employees are substantially equal. Exhibit K3, *Union Contracts*, Art. 11, § 4, attached hereto and made a part hereof.

25. According to the union contracts between the City of Boston and AFCSME for the relevant years, "[a]n employee who is performing, pursuant to assignment, temporary service in a position classified in a grade higher than the grade of the position in which he/she performs regular service, other than for the purpose of filling in for an employee on vacation, shall commencing with the sixth (6th) consecutive day of actual service in such higher position, be compensated for such service in such higher position at the rate to which he/she would have been entitled had he/she been promoted to such position." Exhibit K3, Art. 11, § 2.

26. The Plaintiff never reported to have served, pursuant to assignment, temporary service in a position classified in a grade higher than the grade of the position in which he performed regular service for six or more consecutive days.

27. CFM never reported the Plaintiff to have served,

4

pursuant to assignment, temporary service in a position classified in a grade higher than the grade of the position in which he performed regular service for six or more consecutive days.

28.   During his tenure at the City of Boston, the Plaintiff was, therefore, never paid at a grade level higher than the position he held.

Signed under the pains and penalties of perjury this $6th$ day of February 2007.

Kathleen P. Kelley
Kathleen Kelley

CITY OF BOSTON
ADMINISTRATIVE SERVICES DEPARTMENT
OFFICE OF HUMAN RESOURCES
RECRUITMENT SECTION

### APPLICANT LISTING FORM

TO: KATHY KELLY                                    DEPT: PWD
POSITION: MOTOR EQUIP. REPAIR FOREMAN              POSTING #: AG-211
DATE: 11-15-99                                     POSTING DATE: 11/2/99
                                                   CLOSING DATE: 11/10/99

Attached are the applications of all who have applied for the above position. The names
of the applicants are listed below.

   ALL APPLICANTS WHO MEET THE MINIMUM QUALIFICATIONS
            MUST RECEIVE AN INTERVIEW.

Applications that have not been processed through this office will not be considered for
the above position. Please rank the applicants in order: number 1 being the applicant
offered the position, 2,3,4 etc. Place a "I" next to those that were interviewed. "NI" next
to those not interviewed because they did not meet minimum requirements.

A copy of this Form will be attached to the PAR form of applicant who has been offered
the position.

This original Form will be sent back to OHR with remaining applications as soon as
applicant has been selected

*All applicants must be notified via a letter as to what their status is i.e. Hired; did not
meet minimum requirements or non select within five days that a decision was made.*

3 MICHAEL CONNOLLY SD: 6/6/90 AFTER 3  JOHN BARRETT   SD: 9/9/98  LD: 12/7/94
JAMES MONAGHAN SD 9-2-98 LD 9-25-91    RODERICK LEON DIAZ SD 9-9-98 LD 12-31-86
SCOTT ALTHER SD: 9/8/97 LD: 4/27/90   LUIGI MASTRANGELO SD 5-19-99 LD 5-13-98
WILLIAM COUGHLIN SD 9-9-98 LD 7-22-87  ROBERT GILLETTI D.N.I.
TIM O'LEARY PROVISIONAL LD 11-5-97

Thank You,

Director of Recruitment

CITY OF BOSTON
ADMINISTRATIVE SERVICES DEPARTMENT
OFFICE OF HUMAN RESOURCES
RECRUITMENT SECTION
APPLICANT LISTING FORM

TO: KATHY KELLY                              DEPT: PWD
POSITION:  MOTOR EQUIP. REPAIR FOREMAN         POSTING #: BK-1159
DATE: 7/30/01                                 POSTING DATE: 7/17/01
                                              CLOSING DATE:  7/25/01

Attached are the applications of all who have applied for the above position.  The names
of the applicants are listed below.

ALL APPLICANTS WHO MEET THE MINIMUM QUALIFICATIONS
MUST RECEIVE AN INTERVIEW.

Applications that have not been processed through this office will not be considered for
the above position. Please rank the applicants in order: number 1 being the applicant
offered the position, 2,3,4 etc. Place a "I" next to those that were interviewed. "NI" next
to those not interviewed because they did not meet minimum requirements.

A copy of this Form will be attached to the PAR form of applicant who has been offered
the position.

This original Form will be sent back to OHR with remaining applications as soon as
applicant has been selected

*All applicants must be notified via a letter as to what their status is i.e. Hired; did not
meet minimum requirements or non select within five days that a decision was made.*

LUIGI MASTRANGELO SD: 5/19/99; LD: 5/13/98 RODERICK DIAZ  SD: 9/9/97; LD: 12/3 1/86
SCOTT ALTHER SD: 9/9/97; LD: 4/27/90    PAUL MUSTO  SD: 9/9/98; LD: 10/26/87

Thank You,

*[signature]*

Director of Recruitment

# AGREEMENT

BETWEEN

## CITY OF BOSTON



AND

## AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO

## COUNCIL 93
### AND LOCALS



EFFECTIVE:   JULY 1, 1996
EXPIRING:   JUNE 30, 1999

(CITY-WIDE)

duties do not require him/her to work regularly on a day considered as a holiday under Section 1 of Article XII is called in to work on a holiday he/she shall receive, in addition to his/her regular weekly compensation time-and-one-half for each hour worked on such holiday and in no event shall he/she receive less than four (4) hours' pay on a straight time basis.

(C)   If an employee (other than an employee on a rotating shift or a continuous operation) whose regular workweek does not include Sunday is called in to work on a Sunday, he/she shall receive, in addition to his/her regular weekly compensation double time for each hour worked on such Sunday, and in no event shall he/she receive less than four (4) hours' pay on a straight time basis.

(D)   It is understood that the provisions of this Section are subject to the provisions contained in Section 2 of this Article.

Section 9.   All employees shall be scheduled to work on regular shifts, which shall be defined as the hours an employee is required to work during a workday, and each work shift shall have a regular starting time and quitting time.   Work schedules, which shall be defined as the work days an employee is required to work during the workweek, shall be posted on all department bulletin boards at all times.   Employees shall be given reasonable notice of any change in their work shift or work schedule. (Reasonable notice except in extreme circumstances, shall be fourteen (14) calendar days.)

Section 10.   The City agrees to give the Union reasonable notice of any proposed change in scheduled work shifts and an opportunity to discuss the reasons for the proposed change, the impact of the proposed change and an opportunity to suggest alternatives.   No proposed change shall be instituted within thirty (30) days from the

20

of the stated notice or until the Union has opposed it or the parties may mutually agree to extend this time period.   In the event of failure to agree on this proposed change, the City shall have the right to institute the change and the Union shall have the right to take the matter up as a grievance under the grievance procedure.

Section 11.   All overtime shall be paid no later than the third (3rd) payroll week following the month in which such overtime was earned.

Section 12.   The Union agrees to cooperate with the City in experimenting with the four-day workweek on a limited basis where feasible.

Section 13.   The City agrees not to transfer employees for disciplinary reasons except in accordance with Article VI.

### ARTICLE XI.
### TEMPORARY SERVICE IN A HIGHER OR LOWER CLASSIFICATION

Section 1.   While an employee is performing, pursuant to assignment, the duties of a position classified in a grade lower than the grade of the position in which he/she performs regular service, he/she shall be compensated at the rate of pay for the grade of the position in which he/she performs regular service.

Section 2.   Compensation for Work in a Higher Classification. An employee who is performing, pursuant to assignment, temporary service in a position classified in a grade higher than the grade of the position in which he/she performs regular service, other than for the purpose of filling in for an employee on vacation, shall commencing with the sixth (6th) consecutive day of actual service in such higher position, be compensated for such service in such higher position at the rate to which he/she would have been entitled had he/she been promoted to such position.   A supervisor shall not refuse to provide a written assignment form when requiring an employee to work in a position classified in a higher grade, as described above.   Any remedy based on a grievance filed under this section shall be limited in effect to a period not

21

to exceed five (5) days of the issuance of the grievance in writing. The Employer shall not rotate such assignments among employees for the purpose of avoiding compensation at the higher grade.

Section 3. When there is an existing Civil Service list for a position to be filled by an employee performing temporary service in a higher classification, selection of an employee for such position shall be made in accordance with Civil Service rules.

Section 4. When there is no existing Civil Service list for a bargaining unit position and it is to be filled by an employee performing temporary service in a higher classification, selection of an employee shall be made on the basis of qualifications and abilities; and where qualifications and ability are substantially equal, seniority as defined under Civil Service law and rules shall be the determining factor. In the event that seniority, as so defined, is also equal, total continuous service with the City of Boston, including service prior to an authorized absence shall be the determining factor. In the event that the candidate for a position within the job series as defined by Civil Service, are all non-permanent, thus a seniority date does not exist, and where qualifications and abilities are substantially equal then longevity with job series shall be the determining factor.

Section 5. When there is no existing Civil Service list for a bargaining unit position and it is to be filled by a provisional appointment or provisional promotion, the following procedure shall apply:

(A) The vacancy shall be posted for five (5) consecutive working days in the department, division or employing unit in which the vacancy exists.

(B) On the posting the Appointing Authority shall specify the job classifications eligible to fill the position. The decision as to eligible classifications of employees shall be subject to Civil Service law and rules and shall not be a subject of grievance or arbitration. The posting shall specify the duties and location of the position.

22

(C) Any and all eligible employees of a provisional appointment or provisional promotion shall be made from among the eligible bidders in the manner specified in paragraph (D) below. Notice of the selection shall be posted on the original posting at the time the selection is made.

(D) Selection shall be made on the basis of qualifications and ability; and where qualifications and ability are substantially equal, seniority as defined under Civil Service law and rules shall be the determining factor. In the event that seniority, as so defined, is also equal, total continuous service with the City of Boston, including service prior to an authorized absence shall be the determining factor. In the event that the candidates for a position within the job series as defined by Civil Service, are all non-permanent, thus a seniority date does not exist, and where qualifications and abilities are substantially equal then longevity within job series shall be the determining factor.

(E) The Appointing Authority's selection shall not be made arbitrarily, capriciously or unreasonably.

(F) In the event a more senior applicant is not selected, the Appointing Authority shall, upon written request by the Union, provide in writing reasons for the non-selection for up to three (3) of the most senior applicants who were not selected to fill the position. The Department shall endeavor to be as detailed as reasonably possible when providing said reasons. A complaint by an applicant who is junior to an employee selected under Section 4 and Section 5 shall not be the subject of a grievance or arbitration.

### ARTICLE XI (A).
### LAYOFF AND RECALL
Section 1. The City and the Union agree that if the City,

23



AGREEMENT

BETWEEN

CITY OF BOSTON

AND

AMERICAN FEDERATION OF STATE,
COUNTY AND MUNICIPAL EMPLOYEES,
AFL-CIO

COUNCIL 93
AND LOCALS

EFFECTIVE: JULY 1, 1999
EXPIRING: JUNE 30, 2002

(CITY-WIDE)

# TABLE OF CONTENTS

|  | Page |
|---|---|
| AGREEMENT | 1 |
| WITNESSETH | 1 |
| ARTICLE 1 - PERSONS COVERED BY THIS AGREEMENT | 1 |
| ARTICLE 1A - RESIDENCY | 2 |
| ARTICLE 2 - NON-DISCRIMINATION | 2 |
| ARTICLE 3 - PAYROLL DEDUCTION OF UNION DUES | 4 |
| ARTICLE 4 - PAYROLL DEDUCTION OF AGENCY SERVICE FEE | 4 |
| ARTICLE 5 - MANAGEMENT RIGHTS | 5 |
| ARTICLE 6 - DISCIPLINE AND DISCHARGE | 5 |
| ARTICLE 7 - GRIEVANCE PROCEDURE | 6 |
| ARTICLE 8 - NO-STRIKE CLAUSE | 10 |
| ARTICLE 9 - STABILITY OF AGREEMENT | 11 |
| ARTICLE 10 - HOURS OF WORK AND OVERTIME | 11 |
| ARTICLE 11 - TEMPORARY SERVICE IN A LOWER OR HIGHER POSITION | 14 |
| ARTICLE 11(A) - LAYOFF AND RECALL | 16 |
| ARTICLE 12 - HOLIDAYS | 20 |
| ARTICLE 13 - VACATION LEAVE | 21 |
| ARTICLE 14 - SICK LEAVE | 23 |
| ARTICLE 15 - OTHER LEAVES OF ABSENCE | 27 |
| Military Leave | 28 |
| Jury Duty | 28 |
| Bereavement Leave | 28 |
| Pregnancy-Maternity Leave | 28 |
| Parental Leave | 29 |
| Education Leave | 29 |
| Medical Leave | 29 |
| ARTICLE 15A - UNION BUSINESS | 29 |



pay period after the end of the pay period within which the overtime was earned, provided the time worked is duly reported.

Section 12.  The City agrees to cooperate with the Union in implementing with the four-day workweek on a limited basis where possible.

Section 13.  The Union agrees not to transfer employees for disciplinary reasons except in accordance with Article 6.

## ARTICLE 11 - TEMPORARY SERVICE IN A HIGHER OR LOWER CLASSIFICATION AND PROMOTIONS

Section 1.  While an employee is performing, pursuant to assignment, the duties of a position classified in a grade lower than the grade of the position in which he/she performs regular service, he/she shall be compensated at the rate of pay grade of the position in which he/she performs regular service.

Section 2.  Compensation for Work in a Higher Classification.  An employee who is performing, pursuant to assignment, temporary service in a position classified in a grade higher than the grade of the position in which he/she performs regular service, other than for the purpose of filling in for an employee on vacation, shall commencing with the sixth (6th) consecutive day of actual service in such higher position, be compensated for such service in such higher position, at the rate he/she would have been entitled had he/she been promoted to such position. A supervisor shall not refuse to provide a written assignment form requiring an employee to work in a position based in a higher grade, as described. Any assignment made in a higher grade shall be limited in effect to a period not to exceed five (5) days prior to the date of the filing of the grievance in writing. The Employer shall not rotate such assignments among employees for the purpose of avoiding such compensation at the higher grade.

Section 3.  When there is an existing Civil Service list for a position to be filled by an employee performing temporary service in a higher classification, the selection shall be made on the basis of such position and shall be made in accordance with Civil Service rules.

Section 4.  When there is no existing Civil Service list for a bargaining unit position and it is to be filled by an employee performing temporary service in a higher classification, qualifications and abilities being substantially equal, seniority as defined under Civil Service law and rules shall be the determining factor. In the event qualifications and abilities are substantially equal, total continuous service with the City of Boston, including service prior to an authorized absence shall be the determining factor. In the event that the candidate for a position within the job series as defined by Civil Service, seniority and where qualifications and abilities are substantially equal, then longevity within job series shall be the determining factor.

14

Section 5.  When there is no existing Civil Service list for a bargaining unit position and it is to be filled by a provisional appointment, or provisional promotion, the following procedure shall apply:

The vacancy shall be posted for five (5) consecutive working days in the department, division or employing unit in which the vacancy exists.

On the posting the Appointing Authority shall specify the job classification, eligible classifications of employees shall be subject to Civil Service law and rules and shall not be a subject of grievance or arbitration. The posting shall specify the duties and location of the position.

C.  The selection of an employee for provisional appointment or provisional promotion shall be made from among the eligible bidders in the manner specified in paragraph (d) below. Notice of the selection shall be posted. The posting shall specify the original posting at the time the selection is made.

D.  Selection shall be made on the basis of qualifications and ability, and where qualifications and ability are substantially equal, seniority as defined under Civil Service law and rules shall be the determining factor. In the event qualifications and ability, seniority as so defined, are also equal, total continuous service with the City of Boston, including service prior to an authorized absence shall be the determining factor. In the event that the candidates for a position within the job series as defined by Civil Service, are all non-permanent, then seniority does not exist, and where qualification and abilities are substantially equal, then longevity within the job series shall be the determining factor.

E.  The Appointing Authority's selection shall not be made arbitrarily, capriciously or unreasonably.

F.  In the event a more senior applicant is not selected, the Appointing Authority shall upon written request by the Union provide in writing the reasons for having selected up to three (3) of the most senior applicants who were not selected to fill the position. The Department shall endeavor to be as detailed as reasonably possible when providing the reasons. A complaint by an applicant who is junior to an employee selected under Section 4 or this Section 5 shall not be the subject of a grievance or arbitration.

G.  In the event the Union files a grievance over the non-selection of an employee(s) that the non-selection was arbitrary, the Union shall specify the written reasons to demand arbitration for the grievance of one (1) non-selected employee per vacancy. The Union shall specify such grievance(s) in writing at the time of filing its demand for arbitration.

15

1          COMMONWEALTH OF MASSACHUSETTS
        COMMISSION AGASINT DISCRIMINATION

2
                          #01-BEM-10929

3
                       VOL. I
4                      PGS. 1-46
5    RODERICK DIAZ,                    )
                                       )
6            Plaintiff,                )
                                       )
7        vs                            )
                                       )
8                                      )
     CITY OF BOSTON DPW, ET AL.        )
9                                      )
             Defendant.                )
10                                     )
11     DEPOSITION OF KATHLEEN KELLEY, a witness
12   called on behalf of the Plaintiff taken
13   pursuant to the Massachusetts Rules of
14   Civil Procedure, before Lori J. Atkinson,
15   a Professional Court Reporter and
16   Notary Public in and for the Commonwealth
17   of Massachusetts at the offices of Winston
18   Kendall, 136 Warren Street, Roxbury, MA on
19   the 25th of February, 2004, commencing at
20   2:40 p.m.
21
              EYAL COURT REPORTING, INC.
22            4 Faneuil Hall Marketplace
                 Boston, MA 02109
23               (800) 322-3925
24

Page 2

APPEARANCES:

Winston Kendall, Esq.
LAW OFFICES OF WINSTON KENDALL
136 Warren Street
Boston, MA 02119
(617) 442-6130
Counsel on behalf of the Plaintiff


Tsuyoshi Fukuda, Esq.
CITY OF BOSTON LAW DEPARTMENT
City Hall, Room 615
Boston, MA 02201
(617) 635-4038
Counsel on behalf of the Defendant

Page 3

INDEX

Witness                    Direct

KATHLEEN KELLEY
  (By Mr. Kendall:)         4


          E X H I B I T S

          (None marked.)

Page 4

                 P R O C E E D I N G S
          KATHLEEN KELLEY,
having been first duly sworn by the Notary
Public, was examined and testified as
follows:
          DIRECT EXAMINATION
BY MR. KENDALL:
Q.  Good day. I'm Attorney Kendall. I'm
    going to put a series of questions to you
    with regard to the litigation that is
    pending at MCAD 01-BEM-10929. If at any
    time you do not understand any of my
    questions, please feel to stop me and ask
    me to repeat or restate the question. I
    want to be sure that you understand what
    I'm attempting to elicit before you
    respond; do I make myself clear?
A.  Yes.
Q.  If at any time you want to come forward,
    please let me know and we will take a
    break and come back; is that okay?
A.  That's fine.
Q.  Please state your name, please?
A.  Kathleen Kelly, K-E-L-L-E-Y.

Page 5

          MR. FUKUDA: For the record,
    could I include objections that I had in
    the last deposition of Mr. Higgins. I
    want to reiterate that the predetermined
    deposition of discovery is limited to a
    total of six hours by each party pursuant
    to 804 CMR 1.13 7B.
          Number two, Central Fleet
    Maintenance has only been in existence
    since 1997. If there are any questions
    regarding anything prior to that date are
    not likely to lead to the discovery of
    admissible evidence.
          Thirdly, complainant's complaint
    is based solely on a retaliation cause of
    action. Any questions regarding impact
    and other causes of action, including
    interview questions that are not based in
    retaliation are not relevant and again not
    likely to lead to the discovery of
    admissible evidence.
          Finally, the City of Boston with
    reference to question number seven, nine,
    ten of the February 5, 2004 notice of

2 (Pages 2 to 5)

Page 6

1    deposition, again, they are not relevant
2    to the retaliation claim, which is the
3    complainant's sole cause of action and not
4    likely to lead to the discovery of
5    admissible evidence.
6    BY MR. KENDALL (CONT'D):
7  Q.  Would you tell me what is your job title,
8      Miss Kelley?
9  A.  Principal personnel officer.
10 Q.  Is it Miss or Mrs. Kelley?
11 A.  Miss.
12 Q.  Principal personnel officer?
13 A.  That's correct.
14 Q.  When were you appointed to that position?
15 A.  19 years ago.
16 Q.  What year was that?
17 A.  1985.
18 Q.  Who appointed you to that position?
19 A.  Commissioner Casazza.
20 Q.  Now, are you principal personnel officer
21     for Central Fleet Maintenance, or is it
22     for DPW?
23 A.  Public Works Department.
24 Q.  So you've always had that position from

Page 7

1      1985 to the present?
2  A.  That's correct.
3  Q.  How many people are on your staff?
4  A.  Currently, two, plus myself.
5  Q.  What are the names of those individuals?
6  A.  Mary O'Neill and Lee Ann Parker.
7  Q.  Were you provided with a written job
8      description in connection with your position?
9  A.  I don't understand the question. Was I
10     provided with it?
11 Q.  With a written job description in
12     connection with your position?
13 A.  There was a posting for the position that
14     I applied for.
15 Q.  Is that considered your job description?
16 A.  Yes.
17 Q.  You have a copy of that at your office
18     someplace?
19 A.  Yes.
20 Q.  What are your duties?
21 A.  I am in charge of all personnel matters
22     for the Public Works Department ranging
23     from hiring, disciplinary actions, all
24     paperwork for step raises, promotions, job

Page 8

1      postings. Also civil service lists. Any
2      and all personnel matters for the
3      department.
4  Q.  Could you describe your educational
5      background beginning with high school?
6  A.  Yes. I graduated from Mount St. Joseph
7      Academy in Brighton.
8  Q.  Okay.
9  A.  Got an associate's degree from Bunker Hill
10     Community College.
11 Q.  What year?
12 A.  1990.
13 Q.  Associate's degree in what?
14 A.  Management.
15 Q.  Yes?
16 A.  I received a bachelor's degree from
17     Emanuel College in 1992.
18 Q.  In what?
19 A.  Management. A master's degree in
20     management from Emanuel in 1994.
21 Q.  As part of your job description, are you
22     responsible for affirmative action or
23     equal employment opportunity matters?
24 A.  Within the Public Works Department, yes.

Page 9

1  Q.  Is that part of your job description?
2  A.  Yes.
3  Q.  What specifically do you do in that
4      regard?
5  A.  I track all racial quotas, which are then
6      compiled by the city's office of human
7      resources, which is basically the main
8      personnel office for the entire city. Any
9      data or information which they need
10     pertaining to the Public Works Department,
11     I supply to them.
12 Q.  What type of data would you, for example,
13     compile a list of names of employees by
14     race and job title?
15 A.  Correct. Yes.
16 Q.  How often do you provide that information
17     to the City of Boston?
18 A.  As needed.
19 Q.  Once a year, once every two years?
20 A.  I would say at least once a year.
21 Q.  To whom do you send those reports of that
22     information?
23 A.  To the office of human resources.
24     Currently the director down here is Vivian

3 (Pages 6 to 9)

Page 10

1    Leonard.
2    Q.  Where is Miss Leonard's office located?
3    A.  In room 612 of Boston City Hall.
4    Q.  Where is your office located?
5    A.  Room 17 in Boston City Hall.
6    Q.  What other responsibilities do you have
7        for affirmative action matters besides
8        collecting data?
9    A.  I can't say specifically.  I respond to
10       requests from them, but they are the human
11       resource department for the city.
12   Q.  Did you see a copy of Exhibit 1 prior to
13       today's examination.  Exhibit 1 is before
14       you.
15   A.  Yes, I did.
16   Q.  When and where did you first see that
17       document?
18   A.  Our attorney showed it to me.  To ask me
19       my input on who would be the best person
20       to answer these questions.
21   Q.  When did you first see that document?
22   A.  I want to say a couple of weeks ago.
23   Q.  Was anybody else present when you were
24       shown that exhibit?

Page 11

1    A.  No.
2    Q.  You had some discussion with the attorney?
3    A.  Yes.
4    Q.  Did you have any discussions with anyone
5        else relative to what has been set forth
6        in Exhibit 1?
7    A.  Not at that time.
8    Q.  At any time between the time that you
9        first saw it and today's date?
10   A.  Yes.
11   Q.  With whom did you have discussions?
12   A.  David Higgins.
13   Q.  Anyone else.
14   A.  No.
15   Q.  Where were you when you had the
16       discussions with Mr. Higgins?
17   A.  On the telephone in my office.
18   Q.  On the telephone and in your office?
19   A.  In my office on the telephone.
20   Q.  How long did the conversation last?
21   A.  I would say approximately ten to 15
22       minutes.
23   Q.  Was anyone else present when you spoke to
24       Mr. Higgins on the telephone?

Page 12

1    A.  Yes, the attorney was.
2    Q.  Anybody else?
3    A.  No.
4    Q.  Did you review any documents in
5        preparation for your testimony today?
6    A.  Yes, I did.
7    Q.  What documents did you review?
8    A.  I reviewed Mr. Diaz's personnel file.
9    Q.  Yes.
10   A.  And the folders pertaining to the two
11       positions that he applied for.
12   Q.  Any other documents that you reviewed?
13   A.  In response to some of these questions, I
14       reviewed the overall department's personnel
15       numbers and so forth.
16   Q.  When you say you reviewed the department's
17       personnel numbers, can you be more
18       explicit, please?
19   A.  Number four asked for the breakdown by
20       race of persons who've worked for the
21       heavy and light garages.  Again, I had to
22       review the department personnel records to
23       determine what those figures would be?
24   Q.  Anything else that you reviewed?

Page 13

1    A.  I don't believe so.
2    Q.  Now, does the City of Boston have an
3        affirmative action policy?
4    A.  Yes, it does.
5    Q.  Does it have affirmative action
6        guidelines?
7    A.  Yes, it does.
8    Q.  Who is the affirmative action officer?
9    A.  William Kessler.
10   Q.  Where is his office located?
11   A.  Office of Human Resources, Room 612 in
12       City Hall.
13   Q.  Is he a white male?
14   A.  Yes, he is.
15   Q.  How long has he been in that position?
16   A.  I don't know.
17   Q.  Does your office have interaction or
18       ongoing business with Mr. Kessler?
19   A.  Does the office?  My office?
20   Q.  Yes.
21   A.  Yes.
22   Q.  What sort of interaction do you have with
23       Mr. Kessler.
24   A.  Mr. Kessler works with a number of hats.

4 (Pages 10 to 13)

Page 14

1  In addition to being the city's affirmative
2  action officer, he is also in charge of
3  any complaints that are filed or harassment or
4  hostile work environment or anything like
5  that. He is also the person that is in
6  charge of approving requests for job
7  postings. It is his office that accepts
8  the application for people applying for
9  those job postings.
10         He is also the CDL, commercial
11  driver's license. He administers the
12  program for the City of Boston as far as
13  mandatory drug testing and so forth
14  required by the federal government.
15  Q.  When did those mandatory job testing
16      requirements go into place?
17  A.  When CDL was formed in 1985.
18  Q.  What measures does your office take to
19      ensure there is no racial discrimination
20      in employment at Central Fleet
21      Maintenance?
22         MR. FUKUDA: Objection.
23         You can answer.
24  A.  I'm not sure I understand the question.

Page 15

1         MR. KENDALL: Would you read the
2  question back, please.
3         (Record read as requested.)
4  A.  I guess the best I can answer it is that I
5      review any transactions that are made by
6      any of our managers in hiring or
7      disciplinary process. That's certainly
8      one of the things that I would be looking
9      at when I review them.
10  Q.  Do you use any documents, any guidelines
11      or any memoranda to help you determine
12      whether or not there is a problem with
13      racial discrimination in a decision made
14      within Central Fleet Maintenance?
15         MR. FUKUDA: Objection.
16  A.  No, just my own knowledge.
17  Q.  When you say your own knowledge,
18      specifically what type of knowledge are
19      you referring to?
20  A.  For example, I know when we use civil
21      service lists, we were under court order
22      for a long time that the hiring had to be
23      from two separate lists. We would receive
24      a regular list and a minority's list. I

Page 16

1  had to insure that each person that was
2  selected alternated between the two lists;
3  things like that.
4  Q.  How many black people, African American
5      people, are there in supervisory positions
6      at Central Fleet Maintenance?
7         MR. FUKUDA: Objection.
8  A.  I know Maurice Smith is the superintendent
9      in the light shop. I know Fitzroy Prescott
10      is the foreman. That's all I can think of
11      off the top of my head.
12  Q.  When was Maurice Smith appointed to his
13      position?
14  A.  To the superintendent position?
15  Q.  Yes.
16  A.  Recently, I would say several months ago.
17  Q.  In 2003?
18  A.  Yes.
19  Q.  Who appointed him to the position?
20  A.  Obviously, any appointments are made by
21      the appointing authority who was the
22      commissioner of public works but upon the
23      recommendation of a manager. In that
24      case, David Higgins.

Page 17

1  Q.  Were you part of the process that led to
2      the recommendation of Mr. Smith to the
3      position?
4  A.  Yes, I was.
5  Q.  What role did you play?
6  A.  I was one of the interviewers in a panel
7      of interviewers.
8  Q.  Anything else that you did with respect to
9      the recommendation besides interviewing
10      Mr. Smith?
11  A.  No.
12  Q.  How many people applied for that position?
13      The one that Mr. Smith was awarded?
14  A.  I don't remember off the top of my head.
15  Q.  Do you know what the reasons were for the
16      recommendation that Mr. Smith be appointed
17      to that position?
18  A.  He was the most qualified candidate.
19  Q.  Why was he the most qualified candidate?
20  A.  Based on the results of the interview and
21      the evaluation of the interviewers.
22  Q.  How many interviewers were there?
23  A.  I believe three.
24  Q.  Who were they?

Page 18

1   A.   Myself, David Higgins and Robert Silvey.
2   Q.   What is Mr. Prescott's position?
3   A.   He is a foreman.
4   Q.   When was he appointed to that position?
5   A.   I don't know off the top of my head.
6   Q.   Is he an acting foreman or permanent
7        foreman?
8   A.   I believe he is a permanent foreman.
9   Q.   When was he appointed to a permanent
10       foreman position?
11  A.   I don't know.
12  Q.   Were you involved in that process that led
13       to Mr. Prescott's appointment as a
14       permanent foreman?
15  A.   No, I believe he was made a permanent
16       foreman through Chapter 282 of civil
17       service, which was legislation passed. In
18       lieu of civil service exams, legislation
19       was passed and there was a criteria of a
20       time being served in a position. And if
21       you met the criteria, you were permanently
22       promoted or appointed.
23  Q.   You said that he was appointed because of
24       the operation of the civil service

Page 19

1        regulation?
2   A.   I believe so.
3   Q.   Chapter what?
4   A.   282.
5   Q.   You don't recall the year that that
6        happened?
7   A.   I do.
8   Q.   What year was that?
9   A.   Effective date was 9-9-98.
10  Q.   So you had no direct input into that
11       process?
12  A.   No.
13  Q.   That was strictly civil service?
14  A.   All I did was review dates and titles and
15       so forth for them. There was legislation
16       and their approval.
17  Q.   Now, what is the total number of white
18       supervisory officials at Central Fleet
19       Maintenance?
20            MR. FUKUDA: Objection.
21  A.   I don't know the number.
22  Q.   Would you say there is an imbalance as
23       between black and white supervisors at
24       Central Fleet Maintenance?

Page 20

1            MR. FUKUDA: Objection.
2   A.   Could you clarify the word imbalance.
3   Q.   There are two black supervisors?
4   A.   Yes.
5   Q.   And is it fair to say that there are more
6        than six white supervisors?
7            MR. FUKUDA: Objection.
8   Q.   At Central Fleet Maintenance?
9   A.   I don't know if there are more than six.
10  Q.   You don't know?
11  A.   No.
12  Q.   Who would have that information?
13  A.   Mr. Higgins runs Central Fleet
14       Maintenance.
15  Q.   You are the chief personnel office for
16       Central Fleet Maintenance, are you not?
17  A.   Yes. For the Public Works Department,
18       which includes Central Fleet Maintenance.
19  Q.   Is there another component to the Public
20       Works Department besides Central Fleet
21       Maintenance?
22  A.   Many. We have ten different sections.
23  Q.   What are the other sections?
24  A.   We have the central office. We have

Page 21

1        engineering. We have permit branch.
2        Recycling office. We have bridges.
3        Street lighting. And then highway
4        maintenance, which would be your road
5        construction. Highway maintenance, which
6        would be your street plowing, and so
7        forth, and highway construction.
8   Q.   Highway maintenance and construction
9        are --
10  A.   Two different sections, yes.
11  Q.   Anything else?
12  A.   Central Fleet Building Maintenance and
13       sanitary.
14  Q.   You are saying that you don't know how
15       many supervisor officials there are at
16       Central Fleet?
17  A.   Not off the top of my head. I obviously
18       have personnel records in my office that I
19       could refer to but I don't know off the
20       top of my head.
21  Q.   As you sit here, you don't know whether
22       there is a racial imbalance between black
23       and white supervisory officials at Central
24       Fleet Maintenance?

6 (Pages 18 to 21)

Page 22

1          MR. FUKUDA: Objection.
2    Q.  You simply don't know. You don't have
3       those records in front of you?
4          MR. FUKUDA: Objection.
5    Q.  Pardon me?
6          MR. FUKUDA: I said objection.
7          MR. KENDALL: I heard you, sir,
8       twice.
9    Q.  What was the answer, ma'am?
10   A.  I don't believe I said that.
11   Q.  What did you say?
12   A.  I said that I knew there were two blacks.
13      I did not know of the number of whites.
14   Q.  My question is: Do you know whether or
15      not there is an imbalance between black
16      and white supervisors?
17         MR. FUKUDA: Objection.
18   Q.  At Central Fleet Maintenance?
19         MR. FUKUDA: Objection.
20   Q.  You may answer, ma'am.
21   A.  I don't know.
22   Q.  Is the reason why you don't know because
23      you don't have those records in front of
24      you?

Page 23

1    A.  Correct.
2    Q.  You said the person that would know that
3       is Mr. Higgins?
4    A.  Yes.
5    Q.  Is that part of your job to know the
6       racial breakdown of supervisor officials
7       in the various departments?
8    A.  No.
9    Q.  That is not part of your job?
10   A.  It is part of my job to keep the records
11      that I can look at to find out that
12      information when asked. I don't know it
13      all in my head.
14   Q.  I'm going to ask you to take a look at
15      Defendants' Exhibit 2. I ask you to just
16      look at that, please.
17   A.  Okay.
18   Q.  Have you seen a copy of that document
19      prior to today's date?
20   A.  Yes.
21   Q.  At the bottom of that document there is
22      some language. I have a copy. At the
23      bottom of that document there is a line
24      that says an equal opportunity/affirmative

Page 24

1       action employer. Did I read that correctly?
2    A.  Yes, you did.
3    Q.  The City of Boston is an affirmative
4       action employer, right?
5    A.  Correct.
6    Q.  What is your understanding of that term
7       that the City of Boston is an affirmative
8       action employer? What does that mean?
9          MR. FUKUDA: Objection.
10   Q.  You may answer.
11   A.  That we give equal opportunity to all
12      people.
13   Q.  Are you familiar with the affirmative
14      action guideline promulgated by the Equal
15      Opportunity Employment Commission?
16   A.  I'm familiar with the document. Am I
17      familiar with every line of it? No.
18   Q.  You know the document exists?
19   A.  Yes.
20   Q.  Have you ever read it in the course of
21      your employment?
22   A.  At sometime I'm sure, yes.
23   Q.  Do the guidelines have any language that
24      speak to employee selection and breakdown

Page 25

1       of employees by race?
2    A.  I don't know.
3    Q.  You have read document?
4    A.  Yes.
5    Q.  You were appointed to the position in what
6       year?
7    A.  1985.
8    Q.  Sometime between 1985 and 2004, you have
9       read that document?
10   A.  Yes.
11   Q.  You know what it says?
12   A.  I know --
13   Q.  Do you know what this document says?
14   A.  Do I know word for word what it says? No.
15   Q.  Did you know what it says generally?
16   A.  Generally.
17   Q.  Do you know what the EEO guidelines in the
18      employee selection say?
19   A.  No.
20   Q.  You don't?
21   A.  No.
22   Q.  Have you ever talked to Mr. Kessler, the
23      affirmative action officer, about the
24      affirmative action guidelines and what it

Page 26

1   requires of the City of Boston?
2   A.  No, I have not.
3        MR. FUKUDA: I object to the
4   entire line of questioning. Once, again,
5   this is a retaliation cause of action.
6   The sole cause of action that your complainant
7   is making against the City of Boston is
8   solely retaliation. These questions have
9   absolutely no relevance whatsoever.
10       MR. KENDALL: I will say this
11  for the record, sir. If you look at the
12  document, it says, cause of action
13  discrimination. Name the employer who
14  discriminated against him, It says, David
15  Higgins/director of CFM and City of
16  Boston. It says discriminate. When you
17  say that it is only with respect to
18  retaliation, the document speaks for
19  itself. It also says discrimination.
20       Thank you, counselor.
21  BY MR. KENDALL (CONT'D):
22  Q.  Did you play any part, Miss Kelley, in
23  drafting the requirements set forth in
24  Exhibit No. 2, where it says minimum

Page 27

1   entrance qualification?
2   A.  I typed them.
3   Q.  That is the only part that you played, you
4   typed the form?
5   A.  I type the form. I get the commissioner's
6   signature. I sent it to human resources,
7   budget, so forth.
8   Q.  At the bottom of Exhibit 2 it says
9   signature of appointing authority or
10  designee, I believe that is Mr. Casazza's
11  signature.
12  A.  Yes.
13  Q.  It also says approval of director of human
14  resources?
15  A.  Yes.
16  Q.  Do you know whose signature that is at the
17  bottom?
18  A.  Yes, I do.
19  Q.  Whose signature is that?
20  A.  Vivian Leonard.
21  Q.  Do you know when it says that the director
22  of human resources approved of this
23  document; what is your understanding as to
24  what that means?

Page 28

1   A.  When I type a job posting, it goes to the
2   office of human resources for their review
3   before it is approved. They are the ones
4   that assign the posting dates and posting
5   number.
6   Q.  When the language of the document says
7   approval of director of human resources,
8   what does that mean when it says the
9   director approved of it?
10  A.  Her office has approved the document and
11  approves what is in it.
12  Q.  Did you ever talk to anybody at the office
13  of human resources about the requirements
14  set forth in this document?
15  A.  No.
16  Q.  Did you have any part in the selection in
17  the choosing of the selection criteria for
18  the position that Mr. Diaz applied for?
19  A.  This position, I know he applied for two
20  of them.
21  Q.  Let's deal with this one. Did you have
22  any part in choosing the criteria?
23  A.  Yes.
24  Q.  What was your role?

Page 29

1   A.  I was part of the interview panel. Can I
2   refer to my notes? I know there were two
3   postings. I'm not positive whether this
4   is the first or the second one. I believe
5   this is the second one.
6   Q.  Yes.
7   A.  Second one, yes, I was part of the
8   interview panel.
9   Q.  Apart from being on the interview panel,
10  what other role did you play?
11  A.  Can you repeat the question.
12  Q.  Apart from being on the interview panel
13  that interviewed Mr. Diaz, what other role
14  did you play in establishing the criteria
15  for selection of a successful candidate?
16  A.  If you are referring to the requirements
17  on the posting, those were determined
18  combination of civil service requirements.
19  And when Central Fleet was formed, we
20  developed job descriptions which include
21  minimum entrance requirements for every
22  position in Central Fleet. I was a part
23  of that.
24  Q.  Apart from that, what else did you do in

8 (Pages 26 to 29)

Page 30

1    the selection process?
2  A.  Apart from being on the interview panel, I
3      had no role to play until the commissioner
4      approved the recommendation and then I
5      processed the paperwork.
6  Q.  In the interview process, what happened in
7      this interview process?
8  A.  We interviewed the candidate that applied
9      for the job one-on-one.  We read a series
10     of questions.  Mr. Higgins noted their
11     answers.  We did that for each one.  When
12     the process was completed for all the
13     applicants, the interviewers ranked each
14     of the applicants.  Then when we had done
15     our individual ranking, we then had a
16     discussion to come up with an overall
17     ranking.
18 Q.  You said that you ranked the participants?
19 A.  Correct.
20 Q.  How was this ranking performed?
21 A.  On each person's beliefs who was the most
22     qualified second, third, forth, so forth.
23 Q.  Was this ranking done orally?
24 A.  No.

Page 31

1  Q.  Or in writing?
2  A.  In writing.
3  Q.  What did you write; good, bad, indifferent?
4      How did you set it up?
5  A.  Numbers, one, two, three, four.
6  Q.  One being the highest or lowest?
7  A.  Highest.
8  Q.  For every candidate you would put a check
9      and write in a number?
10 A.  Correct.
11 Q.  What did you do with that information?  Do
12     you write in a sheet of paper?
13 A.  Yes.
14 Q.  What did you do that with information?
15 A.  Just held it until we had the discussion.
16 Q.  So that the panelist didn't know what you
17     were thinking?
18 A.  Correct.
19 Q.  After the candidates had all been
20     interviewed there was a collegial
21     discussion; is that a fair statement?
22 A.  Yes.
23 Q.  How long after the interview?
24 A.  Immediately after the last person was

Page 32

1      interviewed.
2  Q.  All the parties discussed what happened
3      what their views were.  What happened as a
4      result of that process?
5  A.  We all exchanged views about the various
6      candidates.  And then after everyone
7      expressed their various opinions and asked
8      questions and so forth, we then we
9      revealed what our rankings were to come up
10     with an overall ranking.
11 Q.  Who was the chairperson of that panel?
12 A.  I guess it would have been Mr. Higgins.
13 Q.  Was every person required to tell Mr.
14     Higgins what his or her vote was?
15 A.  Yes.
16 Q.  You indicated your vote?
17 A.  Yes.
18         MR. FUKUDA:  Objection.
19 Q.  For whom did you vote?
20         MR. FUKUDA:  Objection.
21 A.  Again, I didn't vote.  I ranked.
22 Q.  You told Mr. Higgins who was your
23     preferred candidate?
24 A.  No, I told Mr. Higgins what the ranking

Page 33

1      was that I had assigned to each candidate.
2  Q.  You never told Mr. Higgins what your
3      preference was orally?
4  A.  Obviously, my number one ranking would be
5      my preference.
6  Q.  Did you hand Mr. Higgins your piece of
7      paper, or did you hold that piece of
8      paper.
9  A.  I held it and we discussed it.
10 Q.  You told him what your rankings were for
11     every one of the participants?
12 A.  Correct.
13 Q.  What did Mr. Higgins do with that
14     information?  What did he say?
15 A.  He recorded each of the interviewers and
16     what their rankings of each of the
17     candidates was.
18 Q.  Did he say at that point after every got
19     through giving his or her view, did Mr.
20     Higgins say at that time who he felt
21     should get the position?
22 A.  Yes.
23 Q.  What did he say?
24 A.  He gave his ranking also.  He ranked as

Page 34

1    well as each of us ranked. He compared
2    the numbers from all of us combined
3    for an overall ranking.
4    Q.   Whom did you choose?
5    A.   Mr. Musto came out number one.
6    Q.   What happened to your notes, you made some
7    notes with some rankings, what happened to
8    your notes?
9    A.   There wasn't notes. It was a piece of
10   paper with numbers.
11   Q.   What happened to your piece of paper with
12   numbers?
13   A.   I don't recall.
14   Q.   Do you have a copy of it someplace?
15   A.   I doubt it. It was a scrap piece of
16   paper. It probably got thrown out.
17   Q.   Mr. Higgins told you right then and there
18   what his decision was going to be?
19   A.   Yes.
20   Q.   Did you concur with that decision?
21   A.   Yes, I did.
22   Q.   Did all of the interviewers concur with
23   that decision?
24   A.   Yes, they did.

Page 35

1    Q.   What did Mr. Higgins say he was going to
2    do based on the collective opinion?
3    A.   That he would make a recommendation to
4    Commissioner Casazza to promote Mr. Musto.
5    Q.   You were satisfied with that?
6    A.   Yes.
7    Q.   You thought that Mr. Musto was the most
8    qualified person?
9    A.   Yes, I did.
10   Q.   Why did you feel that way?
11   A.   From participating in the interview
12   process. Reviewing his application and
13   his personnel record.
14   Q.   Prior to your interview of Mr. Musto, had
15   you ever participated in a similar
16   interview process with respect to any
17   position, any supervisory position of
18   Central Fleet Maintenance?
19   A.   Yes.
20   Q.   With regard to what position and who was
21   the successful candidate?
22   A.   Many times. I don't know that I could
23   list every single one.
24   Q.   When was the last time that you

Page 36

1    participated in any interview process?
2         MR. FUKUDA: Objection.
3    A.   It would be a guess. I would say probably
4    1999.
5    Q.   Who asked to you participate?
6    A.   Mr. Higgins.
7    Q.   On how many separate occasions did you
8    participate in such an interview process
9    in 1999 and December 2003?
10   A.   Approximately ten.
11   Q.   Do you have notes at your office that
12   would help refresh your recollection --
13        MR. FUKUDA: Objection.
14   Q.   -- as to how many times you participated
15   in an interview process --
16        MR. FUKUDA: Objection.
17   Q.   -- in between 1999 and December 2003?
18        MR. FUKUDA: Objection.
19   Q.   You may answer.
20   A.   Do I have notes?
21   Q.   Or any memorandum or writing of any kind?
22   A.   Other than my calendars of where I was
23   each day and what I did. Obviously, if I
24   had interviews scheduled, they would

Page 37

1    reflect in my ca lender.
2    Q.   That is the only memory that you have of
3    something written in your calendar?
4    A.   Yes.
5    Q.   What weight did you give to Mr. Musto's
6    experience --
7         MR. FUKUDA: Objection.
8    Q.   In deciding that he was the most suitable
9    candidate?
10        MR. FUKUDA: Objection.
11   A.   We did not give individual rankings to
12   experience. We gave overall rankings.
13   Q.   Mr. Higgins said that the criteria that he
14   used in making the decision was education,
15   experience, I believe he said job knowledge.
16   Is that your recollection of the criteria
17   that were used?
18        MR. FUKUDA: Objection.
19   A.   Yes.
20   Q.   You didn't weigh them equally? How did
21   you weigh those three criteria?
22   A.   Overall as one total unit.
23   Q.   You weighed some criteria more heavily
24   than others; is that a fair statement?

Page 38

1          MR. FUKUDA: Objection.
2    A.   No.
3    Q.   Did you weigh them equally?
4    A.   It was an overall opinion. All things as
5         one unit.
6    Q.   So all three were rolled into one?
7          MR. FUKUDA: Objection.
8    Q.   You may answer.
9    A.   I don't understand what you mean.
10   Q.   You did not weigh them equally; is that
11        what you are saying?
12         MR. FUKUDA: Objection.
13   Q.   Unequivocally, you did weigh them equally?
14   A.   I didn't weigh them separately at all. I
15        weighed them as one package.
16   Q.   How did you determine that experience
17        would be worth however many points or
18        percentage points you assigned to it as
19        opposed to job knowledge as opposed to
20        something else?
21         MR. FUKUDA: Objection. This
22        again has nothing to do with the
23        retaliation claim. The complaint has
24        absolutely no --

Page 39

1          MR. KENDALL: You said that
2    about six times, counsel.
3          MR. FUKUDA: You are absolutely
4    wrong.
5          MR. KENDALL: You keep
6    repeating. We don't need the speech. You
7    object. Then you stop. Let me go on.
8          MR. FUKUDA: The complaint has
9    absolutely nothing to do with anything but
10   retaliation.
11         MR. KENDALL: It says discrimination,
12   if you look at it. Thank you.
13         MR. FUKUDA: Cause of
14   discrimination based on other.
15         MR. KENDALL: I don't need the
16   speech; okay.
17         MR. FUKUDA: This is in
18   violation of MGL Chapter 151 (b), Section
19   4, Paragraph 4, entitled 7. That is based
20   on retaliation.
21         MR. KENDALL: Thank you. You
22   can cut it; okay. Somebody else might be
23   impressed by you. I am not. This is my
24   office. Okay. Thank you. Let me ask my

Page 40

1    questions so we can get out of here,
2    please.
3    BY MR. KENDALL (CONT'D):
4    Q.   Now, how did you determine what weight to
5         give to any component? Are you saying
6         that you just lumped them all together?
7          MR. FUKUDA: Objection.
8    Q.   Indiscriminately you just lumped them all
9         together; is that correct?
10         MR. FUKUDA: Objection.
11   A.   I did not say that.
12   Q.   How did you decide how you were going to
13        measure experience as opposed to knowledge
14        as opposed to something else?
15   A.   It is not broken down separate. It was
16        taken as one total package.
17   Q.   It depends on how you subjectively
18        perceived the applicant?
19         MR. FUKUDA: Objection.
20   Q.   You may answer.
21   A.   As I perceived the each applicant, yes.
22   Q.   That's based on how that applicant
23        performed on the test and how the
24        applicant answered question --

Page 41

1          MR. FUKUDA: Objection.
2    Q.   -- is that a fair statement?
3          MR. FUKUDA: Objection.
4    A.   As well as their application, resume', so
5         forth, personnel cards.
6    BY MR. KENDALL (CONT'D):
7    Q.   Did you ever talk to anyone at the office
8         of human resources or affirmative action
9         office about whether or not the practices
10        used to select people for these positions
11        were discriminatory or not?
12         MR. FUKUDA: Objection.
13   A.   No.
14   Q.   Did you have any concern that criteria
15        used to select the persons for these
16        positions as foreman that these criteria
17        were discriminatory?
18         MR. FUKUDA: Objection.
19   A.   No.
20   Q.   You had no concern?
21   A.   None whatsoever.
22         MR. FUKUDA: Objection.
23   Q.   Do you continue to have no concern?
24         MR. FUKUDA: Objection.

Page 42

1        MR. KENDALL: Do you mind if I
2  finish the question, counselor. That is
3  the polite thing to do is to let me finish
4  the question and then object.
5        MR. FUKUDA: These questions
6  have absolutely nothing to do with
7  retaliation.
8        MR. KENDALL: It is a question
9  of courtesy, counsel. You allow me to
10 finish the question then you object. You
11 don't cut me off. Maybe because I'm black
12 I don't deserve -- don't roll your eyes at
13 me. This is my office. I pay rent here.
14       Maybe it is because I'm black.
15 Because I go to a lot of white lawyers'
16 offices and I don't cut them off. I allow
17 them to put the statement on the record
18 and then I object. I would like the same
19 courtesy, please.
20       MR. FUKUDA: I would like the
21 record to reflect that I'm not actually
22 white.
23       MR. KENDALL: It is black
24 history month. I don't care what you are.

Page 43

1  You are not black.
2        MR. FUKADA: This is it.
3        MR. KENDALL: This is what? Are
4  you going to jump in my face?
5        MR. FUKADA: No. I'm not going
6  to jump in your face. This is absolutely
7  irrelevant.
8        MS. KENDALL: Oh, yes, it is
9  true, counsel. Allow me to finish my
10 question then you can object. Don't be
11 cutting me off.
12       MR. FUKADA: First of all, how
13 dare you put on the record that I am a
14 racist. That is absolutely --
15       MR. KENDALL: I didn't say you
16 were a racist. Stop putting your hand up
17 to my face.
18       MR. FUKADA: That is absolutely
19 inappropriate.
20       MR. KENDALL: Don't come into my
21 office and point your hand in my face,
22 counsel
23       MR. FUKADA: We can stop this
24 deposition at any time.

Page 44

1        MS. KENDALL: Excuse me?
2        MR. FUKUDA: We can stop this
3  deposition --
4        MR. KENDALL: We?
5        MR. FUKUDA: Yes.
6        MR. KENDALL: Who is running
7  this deposition?
8        MR. FUKUDA: I can take my
9  client and walk out this door.
10       MR. KENDALL: Don't be
11 threatening me, counsel. Don't come into
12 my office --
13       MR. FUKUDA: Don't tell me I'm a
14 racist in your office. This is ridiculous.
15       MR. KENDALL: I did not tell you
16 that you are a racist. If you think that
17 you are a racist, then so be it. Call as
18 you see it, brother.
19 BY MR. KENDALL (CONT'D):
20 Q. My question is: Do you have any concern
21    today, ma'am, that the methods used to
22    select the foreman may have been
23    discriminatory?
24       MR. FUKUDA: I object.

Page 45

1  A. No, I do not.
2        MS. KENDALL: No further
3  questions of the witness.
4        MS. FUKUDA: Thank you.
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

12 (Pages 42 to 45)

Page 46

1       COMMONWEALTH OF MASSACHUSETTS
2   COUNTY OF SUFFOLK, SS.
3           I, Lori J. Atkinson,
        Professional Court Reporter and Notary
4   Public duly and qualified in and for the
        State of Massachusetts do hereby certify
5   there came before me the deponent herein,
        namely KATHLEEN KELLEY, who was by me duly
6   sworn to testify to the truth and nothing
        but the truth concerning the matters in
7   this cause.
            I further certify that the
8   foregoing transcript is a true and correct
        transcript of my original stenographic
9   notes.
            I further certify that I am
10  neither an attorney or counsel for, nor
        related to or employed by any of the
11  parties to the action in which this
        deposition is taken; and furthermore, that
12  I am not a relative or employee of any
        attorney or counsel employed by the
13  parties hereto or financially interested
        in the action.
14
            IN WITNESS WHEREOF, I have
15  hereunto set my hand and affixed my
        Notarial Seal this 4th day of March, 2004.
16
17          LORI J. ATKINSON
            NOTARY PUBLIC
18

    My commission expires:
19  December 8, 2006
20          ***PLEASE NOTE***
    THE FOREGOING CERTIFICATION OF THIS
21  TRANSCRIPT DOES NOT APPLY TO ANY
    REPRODUCTION AND/OR DISTRIBUTION OF THE
22  SAME BY ANY MEANS UNLESS UNDER THE DIRECT
    CONTROL AND/OR SUPERVISION OF THE
23  CERTIFYING COURT REPORTER.
24

**A**

about 25:23 28:13 32:5
   39:2 41:9
absolutely 26:9 38:24
   39:3,9 42:6 43:6,14
   43:18
Academy 8:7
accepts 14:7
acting 18:6
action 5:16,17 6:3 8:22
   10:7 13:3,5,8 14:2
   24:1,4,8,14 25:23,24
   26:5,6,12 41:8 46:11
   46:13
actions 7:23
actually 42:21
addition 14:1
administers 14:11
admissible 5:13,21 6:5
affirmative 8:22 10:7
   13:3,5,8 14:1 24:3,7
   24:13 25:23,24 41:8
affixed 46:15
African 16:4
after 31:19,23,24 32:6
   33:18
again 5:19 6:1 12:21
   26:4 32:21 38:22
against 26:7,14
AGASINT 1:1
ago 6:15 10:22 16:16
AL 1:8
allow 42:9,16 43:9
alternated 16:2
always 6:24
American 16:4
AND/OR 46:21,22
Ann 7:6
another 20:19
answer 10:20 14:23
   15:4 22:9,20 24:10
   36:19 38:8 40:20
answered 40:24
answers 30:11
anybody 10:23 12:2
   28:12
anyone 11:4,13,23 41:7
anything 5:11 12:24
   14:4 17:8 21:11 39:9
Apart 29:9,12,24 30:2
APPEARANCES 2:1
applicant 40:18,21,22
   40:24
applicants 30:13,14
application 14:8 35:12
   41:4
applied 7:14 12:11
   17:12 28:18,19 30:8
APPLY 46:21
applying 14:8
appointed 6:14,18

16:12,19 17:16 18:4
   18:9,22,23 25:5
appointing 16:21 27:9
appointment 18:13
appointments 16:20
approval 19:16 27:13
   28:7
approved 27:22 28:3,9
   28:10 30:4
approves 28:11
approving 14:6
approximately 11:21
   36:10
asked 12:19 23:12 32:7
   36:5
assign 28:4
assigned 33:1 38:18
associate's 8:9,13
Atkinson 1:14 46:3,17
attempting 4:16
attorney 4:8 10:18 11:2
   12:1 46:10,12
authority 16:21 27:9
awarded 17:13

**B**

b 3:10 39:18
bachelor's 8:16
back 4:21 15:2
background 8:5
bad 31:3
based 5:15,18 17:20
   35:2 39:14,19 40:22
basically 9:7
before 1:14 4:16 10:13
   28:3 46:5
beginning 8:5
behalf 1:12 2:8,16
being 14:1 18:20 29:9
   29:12 30:2 31:6
beliefs 30:21
believe 13:1 17:23 18:8
   18:15 19:2 22:10
   27:10 29:4 37:15
besides 10:7 17:9 20:20
best 10:19 15:4
between 11:8 16:2
   19:23 21:22 22:15
   25:8 36:17
black 16:4 19:23 20:3
   21:22 22:15 42:11,14
   42:23 43:1
blacks 22:12
Boston 1:8,22 2:6,12
   2:14 5:22 9:17 10:3,5
   13:2 14:12 24:3,7
   26:1,7,16
bottom 23:21,23 27:8
   27:17
branch 21:1
break 4:21

breakdown 12:19 23:6
   24:24
bridges 21:2
Brighton 8:7
broken 40:15
brother 44:18
budget 27:7
Building 21:12
Bunker 8:9
business 13:18

**C**

C 4:1
ca 37:1
calendar 37:3
calendars 36:22
Call 44:17
called 1:12
came 34:5 46:5
candidate 17:18,19
   29:15 30:8 31:8
   32:23 33:1 35:21
   37:9
candidates 31:19 32:6
   33:17
cards 41:5
care 42:24
Casazza 6:19 35:4
Casazza's 27:10
case 16:24
cause 5:15 6:3 26:5,6
   26:12 39:13 46:7
causes 5:17
CDL 14:10,17
central 5:8 6:21 14:20
   15:14 16:6 19:18,24
   20:8,13,16,18,20,24
   21:12,16,23 22:18
   29:19,22 35:18
certainly 15:7
CERTIFICATION
   46:20
certify 46:4,7,9
CERTIFYING 46:23
CFM 26:15
chairperson 32:11
Chapter 18:16 19:3
   39:18
charge 7:21 14:2,6
check 31:8
chief 20:15
choose 34:4
choosing 28:17,22
city 1:8 2:12,13 5:22
   9:8,17 10:3,5,11 13:2
   13:12 14:12 24:3,7
   26:1,7,15
city's 9:6 14:1
civil 1:14 8:1 15:20
   18:16,18,24 19:13
   29:18

claim 6:2 38:23
clarify 20:2
clear 4:17
client 44:9
CMR 5:7
collecting 10:8
collective 35:2
College 8:10,17
collegial 31:20
combination 29:18
combined 34:2
come 4:19,21 30:16
   32:9 43:20 44:11
commencing 1:19
commercial 14:10
commission 1:1 24:15
   46:18
commissioner 6:19
   16:22 30:3 35:4
commissioner's 27:5
Commonwealth 1:1,16
   46:1
Community 8:10
compared 34:1
compile 9:13
compiled 9:6
complainant 26:6
complainant's 5:14 6:3
complaint 5:14 38:23
   39:8
complaints 14:3
completed 30:12
component 20:19 40:5
concern 41:14,20,23
   44:20
concerning 46:6
concur 34:20,22
connection 7:8,12
considered 7:15
construction 21:5,7,8
continue 41:23
CONTROL 46:22
CONT'D 6:6 26:21
   40:3 41:6 44:19
conversation 11:20
copy 7:17 10:12 23:18
   23:22 34:14
correct 6:13 7:2 9:15
   23:1 24:5 30:19
   31:10,18 33:12 40:9
   46:8
correctly 24:1
counsel 2:8,16 39:2
   42:9 43:9,22 44:11
   46:10,12
counselor 26:20 42:2
COUNTY 46:2
couple 10:22
course 24:20
court 1:15,21 15:21
   46:3,23

courtesy 42:9,19
criteria 18:19,21 28:17
   28:22 29:14 37:13,16
   37:21,23 41:14,16
Currently 7:4 9:24
cut 39:22 42:11,16
cutting 43:11

**D**

D 4:1
dare 43:13
data 9:9,12 10:8
date 5:11 11:9 19:9
   23:19
dates 19:14 28:4
David 11:12 16:24 18:1
   26:14
day 4:8 36:23 46:15
deal 28:21
December 36:9,17
   46:19
decide 40:12
deciding 37:8
decision 15:13 34:18
   34:20,23 37:14
Defendant 1:9 2:16
Defendants 23:15
degree 8:9,13,16,19
department 2:12 6:23
   7:22 8:3,24 9:10
   10:11 12:22 20:17,20
departments 23:7
department's 12:14,16
depends 40:17
deponent 46:5
deposition 1:11 5:3,5
   6:1 43:24 44:3,7
   46:11
describe 8:4
description 7:8,11,15
   8:21 9:1
descriptions 29:20
deserve 42:12
designee 17:14
determine 12:23 15:11
   38:16 40:4
determined 29:17
developed 29:20
Diaz 1:5 28:18 29:13
Diaz's 12:8
different 20:22 21:10
direct 3:3 4:6 19:10
   46:22
director 9:24 27:13,21
   28:7,9
disciplinary 7:23 15:7
discovery 5:5,12,20 6:4
discriminate 26:16
discriminated 26:14
discrimination 1:1
   14:19 15:13 26:13,19

39:11,14
**discriminatory** 41:11
  41:17 44:23
**discussed** 32:2 33:9
**discussion** 11:2 30:16
  31:15,21
**discussions** 11:4,11,16
**DISTRIBUTION**
  46:21
**document** 10:17,21
  23:18,21,23 24:16,18
  25:3,9,13 26:12,18
  27:23 28:6,10,14
**documents** 12:4,7,12
  15:10
**done** 30:14,23
**door** 44:9
**doubt** 34:15
**down** 9:24 40:15
**DPW** 1:8 6:22
**drafting** 26:23
**driver's** 14:11
**drug** 14:13
**duly** 4:3 46:4,5
**duties** 7:20

**E**

**E** 3:10 4:1,1
**each** 5:6 16:1 30:11,13
  30:21 33:1,15,16
  34:1 36:23 40:21
**education** 37:14
**educational** 8:4
**EEO** 25:17
**Effective** 19:9
**elicit** 4:16
**Emanuel** 8:17,20
**employed** 46:10,12
**employee** 24:24 25:18
  46:12
**employees** 9:13 25:1
**employer** 24:1,4,8
  26:13
**employment** 8:23
  14:20 24:15,21
**engineering** 21:1
**ensure** 14:19
**entire** 9:8 26:4
**entitled** 39:19
**entrance** 27:1 29:21
**environment** 14:4
**equal** 8:23 23:24 24:11
  24:14
**equally** 37:20 38:3,10
  38:13
**Esq** 2:3,11
**establishing** 29:14
**ET** 1:8
**evaluation** 17:21
**ever** 24:20 25:22 28:12
  35:15 41:7

**every** 9:19 24:17 29:21
  31:8 32:13 33:11,18
  35:23
**everyone** 32:6
**evidence** 5:13,21 6:5
**examination** 4:6 10:13
**examined** 4:4
**example** 9:12 15:20
**exams** 18:18
**exchanged** 32:5
**Excuse** 44:1
**exhibit** 10:12,13,24
  11:6 23:15 26:24
  27:8
**existence** 5:9
**exists** 24:18
**experience** 37:6,12,15
  38:16 40:13
**expires** 46:18
**explicit** 12:18
**expressed** 32:7
**EYAL** 1:21
**eyes** 42:12

**F**

**face** 43:4,6,17,21
**fair** 20:5 31:21 37:24
  41:2
**familiar** 24:13,16,17
**Faneuil** 1:22
**far** 14:12
**February** 1:19 5:24
**federal** 14:14
**feel** 4:13 35:10
**felt** 33:20
**figures** 12:23
**file** 12:8
**filed** 14:3
**Finally** 5:22
**financially** 46:13
**find** 23:11
**fine** 4:22
**finish** 42:2,3,10 43:9
**first** 4:3 10:16,21 11:9
  29:4 43:12
**Fitzroy** 16:9
**Fleet** 5:8 6:21 14:20
  15:14 16:6 19:18,24
  20:8,13,16,18,20
  21:12,16,24 22:18
  29:19,22 35:18
**folders** 12:10
**follows** 4:5
**foregoing** 46:8,20
**foreman** 16:10 18:3,6,7
  18:8,10,14,16 41:16
  44:22
**form** 27:4,5
**formed** 14:17 29:19
**forth** 11:5 12:15 14:13
  19:15 21:7 26:23

27:7 28:14 30:22,22
  32:8 41:5
**forward** 4:19
**four** 12:19 31:5
**from** 6:24 7:23 8:6,9,16
  8:20 10:10 15:23
  29:9,12,24 30:2 34:2
  35:11
**front** 22:3,23
**FUKADA** 43:2,5,18
**Fukuda** 2:11 5:1 14:22
  15:15 16:7 19:20
  20:1,7 22:1,4,6,17,19
  24:9 26:3 32:18,20
  36:2,13,16,18 37:7
  37:10,18 38:1,7,12
  38:21 39:3,8,13,17
  40:7,10,19 41:1,3,12
  41:18,22,24 42:5,20
  43:12,23 44:2,5,8,13
  44:24 45:4
**further** 45:2 46:7,9
**furthermore** 46:11

**G**

**G** 4:1
**garages** 12:21
**gave** 33:24 37:12
**generally** 25:15,16
**give** 24:11 37:5,11 40:5
**giving** 33:19
**go** 14:16 39:7 42:15
**goes** 28:1
**going** 4:9 23:14 34:18
  35:1 40:12 43:4,5
**good** 4:8 31:3
**government** 14:14
**graduated** 8:6
**guess** 15:4 32:12 36:3
**guideline** 24:14
**guidelines** 13:6 15:10
  24:23 25:17,24

**H**

**H** 3:10
**Hall** 1:22 2:13 10:3,5
  13:12
**hand** 33:6 43:16,21
  46:15
**happened** 19:6 30:6
  32:2,3 34:6,7,11
**harassment** 14:3
**hats** 13:24
**having** 4:3
**head** 16:11 17:14 18:5
  21:17,20 23:13
**heard** 22:7
**heavily** 37:23
**heavy** 12:21
**held** 31:15 33:9
**help** 15:1 36:12

**her** 28:10 32:14 33:19
**hereto** 46:13
**hereunto** 46:15
**Higgins** 5:3 11:12,16
  11:24 16:24 18:1
  20:13 23:3 30:10
  32:12,14,22,24 33:2
  33:6,13,20 34:17
  35:1 36:6 37:13
**Higgins/director** 26:15
**high** 8:5
**highest** 31:6,7
**highway** 21:3,5,7,8
**Hill** 8:9
**him** 16:19 26:14 33:10
**hiring** 7:23 15:6,22
**history** 42:24
**hold** 33:7
**hostile** 14:4
**hours** 5:6
**human** 9:6,23 10:10
  13:11 27:6,13,22
  28:2,7,13 41:8

**I**

**imbalance** 19:22 20:2
  21:22 22:15
**Immediately** 31:24
**impact** 5:16
**impressed** 39:23
**inappropriate** 43:19
**INC** 1:21
**include** 5:2 29:20
**includes** 20:18
**including** 5:17
**INDEX** 3:1
**indicated** 32:16
**indifferent** 31:3
**Indiscriminately** 40:8
**individual** 30:15 37:11
**individuals** 7:5
**information** 9:9,16,22
  20:12 23:12 31:11,14
  33:14
**input** 10:19 19:10
**insure** 16:1
**interaction** 13:17,22
**interested** 46:13
**interview** 5:18 17:20
  29:1,8,9,12 30:2,6,7
  31:23 35:11,14,16
  36:1,8,15
**interviewed** 29:13 30:8
  31:20 32:1
**interviewers** 17:6,7,21
  17:22 30:13 33:15
  34:22
**interviewing** 17:9
**interviews** 36:24
**involved** 18:12
**irrelevant** 43:7

**J**

**J** 1:14 46:3,17
**job** 6:7 7:7,11,15,24
  8:21 9:1,14 14:6,9,15
  23:5,9,10 28:1 29:20
  30:9 37:15 38:19
**Joseph** 8:6
**jump** 43:4,6
**just** 15:16 23:15 31:15
  40:6,8

**K**

**Kathleen** 1:11 3:5 4:2
  4:24 46:5
**keep** 23:10 39:5
**Kelley** 1:11 3:5 4:2 6:8
  6:10 26:22 46:5
**Kelly** 4:24
**Kendall** 1:18 2:3,4 3:6
  4:7,8 6:6 15:1 22:7
  26:10,21 39:1,5,11
  39:15,21 40:3 41:6
  42:1,8,23 43:3,8,15
  43:20 44:1,4,6,10,15
  44:19 45:2
**Kessler** 13:9,18,23,24
  25:22
**kind** 36:21
**knew** 22:12
**know** 4:20 13:16 15:20
  16:8,9 17:15 18:5,11
  19:21 20:9,10 21:14
  21:19,21 22:2,13,14
  22:21,22 23:2,5,12
  24:18 25:2,11,12,13
  25:14,15,17 27:16,21
  28:19 29:2 31:16
  35:22
**knowledge** 15:16,17,18
  37:15 38:19 40:13
**K-E-L-L-E-Y** 4:24

**L**

**language** 23:22 24:23
  28:6
**last** 5:3 11:20 31:24
  35:24
**LAW** 2:4,12
**lawyers** 42:15
**lead** 5:12,20 6:4
**least** 9:20
**led** 17:1 18:12
**Lee** 7:6
**legislation** 18:17,18
  19:15
**lender** 37:1
**Leonard** 10:1 27:20
**Leonard's** 10:2
**let** 4:20 39:7,24 42:3
**Let's** 28:21
**license** 14:11

lieu 18:18
light 12:21 16:9
lighting 21:3
like 14:4 16:3 42:18,20
likely 5:12,20 6:4
limited 5:5
line 23:23 24:17 26:4
list 9:13 15:24,24 35:23
lists 8:1 15:21,23 16:2
litigation 4:10
located 10:2,4 13:10
long 11:20 13:15 15:22
    31:23
look 23:11,14,16 26:11
    39:12
looking 15:8
Lori 11:4 46:3,17
lot 42:15
lowest 31:6
lumped 40:6,8

M
MA 1:18,22 2:6,14
made 15:5,13 16:20
    18:15 34:6
main 9:7
maintenance 5:9 6:21
    14:21 15:14 16:6
    19:19,24 20:8,14,16
    20:18,21 21:4,5,8,12
    21:24 22:18 35:18
make 4:17 35:3
making 26:7 37:14
male 13:13
management 8:14,19
    8:20
manager 16:23
managers 15:6
mandatory 14:13,15
many 7:3 16:4 17:12,22
    20:22 21:15 35:22
    36:7,14 38:17
March 46:15
marked 3:12
Marketplace 1:22
Mary 7:6
Massachusetts 1:1,13
    1:17 46:1,4
master's 8:19
matters 7:21 8:2,23
    10:7 46:6
Maurice 16:8,12
may 22:20 24:10 36:19
    38:8 40:20 44:22
Maybe 42:11,14
ma'am 22:9,20 44:21
MCAD 4:11
mean 24:8 28:8 38:9
means 27:24 46:22
measure 40:13
measures 14:18

memoranda 15:11
memorandum 36:21
memory 37:2
met 18:21
methods 44:21
MGL 39:18
might 39:22
mind 42:1
minimum 26:24 29:21
minority's 15:24
minutes 11:22
Miss 6:8,10,11 10:2
    26:22
month 42:24
months 16:16
more 12:17 20:5,9
    37:23
most 17:18,19 30:21
    35:7 37:8
Mount 8:6
Musto 34:5 35:4,7,14
Musto's 37:5
myself 4:17 7:4 18:1

N
N 4:1
name 4:23 26:13
namely 46:5
names 7:5 9:13
need 9:9 39:6,15
needed 9:18
neither 46:10
never 33:2
nine 5:23
None 3:12 41:21
Notarial 46:15
Notary 1:16 4:3 46:3
    46:17
NOTE 46:20
noted 30:10
notes 29:2 34:6,7,8,9
    36:11,20 46:9
nothing 38:22 39:9
    42:6 46:6
notice 5:24
number 5:8,23 12:19
    13:24 19:17,21 22:13
    28:5 31:9 33:4 34:5
numbers 12:15,17 31:5
    34:2,10,12

O
O 4:1
object 26:3 39:7 42:4
    42:10,18 43:10 44:24
objection 14:22 15:15
    16:7 19:20 20:1,7
    22:1,4,6,17,19 24:9
    32:18,20 36:2,13,16
    36:18 37:7,10,18
    38:1,7,12,21 40:7,10

40:19 41:1,3,12,18
    41:22,24
objections 5:2
obviously 16:20 21:17
    33:4 36:23
occasions 36:7
off 16:11 17:14 18:5
    21:17,19 42:11,16
    43:11
office 7:17 9:6,8,23
    10:2,4 11:17,18,19
    13:10,11,17,19,19
    14:7,18 20:15,24
    21:2,18 28:2,10,12
    36:11 39:24 41:7,9
    42:13 43:21 44:12,14
officer 6:9,12,20 13:8
    14:2 25:23
offices 1:17 2:4 42:16
officials 19:18 21:15,23
    23:6
often 9:16
Oh 43:8
okay 4:21 8:8 23:17
    39:16,22,24
once 9:19,19,20 26:4
one 5:18 17:6,13 28:21
    29:4,5,7 30:11 31:5,6
    33:4,11 34:5 35:23
    37:22 38:5,6,15
    40:16
ones 28:3
one-on-one 30:9
ongoing 13:18
only 5:9 26:17 27:3
    37:2
operation 18:24
opinion 35:2 38:4
opinions 32:7
opportunity 8:23 24:11
    24:15
opportunity/affirmat-
    23:24
opposed 38:19,19
    40:13,14
orally 30:23 33:3
order 15:21
original 46:8
other 5:17 10:6 12:12
    20:23 29:10,13 36:22
    39:14
others 37:24
out 23:11 34:5,16 40:1
    44:9
overall 12:14 30:16
    32:10 34:3 37:12,22
    38:4
own 15:16,17
O'Neill 7:6

P

P 4:1
package 38:15 40:16
panel 17:6 29:1,8,9,12
    30:2 32:11
panelist 31:16
paper 31:12 33:7,8
    34:10,11,16
paperwork 7:24 30:5
Paragraph 39:19
Pardon 22:5
Parker 7:6
part 8:21 9:1 17:1 23:5
    23:9,10 26:22 27:3
    28:16,22 29:1,7,22
participants 30:18
    33:11
participate 36:5,8
participated 35:15
    36:1,14
participating 35:11
parties 32:2 46:11,13
party 5:6
passed 18:17,19
pay 42:13
pending 4:11
people 7:3 14:8 16:4,5
    17:12 24:12 41:10
perceived 40:18,21
percentage 38:18
performed 30:20 40:23
permanent 18:6,8,9,14
    18:15
permanently 18:21
permit 21:1
person 10:19 14:5 16:1
    23:2 31:24 32:13
    35:8
personnel 6:9,12,20
    7:21 8:2 9:8 12:8,14
    12:17,22 20:15 21:18
    35:13 41:5
persons 12:20 41:15
person's 30:21
pertaining 9:10 12:10
PGS 1:4
piece 33:6,7 34:9,11,15
place 14:16
Plaintiff 1:6,12 2:8
play 17:5 26:22 29:10
    29:14 30:3
played 27:3
please 4:13,20,23,23
    12:18 15:2 23:16
    40:2 42:19 46:20
plowing 21:6
plus 7:4
point 33:18 43:21
points 38:17,18
policy 13:3
polite 42:3
position 6:14,18,24 7:8

7:12,13 13:15 16:13
    16:14,19 17:3,12,17
    18:2,4,10,20 25:5
    28:18,19 29:22 33:21
    35:17,17,20
positions 12:11 16:5
    41:10,16
positive 29:3
posting 7:13 28:1,4,4
    29:17
postings 8:1 14:7,9
    29:3
practices 41:9
predetermined 5:4
preference 33:3,5
preferred 32:23
preparation 12:5
Prescott 16:9
Prescott's 18:2,13
present 7:1 10:23
    11:23
principal 6:9,12,20
prior 5:11 10:12 23:19
    35:14
probably 34:16 36:3
problem 15:12
Procedure 1:14
process 15:7 17:1
    18:12 19:11 30:1,6,7
    30:12 32:4 35:12,16
    36:1,8,15
processed 30:5
Professional 1:15 46:3
program 14:12
promote 35:4
promoted 18:22
promotions 7:24
promulgated 24:14
provide 9:16
provided 7:7,10
public 1:16 4:4 6:23
    7:22 8:24 9:10 16:22
    20:17,19 46:4,17
pursuant 1:13 5:6
put 4:9 31:8 42:17
    43:13
putting 43:16
p.m 1:20

Q
qualification 27:1
qualified 17:18,19
    30:22 35:8 46:4
question 4:14 5:23 7:9
    14:24 15:2 22:14
    29:11 40:24 42:2,4,8
    42:10 43:10 44:20
questioning 26:4
questions 4:9,13 5:10
    5:16,18 10:20 12:13
    26:8 30:10 32:8 40:1

42:5 45:3
quotas 9:5

**R**

R 4:1
race 9:14 12:20 25:1
racial 9:5 14:19 15:13
  21:22 23:6
racist 43:14,16 44:14
  44:16,17
raises 7:24
ranging 7:22
ranked 30:13,18 32:21
  33:24 34:1
ranking 30:15,17,20,23
  32:10,24 33:4,24
  34:3
rankings 32:9 33:10,16
  34:7 37:11,12
read 15:1,3 24:1,20
  25:3,9 30:9
reason 22:22
reasons 17:15
recall 19:5 34:13
receive 15:23
received 8:16
Recently 16:16
recollection 36:12
  37:16
recommendation 16:23
  17:2,9,16 30:4 35:3
record 5:1 15:3 26:11
  35:13 42:17,21 43:13
recorded 33:15
records 12:22 21:18
  22:3,23 23:10
Recycling 21:2
refer 21:19 29:2
reference 5:23
referring 15:19 29:16
reflect 37:1 42:21
refresh 36:12
regard 4:10 9:4 35:20
regarding 5:11,16
regular 15:24
regulation 19:1
reiterate 5:4
related 46:10
relative 11:5 46:12
relevance 26:9
relevant 5:19 6:1
remember 17:14
rent 42:13
repeat 4:14 29:11
repeating 39:6
Reporter 1:15 46:3,23
REPORTING 1:21
reports 9:21
REPRODUCTION
  46:21
requested 15:3

requests 10:10 14:6
required 14:14 32:13
requirements 14:16
  26:23 28:13 29:16,18
  29:21
requires 26:1
resource 10:11
resources 9:7,23 13:11
  27:6,14,22 28:2,7,13
  41:8
respect 17:8 26:17
  35:16
respond 4:17 10:9
response 12:13
responsibilities 10:6
responsible 8:22
restate 4:14
result 32:4
results 17:20
resume 41:4
retaliation 5:15,19 6:2
  26:5,8,18 38:23
  39:10,20 42:7
revealed 32:9
review 12:4,7,22 15:5,9
  19:14 28:2
reviewed 12:8,12,14,16
  12:24
Reviewing 35:12
ridiculous 44:14
right 24:4 34:17
road 21:4
Robert 18:1
RODERICK 1:5
role 17:5 28:24 29:10
  29:13 30:3
roll 42:12
rolled 38:6
room 2:13 10:3,5 13:11
Roxbury 1:18
Rules 1:13
running 44:6
runs 20:13

**S**

S 3:10 4:1
same 42:18 46:22
sanitary 21:13
satisfied 35:5
saw 11:9
saying 21:14 38:11
  40:5
says 23:24 25:11,13,14
  25:15 26:12,14,16,19
  26:24 27:8,13,21
  28:6,8 39:11
scheduled 36:24
school 8:5
scrap 34:15
Seal 46:15
second 29:4,5,7 30:22

Section 39:18
sections 20:22,23 21:10
see 10:12,16,21 44:18
seen 23:18
select 41:10,15 44:22
selected 16:2
selection 24:24 25:18
  28:16,17 29:15 30:1
send 9:21
sent 27:6
separate 15:23 36:7
  40:15
separately 38:14
series 4:9 30:9
served 18:20
service 8:1 15:21 18:17
  18:18,24 19:13 29:18
set 11:5 26:23 28:14
  31:4 46:15
seven 5:23
several 16:16
sheet 31:12
shop 16:9
showed 10:18
shown 10:24
signature 27:6,9,11,16
  27:19
Silvey 18:1
similar 35:15
simply 22:2
since 5:10
single 35:23
sir 22:7 26:11
sit 21:21
six 5:6 20:6,9 39:2
Smith 16:8,12 17:2,10
  17:13,16
sole 6:3 26:6
solely 5:15 26:8
some 11:2 12:13 23:22
  34:6,7 37:23
Somebody 39:22
someplace 7:18 34:14
something 37:3 38:20
  40:14
sometime 24:22 25:8
sort 13:22
speak 24:24
speaks 26:18
specifically 9:3 10:9
  15:18
speech 39:6,16
spoke 11:23
SS 46:2
St 8:6
staff 7:3
state 4:23 46:4
statement 31:21 37:24
  41:2 42:17
stenographic 46:8
step 7:24

stop 4:13 39:7 43:16,23
  44:2
street 1:18 2:5 21:3,6
strictly 19:13
subjectively 40:17
successful 29:15 35:21
SUFFOLK 46:2
suitable 37:8
superintendent 16:8,14
SUPERVISION 46:22
supervisor 21:15 23:6
supervisors 19:23 20:3
  20:6 22:16
supervisory 16:5 19:18
  21:23 35:17
supply 9:11
sure 4:15 14:24 24:22
sworn 4:3 46:6

**T**

T 3:10
take 4:20 14:18 23:14
  44:8
taken 1:12 40:16 46:11
talk 28:12 41:7
talked 25:22
telephone 11:17,18,19
  11:24
tell 6:7 32:13 44:13,15
ten 5:24 11:21 20:22
  36:10
term 24:6
test 40:23
testified 4:4
testify 46:6
testimony 12:5
testing 14:13,15
Thank 26:20 39:12,21
  39:24 45:4
their 19:16 28:2 30:10
  32:3,7 33:16 41:4
thing 42:3
things 15:8 16:3 38:4
think 16:10 44:16
thinking 31:17
third 30:22
Thirdly 5:14
thought 35:7
threatening 44:11
three 17:23 31:5 37:21
  38:6
through 18:16 33:19
thrown 34:16
time 4:12,19 11:7,8,8
  15:22 18:20 33:20
  35:24 43:24
times 35:22 36:14 39:2
title 6:7 9:14
titles 19:14
today 12:5 44:21
today's 10:13 11:9

23:19
together 40:6,9
told 32:22,24 33:2,10
  34:17
top 16:11 17:14 18:5
  21:17,20
total 5:6 19:17 37:22
  40:16
track 9:5
transactions 15:5
transcript 46:8,8,21
true 43:9 46:8
truth 46:6,6
Tsuyoshi 2:11
twice 22:8
two 5:8 7:4 9:19 12:10
  15:23 16:2 20:3
  21:10 22:12 28:19
  29:2 31:5
type 9:12 15:18 27:5
  28:1
typed 27:2,4

**U**

under 15:21 46:22
understand 4:12,15 7:9
  14:24 38:9
understanding 24:6
  27:23
Unequivocally 38:13
unit 37:22 38:5
UNLESS 46:22
until 30:3 31:15
use 15:10,20
used 37:14,17 41:10,15
  44:21

**V**

various 23:7 32:5,7
view 33:19
views 32:3,5
violation 39:18
Vivian 9:24 27:20
VOL 1:3
vote 32:14,16,19,21
vs 1:7

**W**

walk 44:9
want 4:15,19 5:4 10:22
Warren 1:18 2:5
wasn't 34:9
way 35:10
weeks 10:22
weigh 37:20,21 38:3,10
  38:13,14
weighed 37:23 38:15
weight 37:5 40:4
well 34:1 41:4
were 6:14 7:7 10:23
  11:15 15:21 17:1,15

17:22,24 18:12,21
22:12 25:5 29:2,17
31:17 32:3,9 33:10
35:5 37:17 38:6
40:12 41:11,17 43:16
**whatsoever** 26:9 41:21
**WHEREOF** 46:14
**white** 13:13 19:17,23
20:6 21:23 22:16
42:15,22
**whites** 22:13
**who've** 12:20
**William** 13:9
**Winston** 1:17 2:3,4
**witness** 1:11 3:3 45:3
46:14
**word** 20:2 25:14,14
**work** 14:4
**worked** 12:20
**works** 6:23 7:22 8:24
9:10 13:24 16:22
20:17,20
**worth** 38:17
**write** 31:3,9,12
**writing** 31:1,2 36:21
**written** 7:7,11 37:3
**wrong** 39:4

**X**

**X** 3:10

**Y**

**year** 6:16 8:11 9:19,20
19:5,8 25:6
**years** 6:15 9:19

**#**

**#01-BEM-10929** 1:2

**0**

**01-BEM-10929** 4:11
**02109** 1:22
**02119** 2:6
**02201** 2:14

**1**

**1** 10:12,13 11:6
**1-46** 1:4
**1.13** 5:7
**136** 1:18 2:5
**15** 11:21
**151** 39:18
**17** 10:5
**19** 6:15
**1985** 6:17 7:1 14:17
25:7,8
**1990** 8:12
**1992** 8:17
**1994** 8:20
**1997** 5:10
**1999** 36:4,9,17

**2**

**2** 23:15 26:24 27:8
**2:40** 1:20
**2003** 16:17 36:9,17
**2004** 1:19 5:24 25:8
46:15
**2006** 46:19
**25th** 1:19
**282** 18:16 19:4

**3**

**322-3925** 1:23

**4**

**4** 1:22 3:6 39:19,19
**4th** 46:15
**442-6130** 2:7

**5**

**5** 5:24

**6**

**612** 10:3 13:11
**615** 2:13
**617** 2:7,15
**635-4038** 2:15

**7**

**7** 39:19
**7B** 5:7

**8**

**8** 46:19
**800** 1:23
**804** 5:7

**9**

**9-9-98** 19:9

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-10154-NG

RODERICK DIAZ

v.

DAVID HIGGINS, Individually,
and, in his capacity as Director
of Central Fleet Maintenance,
City of Boston Department of
Public Works; and CITY OF BOSTON

## AFFIDAVIT OF DAVID HIGGINS

I, David Higgins, hereby state and depose as follows:

1.    I am the Director of Central Fleet Maintenance ("CFM")
for the Public Works Department ("PWD") of the City of Boston.

2.    I have held this position since 1997, when CFM was
created.

3.    As Director of CFM, I oversee the maintenance of and
repair for City Fleet vehicles.

4.    In addition, part of my duties as Director of CFM is
to interview candidates for vacant positions in CFM, and to make
recommendations for appointments to those vacant positions to
the Commissioner of Public Works.

5.    As Director of CFM and a party to this lawsuit, I have
personal knowledge as to the facts and circumstances involved in
this case.

6.    In November 1999, a job posting for Motor Equipment Repair Foreman ("MERF") in the light shop was placed at CFM.

7.    The Plaintiff applied for the position, and was interviewed, along with seven other candidates, on or about December 1999.

8.    The interviews were conducted by Jeremiah Coughlin, Robert Silvey and me.

9.    The interview consisted of written and oral subjective and objective questions which sought information as to the candidates' job knowledge, experience and education.  All of the candidates were asked the same questions and had to complete the same forms.

10.    The criteria used to interview the candidates were weighed as a whole, and were not rated individually.

11.    The Plaintiff was not recommended for the position, and subsequently, was not granted the position.

12.    On or about July 2001, a job posting for MERF in the heavy shop was placed at CFM.

13.    The Plaintiff applied for the position, and was interviewed along with three other candidates in December 2001.

14.    The interviews were conducted by Kathy Kelley, Maurice Smith, Robert Silvey, Jeremiah Coughlin and me.

15.    The interview consisted of oral subjective and objective questions which sought information as to the

2

candidates' job knowledge, experience and education. All of the candidates were asked the same questions.

16. The criteria used to interview the candidates were weighed as a whole, and were not rated individually.

17. After conducting all of the interviews I asked the panelists to rank the candidates in order of preference as to who the panel thought was the most qualified candidate. Exhibit H1, *Panelists' Rank Notes*, attached hereto and made a part hereof.

18. The Plaintiff was ranked by all panelists as the least qualified candidate. Ex. H1.

19. Out of the four candidates, the Plaintiff was the least qualified as he got twenty one and a half questions wrong out of twenty eight and two of his answers were not on point. Exhibit H2, *Employment Interview*, attached hereto and made a part hereof.

20. The candidate the panel agreed to recommend for the position only got three questions wrong out of twenty eight. Exhibit H3, *Employment Interview*, attached hereto and made a part hereof.

21. As a result, the Plaintiff was not recommended for the position, and subsequently was not appointed to it.

22. Afterwards I met with the Plaintiff to inform him that he was not recommended for the position because he was deficient

in three areas: leadership skills, communicative skills and job knowledge. Specifically, I informed him that he lacked knowledge of basic skills, was unsure on how to relate to people reporting to him and lack understanding of rules for out of service criteria. I informed the Plaintiff that I would be willing to coach him. Exhibit H4, *Higgins's Memo to File*, attached hereto and made a part hereof.

23. The Plaintiff's seniority status was not considered in either instance because seniority only comes into play if the qualifications and abilities of the employees are substantially equal. Exhibit H5, *Union Contracts*, Art. 11, § 4, attached hereto and made a part hereof.

24. My practice on interviewing and recommending candidates for appointments has been the same since my commencement with the City of Boston in 1997.

25. The only changes have been to update the questions, and since 2000, there has been no written portion to the interview. The process has not changed.

Signed under the pains and penalties of perjury this 6TH day of February 2007.

David Higgins

4

RATING

|          | ROD | LUIGI | SCOTT | PAUL |
|----------|-----|-------|-------|------|
| GERRI    | 4   | 2     | 3     | 1    |
| BOB      | 4   | 2     | 3     | 1    |
| MAURICE  | 4   | 2     | 3     | 1    |
| KATHY    | 4   | 1     | 3     | 2    |
| DAVID    | 4   | 2     | 3     | 1    |
|          | (4) | (2)   | (3)   | (1)  |



# INTERVIEW COVER SHEET
# POSTING NO _RK-1159_

### City of Boston

### Department of Public Works

### Central Fleet Maintenance

_DATE:_ _12/11/01_

_NAME:_ RODERICK DIAZ

_ADDRESS:_ 329 La Grange St West
Roxbury MA

_TELEPHONE:_ 617 469 1868

_POSITION APPLIED FOR:_ MERF



# CENTRAL FLEET MAINTENANCE
## Employment Interview

Review applicant's work history:

    Consistent with industry    _YES, ALL RELATED_

    Gaps in years?    _1969 TO PRESENT_

Review applicant's educational background

    Industry related?    _SEMINARS + CLINICS_
    _RELEVANT TO INDUSTRY_

    Current status?

Review applicant's overall experience

    Consistent with industry    _AUTOMOTIVE THROUGHOUT_

    Related career path    _ALL RELATED_

## Position:  Motor Equipment Repair Foreman

1.    Give an example of how you exercised leadership in a recent situation, and be specific.

Response:
        ASK  A  PERSON

2.    Describe a recent problem, and how you solved it.

Response:
        ASK  PERSON  WHAT  IS  GOING  ON,  DO  NOT
        SWEAR

3.    Describe how you use your communication skills, first written and then oral.

Response:   FIRST  TALK  TO  PERSON,  WRITE  IT  DOWN

4.    Describe a decision you made recently, regarding a repair function, and how you reached it.

Response:
        TAKE  A  LOOK — SEE  WHAT  NEEDS  TO  BE  REPAIRED
ASSIGN  IT  TO  SOMEONE
                PASS  ON  THAT

5.    How would you assign repair functions in the shop, given the fact you have more jobs to
      accomplish, than you have technicians to do the work?

Response:
        GO  ON  FLOOR,  DO  THE  WORK  WITH  MY  WRENCHES

6.    Think about your response to question 5., how did you prioritize the work you assigned?

Response:
        IF  A  BIG  JOB,  LEAVE  IT  TO  LAST

Response:
CHECK ON MECH EVERY DAY, TO SEE HOW
MUCH TIME

8.    A mechanic is performing at an unsatisfactory rate, how would you raise his productivity?

Response: CALL TECH, SPEAK TO HIM INDIVIDUALLY, CAN I
HELP YOU.

9.    Describe how you would conduct a shift to obtain the maximum work product available.

Response:
PERSONALLY BE ON THE FLOOR, MAKE SURE EACH
MECH IS DOING WHAT HE IS SUPPOSED

10.   Name your best quality that makes you suitable for this position?

Response: 32 YEARS OF EXPERIENCE

11.   Describe the most challenging aspect of this position, and how you plan to deal with the issue.

Response:
RESPECT EVERYBODY, HELP EVERYBODY RATHER
THAN SITTING DOWN

12.   How many defective brakes can a S/A dump trucks have before they are placed out-of service?

Response:
ONE

13.   What is the brake adjustment limit for a Type 30, clamp style chamber?

Response:
DON'T REMEMBER

14.   Is a CMV out-of-service if one of the stoplights is not working? Why, or why not?

Response:
I WOULD FAIL IT   ALL LIGHTS MUST WORK

15. What is the out-of-service criteria for spring leaves for a C.M.V.?

Response: ONE SPRING BROKEN = O/S

16. At what tread depth, for a tire on the steering axle, must a CMV be placed out-of-service?

Response: 4/32" OR MORE

17. You are inspecting a 35,000# GVWR S/A snowplow, and discover a 2" crack on one of the disc wheels. Is this vehicle out-of-service? Why or why not?

Response: YES O/S DISC WHEEL VERY DANGEROUS

18. A mechanic reports to you that the spring brakes, on a tandem axle dump truck will not hold the truck on a slight grade. What tests do you suggest the mechanic perform? Why?

Response: LEAK DOWN TEST, 90 PSI LIGHT OFF - 20 - 40 SPRING BRAKES COME IN

19. Name the four basic steps in a pre-trip inspection.

Response: SEAT BELT - BRAKE SYSTEM - HORN - ENGINE COMP

20. Describe the proper way of checking the parking brake on a S/A, air brake equipped dump. Describe the proper method of checking the service brake on the same vehicle.

Response: START TRUCK, KEEP FOOT ON BRAKE - SERVICE
NO ANSWER ON PARKING

21. What does GVWR mean? How do you determine what any vehicle's GVWR is?

Response: GROSS VEHICLE WEIGHT RATIO
BEHIND DRIVERS SEAT

1/2

22. If your division is 90% productive, how many billable hours per mechanic have each week? Each day?

Response:

    8 HOURS / DAY

    40 Hours / WEEK

22. Describe the software programs you are familiar with? What programs are you proficient with?

Response:

    WINDOWS 98 - LEARNING IT

23. What is the pour point of diesel fuel, and how would you deal with it?

Response:

    WHEN RUNNIN IT IS HOT ~ DAMAGE YOUR SKIN

24. How would you establish a PM schedule, and how would you implement it?

Response: PERSONALLY LOOK AT TRUCK, PUT TRUCK ON LIFT GO BY MILEAGE

CALL UP YARD, HOW MANY MILES ARE ON TRUCK

25. Describe the function, and operation, of a repair order based, parts, labor, & sub-let charge-out plan. What is the purpose of this type of system? How is the purpose achieved?

Response: R/O TELLS YOU WHAT YOU HAVE TO DO ON THE JOB

TECHNICIAN HAS TO FIX TRUCK

27. Do you have knowledge of the occupational hazards and safety precautions of the trade? How are these concerns communicated? Please be specific

Response:

    SEAT BELT - SAFETY GOGGLES - FIRE EXT.

28. Are you willing to work any shift?

Response: YES

That concludes our questions, thank you for your interest in this position. Are there any questions? Again, thank you for your time today.



# *INTERVIEW COVER SHEET*
# *POSTING NO* BK-1159

### *City of Boston*

### *Department of Public Works*

### *Central Fleet Maintenance*

DATE: _12/11/01_

NAME: PAUL MUSTO

ADDRESS: 16 FOSSDALE RD

DORCHESTER

TELEPHONE: 617·436·0060

POSITION APPLIED FOR: MERF



# *CENTRAL FLEET MAINTENANCE*
## *Employment Interview*

Review applicant's work history:

    Consistent with industry     *YES*

    Gaps in years?     *NO*

Review applicant's educational background

    Industry related?     *AU*

    Current status?     *HVD/Leon/*

Review applicant's overall experience

    Consistent with industry     *YES*

    Related career path     *AU Related*

Date: _12/11/01_    Applicant: _PAUL MUSTO_

## Position: Motor Equipment Repair Foreman

1.    Give an example of how you exercised leadership in a recent situation, and be specific.

Response: ASKED EMPLOYEE TO PERFORM FUNCTION/
EMPLOYEE REFUSED, LETTER WRITTEN TO SUPERVISOR

2.    Describe a recent problem, and how you solved it.

Response: ENGINE IN LOADER SKIPPING - DIAGNOSTIC
TEST SHOWED BAD INJECTOR - REPLACED

3.    Describe how you use your communication skills, first written and then oral.

Response: TREAT EVERYONE EQUALLY, DO NOT TALK DOWN
TO ANYONE - SOME DISCIPLINARY LETTERS

4.    Describe a decision you made recently, regarding a repair function, and how you reached it.

Response: ESTABLISH PROBLEM, PERFORM DIAGNOSTIC
CHECKS - REPAIR PROBLEM

5.    How would you assign repair functions in the shop, given the fact you have more jobs to accomplish, than you have technicians to do the work?

Response: PRIORITIZE REPAIR GIVEN LENGTH OF TIME REQUIRED
SEND WORK OUT IF TOO BUSY IN SHOP

6.    Think about your response to question 5., how did you prioritize the work you assigned?

Response: BY SEASON/ SNOW EQUIPMENT IS
FIRST IN WINTER

7.    How do you calculate a mechanics productivity ratio, based on a 40-hour workweek?

Response: NUMBER OF HOURS ON REPAIR JOBS
VS A 40 HR PAYWEEK

8.    A mechanic is performing at an unsatisfactory rate, how would you raise his productivity?

Response: FIRST ASK IF HE UNDERSTANDS WORK ASSIGNED
SECOND BE SURE HE KNOWS HOW TO DO WHATEVER

9.    Describe how you would conduct a shift to obtain the maximum work product available.

Response: ASSIGN WORK BASED ON PARTICULAR SKILLS OF
INDIVIDUAL MECHANICS

10.    Name your best quality that makes you suitable for this position?

Response: PEOPLE SKILLS ABLE TO COMMUNICATE WITH
MECHANICS UNDERSTANDING OF MECHANICS
PROBLEMS ABILITY TO ORGANIZE WORK FLOW

11.    Describe the most challenging aspect of this position, and how you plan to deal with the issue.

Response: INDIVIDUAL PERSONALITIES OF FOLKS IN SHOP
DAY TO DAY REQUIREMENT OF COMMUNICATION AND
OVERSIGHT

12.    How many defective brakes can a S/A dump trucks have before they are placed out-of-service?

Response: NONE

13.    What is the brake adjustment limit for a Type 30, clamp style chamber?

Response: 2"

14.    Is a CMV out-of-service if one of the stoplights is not working? Why, or why not?

Response: YES STOPLIGHTS ARE PART OF
THE O/S RULES

15.    What is the out of service criteria for spring leaves, for a C.M.V.?

Response: NO MORE 1/4 OF LEAVES CRACKED EXCEPT FOR LEAF

16.    At what tread depth, for a tire on the steering axle, must a CMV be placed out-of-service?

Response: 2/32

17.    You are inspecting a 35,000# GVWR S/A snowplow, and discover a 2" crack on one of the disc wheels. Is this vehicle out-of-service? Why or why not?

Response: YES - UNIT IS O/S CRACK CAUCLS CAUSE WHEEL TO COME OFF

18.    A mechanic reports to you that the spring brakes, on a tandem axle dump truck will not hold the truck on a slight grade. What tests do you suggest the mechanic perform? Why?

Response: CHECK BRAKE ADJUSTMENT LINING DEPTH SLACK ADJUSTERS BROKEN

19.    Name the four basic steps in a pre-trip inspection.

Response: ENGINE - CAB - CHASSIS - GENERAL COND

20.    Describe the proper way of checking the parking brake on a S/A, air brake equipped dump. Describe the proper method of checking the service brake on the same vehicle.

Response: APPLY BRAKE - TRY TO MOVE A LITTLE BIT MOVE TRUCK - STEP ON BRAKE

21.    What does GVWR mean? How do you determine what any vehicle's GVWR is?

Response: GROSS VEHICLE WEIGHT RATING ON TAG IN VEHICLE

22.    If your goal is an 80% productivity ratio, how many billable hours must each mechanic have each week? Each day?

Response: _____

_____ KI AN EAD DAY 6 1/2 HOWLS IN A 40 HAD ___

_____ WEEH 32 HOWLS _____

22.    Describe the software programs you are familiar with? What programs are you proficient with?

Response: _____

_____ F/A · ATEC TO OPEN/CLOSE R.O. S ___

_____

23.    What is the pour point of diesel fuel, and how do you deal with it?

Response: _____

_____ DO NOT KNOW _____

_____

24.    How would you establish a PM schedule, and how would you implement it?

Response: _____

_____ LOOK AT HOW MANY UNITS TO DO SCHEDULE ___

_____ A CERTAIN NUMBER PER WEEK ___

25.    Describe the function, and operation, of a repair order based, parts, labor, & sub-let charge-out plan. What is the purpose of this type of system? How is the purpose achieved?

Response: ALL PARTS/LABUR/SUB-LET CHARGES ON R/O

_____ NO TRAFIC HELL MIGH EACH VEHICLE USES ___

_____

_____

27.    Do you have knowledge of the occupational hazards and safety precautions of the trade? How are these concerns communicated? Please be specific

Response: _____

_____ YES MAKE SURE EVERYONE ILLS ALL ___

_____ SAFTY GEAR NEEDED MAKE SURE NO ONE ___

_____ USES HURT ___

_____

28.    Are you willing to work any shift?

Response: _____ YES ___

That concludes our questions, thank you for your interest in this position. Are there any questions? Again, thank you for your time today.



City of Boston
Massachusetts

# Memo

**To:** File

**From:** David Higgins

**CC:** file

**Date:** Dec. 18, 2001

**Re:** Results of MERF Interviews from 12-11-01

---

Met with Rod Diaz, HMER, to explain the results of the interview process that he participated in on 12-11-01. I informed Mr. Diaz he was not the candidate chosen for the position for the following reasons;

- Leadership Skills: lacks knowledge of basic skills

- Communicative Skills: unsure of how to relate to people reporting to him

- Job Knowledge: lacks understanding of rules for O/S criteria

I informed Mr. Diaz I would be happy to coach him, and the rest of the technicians in the heavy shop, on the areas of the Out of Service criteria, which they are seemingly deficient. I stated we would start right after the first of the year, or as the snow season ended.

# AGREEMENT

BETWEEN

## CITY OF BOSTON



AND

## AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO

### COUNCIL 93
AND LOCALS



EFFECTIVE:    JULY 1, 1996
EXPIRING:    JUNE 30, 1999

(CITY-WIDE)

duties do not require him/her to work regularly on a day considered as a holiday under Section 1 of Article XII is called in to work on a holiday he/she shall receive, in addition to his/her regular weekly compensation time-and-one-half for each hour worked on such holiday and in no event shall he/she receive less than four (4) hours' pay on a straight time basis.

(C)   If an employee (other than an employee on a rotating shift or a continuous operation) whose regular workweek does not include Sunday is called in to work on a Sunday, he/she shall receive, in addition to his/her regular weekly compensation double time for each hour worked on such Sunday, and in no event shall he/she receive less than four (4) hours' pay on a straight time basis.

(D)   It is understood that the provisions of this Section are subject to the provisions contained in Section 2 of this Article.

Section 9.   All employees shall be scheduled to work on regular shifts, which shall be defined as the hours an employee is required to work during a workday, and each work shift shall have a regular starting time and quitting time.  Work schedules, which shall be defined as the work days an employee is required to work during the workweek, shall be posted on all department bulletin boards at all times.  Employees shall be given reasonable notice of any change in their work shift or work schedule.  (Reasonable notice except in extreme circumstances, shall be fourteen (14) calendar days.)

Section 10.   The City agrees to give the Union reasonable notice of any proposed change in scheduled work shifts and an opportunity to discuss the reasons for the proposed change, the impact of the proposed change and an opportunity to suggest alternatives.  No proposed change shall be instituted within thirty (30) days from the

20

ly agree to extend this time period.  In the event of failure to agree on this proposed change, the City shall have the right to institute the change and the Union shall have the right to take the matter up as a grievance under the grievance procedure.

Section 11.   All overtime shall be paid no later than the third (3rd) payroll week following the month in which such overtime was earned.

Section 12.   The Union agrees to cooperate with the City in experimenting with the four-day workweek on a limited basis where feasible.

Section 13.   The City agrees not to transfer employees for disciplinary reasons except in accordance with Article VI.

### ARTICLE XI.
### TEMPORARY SERVICE IN A HIGHER OR LOWER CLASSIFICATION

Section 1.   While an employee is performing, pursuant to assignment, the duties of a position classified in a grade lower than the grade of the position in which he/she performs regular service, he/she shall be compensated at the rate of pay for the grade of the position in which he/she performs regular service.

Section 2.   Compensation for Work in a Higher Classification.  An employee who is performing, pursuant to assignment, temporary service in a position classified in a grade higher than the grade of the position in which he/she performs regular service, other than for the purpose of filling in for an employee on vacation, shall commencing with the sixth (6th) consecutive day of actual service in such higher position, be compensated for such service in such higher position at the rate to which he/she would have been entitled had he/she been promoted to such position.  A supervisor shall not refuse to provide a written assignment form when requiring an employee to work in a position classified in a higher grade, as described above.  Any remedy based on a grievance filed under this section shall be limited in effect to a period not

21

to exceed five (5) days from the date of the employee's grievance in writing. The Employer shall not rotate such assignments among employees for the purpose of avoiding compensation at the higher grade.

Section 3. When there is an existing Civil Service list for a position to be filled by an employee performing temporary service in a higher classification, selection of an employee for such position shall be made in accordance with Civil Service rules.

Section 4. When there is no existing Civil Service list for a bargaining unit position and it is to be filled by an employee performing temporary service in a higher classification, selection of an employee shall be made on the basis of qualifications and abilities; and where qualifications and ability are substantially equal, seniority as defined under Civil Service law and rules shall be the determining factor. In the event that seniority, as so defined, is also equal, total continuous service with the City of Boston, including service prior to an authorized absence shall be the determining factor. In the event that the candidate for a position within the job series as defined by Civil Service, are all non-permanent, thus a seniority date does not exist, and where qualifications and abilities are substantially equal then longevity with job series shall be the determining factor.

Section 5. When there is no existing Civil Service list for a bargaining unit position and it is to be filled by a provisional appointment or provisional promotion, the following procedure shall apply:

(A) The vacancy shall be posted for five (5) consecutive working days in the department, division or employing unit in which the vacancy exists.

(B) On the posting the Appointing Authority shall specify the job classifications eligible to fill the position. The decision as to eligible classifications of employees shall be subject to Civil Service law and rules and shall not be a subject of grievance or arbitration. The posting shall specify the duties and location of the position.

22

provisional appointment or provisional promotion shall be made from among the eligible bidders in the manner specified in paragraph (D) below. Notice of the selection shall be posted on the original posting at the time the selection is made.

(D) Selection shall be made on the basis of qualifications and ability; and where qualifications and ability are substantially equal, seniority as defined under Civil Service law and rules shall be the determining factor. In the event that seniority, as so defined, is also equal, total continuous service with the City of Boston, including service prior to an authorized absence shall be the determining factor. In the event that the candidates for a position within the job series as defined by Civil Service, are all non-permanent, thus a seniority date does not exist, and where qualifications and abilities are substantially equal then longevity within job series shall be the determining factor.

(E) The Appointing Authority's selection shall not be made arbitrarily, capriciously or unreasonably.

(F) In the event a more senior applicant is not selected, the Appointing Authority shall, upon written request by the Union, provide in writing reasons for the non-selection for up to three (3) of the most senior applicants who were not selected to fill the position. The Department shall endeavor to be as detailed as reasonably possible when providing said reasons. A complaint by an applicant who is junior to an employee selected under Section 4 and Section 5 shall not be the subject of a grievance or arbitration.

### ARTICLE XI (A).
### LAYOFF AND RECALL

Section 1. The City and the Union agree that if the City,

23



AGREEMENT

BETWEEN

CITY OF BOSTON

AND

AMERICAN FEDERATION OF STATE,
COUNTY AND MUNICIPAL EMPLOYEES,
AFL-CIO

COUNCIL 93
AND LOCALS

EFFECTIVE: JULY 1, 1999
EXPIRING: JUNE 30, 2002

(CITY-WIDE)

## TABLE OF CONTENTS

Page

AGREEMENT ......................................................................... 1

WITNESSETH ........................................................................ 1

ARTICLE 1A - RESIDENCY ............................................................ 2

ARTICLE 1 - PERSONS COVERED BY THIS AGREEMENT .................................... 2

ARTICLE 2 - NON-DISCRIMINATION ................................................... 4

ARTICLE 3 - PAYROLL DEDUCTION OF UNION DUES ...................................... 4

ARTICLE 4 - PAYROLL DEDUCTION OF AGENCY SERVICE FEE .............................. 4

ARTICLE 5 - MANAGEMENT RIGHTS .................................................... 5

ARTICLE 6 - DISCIPLINE AND DISCHARGE ............................................. 5

ARTICLE 7 - GRIEVANCE PROCEDURE .................................................. 6

ARTICLE 8 - NO-STRIKE CLAUSE ..................................................... 10

ARTICLE 9 - STABILITY OF AGREEMENT ............................................... 11

ARTICLE 10 - HOURS OF WORK AND OVERTIME .......................................... 11

ARTICLE 11 - TEMPORARY SERVICE IN A LOWER OR HIGHER POSITION ..................... 14

ARTICLE 11(A) - LAYOFF AND RECALL ................................................ 16

ARTICLE 12 - HOLIDAYS ............................................................ 20

ARTICLE 13 - VACATION LEAVE ...................................................... 21

ARTICLE 14 - SICK LEAVE .......................................................... 23

ARTICLE 15 - OTHER LEAVES OF ABSENCE ............................................. 27
    Military Leave .............................................................. 27
    Jury Duty .................................................................. 28
    Bereavement Leave .......................................................... 28
    Pregnancy-Maternity Leave .................................................. 28
    Parental Leave ............................................................. 29
    Education Leave ............................................................ 29
    Medical Leave .............................................................. 29

ARTICLE 15A - UNION BUSINESS ..................................................... 29



205

pay period after the end of the pay period within which the overtime was earned, provided the time worked is duly reported.

**Section 11.** While an employee is performing, pursuant to assignment, the duties of a position classified in a grade lower than the grade of the position in which he/she performs regular service, he/she shall be compensated at the rate of pay provided for the position in which he/she performs regular service.

**Section 12.** The City agrees not to transfer employees for disciplinary reasons except in accordance with Article 6.

**Section 13.** The Union agrees to cooperate with the City in implementing with the four-day workweek on a limited basis where possible.

## ARTICLE 11 - TEMPORARY SERVICE IN A HIGHER OR LOWER CLASSIFICATION AND PROMOTIONS

**Section 1.** While an employee is performing, pursuant to assignment, temporary service in a position classified in a grade higher than the grade of the position in which he/she performs regular service, other than for the purpose of filling in for an employee on vacation, shall commencing with the sixth (6th) consecutive day of actual service in such higher position, be compensated for such service at the rate he/she would have been hired had he/she been promoted to such position. A temporary assignment to work in a position classified in a higher grade, as described in this Section shall be limited in effect to the period not to exceed five (5) days prior to the date of the filing of the grievance in writing. The Employer shall not rotate such assignments among employees for the purpose of avoiding compensation at the higher grade.

**Section 2.** Compensation for Work in a Higher Classification. An employee who is performing, pursuant to assignment, temporary service in a position classified in a grade higher than the grade of the position in which he/she performs regular service, other than for the purpose of filling in for an employee on vacation, shall be compensated at the rate of pay for the position of the sixth (6th) consecutive day of actual service.

**Section 3.** When there is an existing Civil Service list for a position to be filled by an employee performing temporary service in a higher classification, the selection shall be made on the basis of seniority as defined under Civil Service rules.

**Section 4.** When there is no existing Civil Service list for a bargaining unit position and it is to be filled by an employee performing temporary service in a higher classification, the selection shall be made on the basis of qualifications and abilities; and where qualifications and abilities are substantially equal, seniority as defined under Civil Service law and rules shall be the determining factor. Seniority, as so defined, being equal, the candidate for a position within the job series as defined by Civil Service, prior to an authorized absence shall be the determining factor. In the event that the candidate for a position within the job series as defined by Civil Service, and where qualifications and abilities are substantially equal, then longevity within job series shall be the determining factor.

**Section 5.** When there is no existing Civil Service list for a bargaining unit position and it is to be filled by a provisional appointment, or provisional promotion, the following procedure shall apply:

The vacancy shall be posted for five (5) consecutive working days in the department, division or employing unit in which the vacancy exists.

On the posting the Appointing Authority shall specify, the job classification, eligible classifications of employees shall be subject to Civil Service law and rules and shall not be a subject of grievance or arbitration. The posting shall specify the duties and location of the position.

C. The selection of an employee for provisional promotion shall be made from among the eligible bidders in the manner specified in paragraph (d) below. Notice of the selection shall be posted at the original posting at the time the selection is made.

D. Selection shall be made on the basis of qualifications and ability, and where qualifications and ability are substantially equal, seniority as defined under Civil Service law and rules shall be the determining factor. In determining seniority, as so defined, being equal, the candidate for a position within the job series, including determining factor. In the event that the candidates for a position within the job series as defined by Civil Service, prior to an authorized absence shall be the determining factor. In the event that the candidates for a position within the job series as defined by Civil Service, are all non-permanent, then seniority does not exist, and where qualifications and abilities are substantially equal, then longevity within the job series shall be the determining factor.

E. The Appointing Authority's selection shall not be made arbitrarily, capriciously or unreasonably.

F. In the event a more senior applicant is not selected, the Appointing Authority upon written request by the Union shall provide in writing reasons for being passed for up to three (3) of the most senior applicants who were not selected to fill the position. The Department shall endeavor to be as detailed as reasonably possible when supplying reasons. A complaint by an applicant who is junior to an employee selected under Section (d) and Section 5 shall not be the subject of a grievance or arbitration.

G. In the event the Union files a grievance over the non-selection of an employee(s), the question of the written reasons and arbitration of one (1) non-selected employee who filed a grievance over a particular vacancy. The Union shall specify such grievance(s) in writing at the time of filing its demand for arbitration.

# In The Matter Of:

*Roderick Diaz   v.*
*City of Boston, et al.*

---

*David Higgins*
*Vol. 1, April 19, 2001*

---

*Doris O. Wong Associates, Inc.*

*Professional Court Reporters*

*50 Franklin Street*

*Boston, MA  02110*

*(617) 426-2432*

*Original File HIGGINS.V1, 29 Pages*
*Min-U-Script® File ID: 2446578508*

# Word Index included with this Min-U-Script®

```
0001
                    Volume I
                 Pages 1 to 29
                   Exhibits 1
        COMMONWEALTH OF MASSACHUSETTS
       COMMISSION AGAINST DISCRIMINATION
RODERICK DIAZ,                      :
        Complainant,               :
    vs.                            : Docket No.
                                   : 00-132200
    CITY OF BOSTON, DEPARTMENT OF  :
    PUBLIC WORKS PUBLIC SCHOOLS,   :
        Respondent.                :
    DEPOSITION OF DAVID HIGGINS, a witness
    called on behalf of the Complainant, taken pursuant
    to Rule 30 of the Massachusetts Rules of Civil
    Procedure, before Ken A. DiFraia, Certified
    Shorthand Reporter and Notary Public in and for the
    Commonwealth of Massachusetts, at the Offices of
    Burnham & Hines, 25 Kingston Street, Boston,
    Massachusetts, on Thursday, April 19, 2001,
        commencing at 11:11 a.m.
            PRESENT:
        Burnham & Hines
            (by Geraldine S. Hines, Esq.)
    25 Kingston Street, Boston, MA 02111-2208,
            for the Complainant.
        City of Boston
        Law Department
            (by William J. Donahue, Esq.)
    City Hall, One City Hall Square, Room 615,
    Boston, MA 02201, for the Respondent.
```

Page 2

[1]                 INDEX
[2] WITNESS:    DIRECT CROSS REDIRECT RECROSS
[3] David Higgins
[4]    (By Ms. Hines)  3
[5]
[6]
[7]
                  EXHIBITS
[8] EX. NO.                 PAGE
[9]  1    Position posting notice    16
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]

Page 3

[1]                 **PROCEEDINGS**
[2]    **MS. HINES:** Usual stipulations?
[3]    **MR. DONAHUE:** Yes. Mr. Higgins would like
[4] to read and sign the deposition transcript. We can
[5] waive the notary.
[6]                 **DAVID HIGGINS**
[7] a witness called for examination by counsel for the
[8] Complainant, being first duly sworn, was examined
[9] and testified as follows:
[10]            **DIRECT EXAMINATION**
[11]             **BY MS. HINES:**
[12]    **Q:** Good morning, Mr. Higgins. My name is
[13] Geraldine Hines, and I represent the Complainant in
[14] this case, Roderick Diaz.
[15]       I'm going to ask you some questions this
[16] morning about a complaint that he filed against the
[17] City of Boston.
[18]       Just for the record, would you please state
[19] and spell your name.
[20]    **A:** David Higgins, H-i-g-g-i-n-s.
[21]    **Q:** What is your place of employment,
[22] Mr. Higgins?
[23]    **A:** I'm the Director of Central Fleet
[24] Maintenance at 400 Frontage Road in Boston.

Page 4

[1]    **Q:** Who is your employer?
[2]    **A:** The City of Boston.
[3]    **Q:** How long have you been employed by the City
[4] of Boston?
[5]    **A:** Since August of '97.
[6]    **Q:** What did you do before that?
[7]    **A:** I was the director of fleet maintenance for
[8] the City of Concord, New Hampshire.
[9]    **Q:** How did you come about being employed by
[10] the City of Boston in 1997?
[11]    **A:** I answered an ad in one of the trade
[12] publications, submitted a resume and went through
[13] the process.
[14]    **Q:** Prior to 1997, did you live in New
[15] Hampshire or Massachusetts?
[16]    **A:** New Hampshire.
[17]    **Q:** You had no connection with the City of
[18] Boston as an employee prior to 1997, would that be a
[19] fair statement?
[20]    **MR. DONAHUE:** Objection to form, leading.
[21]    **Q:** I'll rephrase the question. Prior to 1997,
[22] had you ever worked for the City of Boston?
[23]    **A:** No.
[24]    **Q:** What are the duties that you have as — and

---

Page 5

[1] forgive me if I have forgotten your title already.
[2] **Q:** Your title is Director of Central Fleet Maintenance?
[3] **A:** That's correct.
[4] **Q:** What are your duties as Director of Central
[5] Fleet Maintenance?
[6] **A:** I oversee the operation of that division of
[7] public works.
[8] **Q:** Are you the supervisor of all of the
[9] employees who work within that division?
[10] **A:** Yes.
[11] **Q:** You may not supervise them directly, but
[12] you are responsible for the quality and the output
[13] of the work of all the people that work for fleet
[14] maintenance; is that right?
[15] **A:** I have five people that report to me
[16] directly.
[17] **Q:** What are the titles of the five people that
[18] report to you directly?
[19] **A:** The superintendent of heavy maintenance,
[20] the superintendent of light maintenance, the
[21] supervisor of automotive maintenance, the head store
[22] keeper, and the radio communications technician.
[23] **Q:** What is the name of the person who's the
[24] superintendent of heavy maintenance?

Page 7

[1] **A:** I do.
[2] **Q:** What position is that?
[3] **A:** He's an HMER, and that's heavy motor
[4] equipment repairman.
[5] **Q:** Do you know how long Mr. Diaz has been
[6] working for the City of Boston?
[7] **A:** I do not.
[8] **Q:** Was he working in this position when you
[9] came into your job in 1997?
[10] **A:** Yes.
[11] **Q:** Since 1997, have you had any direct contact
[12] with Mr. Diaz?
[13] **A:** As in?
[14] **Q:** As an employee.
[15] **A:** No, other than being an applicant for a
[16] position.
[17] **Q:** Had you ever met him before he applied for
[18] that position?
[19] **A:** Yes.
[20] **Q:** When did you meet him?
[21] **A:** When I first came to the City, I introduced
[22] myself to all of the mechanics.
[23] **Q:** In your capacity as Director of Central
[24] Fleet Maintenance, do you or the individuals who

Page 6

[1] **A:** Bob Silvey.
[2] **Q:** How about the superintendent of light
[3] maintenance?
[4] **A:** Jerry Coughlan.
[5] **Q:** And the supervisor of auto maintenance?
[6] **A:** Horace Rider.
[7] **Q:** R-i-d-e-r?
[8] **A:** R-i-d-e-r.
[9] **Q:** How about the head store keeper?
[10] **A:** Brian McMahon.
[11] **Q:** And radio communications?
[12] **A:** Paul D'Matteira.
[13] **Q:** Underneath the five people who report
[14] directly to you, approximately how many employees
[15] are there?
[16] **A:** I believe there are 55 of us in Central
[17] Fleet Maintenance.
[18] **Q:** That includes the five supervisors and
[19] yourself?
[20] **A:** That's everybody, that's correct.
[21] **Q:** Are you familiar with Roderick Diaz?
[22] **A:** I am.
[23] **Q:** Do you know what position he now holds at
[24] City of Boston?

Page 8

[1] report directly to you do performance evaluations of
[2] the I guess 49 people who work as mechanics and at
[3] other positions?
[4] **A:** Both.
[5] **Q:** You do it, and the people that supervise
[6] you do it as well?
[7] **A:** No. The people that I supervise do it, and
[8] I do it as well.
[9] **Q:** So each of the 49 individuals would get two
[10] evaluations, one by you and one by their immediate
[11] supervisor?
[12] **A:** No. I evaluate the people that report
[13] directly to me, and, in turn, the supervisors
[14] evaluate the people that report directly to them.
[15] **Q:** I understand now. Who would have authority
[16] to discipline the 49 people who work in fleet
[17] maintenance?
[18] **A:** The appointing authority is the only
[19] individual that can do disciplining. We recommend.
[20] So the Commissioner...
[21] **Q:** The pointing authority would be the
[22] Commissioner?
[23] **A:** That's correct.
[24] **Q:** That's Mr. Casazza?

Page 9

[1] **A:** That's correct.
[2] **Q:** Do you have any knowledge of Mr. Diaz'
[3] disciplinary history, if any?
[4] **A:** I don't.
[5] **Q:** Have you ever personally received any
[6] complaints about his work performance?
[7] **A:** No.
[8] **Q:** Are you aware of any complaints about his
[9] work performance?
[10] **A:** No.
[11] **Q:** Do you have an opinion of his ability as a
[12] heavy motor equipment repairman?
[13] **A:** I have not received any communication from
[14] the people that he reports to directly, either good
[15] or bad.
[16] **Q:** Moving to the selection process for the
[17] motor equipment repair foreman, I believe it's
[18] called —
[19] **A:** Uh-huh.
[20] **Q:** — were you involved in the process by
[21] which a person that was hired for a position that
[22] was advertized in November of '99?
[23] **A:** Yes.
[24] **Q:** What was your role in that process?

Page 10

[1] **A:** I conducted the interviews and made
[2] recommendations.
[3] **Q:** Was Mr. Diaz one of the individuals that
[4] you interviewed in connection with that position?
[5] **A:** Yes.
[6] **Q:** How was the selection process developed, to
[7] your knowledge? Or who developed the selection
[8] process? I'll put it that way.
[9] **A:** I did.
[10] **Q:** When did you develop the selection process?
[11] **A:** In the early '90s in Concord, New
[12] Hampshire.
[13] **Q:** So you brought a process with you to the
[14] City of Boston?
[15] **A:** Uh-huh.
[16] **Q:** When you arrived, do you know what the
[17] selection process was for foreman in the fleet
[18] maintenance?
[19] **A:** No.
[20] **Q:** Are you aware of any way in which your
[21] process changed the prior process?
[22] **A:** I don't know what the prior process was.
[23] **Q:** So you don't know whether your process was
[24] different from or the same as the process that was

Page 11

[1] already in effect?
[2] **A:** No.
[3] **Q:** Did you discuss your process with anybody
[4] before you implemented it?
[5] **A:** No.
[6] **Q:** You didn't discuss it with Mr. Casazza?
[7] **A:** No.
[8] **Q:** Mr. Casazza gave you free reign to use
[9] whatever process you saw fit to select the foreman?
[10] **A:** No. We didn't discuss it.
[11] **Q:** You said you brought a process with you
[12] that you used in New Hampshire. Other than the
[13] interview, what else was considered part of that
[14] process?
[15] **A:** It's basically three-fold, education,
[16] experience, job knowledge.
[17] **Q:** How did you go about judging the
[18] educational background of the individual candidates?
[19] **A:** By reading their resumes.
[20] **Q:** How would you judge whether one candidate
[21] was more qualified from an educational standpoint
[22] than the other?
[23] **A:** I checked whatever credentials they had
[24] listed.

Page 12

[1] **Q:** Just from an evaluation standpoint, what
[2] were you looking for in terms of education from the
[3] ideal candidate?
[4] **A:** A course of study that was industry related
[5] such that there had been some achievement in
[6] automotive science.
[7] **Q:** Other than education, what else did you
[8] evaluate in choosing the person for the position?
[9] **A:** Experience, job knowledge.
[10] **Q:** What was the criterion that you used in
[11] experience? What were you looking for there?
[12] **A:** Positions that had been held in the past,
[13] increasing areas of responsibility.
[14] **Q:** Was there anything else under experience
[15] that you were looking for?
[16] **A:** Industry related. All of the criteria that
[17] I looked for was related to the function.
[18] **Q:** The job was what exactly?
[19] **A:** Motor equipment repair foreman.
[20] **Q:** That would include heavy equipment, light
[21] equipment, and automotive?
[22] **A:** This particular function was for the light
[23] shop, but yes, overall.
[24] **Q:** The light shop would include what sort of

David Higgins
Vol. 1, April 19, 2001
Case 1:05-cv-10154-NG    Document 39-19    Filed 02/07/2007    Page 5 of 14
Roderick Diaz    v.
City of Boston, et al.

Page 13

[1] vehicles?

[2] **A:** Passenger cars, pickup trucks, vans, light
[3] duty 1 ton GVWR, gross vehicle weight rating, and
[4] under.

[5] **Q:** In addition to education and experience,
[6] what were you looking for in terms of job knowledge?
[7] You identified that as the third criterion.

[8] **A:** I'm not sure I know how to answer that
[9] question.

[10] **Q:** How would you determine whether the person
[11] had job knowledge or not?

[12] **A:** We use a test, and we use some parts and
[13] systemic identification process.

[14] **Q:** Where did the test come from that you used?

[15] **A:** I wrote it.

[16] **Q:** When did you write the test?

[17] **A:** Early '90s, and I reevaluate it every time
[18] I use it to make sure that it's up to date.

[19] **Q:** That test would have been basically the
[20] same one you brought with you from New Hampshire,
[21] with some revisions?

[22] **A:** Yes.

[23] **Q:** When was the last time that you revised it
[24] before November of 1999?

Page 14

[1] **A:** Then.

[2] **Q:** You revised it for the group of applicants
[3] that Mr. Diaz was included in?

[4] **A:** That's correct.

[5] **Q:** The time before that, when did you last
[6] revise it?

[7] **A:** I believe it was two years prior to that in
[8] '97, was the last time we hired a foreman.

[9] **Q:** In the three criteria you described to me,
[10] how did you weigh them as against each other? Were
[11] they equally weighted? Was one weighted more
[12] heavily than the other? How would you describe
[13] that?

[14] **A:** I did not have, do not have a preset idea
[15] that any individual component only counts for X. I
[16] took as a compilation of all three.

[17] I didn't simply apportion it to mean there
[18] was a third, a third, and a third. I took them all
[19] together.

[20] **Q:** Would it be fair to say you gave them all
[21] equal weight?

[22] **A:** Yes.

[23] **Q:** So experience was just as important as job
[24] knowledge and education?

Page 15

[1] **A:** Yes.

[2] **Q:** Do I understand it — and I think you said
[3] this already, but I want to be clear — that the way
[4] you evaluated the job knowledge was strictly through
[5] the test that you use; is that right?

[6] **MR. DONAHUE:** Objection. You can still
[7] answer the question.

[8] **Q:** You can answer. Did you use anything other
[9] than the test to evaluate the job knowledge?

[10] **A:** Yes.

[11] **Q:** What else?

[12] **A:** A number of parts and some systemic
[13] devices.

[14] **Q:** What do you mean by "parts and systemic
[15] devices"?

[16] **A:** Actual components that go in a vehicle.

[17] **Q:** You showed them actual parts and asked them
[18] to identify those; is that what you mean?

[19] **A:** That's correct.

[20] **Q:** Did you record the result of that part of
[21] your test somewhere?

[22] **A:** I did.

[23] **Q:** What about job performance? You told me
[24] earlier that you were aware that all of the 49

Page 16

[1] people, including Mr. Diaz, were evaluated by their
[2] supervisors. Did the performance evaluations which
[3] had been previously conducted have a role in your
[4] evaluation of the candidates for the position?

[5] **MR. DONAHUE:** Objection.

[6] **A:** No.

[7] **Q:** It did not?

[8] **A:** It did not.

[9] (Document marked as Complainant's
[10] Exhibit 1 for identification)

[11] **Q:** I am showing you what's been marked as
[12] Exhibit 1, and I ask you if you recognize it?

[13] **A:** (Witness reviews document) Yes.

[14] **Q:** What do you recognize that to be?

[15] **A:** A City of Boston position posting notice.

[16] **Q:** Is that the position notice that was posted
[17] in November of 1999 by the City of Boston?

[18] **A:** That's the date on it. I would have to
[19] refer to the posting notice. I believe it is, but
[20] without looking, I couldn't tell you. It's dated
[21] November of 1999, though.

[22] **Q:** Can you look at that and say whether or not
[23] that's the position that Mr. Diaz applied for?

[24] **A:** Yes, it appears to be.

Page 17

[1] **Q:** I'm taking from your testimony,
[2] Mr. Higgins, that you don't know as you sit here
[3] today whether or not a written test was ever used
[4] for a promotion to foreman before you used it in
[5] 1997, when you came to the City?
[6] **A:** I do not, no.
[7] **Q:** Do you have any knowledge of the
[8] appointments of mechanics to work as acting foreman
[9] when the foreman is out of work for whatever reason?
[10] **A:** Yes.
[11] **Q:** What do you know about that process?
[12] **A:** It's a temporary position that is used if a
[13] foreman is going to be absent for something of an
[14] extended time period, usually a day or longer.
[15] **Q:** How do you select the person that's going
[16] to serve as acting foreman?
[17] **A:** I generally don't.
[18] **Q:** Do you know who does that?
[19] **A:** Yes.
[20] **Q:** Who does that?
[21] **A:** The individual shop superintendents.
[22] **Q:** Do you know what procedure the individual
[23] shop superintendent uses to select?
[24] **A:** There is not one.

Page 18

[1] **Q:** As far as you know, it's not done by
[2] seniority?
[3] **A:** No.
[4] **Q:** You know that it is not done by seniority,
[5] correct?
[6] **A:** I don't know that it's done one way or the
[7] other.
[8] **Q:** I take it that that's not something that
[9] you've ever looked into?
[10] **MR. DONAHUE:** Objection to the form of the
[11] question.
[12] **Q:** Have you ever looked into how that is done?
[13] **A:** No.
[14] **Q:** By the way, the criteria that you used to
[15] select the person for the position, did you write
[16] down your criteria in any place and distribute it to
[17] the interested candidates?
[18] **A:** No.
[19] **Q:** Would it be a fair statement that the
[20] criteria that you used for evaluating the candidates
[21] was something that you used on an ad hoc basis?
[22] **MR. DONAHUE:** Objection. You can answer.
[23] **Q:** Would that be a fair statement?
[24] **A:** No.

Page 19

[1] **Q:** In any event, your criteria were not
[2] written and distributed to the candidates, as far as
[3] you can recall?
[4] **A:** I'm not sure I know how to answer that. I
[5] did not give anybody a copy of the test, if that's
[6] what you mean.
[7] **Q:** I don't mean that. I mean did you write
[8] down in any place what the selection process would
[9] be for this position?
[10] **MR. DONAHUE:** Objection. You may answer.
[11] **A:** I'm still not — I don't know how to answer
[12] that.
[13] **Q:** Did you write a memorandum to your file or
[14] to your supervisor or to anybody which outlined what
[15] the process would be for selecting the person for
[16] that position?
[17] **MR. DONAHUE:** Objection.
[18] **A:** No. Process, no.
[19] **Q:** Mr. Higgins, do you have any knowledge of
[20] promotions in the past prior to your tenure at the
[21] City?
[22] **A:** No.
[23] **Q:** You don't have any information about that?
[24] **A:** No.

Page 20

[1] **Q:** Let me give you specifics. In 1996, are
[2] you aware of or do you know a person who worked for
[3] the city named "Billy Keane"? Does that name ring a
[4] bell with you?
[5] **A:** In '96, no. He worked there. Mr. Keane
[6] was an employee when I came in '97.
[7] **Q:** Do you know whether or not Mr. Keane was
[8] the senior person in the department when he was
[9] promoted in 1996, if you know?
[10] **MR. DONAHUE:** Objection.
[11] **A:** No.
[12] **Q:** You don't know?
[13] **A:** (Witness shakes head)
[14] **Q:** You have to answer verbally so he can get
[15] your no audibly.
[16] **A:** In 1996, I have no knowledge of what
[17] happened.
[18] **Q:** I know you were not there in '96. I'm
[19] asking you now, based on what you may have learned
[20] about the people who worked there after you came, do
[21] you know whether or not Mr. Keane was the senior
[22] person who applied for that position in 1996?
[23] **MR. DONAHUE:** Objection.
[24] **A:** I do not know.

Page 21

[1]    Q: What about Mr. Fitzroy Prescott, do you
[2] know Mr. Prescott?
[3]    A: I do.
[4]    Q: Mr. Prescott was promoted in 1995, before
[5] you came.
[6]    A: Okay.
[7]    Q: Do you know whether or not Mr. Prescott was
[8] the senior person who was promoted in 1995, if you
[9] know?
[10]    MR. DONAHUE: Objection.
[11]    A: I don't know.
[12]    Q: How about Mr. Leo O'Leary? I believe he
[13] was promoted from foreman to superintendent at some
[14] point. Are you familiar with Mr. O'Leary?
[15]    A: I don't even know the man.
[16]    Q: How about Mr. Al Young, do you know Al
[17] Young?
[18]    A: I know him.
[19]    Q: Is Mr. Young working there now?
[20]    A: He is.
[21]    Q: Is he a foreman?
[22]    A: He's a general foreman.
[23]    Q: Do you know whether or not he was the
[24] senior applicant when he applied for that position?

Page 22

[1]    MR. DONAHUE: Objection.
[2]    A: I do not.
[3]    Q: How about Mr. Teddy Meyers, do you know
[4] him?
[5]    A: He works there now.
[6]    Q: What is his position?
[7]    A: Motor equipment repair foreman.
[8]    Q: Do you know when he was promoted to that
[9] position?
[10]    A: I don't.
[11]    Q: Do you know whether or not he was the
[12] senior person who applied for that position?
[13]    A: I do not.
[14]    MR. DONAHUE: Objection.
[15]    Q: Could you tell me the name of Mr. Diaz'
[16] immediate supervisor.
[17]    A: That would be Ted Meyers.
[18]    Q: Did you have any conversations with
[19] Mr. Meyers about Mr. Diaz before you made a decision
[20] on the individual to whom the position was offered?
[21]    A: No.
[22]    Q: Did you talk to any of the supervisors
[23] about any of the applicants?
[24]    A: Yes.

Page 23

[1]    Q: Which of the applicants did you seek
[2] information about?
[3]    A: I'm sorry?
[4]    Q: You said you did speak to supervisors about
[5] some of the applicants. I'm just asking you which
[6] ones. Which applicants did you talk to supervisors
[7] about?
[8]    A: I discussed the applicants with Mr. Silvey
[9] and Mr. Coughlan.
[10]    Q: Were Mr. Silvey and Mr. Coughlan the
[11] immediate supervisors of any of the other
[12] applicants?
[13]    A: Immediate, no. They are two levels
[14] above...
[15]    Q: So the question is, just so that we're
[16] clear, did you talk to the immediate supervisors
[17] about any of the applicants?
[18]    A: No.
[19]    Q: After you came in 1997, Mr. Higgins, did
[20] you use your three-pronged procedure for every
[21] position that you hired?
[22]    A: Yes.
[23]    Q: Other than motor equipment repair foreman,
[24] what other positions did you use this three-pronged

Page 24

[1] process for?
[2]    A: All of them, from technicians and clerical
[3] help to parts department folks and driving
[4] instructors.
[5]    Q: Did you hire any motor equipment repair
[6] foremen since 1997 using the process that you
[7] described, experience, education and job knowledge
[8] as measured by the test?
[9]    A: Yes.
[10]    Q: Who did you hire using that process?
[11]    A: William Keane.
[12]    Q: Mr. Keane?
[13]    A: Yes.
[14]    Q: Is that the Billy Keane that I just asked
[15] you about?
[16]    A: I only know of one Bill Keane.
[17]    Q: So you used it when Mr. William Keane was
[18] promoted to a motor equipment repair foreman?
[19]    A: He was acting in that capacity when I got
[20] there. I used the same format, and he was awarded
[21] the position.
[22]    Q: When did you do that? When was that
[23] selection process?
[24]    A: That was a week after I started, August of

Page 25

[1] '99. I can get you the exact date.

[2]     **Q:** August of '99?

[3]     **A:** Sorry, August of '97.

[4]     **Q:** Mr. Keane was hired under this process as a

[5] motor equipment repair foreman. Anyone else?

[6]     **A:** No. That's the only motor equipment repair

[7] foreman position that we've had vacant since I've

[8] been here.

[9]     **Q:** Of the individuals that applied for the

[10] job, can you tell me whether or not Mr. Keane was

[11] the senior person?

[12]     **A:** I don't know.

[13]     **Q:** Would it be a fair statement to say that

[14] seniority played no role in the decisions that you

[15] made about who got the foremen positions?

[16]     **MR. DONAHUE:** Objection to form.

[17]     **Q:** You can answer.

[18]     **MR. DONAHUE:** I would ask you to rephrase

[19] the question. That's suggestive of a yes answer.

[20]     **MS. HINES:** He can answer yes or no, but

[21] I'll rephrase it.

[22]     **Q:** Did you consider seniority in the hiring of

[23] any of the positions that you hired after you came

[24] on in 1997?

Page 26

[1]     **A:** Yes, I did.

[2]     **Q:** Which positions did you consider seniority

[3] for?

[4]     **A:** All of them.

[5]     **Q:** When I asked you earlier what you used to

[6] weigh the qualifications, you told me experience

[7] education, and job knowledge.

[8]     **A:** That's correct.

[9]     **Q:** You didn't mention seniority.

[10]     **A:** Seniority only comes into play once we

[11] identify that all are equal with regard to

[12] credentials.

[13]     **Q:** I see. I take it that there was at least

[14] one position where the individuals were equal, and

[15] you had to use seniority to decide who got the job?

[16]     **A:** Yes.

[17]     **Q:** What position was that?

[18]     **A:** This one (indicating).

[19]     **Q:** Any other one?

[20]     **A:** Not that comes to mind.

[21]     **Q:** The test that you used in 1997 when

[22] Mr. Keane was hired, is that the same test that you

[23] used for the position that Mr. Diaz applied for?

[24]     **A:** Yes, with updates.

Page 27

[1]     **Q:** Do you know whether or not Mr. Diaz has

[2] ever acted as acting foreman?

[3]     **A:** Yes, I believe he has.

[4]     **Q:** Were you involved in any way in the

[5] selection of Mr. Diaz to act as acting foreman?

[6]     **A:** No.

[7]     **Q:** Do you know, when was the last time that

[8] you were aware that Mr. Diaz was acting foreman?

[9]     **A:** I don't know.

[10]     **Q:** I believe that's all the questions I have

[11] for you, Mr. Higgins. If you can just give me a

[12] moment.

[13]     **A:** Sure.

[14]     (Pause)

[15]     **MS. HINES:** That's all I have. Thank you.

[16]     **MR. DONAHUE:** No questions for me.

[17]     (Whereupon the deposition

[18] was concluded at 11:43 a.m.)

Page 28

[1]                   **CERTIFICATE**

[2] I, DAVID HIGGINS, do hereby certify that I have

[3] read the foregoing transcript of my testimony, and

[4] further certify under the pains and penalties of

[5] perjury that said transcript (with/without)

[6] suggested corrections is a true and accurate record

[7] of said testimony.

[8]     Dated at __, this day of ,

[9] 2001.

Page 29

[1] COMMONWEALTH OF MASSACHUSETTS)
[2] SUFFOLK, SS.                                    )
[3]   I, Ken A. DiFraia, Certified Shorthand Reporter
[4] and Notary Public in and for the Commonwealth of
[5] Massachusetts, do hereby certify that there came
[6] before me on the 19th day of April, 2001, at 11:11
[7] a.m., the person hereinbefore named, who was by me
[8] duly sworn to testify to the truth and nothing but
[9] the truth of his knowledge touching and concerning
[10] the matters in controversy in this cause; that he
[11] was thereupon examined upon his oath, and his
[12] examination reduced to typewriting under my
[13] direction; and that the deposition is a true record
[14] of the testimony given by the witness.
[15]   I further certify that I am neither attorney or
[16] counsel for, nor related to or employed by, any
[17] attorney or counsel employed by the parties hereto
[18] or financially interested in the action.
[19]   In witness whereof, I have hereunto set my hand
[20] and affixed my notarial seal this _____ day of May,
[21] 2001.
[22]
[23]            Notary Public
[24]         My commission expires 4/19/02

**Lawyer's Notes**

Roderick Diaz   v.
City of Boston, et al.                Case 1:05-cv-10154-NG    Document 39-19    Filed 02/07/2007    Page 12 of 14

David Higgins
Vol. 9, April 19, 2001

**1**

1 13:3; 16:10, 12
11:43 27:18
1995 21:4, 8
1996 20:1, 9, 16, 22
1997 4:10, 14, 18, 21; 7:9, 11; 17:5; 23:19; 24:6; 25:24; 26:21
1999 13:24; 16:17, 21

**2**

2001 28:9

**4**

400 3:24
49 8:2, 9, 16; 15:24

**5**

55 6:16

**9**

90s 10:11; 13:17
96 20:5, 18
97 4:5; 14:8; 20:6; 25:3
99 9:22; 25:1, 2

**A**

a.m 27:18
ability 9:11
above 23:14
absent 17:13
accurate 28:6
achievement 12:5
act 27:5
acted 27:2
acting 17:8, 16; 24:19; 27:2, 5, 8
Actual 15:16, 17
ad 4:11; 18:21
addition 13:5
advertized 9:22
against 3:16; 14:10
Al 21:16, 16
answered 4:11
appears 16:24
applicant 7:15; 21:24
applicants 14:2; 22:23; 23:1, 5, 6, 8, 12, 17
applied 7:17; 16:23; 20:22; 21:24; 22:12; 25:9; 26:23
appointing 8:18
appointments 17:8

apportion 14:17
approximately 6:14
areas 12:13
arrived 10:16
audibly 20:15
August 4:5; 24:24; 25:2, 3
authority 8:15, 18, 21
auto 6:5
automotive 5:21; 12:6, 21
awarded 24:20
aware 9:8; 10:20; 15:24; 20:2; 27:8

**B**

background 11:18
bad 9:15
based 20:19
basically 11:15; 13:19
basis 18:21
bell 20:4
Bill 24:16
Billy 20:3; 24:14
Bob 6:1
Boston 3:17, 24; 4:2, 4, 10, 18, 22; 6:24; 7:6; 10:14; 16:15, 17
Both 8:4
Brian 6:10
brought 10:13; 11:11; 13:20

**C**

called 3:7; 9:18
came 7:9, 21; 17:5; 20:6, 20; 21:5; 23:19; 25:23
can 3:4; 8:19; 15:6, 8; 16:22; 18:22; 19:3; 20:14; 25:1, 10, 17, 20; 27:11
candidate 11:20; 12:3
candidates 11:18; 16:4; 18:17, 20; 19:2
capacity 7:23; 24:19
cars 13:2
Casazza 8:24; 11:6, 8
case 3:14
Central 3:23; 5:2, 4; 6:16; 7:23
CERTIFICATE 28:1
certify 28:2, 4
changed 10:21
checked 11:23
choosing 12:8
City 3:17; 4:2, 3, 8, 10, 17, 22; 6:24; 7:6, 21; 10:14; 16:15, 17; 17:5; 19:21; 20:3
clear 15:3; 23:16
clerical 24:2

Commissioner 8:20, 22
communication 9:13
communications 5:22; 6:11
compilation 14:16
Complainant 3:8, 13
Complainant's 16:9
complaint 3:16
complaints 9:6, 8
component 14:15
components 15:16
concluded 27:18
Concord 4:8; 10:11
conducted 10:1; 16:3
connection 4:17; 10:4
consider 25:22; 26:2
considered 11:13
contact 7:11
conversations 22:18
copy 19:5
corrections 28:6
Coughlan 6:4; 23:9, 10
counsel 3:7
counts 14:15
course 12:4
credentials 11:23; 26:12
criteria 12:16; 14:9; 18:14, 16, 20; 19:1
criterion 12:10; 13:7

**D**

D'Matteira 6:12
date 13:18; 16:18; 25:1
dated 16:20; 28:8
DAVID 3:6, 20; 28:2
day 17:14; 28:8
decide 26:15
decision 22:19
decisions 25:14
department 20:8; 24:3
deposition 3:4; 27:17
describe 14:12
described 14:9; 24:7
determine 13:10
develop 10:10
developed 10:6, 7
devices 15:13, 15
Diaz 3:14; 6:21; 7:5, 12; 9:2; 10:3; 14:3; 16:1, 23; 22:15, 19; 26:23; 27:1, 5, 8
different 10:24
DIRECT 3:10; 7:11
directly 5:11, 16, 18; 6:14; 8:1, 13, 14; 9:14
Director 3:23; 4:7; 5:2, 4; 7:23
disciplinary 9:3
discipline 8:16
disciplining 8:19
discuss 11:3, 6, 10

discussed 23:8
distribute 18:16
distributed 19:2
division 5:6, 9
Document 16:9, 13
DONAHUE 3:3; 4:20; 15:6; 16:5; 18:10, 22; 19:10, 17; 20:10, 23; 21:10; 22:1, 14; 25:16, 18; 27:16
done 18:1, 4, 6, 12
down 18:16; 19:8
driving 24:3
duly 3:8
duties 4:24; 5:4
duty 13:3

**E**

earlier 15:24; 26:5
early 10:11; 13:17
education 11:15; 12:2, 7; 13:5; 14:24; 24:7; 26:7
educational 11:18, 21
effect 11:1
either 9:14
else 11:13; 12:7, 14; 15:11; 25:5
employed 4:3, 9
employee 4:18; 7:14; 20:6
employees 5:9; 6:14
employer 4:1
employment 3:21
equal 14:21; 26:11, 14
equally 14:11
equipment 7:4; 9:12, 17; 12:19, 20, 21; 22:7; 23:23; 24:5, 18; 25:5, 6
evaluate 8:12, 14; 12:8; 15:9
evaluated 15:4; 16:1
evaluating 18:20
evaluation 12:1; 16:4
evaluations 8:1, 10; 16:2
even 21:15
event 19:1
everybody 6:20
exact 25:1
exactly 12:18
examination 3:7, 10
examined 3:8
Exhibit 16:10, 12
experience 11:16; 12:9, 11, 14; 13:5; 14:23; 24:7; 26:6
extended 17:14

**F**

fair 4:19; 14:20; 18:19, 23; 25:13

familiar 6:21; 21:14
far 11:8; 19:2
file 19:13
filed 3:16
first 3:8; 7:21
fit 11:9
Fitzroy 21:1
five 5:15, 17; 6:13, 18
Fleet 3:23; 4:7; 5:2, 5, 13; 6:17; 7:24; 8:16; 10:17
folks 24:3
follows 3:9
foregoing 28:3
foreman 9:17; 10:17; 11:9; 12:19; 14:8; 17:4, 8, 9, 13, 16; 21:13, 21, 22; 22:7; 23:23; 24:18; 25:5, 7; 27:2, 5, 8
foremen 24:6; 25:15
forgive 5:1
forgotten 5:1
form 4:20; 18:10; 25:16
format 24:20
free 11:8
Frontage 3:24
function 12:17, 22
further 28:4

**G**

gave 11:8; 14:20
general 21:22
generally 17:17
Geraldine 3:13
Good 3:12; 9:14
gross 13:3
group 14:2
guess 8:2
GVWR 13:3

**H**

H-i-g-g-i-n-s 3:20
Hampshire 4:8, 15, 16; 10:12; 11:12; 13:20
happened 20:17
head 5:21; 6:9; 20:13
heavily 14:12
heavy 5:19, 24; 7:3; 9:12; 12:20
held 12:12
help 24:3
hereby 28:2
Higgins 3:3, 6, 12, 20, 22; 17:2; 19:19; 23:19; 27:11; 28:2
HINES 3:2, 11, 13; 25:20; 27:15
hire 24:5, 10
hired 9:21; 14:8; 23:21; 25:4, 23; 26:22

David Higgins
Vol. 1, April 19, 2001

Case 1:05-cv-10154-NG     Document 39-19     Filed 02/07/2007

Roderick Diaz  v.
City of Boston, et al.

Page 13 of 14

hiring 25:22
history 9:3
HMER 7:3
hoc 18:21
holds 6:23
Horace 6:6

## I

idea 14:14
ideal 12:3
identification 13:13; 16:10
identified 13:7
identify 15:18; 26:11
immediate 8:10; 22:16; 23:11, 13, 16
implemented 11:4
important 14:23
include 12:20, 24
included 14:3
includes 6:18
including 16:1
increasing 12:13
indicating 26:18
individual 8:19; 11:18; 14:15; 17:21, 22; 22:20
individuals 7:24; 8:9; 10:3; 25:9; 26:14
industry 12:4, 16
information 19:23; 23:2
instructors 24:4
interested 18:17
interview 11:13
interviewed 10:4
interviews 10:1
into 7:9; 18:9, 12; 26:10
introduced 7:21
involved 9:20; 27:4

## J

Jerry 6:4
job 7:9; 11:16; 12:9, 18; 13:6, 11; 14:23; 15:4, 9, 23; 24:7; 25:10; 26:7, 15
judge 11:20
judging 11:17

## K

Keane 20:3, 5, 7, 21; 24:11, 12, 14, 16, 17; 25:4, 10; 26:22
keeper 5:22; 6:9
knowledge 9:2; 10:7; 11:16; 12:9; 13:6, 11; 14:24; 15:4, 9; 17:7; 19:19; 20:16; 24:7; 26:7

## L

last 13:23; 14:5, 8; 27:7
leading 4:20
learned 20:19
least 26:13
Leo 21:12
levels 23:13
light 5:20; 6:2; 12:20, 24; 24; 13:2
listed 11:24
live 4:14
long 4:3; 7:5
longer 17:14
look 16:22
looked 12:17; 18:9, 12
looking 12:2, 11, 15; 13:6; 16:20

## M

Maintenance 3:24; 4:7; 5:2, 5, 14, 19, 20, 21, 24; 6:3, 5, 17; 7:24; 8:17; 10:18
man 21:15
many 6:14
marked 16:9, 11
Massachusetts 4:15
may 5:11; 19:10; 20:19
McMahon 6:10
mean 14:17; 15:14, 18; 19:6, 7, 7
measured 24:8
mechanics 7:22; 8:2; 17:8
meet 7:20
memorandum 19:13
mention 26:9
met 7:17
Meyers 22:3, 17, 19
mind 26:20
moment 27:12
more 11:21; 14:11
morning 3:12, 16
motor 7:3; 9:12, 17; 12:19; 22:7; 23:23; 24:5, 18; 25:5, 6
Moving 9:16
myself 7:22

## N

name 3:12, 19; 5:23; 20:3; 22:15
named 20:3
New 4:8, 14, 16; 10:11; 11:12; 13:20
notary 3:5
notice 16:15, 16, 19
November 9:22; 13:24;

16:17, 21
number 15:12

## O

O'Leary 21:12, 14
Objection 4:20; 15:6; 16:5; 18:10, 22; 19:10, 17; 20:10, 23; 21:10; 22:1, 14; 25:16
offered 22:20
once 26:10
one 4:11; 8:10, 10; 10:3; 11:20; 13:20; 14:11; 17:24; 18:6; 24:16; 26:14, 18, 19
ones 23:6
only 8:18; 14:15; 24:16; 25:6; 26:10
operation 5:6
opinion 9:11
out 17:9
outlined 19:14
output 5:12
overall 12:23
oversee 5:6

## P

pains 28:4
part 11:13; 15:20
particular 12:12
parts 13:12; 15:12, 14, 17; 24:3
Passenger 13:2
past 12:12; 19:20
Paul 6:12
Pause 27:14
penalties 28:4
people 5:13, 15, 17; 6:13; 8:2, 5, 7, 12, 14, 16; 9:14; 16:1; 20:20
performance 8:1; 9:6, 9; 15:23; 16:2
period 17:14
perjury 28:5
person 5:23; 9:21; 12:8; 13:10; 17:15; 18:15; 19:15; 20:2, 8, 22; 21:8; 22:12; 25:11
personally 9:5
pickup 13:2
place 3:21; 18:16; 19:8
play 26:10
played 25:14
please 3:18
point 21:14
pointing 8:21
position 6:23; 7:2, 8, 16, 18; 9:21; 10:4; 12:8; 16:4, 15, 16, 23; 17:12; 18:5; 19:9, 16; 20:22; 21:24; 22:6, 9, 12, 20; 23:21;

24:21; 25:7; 26:14, 17, 23
positions 8:3; 12:12; 23:24; 25:15, 23; 26:2
posted 16:16
posting 16:15, 19
Prescott 21:1, 2, 4, 7
preset 14:14
previously 16:3
Prior 4:14, 18, 21; 10:21, 22; 14:7; 19:20
procedure 17:22; 23:20
PROCEEDINGS 3:1
process 4:13; 9:16, 20, 24; 10:6, 8, 10, 13, 17, 21, 21, 22, 23, 24; 11:3, 9, 11, 14; 13:13; 17:11; 19:8, 15, 18; 24:1, 6, 10, 23; 25:4
promoted 20:9; 21:4, 8, 13; 22:8; 24:18
promotion 17:4
promotions 19:20
public 5:7
publications 4:12
put 10:8

## Q

qualifications 26:6
qualified 11:21
quality 5:12

## R

R-i-d-e-r 6:7, 8
radio 5:22; 6:11
rating 13:3
read 3:4; 28:3
reading 11:19
reason 17:3
recall 19:3
received 9:5, 13
recognize 16:12, 14
recommend 8:19
recommendations 10:2
record 3:18; 15:20; 28:6
reevaluate 13:17
refer 16:19
regard 26:11
reign 11:8
related 12:4, 16, 17
repair 9:17; 12:19; 22:7; 23:23; 24:5, 18; 25:5, 6
repairman 7:4; 9:12
rephrase 4:21; 25:18, 21
report 5:15, 18; 6:13; 8:1, 12, 14
reports 9:14
represent 3:13
responsibility 12:13
responsible 5:12
result 15:20

## resume
resume 4:12
resumes 11:19
reviews 16:13
revise 14:6
revised 13:23; 14:2
revisions 13:21
Rider 6:6
right 5:14; 15:5
ring 20:3
Road 3:24
Roderick 3:14; 6:21
role 9:24; 16:3; 25:14

## S

same 10:24; 13:20; 24:20; 26:22
saw 11:9
science 12:6
seek 23:1
select 11:9; 17:15, 23; 18:15
selecting 19:15
selection 9:16; 10:6, 7, 10, 17; 19:8; 24:23; 27:5
senior 20:8, 21; 21:8, 24; 22:12; 25:11
seniority 18:2, 4; 25:14, 22; 26:2, 9, 10, 15
serve 17:16
shakes 20:13
shop 12:23, 24; 17:21, 23
showed 15:17
showing 16:11
sign 3:4
Silvey 6:1; 23:8, 10
simply 14:17
sit 17:2
somewhere 15:21
sorry 23:3; 25:3
sort 12:24
speak 23:4
specifics 20:1
spell 3:19
standpoint 11:21; 12:1
started 24:24
state 3:18
statement 4:19; 18:19, 23; 25:13
still 15:6; 19:11
stipulations 3:2
store 5:21; 6:9
strictly 15:4
study 12:4
submitted 4:12
suggested 28:6
suggestive 25:19
superintendent 5:19, 20, 24; 6:2; 17:23; 21:13
superintendents 17:21
supervise 5:11; 8:5, 7

Roderick Diaz   v.
City of Boston, et al.
Case 1:05-cv-10154-NG    Document 39-19    Filed 02/07/2007    Page 1 of 1

David Higgins
Vol. 1, April 19, 2001

supervisor 5:8, 21; 6:5;
8:11; 19:14; 22:16
supervisors 6:18; 8:13;
16:2; 22:22; 23:4, 6, 11, 16
sure 13:8, 18; 19:4; 27:13
sworn 3:8
systemic 13:13; 15:12,
14

**T**

talk 22:22; 23:6, 16
technician 5:22
technicians 24:2
Ted 22:17
Teddy 22:3
temporary 17:12
tenure 19:20
terms 12:2; 13:6
test 13:12, 14, 16, 19;
15:5, 9, 21; 17:3; 19:5;
24:8; 26:21, 22
testified 3:9
testimony 17:1; 28:3, 7
third 13:7; 14:18, 18, 18
though 16:21
three 14:9, 16
three-fold 11:15
three-pronged 23:20, 24
title 5:1, 2
titles 5:17
today 17:3
together 14:19
told 15:23; 26:6
ton 13:3
took 14:16, 18
trade 4:11
transcript 3:4; 28:3, 5
trucks 13:2
true 28:6
turn 8:13
two 8:9; 14:7; 23:13

**U**

under 12:14; 13:4; 25:4;
28:4
Underneath 6:13
up 13:18
updates 26:24
use 11:8; 13:12, 12, 18;
15:5, 8; 23:20, 24; 26:15
used 11:12; 12:10; 13:14;
17:3, 4, 12; 18:14, 20, 21;
24:17, 20; 26:5, 21, 23
uses 17:23
using 24:6, 10
Usual 3:2
usually 17:14

**V**

vacant 25:7
vans 13:2
vehicle 13:3; 15:16
vehicles 13:1
verbally 20:14

**W**

waive 3:5
way 10:8, 20; 15:3; 18:6,
14; 27:4
week 24:24
weigh 14:10; 26:6
weight 13:3; 14:21
weighted 14:11, 11
what's 16:11
Whereupon 27:17
who's 5:23
William 24:11, 17
with/without 28:5
within 5:9
without 16:20
witness 3:7; 16:13; 20:13
work 5:9, 13, 13; 8:2, 16;
9:6, 9; 17:8, 9
worked 4:22; 20:2, 5, 20
working 7:6, 8; 21:19
works 5:7; 22:5
write 13:16; 18:15; 19:7,
13
written 17:3; 19:2
wrote 13:15

**X**

X 14:15

**Y**

years 14:7
Young 21:16, 17, 19

1

PAGES 1 - 34

EXHIBITS - None

COMMONWEALTH OF MASSACHUSETTS
COMMISSION AGAINST DISCRIMINATION

NO. 00-132200

```
***********************************
                                  *
RODERICK DIAZ,                    *
                                  *
              Complainant,        *
                                  *
                                  *
VS.                               *
                                  *
                                  *
CITY OF BOSTON, DEPARTMENT OF     *
PUBLIC WORKS,                     *
                                  *
              Respondents.        *
***********************************
```

DEPOSITION OF JEREMIAH COUGHLIN, a witness called by

and on behalf of the Complainant pursuant to the applica-

ble provisions of the Massachusetts Rules of Civil Proce-

dure, before Caroline Marshall-Smith, a Professional

Court Reporter and Notary Public in and for the Common-

wealth of Massachusetts at the Law Offices of Burnham &

Hines, 25 Kingston Street, Boston, Massachusetts 02111,

on Tuesday, March 27, 2001, commencing at 1:55 p.m.

2

1    APPEARANCES:

2

3         Attorney Geraldine Hines, Law Offices of
     Burnham & Hines, 25 Kingston Street, Boston, Massa-
4    chusetts, 02111, (617) 451-2299; on behalf of the
     Plaintiff.

5

6         Attorney William J. Donahue, Law Department
     Room 1615, City Hall, One City Hall Square, Boston,
7    Massachusetts 022013; on behalf of the Defendants.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

3

## I N D E X

WITNESS                                                    PAGE

JEREMIAH COUGHLIN

    Direct Examination by Ms. Hines.................4

## E X H I B I T S

NUMBER                                                     PAGE

NONE.

4

S T I P U L A T I O N S

It is hereby stipulated and agreed by and between counsel for the respective parties that the reading and the signing of the deposition under the pains and penalties of perjury by the witness is not waived.

It is further stipulated that all objec-tions, except as to the form of the question, and motions to strike shall be reserved until the time of trial.

JEREMIAH COUGHLIN, having duly affirmed that his testimony would be the truth, the whole truth and nothing but the truth, testified as follows in answer to direct interrogatories:

BY MS. HINES:

Q.   Good afternoon, Mr. Coughlin, my name is Geri Hines and I represent Robert Diaz in this matter.  Could you please state your name for the record?

A.   Jeremiah Coughlin.

Q.   And could you spell that please?

A.   J-e-r-e-m-i-a-h, Coughlin is C-o-u-g-h-l-i-n.

Q.   Okay.  Mr. Coughlin, are you employed?

A.   Yes, I am.

Q.   And who are you employed by?

5

A.    City of Boston, Central Maintenance.

Q.    What is your job with the City of Boston?

A.    Superintendent of Light Maintenance.

Q.    How long have you been in that position?

A.    Since 1988.

Q.    Was that the beginning of your employment with the City of Boston?

A.    No, it was not.

Q.    When did you begin your employ with the City of Boston?

A.    '69.

            MS. HINES:  Can we go off the record for a second?

            MR. DONAHUE:  Sure.

            (Discussion off the record.)

BY MS. HINES:

Q.    Back on the record.  Mr. Coughlin, in 1969, what was your position with the City of Boston?

A.    Motor equipment repairman.

Q.    Was that the first job you held with the City of Boston?

A.    That's correct.

Q.    And if you remember, what was the next position that you held?

6

A.    Working foreman.

Q.    Working?

A.    Working foreman.

A.    Yeah.

Q.    And when did you become working foreman?

A.    Late '70's or early '80's, the year, I couldn't
      exactly tell you.

Q.    Okay.  And after working foreman, what was the next
      job that you held?

A.    Foreman.

Q.    When did you become foreman?

A.    I think it was around '83.

Q.    And this is within the same division or department
      within the City of Boston that you are with now?

A.    No, that was with the Transportation Department.

Q.    Transportation, okay.  And the prior position that
      you described, the working foreman, was that with
      Transportation, as well?

A.    Correct.

Q.    And how long did you stay in the position as fore-
      man after you were promoted to foreman in 1983?

A.    Two years.

Q.    So, that 1985 you had another job title?

A.    General foreman, yes.

7

Q.  And how long were you in that position?

A.  Until 1988.

Q.  What position did you go to in 1988?

A.  Superintendent of Automotive Maintenance.

Q.  Is that the position that you hold right now?

A.  Well, it's the same title, but two different de-
    partments.  Superintendent of Automotive Mainte-
    nance for Transportation was in '88.  Then they
    merged with the Public Works Department in 1998.
    And we moved to the Fontage Road facility.

Q.  Okay.  And in 1998 when the two departments merged,
    your position was still Superintendent of the
    Automotive Division?

A.  Correct, in the light shop.

Q.  Okay.  And you got a new title in 1998?

A.  The same title, but just more responsibilities.

Q.  Okay.  Right.  Now, when you were promoted to
    superintendent in 1998.

A.  Right.

Q.  What was the process for moving to general foreman
    to superintendent?

A.  Well, there was an application process that we had
    to be interviewed by the director of operations.

Q.  And the director of operations was who at that

8

time, if you can remember?

A.   Chuck Moralli.

Q.   And was that all that was required of you, an interview with Mr. Moralli?

A.   And my job experience, training, knowledge, education.

Q.   How is that recorded, your job experience, your training and your knowledge, was that on a written application?

A.   On a lot of them we get certificates for each class that you go through.

Q.   And did you attach all of this documentation to your application for the job?

A.   Yes, it's all in my personnel file.

Q.   Was there any kind of test that you had to take to go from general foreman to superintendent?

A.   God, if I could remember.  It was just like an oral questions, not written.

Q.   Right.  During the interview itself, or was this a separate proceeding?

A.   Just during the interview.

Q.   Okay.

A.   Because I believe there was more applicants then I for the same position.

Q.   Okay.   All right.   And what about when you moved
     from foreman to general foreman, was there a test
     involved with that promotion?

A.   No.

Q.   A written test?

A.   No.

Q.   Well, let me put it this way, since 1969, have you
     ever had to take a written promotion -- a written
     test to move from one job to the other?

          MR. DONAHUE:   Objection.

          MS. HINES:   You can still answer.

          MR. DONAHUE:   You can answer.

          THE WITNESS:   Could you repeat the ques-
     tion?

BY MS. HINES:

Q.   Since 1969, have you ever had to take a written
     test for promotion from one job to the other?

A.   No.

Q.   Okay.   Now, in your capacity as superintendent of
     the light --

A.   Light maintenance.

Q.   -- light maintenance, what are your job duties?

A.   Job duties is to maintain -- I work with a fleet of
     vehicles which consists of 800, 85 percent opera-

10

tional at any given date.

Q.    And how many people do you directly supervise?

A.    Thirteen.

Q.    What are their job titles?

A.    One general foreman, two foremen and the rest are heavy motor equipment repairmen.

Q.    Heavy motor equipment repairmen?

A.    Right.

Q.    So, far that would be ten, ten of those?  Okay. And these are the people who assist you in maintaining these 800 vehicles at 85 percent working capacity?

A.    Right.

Q.    Okay.  Is Mr. Rod Diaz one of those people who works directly under you?

A.    No.

Q.    He's in the heavy machinery?

A.    That's correct.

Q.    Okay.  Who would that superintendent be?

A.    Bob Silvi.

Q.    Mr. Silvi.  Okay.  Now, you indicated that you supervise these 13 individuals.  Do you also do job performance evaluations of the 13?

A.    We do them annually.

11

Q.   Okay.  And is that throughout the DPW?

A.   That's correct.

Q.   So that Mr. Silvi would have the same responsi-
     bilities with respect to evaluations you do?

               MR. DONAHUE:  Objection.

     BY MS. HINES:

Q.   Is that right?

A.   Yes.

Q.   Okay.  And is this a written form that you use to
     do this evaluation?

A.   Correct.

Q.   And where does that form come from?

A.   The Personnel Department.

Q.   Okay.  Of the City of Boston or of your department?

A.   Public Works.

Q.   Okay.  So, the DPW or Department of Public Works
     develops its own personnel evaluation form?

A.   Right.  But I don't know if it comes through Office
     of Human Services.

Q.   Okay.

A.   Or HR whatever it is.

Q.   Right.

A.   It may originally generate there and they distri-
     bute to each department, that I'm not sure.

12

Q.   Okay.   But you do know that you get one of these
     forms every year --

A.   For each employee.

Q.   -- for the 13 persons?

A.   Right.

Q.   And then you evaluate them based on what's included
     in that form?

A.   That's correct.

Q.   And is the same form used for the heavy equipment
     people?

A.   That's correct.

Q.   And if you remember, what are the things that you
     evaluate, just if you remember because we don't
     have one in front of us here.

A.   Their  job  knowledge,  training,  accountability,
     productivity.   We evaluate time and punctuality,
     tardiness.

Q.   Okay.   Anything else that you can think of?

A.   That's about it.

Q.   Okay.   Is it the policy or practice of the DPW to
     meet  with  each  employee  after  this  performance
     evaluation is done on an annual basis?

A.   I meet -- I do it with the employee, I give him a
     copy of the evaluation, the original goes to the

13

Personnel Department.

Q.   Okay.  All right.  Now, as part of your duties, do you participate in the hiring decisions for any of the individuals under your supervision?

A.   Yes, I get involved in that.

Q.   Okay.  And what is your involvement exactly?

A.   I go through the interview process.

Q.   Is that written down somewhere or are you just invited as a courtesy to participate in that?

A.   It's a -- if somebody is going to be working under me, I would like to make sure that I was involved in some kind of selection to see who I was getting to make sure that the person is qualified.

Q.   Right.  I understand.  And what I'm asking you is whether your ability to participate is based on your request or is it written down somewhere that the superintendent must participate in this process?

A.   I don't think it's written down anywhere.

Q.   Okay.

A.   But usually it's done by the director and the two superintendents.

Q.   Okay.  All right.  So, if you were to get a new director, that director wouldn't necessarily have

14

to involve you, but they could if they wanted to?

A.   I would say that that could be correct.

Q.   Okay.  Now, do you know Mr. Rod Diaz, who is the complainant in this case?

A.   I just know him as an employee there.

Q.   Okay.  Do you all work in the same physical complex?

A.   Same complex -- well, there's two different shops. Like an office area, there's a light shop and there's a heavy shop.  They're apart by about probably say about 50 feet.

Q.   Okay.  Are there occasions when people from the heavy shop will be asked to work in the light shop and vice versa?

A.   Very, very, very seldom.

Q.   And why is that?

A.   I think the workload is so great in each shop, we can't wind up taking people from one to the other.

Q.   Okay.  Is the expertise that's required different for the light shop and the heavy shop?

A.   You have to have a lot more knowledge and skills to stay up with the newer vehicles.

Q.   In which shop?

A.   The light shop.

15

Q. Okay. So, that the people who work in your shop have to do a lot more education to stay on top of their jobs --

A. Right.

Q. -- would that be a fair statement?

A. Right. Yes, that's correct.

Q. Okay. Now, and have you ever had the occasion to supervise Mr. Diaz --

A. No.

Q. -- during the course of your tenure as superintendent?

A. No.

MR. DONAHUE: Wait until she finishes her question before you answer.

THE WITNESS: Okay.

BY MS. HINES:

Q. That would be Mr. Silvi's job, right?

A. That's correct.

Q. Okay.

A. Or the director.

Q. Or the director, that would be Mr. Higgins?

A. That's correct.

Q. Okay. Now, you indicated that you get involved in the hiring process for the individuals who are

16

under superintendent, is that right?

A.   Yes.

Q.   And you are the superintendent of the light divi-
sion, as I understood it, correct?

A.   That's correct.

Q.   But am I to understand that you also participate in
the hiring decisions for individuals in the heavy
division?

A.   That is correct also.

Q.   Okay.  Now, tell me what your understanding is of
the process that was used to select the foreman
position that Mr. Diaz applied for in November of
1999?

A.   Usually, we have three criteria which is education,
knowledge and experience relative to the industry.

Q.   Right.  And is that something that's been pretty
consistent over the years that you've been employed
in your capacity as superintendent?

A.   Yes.

Q.   And in 1999 when the position was noticed experi-
ence, education, and knowledge were the criteria
that you used to select the individual, is the
right?

A.   Correct.

17

Q.   Okay.  And did you look at job performance at all?
     In other words, those evaluation forms that you
     just told me about, did those come into play at all
     in the hiring decision?

A.   No.  Because that was the first year that we just
     started them and I think it was in the process of
     completing them.  I believe the interview was in
     December?

Q.   Right.

A.   And I think that was the first year of employee
     evaluation and they weren't even completed at that
     time.

Q.   Okay.  So, that job performance was not something
     that you considered?

A.   Oh, it was considered, but as far as the evaluation
     for each employee, it wasn't completed at that
     time.

Q.   Okay.  Well, how would you know what the person's
     job performance was without the evaluation form?

A.   The test that we gave them.

Q.   Okay.  When I say job performance, I'm speaking of
     what a person would do day-in and day-out on the
     job.  Was that a factor in your hiring decision for
     this particular position?

18

A.   Yes, by all means.

Q.   Okay.  And then my next question is how does one know what somebody does on a day-to-day basis if it's not written down somewhere?

A.   We do have that written down.  We have an employee accountability form that's filled out on a daily basis.  And it's also filled out on a weekly basis and that is turned into me at the end of each week.

Q.   Okay.  And that would be the same in Mr. Silvi's shop?

A.   I believe so, that I can't be sure of.

Q.   Right.  And what is the name of this form that you're referring to?

A.   Daily activity report.

Q.   Okay.  And would you record on that report if somebody had done something that they weren't suppose to do and had to be disciplined for that, would that be recorded there?

A.   No.  This is only a accountability of the work that he performed for each day.

Q.   Okay.

A.   We have to review those, daily hours paid.  We've got to be accountable for our time.

Q.   Okay.  So, this is a time sheet then that you're

19

referring to?

A.   Accountability.

Q.   Okay.  What would be on there, in addition to the hours that the person worked?

A.   The vehicle in the Department that the vehicle belonged to.

Q.   You mean a particular vehicle that they may have serviced?

A.   Yeah.

Q.   Okay.

A.   We work for 30 different city agencies.

Q.   Right.

A.   And we have to bill them accordingly.

Q.   Okay.

A.   We give two hours on a Transportation vehicle, you could get three hours on a Parks Department vehicle, you could get five hours on another vehicle.

Q.   Okay.

A.   But you have to make sure to charge the same -- the equal amount of time to each department per vehicle.

Q.   All right.  Now, on that form, is there anyway to record whether the employee does a satisfactory job of repairing the vehicle, an unsatisfactory job,

20

average, adequate, above average would any of that

be noted on that form that you're referring to?

A.    No.

Q.    And before 1999, did you have anyway of recording

the quality of an employee's work on the vehicles?

A.    Right, we did the same thing then.

Q.    You did the same thing, as in?

A.    Right.  Oh, do you mean on an individual basis?

Q.    Right, individual basis.

A.    No, the performance evaluation was not in effect at

the time.

Q.    Okay.  All right.  Now, when did you find out that

the position that Mr. Diaz applied for was going to

be announced, if you recall?  When did you first

find out?

A.    When the posting came down from the Personnel

Department.

Q.    Okay.  So, you wouldn't have received any advance

notice, you would of found out when it was posted,

just like anybody else?

A.    Right.

Q.    Okay.  And at what point did you become involved in

the selection process?

A.    I was involved in the -- the director set up the

21

interviews.

Q.   Okay.  That would be Mr. Higgins?

A.   That's correct.  And then we interviewed all the candidates that applied for the job.

Q.   Okay.  And did the three of you, that is Mr. Higgins, Mr. Silvi and yourself, meet before interviewing the candidates to discuss what the process was going to be and how you were going to do it?

A.   Yes, we drew up the questions on knowledge, experience and education.

Q.   Okay.  When did you draw up the questions?

A.   Prior to the interview.

Q.   Okay.  And this was a collaborative effort between the three -- the two superintendents and the director?

A.   Yes, from past interviews, we compiled the questions relative to that position.

Q.   Okay.  All right.  And prior to December of 1999, had you ever used these particular questions before?

A.   Yes, some of them.

Q.   Okay.  Was this the first time that you had had a written test for the applicants?

A.   No, I have done that since 1988.

22

Q. Okay. You've had a written test since 1988?

A. That's correct.

Q. That would have been after you became superinten-
dent, is that correct?

A. That's correct.

Q. And did you have any part in developing the written
test in 1988?

A. Yes, I did.

Q. Who else was involved with you in developing the
written test?

A. The director of operations for the Transportation
Department.

Q. That wasn't Mr. Higgins, that would have been?

A. Mr. Moralli.

Q. Mr. Moralli, okay. Anyone else?

A. No.

Q. Okay. So, the two of you developed the written
test. Now, when you developed this test was --
strike that. When you did your interviews in 1999,
did you decide ahead of time how much weight you
were going to give to the written test, as opposed
to some of the other factors that you might have
been considering?

A. The test is important and their qualifications are

23

important and the certification that each employee
puts before us is also very important.

Q.   Okay.  But was the test weighted at 50 percent of
the total score or 75 percent of the total score,
25 percent?  I'm just trying to get some sense of
how important this test was.  I understand that it
was important, but I'm trying to fit it in with the
other things that you said you were looking at.

A.   Well, the test combined of all three aspects.  So,
what I said was education, knowledge and experi-
ence.

Q.   Okay.

A.   And so I could give it 33 percent to each.

Q.   Okay.  I understand, okay.  So, the test was 100
percent, but it included all of the three things
that you've just told me about?

A.   Right.

Q.   Education, knowledge and experience?

A.   Right.

Q.   Okay.  All right.  I understand.  So, that the
person who scored the highest on the test, barring
some other factor, would be the one chosen for the
job?

A.   Correct.

24

Q.    Okay.   And did you use this written test for any other position, other than the foreman's position?

A.    Yes, we've used it in all applications that we hire.

Q.    Okay.

A.    We use it for -- not exactly the same questions, but the same criteria almost.   We use it for the parts inventory manager, we use it for the mechanics.   Some of the questions in there are different for regular repairman.   Anybody we hire, we go through an interview process.

Q.    Okay.   And you use the written test for positions, other than foreman --

A.    That's correct.

Q.    -- is that correct?

A.    Yes.

Q.    And you use the written for every position?

A.    That's correct.

Q.    And this all started in 1988?

A.    As far as I was concerned, I don't know what Public Works done.

Q.    Okay.   All right.   So, you were in Transportation at the time?

A.    Yes, right.

25

Q.   So, this is what you all were doing?

A.   Right.

Q.   Okay.  Now, after you interviewed all the candi-
     dates and they took the written test, how did you
     score the test that they were given?

A.   On how well they presented themselves, as far as
     the answers went.

Q.   Mm-hmm.

A.   And their qualifications.

Q.   Did you have an answer sheet that you used to grade
     the test that you had given to each person?

A.   Yes, the director has all the answers.

Q.   Okay.  And do you remember how Mr. Diaz scored on
     the test?

A.   I think he scored, as we rated him, I believe he
     scored number eight.

Q.   Okay.  Which would of been the last of all of the
     candidates for the position?

A.   That is right.

Q.   Okay.  And was any consideration given to Mr. Diaz'
     length of service in his position at the City or
     was it just the test?

A.   It was just the test.

Q.   Okay.  So, it was completely objective as far as

26

the test is concerned?

A.   Correct.

Q.   And was there any discussion of any skills or
     characteristics that the person would bring to the
     job, other than the test?

A.   Certifications and training.

Q.   Okay.  So, you did give rate to certification?

A.   Sure.

Q.   And training?  Training?

A.   Right.

Q.   Okay.  Anything else?

A.   Attendance.

Q.   Attendance.

A.   Tardiness.

Q.   Okay.  Anything else?

A.   Ability.  That's about it.

Q.   That's it, okay.  Now, in your shop, Mr. Coughlin,
     did you use acting foremen when your foremen would
     be out sick or vacation or whatever?

A.   I had a person when that position was open, it was
     open on the night shift and I had a person in there
     provisionally.

Q.   Okay.  Well, I'm thinking of the situation where
     let's just say the foreman is out for the day and

27

you need somebody to stand in for the foreman just
on a temporary basis.

A.  Right.

Q.  Did you have a system for filling in on that basis?

A.  I would select the most qualified employee, as the
way I see it.  Some people don't want to do it.
Some people likes to do it.  So I would pick the
most qualified candidate that I could -- or techni-
cian that I could that would accept the respon-
sibility.

Q.  Now, would your choice be related to seniority, at
all?

A.  Seniority, yes, it would come into play.  If two
people are equal, then I would go on seniority.

Q.  Okay.  But in other words, you wouldn't select the
person based on seniority alone?

A.  No.

Q.  Okay.  And as far as you know, that's not how it's
done in your shop?

A.  Could you repeat that?

Q.  As far as you're concerned, the acting foreman is
not designated on the basis of seniority alone?

A.  No.

Q.  Okay.  And if you know whether or not Mr. Silvi

28

follows that same policy in the heavy machinery shop?

    MR. DONAHUE:  Objection.  You can answer.

BY MS. HINES:

Q.  If you know.

A.  I don't know.

Q.  Okay.  Now, Mr. Coughlin, do you know whether or not seniority has been the criteria in the past for promotions in the DPW?

A.  I don't know.

Q.  Okay.  Have you ever participated in promotion decisions where seniority was the criteria for promotion?

A.  No.

Q.  So, as far as you know, it's never been based on seniority alone?

A.  No.

Q.  And let me just throw some names at you and ask you if you know any of these people.  Mr. Ted Myers, are you familiar with Mr. Myers?

A.  I know Mr. Myers, yes.

Q.  Okay.  And do you know whether or not he was the senior person when he was promoted to foreman?

A.  I have no idea.

29

1   Q.  You don't know, okay.  What about Mr. Parsons, do

2       you know Mr. Parsons?

3   A.  Never seen the man.

4   Q.  Okay.  Do you know -- you don't know him?

5   A.  No.

6   Q.  Okay.  Mr. DiMato?

7   A.  Mr. DiMatia, right?  Yes, I do know him.

8   Q.  And is he in your shop?

9   A.  No, he's in charge of radio communications.

10  Q.  Okay.  And what about Mr. Donovan?

11  A.  Mr. Donovan is --

12  Q.  Bob Donovan.

13  A.  -- in the welding shop.

14  Q.  Okay.  And do you know whether or not Mr. Donovan

15      was ever promoted to foreman?

16  A.  I have no idea.

17  Q.  Mr. Larry Driscoll, do you know whether he was ever

18      promoted to foreman?

19  A.  Never even heard of the man.

20  Q.  Billy Keen, do you know that name?

21  A.  Yes, I do.

22  Q.  And is he in your shop?

23  A.  No, he's not.

24  Q.  Do you know whether or not he was ever promoted to

30

foreman?

A.    Yes, he was.

Q.    And do you know whether or not he was the senior person on the list of candidates at the time that he was promoted?

A.    I don't think he was.

Q.    Okay.  What about Mr. Fitzroy Prescott, do you know Mr. Prescott?

A.    Yes, he works for me.

Q.    And is he a foreman?

A.    That's correct.

Q.    And was he promoted to foreman under you?

A.    No, he was a foreman when we got there.

Q.    Okay.  And do you have any knowledge of his senior-ity status at the time he was promoted to foreman?

A.    No.

Q.    Okay.  Now, did you review any document relating to this case before coming here today?

A.    No.

Q.    Okay.  Did you speak to Mr. Higgins before coming here today?

A.    He informed me that I had to come up and meet with Mr. Donahue.

Q.    Okay.

31

A.  And he informed me that we were coming here.
    That's all I know.

Q.  Okay.  He didn't discuss the case with you or
    anything like that?

A.  No.

Q.  And you didn't review any documents or anything?

A.  No.

         MS. HINES:  I believe that's all I have,
    Ms. Marshall-Smith.  Thank you.


         (Whereupon, the above-entitled matter was
    concluded at 2:30 p.m.)

32

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.

I, Caroline Marshall-Smith, a Massachusetts Steno-mask Reporter and Notary Public duly commissioned and qualified in and for the Commonwealth of Massachusetts, do hereby certify that there came before me on the 27th day of March, 2001 at 1:55 p.m., the person hereinbefore named, who was by me duly sworn to testify to the truth and nothing but the truth of his knowledge touching this cause; that he was thereupon examined upon his oath, and his examination reduced to typewriting under my direction; that the deposition is a true and accurate recording of the testimony given by the witness.

I further certify that I am neither attorney or counsel for, nor related to or employed by any of the parties to the action in which this deposition is taken and, further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto or financially interested in the action.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 5th day of May, 2001.  My Commission expires on October 18, 2002.

*Caroline Marshall-Smith*
Notary Public

COMMONWEALTH OF MASSACHUSETTS
COMMISSION AGAINST DISCRIMINATION

Docket No: 00132200

RODERICK DIAZ,
        Complainant

v.

CITY OF BOSTON PUBLIC WORKS
DEPARTMENT,
        Respondent

## AFFIDAVIT OF DAVID P. HIGGINS

I, *David P. Higgins*, do hereby swear and affirm:

1. I am employed as Director of Central Fleet Maintenance in the Public Works Department of the City of Boston.

2. I have held this position since August of 1997.

3. As part of my duties, I am required on occasion to interview prospective candidates for open positions within the Fleet Maintenance Division.

4. On December 9, 1999, I interviewed eight candidates for the position of Motor Equipment Repair Foreman (posting #AG-211).

5. Among the factors assessed in awarding the position were: Job Knowledge; Education and Experience.

6. Interviews were conducted by myself along with Jerry Coughlin, Superintendent of Light Maintenance, while Robert Silvey, Superintendent of Heavy Maintenance sat in on a couple of interviews.

7. As an interviewer, I sought to select the person who best demonstrated success in the three previously mentioned areas of Job knowledge, Education and Experience.

8. In no way did I or any other member of the hiring team discriminate any candidate on the basis of his age, race or nationality.

9. As part of the Interview, a Questionaire, including several subjective and objective questions, was asked of each candidate.

10. The questions were read to each candidate by an Interviewer.

11. I recorded the responses of each candidate on separate individual forms that were identified by each candidate's name.

12. We read the questions out loud to assist any candidate who may have difficulty reading.

13. I recorded the responses in my own handwriting to assist the process in having legible responses.

14. The questions focused on several subjective and objective areas including Management Style; Situational Analysis and Repair Scenarios.

15. The candidates also had the opportunity to answer a two-page set of questions in their own writing demonstrating knowledge of certain automotive terms and abbreviated terms.

16. The candidates were finally asked to identify four demonstrative pieces of equipment that were shown to them in the interview.

17. In between each interview, Jerry Coughlin, Robert Silvy, (in only a couple of interviews) and I discussed the general strengths and weaknesses of each candidate.

18. After completion of all the interviews, the candidates were ranked according their particular strengths and weakness with respect to the areas of Job knowledge, Education and Experience.

19. Candidates Timothy O'Leary and James Monaghan were ranked first and second respectively.

20. The two were considered "substantially equal" in the eyes of the interviewers.

21. Although Mr. O'Leary was ranked higher than Mr. Monaghan, Monaghan was chosen for the Foreman position since he had more seniority than Mr. O'Leary and the two were considered "substantially equal" with respect to their capabilities.

2

*Signed under the pains and penalties of perjury this 11th day of December 2000.*

David P. Higgins
Director of Central Fleet Maintenance
City of Boston Public Works Department

The Commonwealth of Massachusetts
Commission Against Discrimination
One Ashburton Place, Boston, MA 02108
Phone: (617)727-3990       Fax: (617)720-6053

08-03-2000

Attn: Attn:City Hall
C - Boston Public Works
Boston City Hall
Room 714
Boston, MA 02201

RE:Mr. Roderick Diaz VS. C - Boston Public Works
MCAD Docket No.:00132200

Dear Sir/Madam:

Please be advised that the Massachusetts Commission Against Discrimination (MCAD)
has received the above referenced complaint, which alleges that you have committed
an act or acts of discrimination. A copy of that complaint is enclosed. State law
requires the Commission to conduct an impartial review of these allegations.

**State law requires that you submit a formal written answer to the complaint in the
form of a Position Statement, attested to under oath by a principal of the
Respondent other than representing counsel. This Position Statement should be
submitted to your attorney investigator within twenty-one (21) days of receipt of
this notification. At the same time a copy must also be served on the Complainant's
attorney by mail to the address listed below.**

The Commission encourages parties to consider rapid, informal, and voluntary
resolution of disputes as an alternative to the often lengthy and expensive
litigation process. To discuss the possibility of settlement, please contact the
opposing counsel. If both parties express interest in mediation, then contact the
undersigned for further information.

Enclosed please find a brief fact sheet designed to address the most frequently
asked questions about the Attorney Assisted Unit. If you have any further questions
pertaining to this investigation, please contact the undersigned at (617) 727-3990
extension 26041.

Sincerely,

Marzella Hightower
Adminstrative Assistant
Attorney Assisted Unit (AAU)

cc:

FORM: aau.ltr.resp

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

PERSON FILING CHARGE:
    Mr. Roderick Dia
THIS PERSON (Check One):
    ( ) Claims to be aggrieved
    ( ) Is filing on behalf of
DATE OF ALLEGED VIOLATION:

C - Boston Public Works
Attn:City Hall
Boston City Hall
Room 714
Boston, MA 02201

    01/07/00
PLACE OF ALLEGED VIOLATION:
    suffolk
EEOC CHARGE NUMBER:

FEPA CHARGE NUMBER:
    00BEM2200

---

NOTICE OF CHARGE OF DISCRIMINATION WHERE AN FEP AGENCY WILL INITIALLY PROCESS
(See Attached Information Sheet For Additional Information)

YOU ARE HEREBY NOTIFIED THAT A CHARGE OF EMPLOYMENT DISCRIMINATION UNDER

    [ ] Title VII of the Civil Rights Act of 1964
    [ ] The Age Discrimination in Employment Act of 1967 (ADEA)
    [ ] The Americans Disabilities Act (ADA)

HAS BEEN RECEIVED BY
    [ ] The EEOC and sent for initial processing to __MCAD__
                          (FEP Agency)

    [X] The <u>Mass. Commission Against Discrimination</u>
       (FEP Agency) and sent to the EEOC for dual filing purposes.

While the EEOC has jurisdiction (upon the expiration of any deferral
requirements if this is a Title VII or ADA Charge) to investigate this
charge, EEOC may refrain from beginning an investigation and await the
issuance of the Agency's final findings and orders. These final findings
and orders will be given weight by EEOC in making its own determination as
to whether or not reasonable cause exists to believe that the allegations
made in the charge are true.

You are therefore encouraged to cooperate fully with the Agency. All facts
and evidence provided by you to the Agency in the course of its
proceedings will be considered by the Commission when it reviews the
Agency's final findings and orders. In many instances the Commission will
take no further action, thereby avoiding the necessity of an investigation
by both the Agency and the Commission. This likelihood is increased by
your active cooperation with the Agency.

[X]  As a party to the charge, you may request that EEOC review the final
    decision and order of the above named Agency. For such a request to be
    honored, you must notify the Commission in writing within 15 days of
    your receipt of the Agency's issuing a final finding and order. If
    the agency terminates its proceedings without issuing a final
    finding and order, you will be contacted further by the Commission.
    Regardless of whether the Agency or the Commission processes the
    charge, the Recordkeeping and Non-Retaliation provisions of Title VII
    and the ADEA as explained on the second page of this form apply.

For further correspondence on this matter, please use the charge
number(s) shown.

[ ]   An Equal Pay Act Investigation (29 U.S.C 206(d) will be conducted by the
      Commission concurrently with the Agency's investigation of the charge.

[X]   Enclosure: Copy of the Charge

---

Basis of Discrimination:
( )Race      ( )Color     ( )Sex        ( )Religion    ( )National Origin
( )Age       ( )Disability ( )Retaliation ( )Other

---

Circumstances of alleged violation:
SEE ENCLOSED COPY OF THE CHARGE OF DISCRIMINATION (or EEOC FORM 5)

---

| Date | Type Name/Title of Authorized EEOC Official | Signature |
|------|---------------------------------------------|-----------|
| 07/21/00 | Robert L. Sanders, Director | |

---

Form:131

**The Commonwealth of Massachusetts**
**Commission Against Discrimination**

*MCAD 2356*

| | |
|---|---|
| DOCKET NUMBER:00132200 | EEOC/HUD NUMBER: |
| FILING DATE:07-19-2000 | VIOLATION DATE:01/07/00 |

--------------------------------------------------------------------------------

<u>Name of Aggrieved Person or Organization:</u>
Mr. Roderick Diaz
C/O Burnham & Hines
25 Kingston St. S-6
Boston, MA 02111
Telephone Number: (617) 451-2299

--------------------------------------------------------------------------------

<u>Named is the employer, labor organization, employment agency, or state/local</u>
<u>government agency who discriminated against me:</u>
C - Boston Public Works
Attn:City Hall
Boston City Hall
Room 714
Boston, MA 02201
Telephone Number:(617) 635-7555      No. of Employees:20 +

Work Location: Boston, MA

--------------------------------------------------------------------------------

<u>Cause of Discrimination based on:</u>
Age
Race, Color
National Origin.
(Age Discrimination unspecified or general
Hispanic
National origin discrimination, unspec. or general).

--------------------------------------------------------------------------------

**The particulars are:**
I, Mr. Roderick Diaz, the Complainant believe that I was
discriminated against by C - Boston Public Works, on the basis of
Age Race, Color National Origin. This is in violation of M. G. L.
Chapter 151B S4 P1b,1,1.

SEE ATTACHED.

--------------------------------------------------------------------------------

I swear or affirm that I have read this complaint and that it is
true to the best of my knowledge, information and belief.


                                    _____
                                    (Signature of Complainant)
SWORN TO AND SUBSCRIBED BEFORE ME THIS 21st Day of July, 2000

NOTARY PUBLIC: _____

SIGNATURE   NOTARY   PUBLIC:_____   MY   COMMISSION
EXPIRES:_____

# BURNHAM & HINES
ATTORNEYS AT LAW
25 KINGSTON STREET, SUITE 6
BOSTON, MASSACHUSETTS 02111-2208

(617) 451-2299
(617) 451-2998 (FAX)

MARGARET A. BURNHAM

CHERYL D. BEZIS
OF COUNSEL

GERALDINE S. HINES

ELSA M. DÍAZ-ALONSO
OF COUNSEL

July 19, 2000

Ms. Nancy Barnes
MCAD
One Ashburton Place
Boston, MA 02108

RE:  *Roderick Diaz v. City of Boston*
00132200

Dear Ms. Barnes:

Please find enclosed complainant's Charge of Discrimination and Affidavit in the above-entitled matter.  Kindly file and docket same.

Thank you for your attention.

Very truly yours,

Geraldine S. Hines
Geraldine S. Hines

# CHARGE OF DISCRIMINATION

ENTER CHARGE NUMBER

☐ FEPA

☐ EEOC

This form is affected by the Privacy Act of 1974; see Privacy Act Statement on reverse before completing this form.

## Massachusetts Commission Against Discrimination
### (State or local Agency, if any)
and EEOC

| NAME (Indicate Mr., Ms., or Mrs.) | HOME TELEPHONE NO. (Include Area Code) |
|---|---|
| Mr. Roderick Diaz | 288-8893 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 23 Van Winkle Street | Dorchester, MA 02124 | Suffolk |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

| NAME | NO. OF EMPLOYEES/MEMBERS | TELEPHONE NUMBER (Include Area Code) |
|---|---|---|
| City of Boston Department of Public Works | 100+ | 617/635-7555 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE |
|---|---|
| Boston City Hall Room 714 | Boston, MA 02201 |

| NAME | TELEPHONE NUMBER (Include Area Code) |
|---|---|
| | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE |
|---|---|
| | |

CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es))

☒ RACE  ☐ COLOR  ☐ SEX  ☐ RELIGION  ☒ NATIONAL ORIGIN

☒ AGE  ☐ RETALIATION  ☐ OTHER(Specify)

DATE MOST RECENT OR CONTINUING DISCRIMINATION TOOK PLACE (Month, day, year)
5/2/00

THE PARTICULARS ARE (If additional space is needed, attached extra sheet(s)):

SEE ATTACHED.

☐ I also want this charge filed with the EEOC. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

NOTARY - (When necessary to meet State and Local Requirements)

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Roderick L Diaz

Date

Charging Party (Signature)

SIGNATURE OF COMPLAINANT

Gloria Martell

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (Day, month, and year)
7/18/00

EOC FORM 5 MAR 84

PREVIOUS EDITIONS OF THIS FORM ARE OBSOLETE AND MUST NOT BE USED

COMMONWEALTH OF MASSACHUSETTS

COMMISSION AGAINST DISCRIMINATION

RODERICK DIAZ,                          *
            Complainant                 *
                                        *
            v.                          *          Docket No.
                                        *
CITY OF BOSTON, DEPARTMENT*
OF PUBLIC WORKS,                        *
            Respondent                  *

### *AFFIDAVIT IN SUPPORT OF COMPLAINT*

I, Roderick Diaz, hereby state the following under the pains and penalties of perjury:

1)    I am the complainant in the above-entitled matter.  In this charge, I allege that the City of Boston, Department of Public Works discriminated against me because of my race, age and national origin in violation of G.L. c.151B, §4.  The particulars of my charge are set forth below.

2)    I am a fifty-seven year old black citizen of the Commonwealth of Massachusetts.  I reside at 23 Van Winkle Street in Dorchester, Massachusetts.

3)    In 1986, I began my employment as a motor equipment repairman with the Respondent, City of Boston.  Prior to my employment with the City of Boston, I accumulated more than 20 years experience as an auto mechanic with various employers.

4)    On November 4, 1999, the Respondent posted notice of a position entitled *"Motor Equipment Repair Foreman (CFM) R17##"*. The job description included responsibilities for which I am well qualified, including but not limited to supervision of subordinate personnel in the maintenance and repair of a variety of automotive vehicles, performance of complex auto repairs and other related tasks.

5)    On information and belief, the position of "Motor Equipment Repair Foreman" in the Department of Public Works repair shops has always been filled according to seniority.

6)    On November 9, 1999, I applied for the position of Motor Equipment Repair Foreman that had been posted on November 4, 1999.  I believe that I was the most senior person to apply for the position.  Based on the previous practice of awarding the position on the basis of seniority, I expected that I would be chosen to fill the vacancy.

7)    In addition to my seniority, I am well qualified for the position.  My experience and expertise in the field meets or exceeds that of all the other candidates for the position.  Moreover on various occasions, including in November 1999, I served as acting foreman.  In so doing, I satisfactorily

2

performed all the duties and responsibilities of the position of Motor Equipment Repair Foreman.

8)    On December 30, 1999, Respondent appointed James J. Monaghan, a white male, to the position. Respondent posted notice of this appointment on January 5, 2000.

9)    In making this appointment, Respondent departed from its usual practice of filling foreman vacancies on the basis of seniority and bypassed me in favor of the less senior Monaghan.

10)   On January 7, 2000, I filed a grievance alleging that the longstanding and well-established practice of filling foreman vacancies on the basis of seniority had been violated. The grievance was denied on May 2, 2000.

11)   Based on these facts, I believe that the City of Boston discriminated against me on the basis of my race and national origin.

7/18/00
DATE

_Roderick L Diaz_
RODERICK L. DIAZ

Subscribed and sworn before me this 18 day of July, 2000.

_Gloria Martell_
NOTARY PUBLIC
My Commission Expires 4/7/06.

3

MASSACHUSETTS COMMISSION AGAINST DISCRIMINATION
ONE ASHBURTON PLACE, ROOM 601, BOSTON, MA 02108
(617) 994-6000

- **DISMISSAL and NOTIFICATION of RIGHTS** -

| Winston Kendall, Esq. | Case: Diaz v City of Boston, DPW |
| 134 Warren Street | Docket No: 00132200 |
| Roxbury, MA 02119 | EEOC: 16CA02356 |
| | Attorney Investigator: Ellen Pinkos Cobb, Esq. |

Your complaint has been dismissed for the following reasons:

[ ]    The facts alleged fail to state a claim under any of the statutes the Commission enforces.

[ ]    Respondent employs less than the required number of employees

[ ]    Your complaint was not timely filed with the Commission, i.e. you waited too long after the date(s) of the alleged discrimination to file. Because it was filed outside the time limit prescribed by law, the Commission cannot investigate your allegations.

[ ]    The Commission's efforts to locate you have been unsuccessful. You have had at least 30 days in which to respond to a notice sent to your last known address.

[ ]    The Respondent has made a reasonable settlement, offering full relief for the harm you allege. 30 days have expired since you received actual notice of this settlement offer.

[ X ]    The Commission issues the following determination. Based upon the Commission's investigation, the Commission is unable to conclude that the information obtained establishes a violation of the statutes. This does not certify that the Respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this complaint.

[ ]    Other.

### - NOTICE of APPEAL -

If you wish to appeal the dismissal of your complaint and believe that the above stated reason for dismissal is incorrect, you may appeal to this Commission within 10 days after receipt of this notice. You or your attorney must make your appeal of the dismissal in writing to the appeals clerk of this Commission. **Attention: Ms. Nancy To.**

All employment complaints, where applicable, were filed by the MCAD with the Equal Employment Opportunity Commission. Our finding, which will be forwarded to its area office, JFK Federal Building, Boston, MA will be given substantial weight provided that such findings are in accordance with the requirements of Title VII of the Civil Rights Act of 1964, the ADEA, and/or the ADA, as amended.

Walter J. Sullivan, Jr.
Investigating Commissioner

9/24/03
DATE

Cc: Tsuyishi Fukuda, Esq.
    Assistant Corporation Counsel
    City Of Boston Law Department
    City Hall, Room 615
    Boston, MA 02201

## MEMORANDUM

**TO:** Case File
**FR:** Attorney Assisted Unit
**RE:** Roderick Diaz v. City of Boston Department of Public Works
**RECOMMENDATION:** Lack of Probable Cause Finding
**DOCKET:** 00132200
**EEOC No:** 16CA02356
**INVESTIGATOR:** Ellen Pinkos Cobb

   On July 19, 2000, Complainant filed a complaint with this Commission alleging that he was discriminated against on the basis of race and color (black), national origin (American) and age (57 at the time of filing complaint) in failing to be promoted in violation of Massachusetts General Laws c. 151B §4, paragraphs 1 and 1B, Title VII of the Civil Rights Act of 1964, as amended and the ADEA, as amended.

### Summary of Allegations:

   Complainant alleges that he began his employment as a motor equipment repairman with Respondent in 1986 following twenty years of prior experience as an auto mechanic. He avers that in November 1999, he applied for the position of Motor Equipment Repair Foreman (MERF) and that although was well qualified for the position and the employee with the greatest amount of seniority, he was not selected. Complainant alleges that he was the most senior applicant and that the applicant with the greatest seniority is always appointed. He further avers that Respondent failed to speak to his supervisor or review his performance evaluations, therefore giving his experience and job knowledge no weight in assessing his qualifications. Complainant contends that the test for the position was subjective, arbitrary and not job validated, that the panel of three interviewers was white and that a white male was appointed to the position. He contends that he grieved his non-selection in January 2000 and it was denied in May 2000. Complainant avers that Respondent's managerial ranks are generally closed to black persons.

   Respondent contends that Complainant was not selected for the MERF position because he was not the candidate most qualified for the job. It avers that the three main criteria for the position were job knowledge, education, and experience, that all applicants were asked the same questions and given a test in order to evaluate mechanical knowledge and supervisory potential, and that Complainant's application and questionnaire demonstrated that he was lacking in the area of job related knowledge. Respondent alleges that after eight candidates were interviewed, Complainant was not ranked among the top three. It alleges that Complainant failed to show the process was arbitrary, capricious or unreasonable or violated the collective bargaining agreement.

### Investigation Revealed[1]:

Race Discrimination

   The investigation revealed that Complainant established a prima facie case of failure to promote on the basis of race and color. A member of a protected class, he applied for an available position, met the qualifications for the position, and was rejected while a white male was selected. Respondent articulated legitimate non-discriminatory reasons for not selecting Complainant

---

[1] Respondent relied upon its Position Statement and did not submit a Memorandum of Fact and Law.

related to his lack of knowledge required for the position. It contended that Complainant's seniority did not translate into knowledge, as shown by the results of his questionnaire, and that Complainant's years of employment did not translate into knowledge of terms and situations that would arise in the MERF position. It also argues that Complainant listed no supervisory experience on his application or resume.

The investigation revealed that Complainant did not demonstrate that Respondent's reasons for his non-selection were a pretext for discrimination. The evidence showed that the Respondent employee who conducted the interviews and made the recommendation for the position stated that the three factors of education, experience and job knowledge were equally important factors for the position, that he administered a test he had written in a prior job in the early 1990s and revised for the November 1999 selection process as well as showing applicants some components of a vehicle and having the applicants identify them, and that he did not discuss his selection process with anyone at Respondent before implementing it or reduce the selection criteria to writing or provide the written criteria to the applicants. Without more, this does not constitute evidence of pretext.

Further, although Complainant argues a disparate impact theory in relation to the test administered for the position, his allegation that the test used by Respondent was not job validated or shown to evaluate selection procedures to determine whether they produced a disparate impact on black persons, was not supported by evidence. Rather, evidence submitted by Respondent showed that Complainant did not do as well on his questionnaire as higher ranked candidates.

Although the investigation revealed that Complainant had more seniority than the two top rated candidates, he did not support his allegation that the Respondent had previously filled the position based on seniority. Moreover, the section of the collective bargaining agreement relied upon by the Office of Labor Relations states in part, "Selection of an employee shall be made on the basis of qualifications and abilities; and where qualifications and ability are substantially equal, seniority....shall be the determining factor." The City found that Complainant's skills and abilities were not substantially equal to those of the successful candidate and as such, seniority was not a factor in Complainant's case. As stated, Complainant did not show that this was pretext. Finally, Complainant did not submit evidence to support his contention that managerial positions at Respondent are generally closed to black persons.

National Origin and Age Discrimination

The investigation revealed that Complainant failed to submit any evidence to support his contention that his non-selection was related to his age or national origin.

**Conclusion:**

For the foregoing reasons, a finding of **lack of probable cause** is recommended.

_Ellen Cobb_
Ellen Pinkos Cobb, Esq.
AAU Investigator

_Sunila T. George_
Sunila Thomas George, Esq.
AAU Supervisor

The Commonwealth of Massachusetts
Commission Against Discrimination
One Ashburton Place, Room 601, Boston, MA 02108

JUN 3 0 2004

Winston Kendall, Esquire
Attorney at Law
136 Warren Street
Roxbury, MA 02119

RE: Roderick Diaz v. City of Boston, DPW
MCAD DOCKET NO: 00132200

Dear Parties:

On January 14, 2004 a preliminary hearing was held regarding the above reference complaint to consider the Complainant's appeal of lack of probable cause finding issued in this Complaint on September 24, 2003.

Based upon information presented at the appeal hearing and a review of the evidence adduced in investigation, I have determined that the <u>Lack of Probable Cause</u> finding in this case is affirmed. This means that investigation and appeal evidence fails to establish sufficient evidence to determine that an unlawful act of discrimination has been committed.

All employment complaints where applicable, are dual filed with the U.S. Equal Employment Opportunity Commission (EEOC). Our finding will be forwarded to its Area Office, JFK Federal Building, Boston, MA 02203. The MCAD finding will be given substantial weight by the EEOC provided that such finding are in accordance with the requirements of Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act of 1967, and or The Americans with disabilities Act of 1990.

Very truly yours,

Walter J. Sullivan, Jr.
Investigating Commissioner

cc: Tsuyoshi Fukuda
    Assistant Corporation Counsel
    City of Boston
    Law Department
    City Hall, Room 615
    Boston, MA 02201

CITY OF BOSTON EMPLOYMENT OPPORTUNITY
FORM ONE

POSTING DATE: _7/17/01_

CLOSING DATE: _7/25/01_

| Position Title: | Posting Number: |
|---|---|
| Motor Equipment Repair Foreman (CFM)  R 17A##  (1 Position) | _BK - 1159_ |

**Brief Job Description (essential functions of the job):**
Under direction performs work of moderate difficulty involving supervising and assisting subordinate personnel engaged in the maintenance and repair of a variety of automotive vehicles such as pick up trucks, packers, wagons, 35 ton bulldozers, and other vehicular, diesel equipment, alternative fuel vehicles and specialty equipment; ensures preventative maintenance programs are adhered to; assists in the more complex automotive repairs; maintains time and attendance records; requisitions parts and supplies; performs mechanical work and related work as required.  Required to work any emergency as directed by the Commissioner of Public Works.

**Minimum Entrance Qualifications:**
Requires at least three (3) years of full-time, or equivalent part-time, paid professional experience as an automotive mechanic, working on a broad range of commonly known light and heavy duty automotive equipment.  Must possess a valid Massachusetts CDL Class B with an air brakes endorsement.  Must possess a valid Massachusetts Hoisting License.  Must be certified to operate Mass. Emission Testing Machines, including all MVI.  Must be certified in any required refrigerant recycling and service procedures.
Ability to operate electronic diagnostic equipment; hydraulic testing equipment; air testing equipment; and anti-freeze testing equipment.  Good knowledge of the theories, principals and practices of automotive diagnosis, repair and maintenance; of the tools, materials, supplies and equipment used in the area of automotive repair; of the detailed operation of different parts of automobiles such as suspensions, brakes, electrical systems etc.; of diagnostic equipment such as the Interragater II computer, air conditioning recharging systems, radio trunking system; programming and repair of other computer systems; of the safety practices utilized in the area of automotive repair.  Working skill in the diagnosis, maintenance and repair of light and heavy automotive equipment; in the application of tools used in the trade.  Ability to plan, assign and supervise the work of subordinate personnel.  Ability to operate a computer.  **BOSTON RESIDENCY REQUIRED**

| Department  Name and Address : | Employment Site (If Different): |
|---|---|
| Boston Public Works Department | Central Fleet Maintenance |
| Room 714, Boston City Hall | 400 Frontage Road, Boston |

| Pay and Hours Per Week: | Submit Application To : |
|---|---|
| minimum salary $ 748.78   **Must be available to work any shift.** | Office of Human Resources |
| maximum salary $ 1001.65 | Boston City Hall Room 612 |
| 40      Hours per week | Boston, MA 02201 |
| | Phone 617-635-3370 |

AN EQUAL OPPORTUNITY/AFFIRMATIVE ACTION EMPLOYER
ALL APPLICANTS MEETING MINIMUM ENTRANCE
REQUIREMENTS WILL BE CONSIDERED FOR THIS VACANCY

Signature of Appointing Authority or Designee :
Approval of Director Human Resources :

Review: (initial) Cabinet Officer ___  OBM ___  Class. Sec. ___  Recruit. ___  COO ___
Review: (date)  Cabinet Officer ___  OBM ___  Class. Sec. ___  Recruit. ___  COO ___

**The Commonwealth of Massachusetts**
**Commission Against Discrimination**
**One Ashburton Place , Boston, MA 02108**
**Phone: (617) 994-6000 Fax: (617) 994-6024**

12/19/2001

City of Boston Dept. of Public Work
DAVID HIGGINS/DIRECTOR OF CFM
400 Frontage Road
Boston, MA.02108

RE: Roderick L. Diaz   vs. C-Boston DPW
MCAD Docket Number: 01BEM10929
EEOC/HUD Number:

Dear Respondent Party:

Please be advised that the Massachusetts Commission Against Discrimination (MCAD) has received the
above referenced complaint, which alleges that you have committed an act or acts of discrimination. A
copy of that complaint is enclosed. State law requires the Commission to conduct an impartial review of
these allegations.

State law requires that you submit a formal written answer to the complaint in the form of a Position
Statement, attested  to under  oath by a principal of the Respondent other than representing counsel. This
Position Statement should be submitted to your attorney investigator within twenty-one (21) days of
receipt of this notification.  At the same time a copy must also be served on the Complainant's attorney by
mail to the address listed below.

The Commission encourages parties to consider rapid, informal, and voluntary resolution of disputes as an
alternative to the often lengthy and expensive litigation process.  To discuss the possibility of settlement,
please  contact the opposing counsel.  If both parties express interest in mediation, then  contact the
undersigned for further information.

Enclosed please find a brief fact sheet designed to address the most frequently asked questions about the
Attorney Assisted Unit.  If you have any further questions pertaining to this investigation, please contact
the undersigned at (617) 994-6040.

Sincerely,


Sunila Thomas-George, Esq.
Supervisor
Attorney Assisted Unit (AAU)

Cc:

MCAD Docket Number 01BEM10929, Serve Respondent - AAU

### The Commonwealth of Massachusetts
### Commission Against Discrimination
### One Ashburton Place , Boston, MA 02108
### Phone: (617) 994-6000 Fax: (617) 994-6024

| | |
|---|---|
| MCAD DOCKET NUMBER: 01BEM10929 | EEOC/HUD CHARGE NUMBER: |
| FILING DATE: 12/19/01 | VIOLATION DATE: 12/18/01 |

Name of Aggrieved Person or Organization:
Roderick L. Diaz
329 La Grange St.
West Roxbury, MA 02132
Primary Phone: (617)469-1808 ext. _____

Named is the employer, labor organization, employment agency, or state/local government agency who discriminated against me:
C-Boston DPW
DAVID HIGGINS/DIRECTOR OF CFM
400 Frontage Road
Boston, MA 02108
Primary Phone: (617)635-7555 ext. 110_

No. of Employees:          N/A

Work Location: Boston

Cause of Discrimination based on:
Other, Paragraph 4, Retaliation.

The particulars are:
I, Roderick L. Diaz, the Complainant believe that I was discriminated against by C-Boston DPW, on the basis of Other. This is in violation of M.G.L. 151B Section 4 Paragraph 4 and Title VII.

ON 7/19/00 I FILED A COMPLAINT WITH THE MCAD, ON THE BASIS OF MY RACE/COLOR BLACK. NATIONAL ORIGIN (CARRIBEAN) AND AGE 58, AGAINST RESPONDENT CITY OF BOSTON DEPT. OF PUBLIC WORKS. ON 7/01 I SUBMMITED AN APPLICATION FOR THE POSITION OF WORKING FOREMAN, ON 12/11/01 WE WERE INTERVIEWED FOR THE POSITION. I WAS TOLD BY RESPONDENT THAT THE POSITION WASN'T GIVEN TO ME, BASED ON LACK OF COMMUNICATIONS SKILLS, I BELIEVE THIS WAS JUST AN EXCUSED, I BELIEVE I WAS WELL QUALIFIED FOR THE POSITION, BUT INSTEAD RESPONDENT GAVE THE POSITION TO A WHITE MALE EMPLOYEE WITH LESS SENORITY WHO CAN NOT READ OR WRITE PROPERLY, AND WHO I BELIEVE IS UNDER THE AGE OF 40 (OR AT LEAST MUCH YOUNGER THAN I). THIS IS THE SECOND TIME I WAS PAST OVER FOR A PROMOTION, AND I BELIEVE RESPONDENT DENIED ME THE PROMOTION, IN RETALIATION FOR FILING A COMPLAINT WITH THE MCAD. THIS IS IN VIOLATION OF MGL CHAPTER 151B SECTION 4 PARAGRAPH 4 AND TITLE VII.

I swear or affirm that I have read this complaint and that it is true to the best of my knowledge, information and belief.

_Roderick L Diaz_
(Signature of Complainant)

_Altagracia Mejia_
_my Commission Expires_
_7/25/08_

MCAD Docket Number 01BEM10929, Complaint

COMMONWEALTH OF MASSACHUSETTS    **04-5507**

SUFFOLK, SS                                      SUPERIOR COURT
                                                          C.A.#

RODERICK DIAZ

                              VERIFIED COMPLAINT

v.

DAVID HIGGINS, Individually,
and, in his capacity as Director of
Central Fleet Maintenance, City of
Boston Department of Public Works;
CITY OF BOSTON

1.  Plaintiff Roderick Diaz is a black male, who was born in the Republic of
Trinidad and Tobago, and a citizen of the Commonwealth of Massachusetts,
living at 329 LaGrange Street, W.Roxbury, Suffolk County, Massachusetts.

2.  Defendant David Higgins is a white male citizen of the United States whose
residential address is unknown to plaintiff.  Plaintiff will seek leave to amend the
complaint to state the defendant's residential address, after he ascertains same
through the discovery process in this action.  At all times relevant to this action,
Higgins was employed by the defendant City of Boston, in the capacity of
Director of Central Fleet Maintenance ("CFM") of the Department of Public
Works ("DPW") and acted under colour of law.  Higgins is being sued
individually and in his capacity as Director of CFM of the City of Boston.

3.  The defendant City of Boston, is a corporation duly organized and doing
business under the laws of the Commonwealth of Massachusetts.  The defendant
manages and operates the Department of Public Works and its Central Fleet
Maintenance and is responsible for its administration and the enforcement of its
personnel practices, including but not limited to personnel selection procedures.

4.  The defendant City of Boston has promulgated an Affirmative Action Plan by
which it has pledged that it would observe fair employment practices in all phases

Page 1

of its employment procedures.

5. The defendant City of Boston (hereinafter referred to as "the City") is a recipient of federal funds, and, is required as a condition of the receipt of said funds, to maintain an Affirmative Action Plan/Program, including, the implementation of procedures to monitor adherence by supervisory officials and managers to its provisions, in the enforcement of personnel procedures.

6. The representations made by the City with regard to its adherence to equal employment opportunity and affirmative action in its selection procedures, were sufficient to form the terms of a contract between it and the plaintiff.

7. The plaintiff, in commencing his employment with the City, as a mechanic, in December, 1986 and in remaining in its employ, relied on its representations relative to equal employment opportunity practices. Plaintiff was seeking long term employment and anticipated promotions within the normal course of his employment.

8. Plaintiff was qualified for the employment and competently discharged his duties.

9. Until very recently, there were exclusively white male foremen or acting foremen at the CFM.

10. Plaintiff did serve as a Temporary Foreman of the Shop, located at Frontage Road, Boston, when he was asked to do so by Al Young. At the time of this temporary assignment, plaintiff was the most senior qualified mechanic in the Shop.

11. There was a well established practice/custom at CFM whereby the most senior person in the Shop, whether it was the "Light" or "Heavy" Shop, would be appointed to the position of Foreman when a vacancy would arise.

12. White male supervisors were also in the habit of placing other white males in so-called "Acting" or "Temporary" positions, as Foremen, whereby they would gain invaluable experience, denied to black employees. Such "temporary" placements were arbitrary and racially discriminatory, since they generally

excluded qualified black candidates.

13. Thus, when vacancies would arise in the foreman position, the white person who had been serving in the "Acting" or "Temporary" capacity, would have an advantage by virtue of the "experience" which he had gained in the "Temporary" position.

14. In 1999, plaintiff applied for the position of "Working Foreman" in the Light Shop, but his application was discriminatorily rejected by the defendants. The defendant Higgins recommended to the Commissioner, Mr. Cassazza, also a white male, that the position be given to a white male, who was not as qualified as the plaintiff.

15. The denial of plaintiff's application, when he was the most senior qualified person in the Shop, was a sharp departure from the practice/custom of appointing the most senior qualified person to fill the vacancy in the foreman's position.

16. Plaintiff did file a grievance with his Union over this rejection, but the decision of the employer was not overturned.

17. After the filing of the Grievance, defendant Higgins retaliated against the plaintiff by refusing to give him any more "Acting" assignments. In fact, Higgins ousted plaintiff from his "Acting" Foreman position once plaintiff hired an attorney to challenge the discriminatory denial of his application for the foreman's position.

18. Plaintiff filed a Charge of discrimination at the MCAD on account of the discriminatory denial of the promotion.

19. The defendants Higgins and the City used the pretext of the plaintiff's alleged poor performance in an Interview Process to deny his application for the foreman's position. This very Interview Process was itself discriminatory, in its creation, by defendant Higgins, and implementation. Defendant City acquiesced in, and ratified, the implementation of this discriminatory Interview Process.

20. The defendants did discriminate against plaintiff in the award of overtime work. There were occasions on which overtime work was available, but the

Page 3

defendants did not notify plaintiff of same. The overtime work was given primarily to white persons by white supervisors.

21. Plaintiff again applied for a foreman's position in 2001, when the defendants posted a position.

22. At some time on or about 18[th December], '01, defendant Higgins denied the position to plaintiff and recommended to the Commissioner and the defendant City, that the position be awarded to a white male, who was not as qualified as plaintiff. The defendants, since that date have engaged in a continuing course of conduct to conceal and cover up the facts with regard to their discriminatory acts and to falsely testify as to their motivation for the denial of the positions to plaintiff.

23. Defendants again advanced as their rationale for the denial, plaintiff's alleged poor performance in the Interview Process.

24. The denial of the position to the plaintiff, was a radical departure from the practice/custom of appointing the senior most qualified person to fill the vacancy and was a pretext for discrimination and retaliation.

25. The subjective employment practices of supervisory officials, most of whom were white and the use of non-job validated selection criteria, including but not limited to an ad hoc Interview Process, which was not formally approved by the City's Office of Human Resources nor consistent with the mandates of its Affirmative Action Plan/Program, produced a disparate impact on members of plaintiff's protected class. The tangible result of this disparate impact was that there was a selection rate of black employees for the position of Foreman which was in contravention of the provisions of 29 CFR S.1607.4(D).

26. The continuing discriminatory and retaliatory denial of promotions to plaintiff and the refusal of the defendant Higgins to place plaintiff even in a "Temporary" position as Foreman, caused the workplace to be contaminated with racial discrimination, harassment and retaliation and to adversely affect the terms and conditions of plaintiff's employment.

27. Plaintiff came to realize that despite his many years of dedicated service to the City, it was extremely unlikely that the defendants would promote him; that his role would continue to be to train junior white males who would then be promoted to the foreman's position and that he had no future at the CFM.

28. The above stated acts of racial discrimination and retaliation led to the workplace being contaminated with racial harassment and discrimination, produced conditions which became too onerous and oppressive and caused plaintiff to be subjected to constructive termination and to be involuntarily separated from employment with the City of Boston, on or about 19th.March, '04.

29. All conditions precedent to the institution of this action have occurred and have been fulfilled.

30. As a direct and proximate result of the foregoing, plaintiff has suffered pain in body and mind, has been prevented from transacting his business and has been otherwise damaged.

CLAIMS FOR RELIEF

COUNT 1:

31. Plaintiff re-alleges and re-avers all of the averments of paragraphs 1 through 30 with the same force and effect as if fully set forth herein.

32. By reason of the foregoing, the defendant Higgins has:

a. Violated plaintiff's rights under G.L.c.151B(4).    — Dismiss

b. Violated plaintiff's rights under G.L.c.151B(4)(4).

 Can stay in.

C. Violated plaintiff's rights under 42 USC S.1981

d. Interfered with plaintiff's contract of employment with the City of Boston.

COUNT 2:

33. Plaintiff re-alleges and re-avers all of the averments of paragraphs 1 through 30 with the same force and effect as if fully set forth herein.

34. By reason of the foregoing, defendant City of Boston has:

a. Violated plaintiff's rights under G.L.c.151B(4).

b. Violated plaintiff's rights under G.L.c.151B(4)(4).

c. Violated plaintiff's rights under 42 USC S.1981

d. Violated plaintiff's rights under Title VII.

e. Violated plaintiff's rights under 42 USC S.2000e-3(a).

WHEREFORE, plaintiff prays that this Court:

1. Award compensatory damages to plaintiff.

2. Award front pay.

3. Impose punitive damages.

4. Award costs and reasonable attorney's fees.

5. Grant such other relief as may be equitable and appropriate.

Plaintiff,
By his Attorney,

W. Kendall
BBO #267480
136 Warren Street
Roxbury, Ma.02119
(617) 442-6130

COMMONWEALTH OF MASSACHUSETTS
SUFFOLK, SS

I, Roderick Diaz, being sworn, depose and say that I am the plaintiff in this Complaint, that I have read its allegations and the same are true as of my knowledge.

Roderick Diaz

Dated __16__ December, '04

**Full docket text:**
Judge Nancy Gertner : ORDER entered granting in part and denying in part (#5) Motion to Dismiss, granting in part and denying in part (#8) Motion to Dismiss, denying (#13) Motion to Strike: Defendant Higgins' motion to dismiss (#8) is granted only with respect to Count I, Paragraph 32(a); Count I, Paragraph 32(b); and Count I, Paragraph 32(c), and only insofar as that count alleges liability in Higgins' official capacity. Defendant City of Boston's motion to dismiss (#5) is granted with respect to Count II, Paragraph 34(e), insofar as it is completely duplicative of Count II, Paragraph 34(d). In all other respects, these motions to dismiss are denied.

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 11/21/2006 12:07:33 | | | |
| **PACER Login:** | cb0384 | **Client Code:** | diaz |
| **Description:** | History/Documents | **Search Criteria:** | 1:05-cv-10154-NG |
| **Billable Pages:** | 1 | **Cost:** | 0.08 |

Page 1

1    COMMONWEALTH OF MASSACHUSETTS
2        COMMISSION AGAINST DISCRIMINATION
3                              #01-BEM-10929
4                              VOL. I
                               PGS.  1-97
5
     RODERICK DIAZ,                    )
6                                      )
             Plaintiff,                )
7                                      )
         vs                            )
8                                      )
                                       )
9    CITY OF BOSTON DP, ET AL.         )
                                       )
10             Defendant.              )
                                       )
11
12      DEPOSITION OF DAVID HIGGINS, a witness
13   called on behalf of the Plaintiff taken
14   pursuant to the Massachusetts Rules of
15   Civil Procedure, before Lori J. Atkinson,
16   a Professional Court Reporter and
17   Notary Public in and for the Commonwealth
18   of Massachusetts at the offices of Winston
19   Kendall, 136 Warren Street, Roxbury, MA on
20   the 25th of February, 2004, commencing at
21   11:30 a.m.
22
             EYAL COURT REPORTING, INC.
23           4 Faneuil Hall Marketplace
                 Boston, MA 02109
24               (800) 322-3925

Page 6

1   complainant has some things to say.  First
2   of all, Mr. David Higgins is a named
3   respondent in this matter.  Secondly, we
4   do not know, "we," meaning the complainant, has
5   no documentary evidence that supports your
6   claim that Central Fleet Maintenance came
7   into existence in 1997.  Therefore, we are
8   going to feel free to question as far back
9   as we think is reasonably necessary.
10      Third, the issue of whether or
11  not information is relevant is not the
12  test with respect to discovery as counsel
13  for the Defendant well knows.  The test is
14  whether or not the information which we
15  are seeking to elicit is reasonably likely
16  to lead to discovery of information admissible
17  at trial.  Therefore, discovery is going
18  to be wide-ranging and is going to cover
19  every one of the topics listed on the list
20  of deposition.
21      If the Defendants had a problem
22  with it or the Respondents had a problem
23  with the notice of deposition, the
24  Respondents should have filed a motion to

Page 7

1   strike; the Defendants did not do so.  So
2   therefore everything listed on the notice of
3   deposition is open for discussion and inquiry.
4       Thank you.
5       Would you mark this, please.
6       (Document marked Exhibit No. 1
7   for identification.)
8       MR. KENDALL:  Before we proceed,
9   we should state that the stipulations are
10  the normal stipulations.  That is, all
11  objections, I guess as to form, will be reserved
12  until the time of trial.
13      MR. FUKUDA:  Yes.
14      MR. KENDALL:  Do you wish to have the
15  witness read, sign and file the notice of
16  deposition?
17      MR. FUKUDA:  Read and sign.  We
18  can waive the notary.
19      MR. KENDALL:  Any other stipulations?
20      MR. FUKUDA:  No.
21  BY MR. KENDALL: (CONT'D):
22  Q.  Would you state your name, sir?
23  A.  My name is David Higgins.
24  Q.  What is your business address?

Page 8

1   A.  400 Frontage Road.
2   Q.  That's Boston?
3   A.  Yes.  02118.
4   Q.  What is your home address, sir?
5   A.  121 Walworth Street.
6   Q.  How do you spell that, sir?
7   A.  W-A-L-W-O-R-T-H.
8   Q.  Where is that, sir?
9   A.  Roslindale.
10  Q.  Zip code?
11  A.  02131.
12  Q.  Thank you, sir.  What is your job title?
13  A.  I'm director of Central Fleet Maintenance.
14  Q.  That's the City of Boston?
15  A.  Yes.  Department of Public Works.
16  Q.  So what are your duties associated with that
17      position?
18  A.  I oversee the maintenance of and repair
19      for city fleet vehicles.
20  Q.  Anything else?
21  A.  All of the associated tasks from budget
22      preparation to aiding other departments in
23      preparing specifications for vehicles to
24      be purchased to disposal of vehicles.

Page 9

1   Q.  When you say including aiding other departments
2       for disposal and purchase of vehicles, what
3       other departments do you aid or assist, sir?
4   A.  We service all of the city departments
5       with two exceptions; the fire department
6       and the police department.  Although, we
7       do some maintenance for them it's fairly
8       minor.
9           Other than the fire department
10      and the police department, we do maintenance
11      on most of the city's fleet.
12  Q.  You say you also assist in budget preparation
13      for the department?
14  A.  Yes.
15  Q.  What was the budget for the current fiscal year,
16      or is the budget for the current fiscal year?
17  A.  The Central Fleet budget?
18  Q.  Yes, sir.
19  A.  It is just north of a million dollars.  I
20      couldn't tell you exactly.
21  Q.  Around $1 million?
22  A.  Just a little bit above $1 million, I
23      believe.
24  Q.  Were you ever provided with a written job

3 (Pages 6 to 9)

Page 10

1   description?
2   A.  I responded to -- when I came to work for
3       the City, I responded to a job outline of
4       the director of Central Fleet Maintenance,
5       yes.
6   Q.  Are you familiar with what is stated in the job
7       outline to which you responded, sir?
8   A.  No.  I have got a copy of it.  It basically
9       outlines the duties that I have described.
10  Q.  When was the last time that you read that
11      document, sir?
12  A.  I don't I think I have looked at it since
13      I started with the City.
14  Q.  That's when, sir?
15  A.  In 1997.
16  Q.  Are you required as part of your job description
17      to report to anyone, sir?
18  A.  Yes.
19  Q.  To whom are you required to report?
20  A.  I report to the commissioner of public works.
21  Q.  Who is that, sir?
22  A.  Joseph Casazza.
23  Q.  What form does your reporting take, sir?
24  A.  I do a monthly activity report.

Page 11

1   Q.  Yes, sir.
2   A.  And meet with the commissioner from time
3       to time on issues that he or I have.
4   Q.  How often in a two-month calendar year, would
5       you say that you meet with the commissioner,
6       sir?
7   A.  I would say three or four times a month,
8       so up to 50 times in a calendar year.
9   Q.  Now, you say that you prepare monthly activity
10      reports, would you tell us what the components
11      of these monthly activity reports are?
12  A.  I basically give the commissioner the highlights
13      of what Central Fleet is involved in on a
14      monthly basis; from seasonal preparation
15      of vehicles to -- we have done a number of
16      demonstrations and trials that have alternative
17      fueled vehicles; from electric vehicles to
18      vehicles that are powered by compressed
19      natural gas to different forms of -- we
20      have got a number of vehicles that were
21      donated to the City that are electrically
22      powered that look similar to golf carts.
23      Those types of -- I don't communicate the
24      day-to-day broke truck, fixed truck.  It

Page 12

1   is just basically the highlights of what goes
2   on on a monthly basis.
3   Q.  Anything else that you can think of that goes in
4       to those monthly activity reports?
5   A.  Any anomaly that we may have.  If Central
6       Fleet is involved with any external agencies
7       for -- we had an instance where the shop
8       was found in violation because of some
9       storage -- oil storage tanks, old lift
10      tanks, and any regulatory issue like that
11      I would keep the commissioner apprised about.
12  Q.  What agency or what body found the shop to be
13      in violation, sir?
14  A.  It was either DEP or DES.
15  Q.  What does DEP --
16  A.  The Department of Environmental Protection.
17  Q.  Do you remember what year that was, sir?  The
18      date of that finding?
19  A.  I believe it was '98 or '99.
20  Q.  What was the violation that was found, sir?
21  A.  We needed to have a written plan as to what would
22      happen in the event of an oil spill, because we
23      had exceeded the floor limit for storage
24      capacity even though there wasn't anything

Page 13

1   in the tanks.
2   Q.  Any other report or requirements that you have,
3       sir, apart from what you have told us?
4   A.  No.
5   Q.  I'm going to show you what has been marked as
6       Exhibit 1.  I ask you to take a look at it,
7       please, read it to yourself.
8           (Witness examined document.)
9   Q.  Exhibit 1, sir.  Have you seen a copy of that
10      document prior today's date?
11  A.  Yes.
12  Q.  When and where did you see that document,
13      please?
14  A.  In Attorney Fukuda's office yesterday.
15  Q.  When you saw that, sir, who else was present
16      besides counsel?
17  A.  Kathleen Kelley.
18  Q.  Who else, sir?
19  A.  That's all.
20  Q.  You read that document so you understood what it
21      said, did you not, sir?
22  A.  Yes.
23  Q.  In preparation for the examination today, could
24      you tell us what documents you examined or

4 (Pages 10 to 13)

Page 14

1  looked at?
2  A.  I reviewed the file for the interview in
3     question.  And I also reviewed the file for the
4     original interview.
5  Q.  Now, when you say you reviewed the file for the
6     original interview, are you referring to the
7     file with respect to Mr. Diaz's first charge of
8     discrimination in employment filed in the
9     MCAD sometime in 2000?
10 A.  I'm not sure of the date, but, yes that's
11    the first charge.
12 Q.  When you say you reviewed the file for the
13    interview the first time, that means you are
14    referring to the interview with respect to the
15    second charge of discrimination?
16 A.  I don't understand.
17 Q.  One filed sometime in 2001?
18 A.  There were two interviews and I reviewed both
19    files.
20 Q.  You say there were two interviews, when was the
21    first interview?  What date was that conducted?
22 A.  I believe it was December of 1999.
23 Q.  When was the second interview conducted?
24 A.  It was August -- it was August of '01, I

Page 15

1     think.  I'm not quite sure.
2  Q.  Apart from these documents, did you review any
3     other documents in preparation for your
4     examination today?
5  A.  No.
6  Q.  Apart from the people who you've mentioned were
7     in the room when you spoke to your attorney,
8     Miss Kelly, have you spoken to anyone else with
9     respect to your examination here today?
10 A.  No.
11 Q.  Did you review Mr. Diaz's personnel file in the
12    Department of Public Works?
13 A.  No.
14 Q.  In connection with this deposition?
15 A.  No.
16 Q.  Did you review the personnel file of any other
17    persons in conjunction with preparation for the
18    deposition today?
19 A.  No.
20 Q.  How much time would you say that you spent in
21    preparing for this examination today, sir?
22 A.  A couple of hours.
23 Q.  Is that two hours?
24 A.  Yes.

Page 16

1  Q.  Did you see Mr. Diaz's answers to interrogatories
2     in this case?
3  A.  No.
4  Q.  Did you see Mr. Diaz's answers to request for
5     production in this matter?
6  A.  No.
7  Q.  Would you tell us where you went to high school?
8  A.  North Quincy High School.
9  Q.  What year did you graduate?
10 A.  1961.
11 Q.  Where did you go to college?
12 A.  Wentworth Institute.
13 Q.  What year did you graduate?
14 A.  I did not.
15 Q.  How far did you go at Wentworth College?
16 A.  I went for a year and a half.
17 Q.  Have you taken any work-related seminars within
18    the last five years, sir?
19 A.  Yes.
20 Q.  Would you tell us what those seminars are?
21 A.  From the American Public Works Association.
22 Q.  What was the name of the seminar?
23 A.  I actually put the seminar on.  I taught the
24    class.

Page 17

1  Q.  What did you teach, sir?
2  A.  Specification writing.
3  Q.  Any other seminar in which you participated or
4     attended, sir?
5  A.  I have authored a number of articles regarding
6     fleet maintenance and specification writing.
7  Q.  Anything else that you have done or seminars
8     that you have attended, sir?
9  A.  I'm a past president of the maintenance
10    association of the granite state.  And I'm
11    also a certified CEL instructor.
12 Q.  Certified by what agency or what party?
13 A.  Human services corporation here in Massachusetts.
14 Q.  When did you receive that certification?
15 A.  In 1990 -- '89.  1989.
16 Q.  Can you recall any of the seminars which you
17    attended or participated apart from what you
18    have told us?
19 A.  There have been a number of them and no, I
20    cannot recall.
21 Q.  When did you first begin to work for the City of
22    Boston Department of Public Works?
23 A.  In the summer of 1997.
24 Q.  Before you worked at the City of Boston, where

5 (Pages 14 to 17)

Page 18

1    did you work, sir?
2  A. I was the director of equipment service
3    for the City of Concord, New Hampshire.
4  Q. From when to when did you hold that position,
5    sir?
6  A. I went to work there in 1990, and I worked
7    there until I came to the City of Boston
8    in 1997.
9  Q. Approximately when did you leave the City of
10    Concord, New Hampshire?
11  A. December of '97.
12  Q. Do you remember the month, sir?
13  A. I believe it was August.
14  Q. You left directly from there to come to the City
15    of Boston; is that it?
16  A. Yes.
17  Q. What were your duties at the City of Concord as
18    director of equipment service?
19  A. Essentially the same as my duties in Boston.
20    The fleet in Concord is considerably
21    smaller than the fleet in Boston.
22  Q. How many employees did you supervise in your
23    capacity as director of equipment services in
24    Concord?

Page 19

1  A. Approximately 20.
2  Q. What percentage of those 20 were black or
3    African American?
4        MR. FUKUDA: Objection.
5  A. One.
6  Q. What was his job title his or her job title, the
7    black person?
8  A. It was a male and he was mechanic, a technician.
9  Q. Do you recall his name?
10  A. His name was Brock Haith.
11  Q. How do you spell the last name?
12  A. I believe it is H-A-I-T-H.
13  Q. Did the City of Concord, when you were employed
14    there, did it have an affirmative action office?
15        MR. FUKUDA: Objection.
16        You can answer.
17  A. There was a personnel office. I don't know if
18    it was an affirmative action office. If
19    there was, I never had any dealings with
20    anybody there.
21  Q. While you were the director of equipment
22    services in Concord, were you confronted by any
23    affirmative action employment discrimination
24    issues?

Page 20

1        MR. FUKUDA: Objection.
2        You can answer.
3  A. No.
4  Q. How many employees do you supervise as director
5    of Central Fleet Maintenance?
6  A. Currently there are 41 folks at Central Fleet.
7    There has been as many as 56 or -7. We are currently
8    critically under staffed.
9  Q. What made you apply for the position of director
10    of Central Fleet Maintenance?
11  A. My parents. My parents still live here in
12    Massachusetts. My dad, who has recently
13    passed away, was not doing very well, and
14    I was commuting three nights a week and
15    weekends from my home in New Hampshire to
16    Plymouth, and I needed to be closer to them.
17  Q. How did you come to hear about the position as
18    director of Central Fleet Maintenance?
19  A. I saw an advertisement in one of the trade
20    journals and submitted a resume'.
21  Q. To whom did you send the resume'?
22  A. I believe it was their personnel department.
23  Q. You got a response, I take it, to your resume'?
24  A. I did.

Page 21

1  Q. What did you do to follow that? Did you come to
2    the City of Boston to talk to someone?
3  A. A number of times.
4  Q. To whom did you speak in the City of Boston with
5    respect to your application for the position?
6  A. The gentleman was named William Stanton.
7  Q. Do you know what his job title is or was?
8  A. I do not. He worked with the Property Management
9    Department.
10  Q. He was employed for the City of Boston at that
11    time?
12  A. That's correct.
13  Q. Is he still employed by the City of Boston?
14  A. I don't believe so. I believe he has gone
15    somewhere else.
16  Q. He is a white male?
17  A. Yes.
18        MR. FUKUDA: Objection.
19  Q. With whom else did you speak besides Mr. William
20    Stanton?
21  A. An attorney for the transportation department
22    by the name of David Galogouy.
23  Q. Could you spell the last name?
24  A. I was afraid you were going to say that.

6 (Pages 18 to 21)

Page 22

1      G-A-L. And I would take guess at the rest
2      of it. G-A-L-O-G-O-U-Y, or something.
3      That may be close.
4   Q.  Anybody else with whom you spoke, sir?
5   A.  Yes. Ultimately I spoke with the current
6      public works employees and the commissioner
7      of public works.
8   Q.  How many times did you speak to the commissioner
9      before you were hired or before you were
10     informed that you were hired for the position?
11  A.  Twice.
12  Q.  And this was at his office?
13  A.  Yes.
14  Q.  His office is located where, sir? Where was it
15     located at that time?
16  A.  In City Hall.
17  Q.  When you spoke to the commissioner, was there
18     anybody else present at this interview or when
19     you spoke with him?
20  A.  No.
21  Q.  When you spoke with the commissioner, were you
22     asked to provide any documents with respect to
23     your experience apart from your resume'?
24  A.  No.

Page 23

1   Q.  Do you know how long the interview lasted in
2      total, sir?
3   A.  Approximately an hour each.
4   Q.  Is it fair to state, sir, that Mr. Casazza
5      explained to you what your duties would be in
6      your position?
7   A.  Yes and no. The position didn't exist.
8      Central Fleet didn't exist. It was a new
9      position that no one had ever held before.
10     So this was breaking new ground. So I guess the
11     answer to your question is yes and no. He
12     outlined what they would be, but no one
13     knew because the position had never
14     existed before.
15  Q.  When you met with Mr. Casazza and spoke on these
16     two occasions, did he give you a written job
17     description?
18  A.  No.
19  Q.  At some point in time were you provided with a
20     written job description?
21  A.  An outline, yes.
22  Q.  How long after you were hired was it before you
23     were provided with that outline?
24  A.  Within a month.

Page 24

1   Q.  Who provided you with the outline, sir?
2   A.  Mr. Stanton.
3   Q.  Is it fair to state that you read over the
4      outline and you understood what was stated
5      therein?
6   A.  Yes.
7   Q.  You didn't have any problems with anything that
8      was written in the outline, did you?
9   A.  No.
10  Q.  You say you also met with employees from the
11     Department of Public Works before you were
12     hired?
13  A.  Prior to my -- yes, I did.
14  Q.  Do you remember the names of any persons with
15     whom you met, sir?
16  A.  Yes. Robert Silvey.
17  Q.  Yes.
18  A.  Jerry Caughlin.
19  Q.  Yes.
20  A.  And Joseph Canavan.
21  Q.  Could you spell the last name?
22  A.  C-A-N-A-V-A-N, I believe.
23  Q.  Do you know what their job titles were, sir?
24  A.  Mr. Silvey was the acting director of

Page 25

1      transportation for public works. Mr. Caughlin
2      was the director or superintendent or
3      director, I'm not sure which, of maintenance
4      for the BTD, Boston Transportation Department.
5      And Joseph Canavan was -- is the highway
6      superintendent.
7   Q.  These individuals who you mentioned are all
8      white males; is that correct?
9          MR. FUKUDA: Objection. You can
10     answer.
11  A.  Yes.
12  Q.  Are they all supervisors? Would you say they
13     were all supervisors?
14  A.  Yes.
15  Q.  Now, you say there was no Central Fleet
16     Maintenance prior to your coming to Boston.
17     What organization or what entity provided
18     services which are being provided by the
19     Central Fleet Maintenance for the City of Boston
20     prior to your arrival in 1997?
21  A.  None. It did not exist centrally.
22  Q.  Some agency or some group of people provided
23     service trucks and vehicles for the City of
24     Boston; is that fair to state, before 1997?

7 (Pages 22 to 25)

Page 26

1  A.  Yes.
2  Q.  Would you tell us what department, division or
3      agency within the City of Boston provided those
4      services?
5  A.  Each department or agency provided their own.
6  Q.  Could you tell me what agencies provided their
7      own, sir, maintenance vehicles before 1997?
8  A.  Public Works provided maintenance for public
9      works.  BTD provided maintenance for BTD.
10     The Parks Department provided maintenance
11     for the Parks Department.  Some of the smaller
12     departments took vehicles to the maintenance
13     facility at BTD, I think.  As I said, all
14     of that occurred prior to my coming to Boston.
15     There was no centralized maintenance facility.
16     Each of the individual departments were
17     left to either supply their own maintenance or
18     contract with an external vendor to do so.
19 Q.  Where was the Boston Public Works Department
20     located prior to your arrival in 1997?
21 A.  At 400 Frontage Road.
22 Q.  That's where it is today?
23 A.  That's correct.
24 Q.  Where was the Boston Traffic Department located

Page 27

1      in 1997?
2  A.  They were at 112 South Hampton Street.
3  Q.  Where was the Parks Department located?
4  A.  They were at the Franklin Park maintenance
5      yard.
6  Q.  When you came to 400 Frontage Road, that's where
7      you went in July of 1997, that's where your
8      office was, right?
9  A.  Yes.
10 Q.  That's where it remains up until today?
11 A.  That's correct.
12 Q.  When you went to the Boston Public Works
13     department in 1997, how many people were
14     employed there, sir?
15 A.  I don't know.
16 Q.  Do you know how many supervisor officials were
17     at 400 Frontage Road when you were there in
18     1997?
19 A.  I do not know.
20 Q.  Did you have to take any examination of any kind
21     in order to get your position, sir?
22        MR. FUKUDA:  Objection.
23        You can answer.
24 A.  No.

Page 28

1  Q.  It was simply the interviews that you mentioned
2      with Mr. Casazza and after that you were hired?
3  A.  The interview was with Mr. Casazza and Mr.
4      Stanton.
5  Q.  How many interviews did you have with Mr.
6      Stanton?
7  A.  Two or three, I believe.
8  Q.  When you had interviews with Mr. Stanton, was
9      anyone else present besides you and Mr. Stanton?
10 A.  On one occasion, yes.
11 Q.  Who was that person, sir?
12 A.  Mike Galvin.
13 Q.  Mike who?
14 A.  Michael Galvin.
15 Q.  What was his job title, sir?
16 A.  He is a cabinet secretary for the mayor.
17 Q.  Who was the mayor at that time, sir?
18 A.  Mayor Menino.
19 Q.  So it's fair to say you had interviews with Mr.
20     Stanton, Mr. Casazza and sometime thereafter you
21     were notified that you had been hired; is that
22     correct?
23 A.  Yes.
24 Q.  What did you know, sir, about the Boston Public

Page 29

1      Works Department before you were hired?
2  A.  Very little.  I knew Commissioner Casazza by
3      name.  Commissioner Casazza is a past
4      president of the National American Public
5      Works Association.  And I had been fairly
6      active in that organization in my role as
7      the director of equipment service for Concord,
8      New Hampshire.  So I knew who he was and
9      where he was from, but that's about the
10     extent of my prior knowledge of public works in
11     Boston.
12 Q.  Sir, are you familiar with the concept of
13     affirmative action and equal employment
14     opportunity?
15        MR. FUKUDA:  Objection.
16        You can answer.
17 A.  Yes.
18 Q.  Would you tell us what you know about those
19     concepts, sir?
20        MR. FUKUDA:  Objection.
21        You can answer.
22 A.  I ran a private fleet in Loundonderry, New
23     Hampshire prior to my working for the City
24     of Concord and the State of New Hampshire.

8 (Pages 26 to 29)

Page 30

1      I don't know whether it was state or federal.
2      There was an EEOC or EOC office in Manchester.
3      And one of their representatives visited
4      the fleet shop at that company. There was
5      a significant French population in and
6      around the greater Manchester area, and I
7      believe they were -- I think it is called
8      a protected class. There was a survey
9      done to see the number of folks of French
10     decent that were employed at that company.
11  Q. What was the name of company, sir?
12  A. Silver Brothers Company, Incorporated.
13     S-I-L-V-E-R, Brother Company.
14  Q. That was based in Loundonderry?
15  A. That's correct.
16  Q. And apart from what you told us, what other
17     familiarity do you have with the concept of
18     affirmative action or EEO law?
19         MR. FUKUDA: Objection.
20         You may answer.
21  A. None.
22  Q. Does the City of Boston have an affirmative
23     action office, sir?
24  A. I believe so.

Page 31

1   Q. Would you tell us who or his name, sir?
2   A. I do not know.
3   Q. Do you believe that you have ever met the
4      affirmative action office in the City of Boston
5      in the course of your duties as director of
6      Central Fleet Maintenance?
7   A. I don't know.
8   Q. Do you know where the office of affirmative
9      action is located in the City of Boston, sir?
10  A. I do not know.
11  Q. Have you ever seen, sir, a copy of the
12     affirmative action guidelines or plans of
13     the City of Boston?
14  A. No, not to my knowledge.
15  Q. Sir, do you know whether or not the City of
16     Boston has conducted any survey since the time
17     that you were director of Central Fleet
18     Maintenance to determine the number of black or
19     African American people employed by the Central
20     Fleet Maintenance and DPW and their capacities;
21     that is, what they were doing, the jobs that
22     they were doing, et cetera?
23         MR. FUKUDA: Objection.
24         You can answer.

Page 32

1   A. Yes.
2   Q. When was that survey or analysis done, sir?
3   A. Within the last couple of months. Kathy Kelly,
4      who was the director of HR for Public Works,
5      did a study or did that survey.
6   Q. You said within a couple of months, could you
7      tell us what months you had in mind, sir?
8   A. I don't know exactly when it was done, no.
9   Q. What was Miss Kelly's involvement as you
10     understand it, sir?
11  A. She did the study or she did the survey.
12     She keeps the personnel records.
13  Q. What was your role in the conduct of this
14     survey, sir?
15  A. None.
16  Q. Have you seen the product or the findings of
17     this survey, sir?
18  A. Yes. It's a list.
19  Q. It's a list?
20  A. A list.
21  Q. How many pages does the list comprise, sir?
22  A. I think it is three.
23  Q. You have read this list, sir. You are familiar
24     with what it says?

Page 33

1   A. I looked at it.
2   Q. When did you look at it, sir?
3   A. I think I looked at it a week or so ago.
4   Q. Apart from this survey that you mentioned that
5      Miss Kelley conducted, are you aware of any
6      survey conducted by the City of Boston with
7      respect to the racial make up of employees and
8      the jobs at Central Fleet Maintenance of DPW?
9          MR. FUKUDA: Objection.
10         You can answer.
11  A. No.
12  Q. No meaning that you are not aware of any such
13     survey?
14  A. Correct.
15  Q. In 1997, when you came, you mentioned three
16     people. You mentioned three names of supervisor
17     officials, Mr. Silvey, Mr. Canavan, Mr. Caughlin.
18     Do you remember mentioning those names?
19  A. Correct.
20  Q. You spoke with those people?
21  A. Correct.
22  Q. Since 1997, can you tell us the names of all the
23     supervisor officials from 1997 to the present
24     and give me the names and the race of every one

Page 34

1       of the supervisor officials --
2               MR. FUKUDA: Objection.
3   Q.  -- who worked at DPW Central Fleet Maintenance
4       since you have been there.
5               MR. FUKUDA: Objection.
6   A.  Without looking at a list, no.
7   Q.  How many supervisors would you say have worked
8       at Central Fleet Maintenance DPW from 1997 to
9       present?
10  A.  There are eight supervisor positions.
11  Q.  Those eight positions are what? What are those
12      positions?
13  A.  There are two foremen in each shop. There
14      is a general foreman in each shop. And
15      there are two superintendents.
16  Q.  Who are the two foremen in each shop, sir?
17  A.  The foreman in the heavy shop, Paul Musto
18      and Ted Meyers. The foreman in the light
19      shop, Fitzroy Prescott and James Monahan.
20  Q.  Who is the general foreman, sir?
21  A.  General foreman in the light shop is
22      Maurice Gracia.
23  Q.  How do you spell the last name, sir?
24  A.  G-R-A-C-I-A, I believe. The general foreman

Page 35

1       in the heavy shop is currently vacant.
2   Q.  Who are the two superintendents, sir?
3   A.  The superintendent of the heavy shop is
4       Robert Silvey.
5   Q.  Yes.
6   A.  And the superintendent of the light shop
7       is Maurice Smith.
8   Q.  Since you became director of Central Fleet
9       Maintenance, how many black or African American
10      persons have supervised in any of the capacities
11      that you have mentioned?
12              MR. FUKUDA: Objection.
13  A.  Two.
14  Q.  What are their names, sir?
15  A.  Maurice Smith and Fitzroy Prescott.
16  Q.  When was Maurice Smith appointed a position,
17      sir?
18  A.  Maurice was retired in December. In January or
19      February of '03. In January or February
20      '03 Maurice was appointed to that position.
21  Q.  Who appointed Mr. Smith to that position?
22  A.  Commissioner Casazza. He is the only person
23      that can.
24  Q.  When was Prescott appointed to a position?

Page 36

1   A.  I don't know.
2   Q.  Do you know who appointed Mr. Prescott to that
3       position?
4   A.  I do not know.
5   Q.  Mr. Prescott is a foreman of the night shop?
6   A.  That is correct.
7   Q.  Now, is the position that is held by Mr. Maurice
8       Smith is it an acting capacity or is that a
9       permanent position, sir?
10  A.  I don't understand.
11  Q.  Is he an acting foreman or has he been appointed
12      permanently as a foreman?
13  A.  He is not a foreman. He is a
14      superintendent.
15  Q.  Is he a permanent superintendent or acting
16      superintendent?
17  A.  No, he is permanent.
18  Q.  With respect to Mr. Prescott, is that a
19      temporary or active position, or is that a
20      permanent position?
21  A.  He is permanent.
22  Q.  You don't recall the date when he was made
23      permanent?
24  A.  No. He was an employee when I got there.

Page 37

1       He has been a foreman all along.
2   Q.  When was he appointed foreman?
3   A.  I don't know.
4   Q.  When he was appointed foreman, was he appointed
5       in a temporary or acting position or placed in a
6       permanent capacity?
7   A.  I don't know.
8   Q.  Who would have that information, sir?
9   A.  Kathy Kelley.
10  Q.  Apart from Maurice Smith and Fitzroy Prescott,
11      how many of the black people served either as
12      foreman or acting foreman since you have been
13      director of Central Fleet Maintenance?
14              MR. FUKUDA: Objection.
15  A.  The working foreman for the welder is Cleo Bino.
16      He is an African American.
17  Q.  When was he appointed to that position, sir?
18  A.  I don't know.
19  Q.  When you say working foreman, what does that
20      mean, sir? Is that a temporary position or
21      permanent position?
22  A.  Permanent.
23  Q.  You say you have no idea when he became --
24  A.  No.

Page 38

1   Q.  Was it sometime last year in 2002 or 2001?
2   A.  It was prior to my coming to this city.
3   Q.  He was in that position prior to 1997?
4   A.  That's correct.
5   Q.  That is considered a supervisory position, sir,
6       working foreman?
7   A.  Yes.
8   Q.  Any of the black people, African Americans who
9       had supervisor capacity as foreman or
10      superintendent either acting or permanent apart
11      from the three names that you have given us,
12      sir?
13          MR. FUKUDA:  Objection.
14  A.  Not to my knowledge, no.
15  Q.  Now, did Mr. Maurice Smith have to take an
16      examination in order to be appointed to the
17      position?
18  A.  Yes.
19  Q.  When did he take the examination, sir?
20  A.  I have to look at my records for the
21      dates.
22  Q.  What role, if any, did you play in the
23      appointment of Mr. Maurice Smith to the
24      position?

Page 39

1   A.  I made the recommendation to Commissioner
2       Casazza that he was the candidate that
3       came out first in the interview process.
4   Q.  And how many people were involved in the
5       interview process, sir, with regard to Mr.
6       Smith?
7   A.  I believe it was three or four.
8   Q.  What were their names, sir?
9   A.  Horris Rider.
10  Q.  Yes.
11  A.  Maurice Gracia.  Maurice Smith.  And I
12      would have to look at my records.
13  Q.  So Mr. Smith was interviewed by Mr. Rider, Mr.
14      Gracia and Mr. Smith?
15  A.  No.  They were all candidates for Maurice's job.
16  Q.  Who interviewed Mr. Smith, that's what I'm
17      trying to find out, for the position?
18  A.  I did.
19  Q.  Anybody else?
20  A.  Kathy Kelley.
21  Q.  Yes?
22  A.  And I believe Bob Silvey was part of that
23      interview committee.  Again, I would have to look
24      at my records.

Page 40

1   Q.  Do you remember when this interview took place,
2       sir?
3   A.  In January of '03, I believe.
4   Q.  Did Mr. Smith have to take a written exam at
5       that time, sir?
6           MR. FUKUDA:  Objection.
7   A.  It isn't an exam.  We ask interview questions.
8       And yes, he did.
9   Q.  Was there written component with regard to this
10      interview process?
11  A.  I give the candidates a copy of the interview
12      questionnaire to follow along with but it
13      is oral.  We verbalize all of the questions.
14  Q.  With respect to Mr. Prescott, what role did he
15      play in the interview process or appointment or
16      recommendation for appointment?
17  A.  None.
18  Q.  Do you know who interviewed Mr. Prescott for the
19      position?
20  A.  I do not.
21  Q.  So would you say there is an under representation
22      of blacks or African Americans in supervisory
23      positions at DPW?
24          MR. FUKUDA:  Objection.

Page 41

1   A.  I don't understand.
2   Q.  Would you say that there is an under
3       representation of black or African American
4       persons in supervisory positions at DPW?
5           MR. FUKUDA:  Objection.  You asked the
6       same question.  He didn't understand the question
7       as phrased.
8           MR. KENDALL:  He didn't say he didn't
9       understand.
10          MR. FUKUDA:  He did say he didn't
11      understand.
12          MR. KENDALL:  He didn't say that
13      he didn't understand the second time, so
14      I'm waiting for his response.
15  A.  I don't know how to answer that.
16  Q.  What about that question troubles you, sir?
17      What is not understandable or unintelligible?
18  A.  An under representation of what?
19  Q.  Blacks or African Americans in supervisory
20      positions at DPW?
21  A.  I understand the words.  I don't understand the
22      premise.  An under representation as
23      compared to the population of the world?
24      What comparison are you looking for?

11 (Pages 38 to 41)

Page 42

1  Q.  Both to the workforce at DPW and to the general
2      population of black people in the City of Boston.
3          MR. FUKUDA: Objection.
4  Q.  You may answer, sir.
5  A.  I don't know what the population or the
6      percentage of population of African Americans in
7      Boston is. My answer with regard to the
8      number of African Americans that work for the
9      City would be no, I don't believe there is an
10     under representation. I have never sat
11     down and done any arithmetic computations
12     to see what percentage of the workforce
13     they make up as opposed to what percentage
14     of the supervisory capacity they make up.
15     So no, I don't think so, but I can't answer the
16     question.
17 Q.  Is it fair to say that you are satisfied that
18     blacks and African Americans are adequately
19     represented in supervisory positions in the
20     City of Boston, DPW; is that a fair statement,
21     sir?
22         MR. FUKUDA: Objection.
23 A.  I don't know.
24 Q.  You don't know whether it is satisfied or not

Page 43

1      sir, sir?
2          MR. FUKUDA: Objection.
3          MR. KENDALL: Excuse me, I'm not
4      finished.
5          MR. FUKUDA: It is Argumentative.
6          MR. KENDALL: Excuse me. Listen, sir,
7      I'm running this deposition. I'm going to
8      ask questions, when I get through asking
9      the question, you may object. That's the
10     way it is done.
11 BY MR. KENDALL (CONT'D):
12 Q.  You were the director of Central Fleet
13     Maintenance; is that correct? You know how many
14     blacks work for Central Fleet Maintenance; is
15     that a fair statement? You know how many black
16     people in supervisory positions; is that correct?
17 A.  Yes.
18 Q.  You know how many white people in supervisory
19     positions in Central Fleet Maintenance; is that
20     correct?
21 A.  Yes.
22 Q.  My question is simply this: Are you satisfied
23     with the number of representation of blacks in
24     supervisory positions at Central Fleet

Page 44

1      Maintenance?
2          MR. FUKUDA: Objection.
3  Q.  Yes or no?
4          MR. FUKUDA: Objection. Mr. Higgins'
5      opinion has absolutely no relevance and will not
6      lead to the discovery of admissible evidence in
7      this case. This is a retaliation claim
8      based on Mr. Diaz's belief that he wasn't
9      given a promotion because of a retaliatory
10     motive. These questions are absolutely
11     irrelevant.
12         MR. KENDALL: Let me explain
13     something to you. If you don't know, I
14     have been doing this work for a long time.
15     I think I know what questions I can ask.
16     I have a question before the witness. You
17     stated your peroration. I'm waiting for
18     an answer from the witness. If you can't
19     answer, say you can't answer and we will
20     move on.
21 A.  I don't know.
22 Q.  You can't answer the question or you don't know,
23     which is it?
24 A.  I have never done any type of analysis of

Page 45

1      the number of people. I have never looked
2      at it with the guide to being satisfied
3      with a number of African Americans that
4      have applied or are in supervisory positions,
5      so no, I can't answer the question.
6  Q.  Thank you, sir. Sir, are you aware of any
7      programs in existence at the City of Boston,
8      specifically DPW, designed to assist African
9      Americans or black persons in obtaining
10     supervisory positions?
11         MR. FUKUDA: Objection.
12 A.  No.
13 Q.  Have you taken or directed anyone to take any
14     measures designed to train black employees or
15     black persons for supervisory positions at the
16     DPW City of Boston?
17         MR. FUKUDA: Objection.
18 A.  We haven't done supervisory training for
19     anybody; black or white.
20 Q.  I'm not concerned with anybody else but black
21     people.
22         Have you done anything, directed
23     anyone to do anything to set up training
24     programs to assist black people in getting

12 (Pages 42 to 45)

Page 46

1     supervisory positions?
2            MR. FUKUDA: Objection.
3  A.  No.
4  Q.  Have you had any discussions with anyone from
5     the Office of Human Resources with respect to
6     this issue?
7            MR. FUKUDA: Objection.
8  A.  No.
9            MR. KENDALL: Let's mark this
10     document, please.
11            (Document marked Exhibit No. 2
12     for identification.)
13     BY MR. KENDALL (CONT'D):
14  Q.  I'm going to show you what has been marked as
15     Exhibit No. 2. I ask you to look at Exhibit No.
16     2 to yourself, please.
17            Have you read what has been marked as
18     Exhibit 2, sir?
19  A.  Yes.
20  Q.  Have you seen a copy of that document prior to
21     today's date?
22  A.  Yes.
23  Q.  It is fair to state that this is a posting of
24     position of motor equipment repair foreman for

Page 47

1     Central Fleet Maintenance?
2  A.  That's correct.
3  Q.  It says at the top of the document, section the
4     19th of July '01, posting date?
5  A.  Correct.
6  Q.  There closing date is the 25th of July '01?
7  A.  Correct.
8  Q.  And at the bottom of the document it says in
9     capital letters an Equal Opportunity slash
10     Affirmative Action employer?
11  A.  Yes.
12  Q.  "All applicants meet the minimum and transfer
13     requirements will be considered for this
14     vacancy." Did I read that correctly?
15  A.  Correct.
16  Q.  This has a signature of appointed authorities
17     designee. Can you tell whose signature that is
18     at the bottom, sir, next to appointing
19     authority?
20  A.  It looks like the commissioner's signature.
21  Q.  The commission is who?
22  A.  Joseph Casazza.
23  Q.  Do you have any reason to believe it is not
24     Joseph Casazza's signature or copy thereof, sir?

Page 48

1  A.  It appears to be his.
2  Q.  It says approval of. Right below that approval
3     of director of human resources. Could you tell
4     whose signature that is, sir, a copy in the
5     right-hand corner.
6  A.  I believe that is Richard Driscoll but that is
7     just a guess.
8  Q.  Was Richard Driscoll director of Human Resources
9     in 2001 for the City of Boston?
10  A.  I think so, yes.
11  Q.  Do you know Mr. Richard Driscoll, sir?
12  A.  I have met him on a couple of occasions.
13  Q.  In the course of your work as director of
14     Central Fleet Maintenance?
15  A.  Yes.
16  Q.  This document is the one to which Mr. Diaz
17     responded for employment as motor equipment
18     repair foreman; is that correct?
19  A.  Yes.
20  Q.  The language at the bottom Equal Opportunity
21     Affirmative Action Employer; what does that mean
22     to you, sir?
23            MR. FUKUDA: Objection.
24  Q.  What do you take that language to mean, sir?

Page 49

1  A.  Just what it says.
2  Q.  I understand that. My question is: Could you
3     be more explicit what do you take that to mean?
4            MR. FUKUDA: Objection.
5  A.  The City of Boston is an equal opportunity
6     employer.
7  Q.  Are there any specific guidelines as far as you
8     know with respect to what the City is supposed
9     to do as an affirmative action or equal
10     opportunity employer?
11            MR. FUKUDA: Objection. None of
12     these questions have anything to do with
13     the retaliation and the cause of action
14     that is pending in the MCAD here. These
15     questions are completely out of line.
16            MR. KENDALL: Do you have anything
17     else to say, sir, on this question? I do
18     want to get on with examining the witness.
19     Are you finished?
20            MR. FUKUDA: I object to the question.
21            MR. KENDALL: All you have to do, sir,
22     as I understand the rule is object. You
23     are not supposed to give a speech, as you
24     well know. Thank you.

13 (Pages 46 to 49)

Page 50

1    BY MR. KENDALL (CONT'D):
2    Q.  Did you play any part in fashioning the language
3        set forth in document marked Exhibit 2, sir?
4    A.  No.
5    Q.  Do you know who put this document together? Who
6        devised the minimum entrance qualification and
7        job descriptions set forth in this document
8        Exhibit 2?
9    A.  I believe it was a compilation of effort
10       from Attorney Gologali, the civil service
11       language requirement law. I'm not sure
12       exactly the source of the civil service
13       portion and what existed in the Public
14       Works Department prior to Central Fleet's
15       creation.
16   Q.  Did you have discussions with any of the
17       individuals you mentioned prior to the post --
18       with respect to what was required of the
19       position and what was required of the candidates
20       prior to the posting of Exhibit 2, sir?
21   A.  Yes.
22   Q.  With whom did you can have discussions, sir?
23   A.  Mr. Stanton and Attorney Gologali.
24   Q.  How many times did you have discussions with

Page 51

1        them, sir?
2    A.  Five or six.
3    Q.  As you state, you didn't have anything to do
4        with setting forth this language; is that
5        correct? You didn't have anything to do with
6        the drafting of the specifications of the
7        position; is that correct?
8    A.  I did not create the language. I had input
9        into the content.
10   Q.  What input did have you, sir, into the content?
11   A.  The types of vehicles that would be involved.
12       And some of the job duties. I believe the
13       minimum entrance qualifications come from
14       civil service, but I'm not 100 percent sure.
15   Q.  Anything else that you did by way of
16       participation, sir?
17   A.  No.
18   Q.  Apart from what is set forth in this document,
19       what other criteria were used to select the
20       successful candidate for the position, sir? As
21       posted in Exhibit 2.
22   A.  There were three areas; education, experience,
23       and job knowledge.
24   Q.  Do you know on what date Mr. Diaz was

Page 52

1        interviewed for the position, sir? The one that
2        is the subject of Exhibit 2.
3    A.  I don't. I would have to look it up.
4    Q.  Some months after the posting closed?
5    A.  It could have been after the posting closed,
6        yes.
7    Q.  Who are the persons who interviewed Mr. Diaz,
8        sir?
9    A.  Myself, Kathleen Kelley, Maurice Smith,
10       Bob Silvey. That's all. It was five of us.
11   Q.  That interview would have taken place sometime
12       in 2000; is that correct?
13   A.  I would have to look at my documents.
14   Q.  The posting was in 2001?
15   A.  Yes.
16   Q.  It's fair to assume that the interview would
17       have been conducted before 2001 ended; is that a
18       fair statement?
19   A.  Again, I would have to look to see what
20       the date was.
21   Q.  Do you think it was in 2002, sir?
22           MR. FUKUDA: You don't have to
23       answer. It is a guess. He doesn't know.
24       He answered the question. I object to the

Page 53

1        question. He answered the question.
2            MR. KENDALL: Counsel, as I
3        understand the rules, you are supposed to
4        object, if the objection is as to form.
5        I don't think you are supposed to give a
6        speech, because I don't need a speech,
7        counsel. Do you understand me? You say
8        we have six hours and you are using up my
9        six hours very well. I don't appreciate it.
10       Thank you.
11       BY MR. KENDALL (CONT'D):
12   Q.  Do you think the interview could have been
13       in 2002?
14   A.  I don't know. I would to look.
15   Q.  You have no idea. It is more likely than not it
16       was in 2001?
17   A.  I don't know.
18   Q.  It could have been in 2002; is that what you are
19       saying?
20   A.  I don't know.
21   Q.  It couldn't have been in 2003, could it?
22   A.  That's not likely.
23   Q.  At the time of the interview you say Mr. Maurice
24       Smith was one of the interviewers. What was his

Page 54

1    job title at that time, sir?  At the time of the
2    interview?
3  A.  He was the principal administrative assistant.
4  Q.  To whom and to what?
5  A.  To Central Fleet Maintenance.
6  Q.  When was he appointed to that position?
7  A.  When Central Fleet was organized.
8  Q.  When was that, sir?
9  A.  In 1997.
10  Q.  What were his duties as principal administrative
11    assistant at Central Fleet maintenance, sir?
12  A.  He ran the motor vehicle management bureau,
13    which is the entity that is part of Central Fleet
14    Maintenance that is responsible for maintaining
15    all of the vehicle registrations, the database
16    for all of our regulatory registration license
17    permits for the Registry of Motor Vehicles.
18  Q.  Who interviewed -- what were the names of the
19    people that interviewed Mr. Diaz on his first
20    application for position as foreman?
21      MR. FUKUDA:  Objection.
22  A.  That would have been Jerry Caughlin, myself,
23    and Bob Silvey.
24  Q.  Now, you mentioned that there were four criteria

Page 55

1    to looked at, selection criteria, with respect
2    to the position listed in Exhibit 2; education
3    -- education, experience and job knowledge; 3
4    criteria.  I did get that correctly?
5  A.  Yes.
6  Q.  Why did you choose those three criteria?
7  A.  I believe that best reflects anybody's ability to
8    perform the function.
9  Q.  To perform what function, sir?
10  A.  The function that we are interviewing for.
11  Q.  Which is or was?
12  A.  The motor equipment repair form.
13  Q.  Any other reasons why you chose those three
14    criteria, sir?
15  A.  Trying to find the best person for the job.
16  Q.  Any other reasons that you had for choosing
17    those three criteria, sir?
18  A.  No.
19  Q.  Now, you listed three criteria for the position,
20    could you tell us what weight you attached,
21    using 100 percent, what weight did you attach to
22    every one of those criteria, sir?
23      MR. FUKUDA:  Objection.
24  A.  No.

Page 56

1  Q.  No meaning what, sir?
2  A.  No meaning I didn't assign a numeric value
3    to any one of those areas individually.
4    I didn't break it up in thirds, if you will,
5    33.33 percent for each are used.  A compilation
6    of all of those to try to determine the
7    most qualified candidate.
8  Q.  What was your reason for that, sir?
9  A.  To try to determine the most qualified
10    candidate.
11  Q.  Why didn't you weight them equally; one-third,
12    one-third, one-third.
13  A.  I didn't.  I didn't.  Again, I tried to use
14    all of those as you put in to making the
15    best decision that I could.
16  Q.  Based on your answer, one can assume that you
17    weighed one criteria more heavily than the
18    other; is that a fair statement?
19      MR. FUKUDA:  Objection.
20  A.  No.
21  Q.  One couldn't assume that?
22  A.  That's correct.
23  Q.  If you didn't weigh one criterion more than the
24    other, then it is fair to say that you weighed

Page 57

1    all criteria equally; is that a fair statement?
2      MR. FUKUDA:  Objection.
3  Q.  You weighed them equally or you weighed them
4    unequally, which is it?
5      MR. FUKUDA:  Objection.
6  A.  I weighed them in total.
7  Q.  Well, there were three components; we are clear
8    on that?
9  A.  Yes.
10  Q.  Are you saying categorically that you did not
11    weigh them equally; one-third, one-third,
12    one-third?  I believe that's what you said
13    earlier?
14  A.  That's correct.
15  Q.  The corollary of that statement is that if you
16    didn't weigh them equally you weighed them
17    unequally; is that a fair statement?
18      MR. FUKUDA:  Objection.
19  A.  Yes.
20  Q.  The reason why you did that is because you were
21    simply looking for the best candidate; is that
22    your reason?
23  A.  Yes.
24  Q.  Do you have any other reasons besides that, sir?

Page 58

1  A.  No.
2  Q.  Could you tell us the names of the persons who
3      were involved in the decision-making process
4      that led to the selection of a successful
5      candidate with regard to Exhibit 2?
6  A.  The people that were on the interview committee;
7      Bob Silvey, Maurice Smith, Kathy Kelley
8      and myself.
9  Q.  After the interviews were conducted, was there a
10     meeting of all of you to discuss the merits of
11     the various candidates?
12 A.  Yes.
13 Q.  Could you tell us when and where the meeting
14     took place, sir?
15 A.  That day.
16 Q.  Where did the meeting take place, sir?
17 A.  In the conference rooms where we did the
18     interviews.
19 Q.  How long did the meeting last, sir?
20 A.  Half hour, 45 minutes.
21 Q.  Are there any memoranda or documents which
22     memorialize the substance of the discussions of
23     that meeting?
24 A.  Yes.

Page 59

1  Q.  Could you tell us the names of those documents,
2      sir?
3  A.  Those are notes in my file.
4  Q.  You said there are notes in your file?
5  A.  One of the things that we do when each
6      individual candidate is interviewed, I ask
7      everyone to write down their thoughts
8      about the individual candidate.   When all
9      of the interviews are complete, I ask
10     everyone to rate all of the candidates for
11     the position and then their attributes,
12     good or bad, are discussed with all of the
13     committee members.  Then I ask everybody
14     to rate them again to see if anybody has
15     changed their mind based on what somebody
16     else said. And then I record the ratings
17     that we came up with.
18 Q.  You made some notes with respect to your
19     discussions?
20 A.  Yes.
21 Q.  Those notes are in your possession in your
22     office?
23 A.  Yes.
24 Q.  How many pages are in those notes, sir?

Page 60

1  A.  I believe it is one or two.
2  Q.  Based on those notes or based on those ratings,
3      you reached a decision?
4  A.  Yes.
5  Q.  Was the decision a collective decision or an
6      individual decision?
7  A.  It was collective.
8  Q.  Was there a vote taken right after this meeting
9      of this conference as to who was the most
10     qualified person?
11         MR. FUKUDA:  Objection.
12 A.  Not a vote -- I guess you have to describe
13     a vote.  I asked everybody for how they
14     rated the candidates.  We discussed it.
15     When we were done discussing it, I asked
16     them how they rated the candidates after
17     the discussion.
18 Q.  Was there a vote?  Did you ask people to raise
19     their hands and say, Do you like X as opposed to
20     Y or Z?  Did you do it that way or did you
21     simply have people write out a rating that you
22     took the notes and you studied the notes later
23     on?
24         MR. FUKUDA:  Objection.

Page 61

1  A.  We verbalized the discussion at the end of
2      my asking for the rating and then questions were
3      asked, and I polled those present to see what
4      their recommendations were.
5  Q.  Well, when you did the poll, every person that
6      you polled had an opinion as to who he thought
7      would be the best person for the job?
8  A.  That's correct.
9  Q.  You made a note of that name?
10 A.  That's correct.
11 Q.  At the end of the conference, did you announce
12     to people in that conference who you would
13     recommend to the commissioner as a successful
14     candidate?
15 A.  Yes.
16 Q.  What name did you say?
17 A.  Paul Musto.
18 Q.  Did everybody agree at that time?
19 A.  Yes.
20 Q.  You have the notes that reflect that poll or
21     that vote in your file someplace?
22         MR. FUKUDA:  Objection.
23 A.  Yes.
24 Q.  What was the consensus or discussion as to why

16 (Pages 58 to 61)

Page 62

1    Mr. Musto was the best candidate for the
2    position?
3  A. Based on the results of the interview.
4  Q. Was there anything said with respect to the
5    reasons why Mr. Musto was the most appropriate
6    person for the position?
7  A. No.
8  Q. Since you have been commissioner -- is it
9    director of Central Fleet?
10  A. Yes, director.
11  Q. Before I get to that. Did you make the
12    recommendation to Mr. Casazza that Mr. Musto be
13    appointed to the position?
14  A. I did.
15  Q. How was that recommendation made, sir?
16  A. In the form of a letter to the commissioner.
17  Q. Do you have a copy of that letter in your file
18    some place, sir?
19  A. Yes, I believe so, or Kathy -- Kathy
20    Kelley would.
21  Q. After you sent a letter to Mr. Casazza, was
22    there some exchange or discussion between Mr.
23    Casazza and you relative to your recommendation?
24  A. No.

Page 63

1  Q. What happened next after you sent the letter to
2    Mr. Casazza?
3  A. We get a notice of appointment. I believe
4    it is referred to as a personnel action, a
5    PA. We get a notice from personnel. I think
6    they call it a PA, a personnel action form.
7    that the candidate, whoever has been appointed
8    to the position.
9  Q. When you say we got a PA, who is the we to whom
10    you are making reference?
11  A. Central Fleet.
12  Q. Did you see this recommendation or did you see
13    this PA?
14  A. I think I must have. I don't -- I think
15    so.
16  Q. The PA simply said that Mr. Musto had been
17    appointed to the position?
18  A. Yes. There is words -- there is verbiage
19    that says something about pending civil
20    service list of verification from a list;
21    something like that. But yes, it's a
22    document similar to the posting that indicates
23    who the successful candidate was.
24  Q. How long after you sent the letter to Mr.

Page 64

1    Casazza was it before you saw this PA?
2  A. I can't tell you. I don't remember.
3  Q. Was it within a month?
4  A. A month or two.
5  Q. Did you have any second thoughts after your
6    recommendation to Mr. Casazza as to whether or
7    not Mr. Musto was the correct person for the
8    position?
9  A. No.
10  Q. Sir, since you have been director of Central
11    Fleet, have you been aware of any complaints
12    of racial discrimination?
13        MR. FUKUDA: Objection.
14  Q. At DPW Central Fleet?
15  A. Two, yes.
16  Q. Who were the complainants?
17  A. A gentleman by the name of Lincoln Ralph.
18  Q. How do you spell the last name, sir?
19  A. R-A-L-P-H.
20  Q. Who else sir?
21  A. A gentleman by the name of Alphonso
22    Francisco.
23  Q. What was Mr. Ralph's complaint, sir?
24  A. That he was discharged because he was

Page 65

1    African American.
2  Q. What was Alphonso Francisco's charge or claim?
3  A. That the general foreman at the time, a
4    gentleman who has since retired by the
5    name of Al Young, had used disparage language
6    regarding Mr. Francisco.
7  Q. Do you know what language Mr. Young used towards
8    Mr. Francisco?
9  A. No, I don't know directly. I heard indirectly
10    that he called him a vile name.
11  Q. What was the name?
12  A. It was a vile name.
13  Q. What was the vile name?
14        MR. FUKUDA: Objection.
15  A. He allegedly called him a nigger.
16  Q. Do you know what happened to these
17    allegations -- first of all, allegation of
18    complaint of Mr. Lincoln, what happened to that
19    complaint?
20  A. The complaint was not found to have any
21    substance. Mr. Ralph alleged that the
22    gentleman was hired at the same time he
23    was, was treated better than he was, and
24    was allowed to -- the City uses a six-

17 (Pages 62 to 65)

1   month probationary period to make sure
2   that the position is a fit for the
3   employee and the employee is a fit for the
4   position. Within six months the employee
5   isn't a member of the union. Mr. Ralph
6   was discharged for poor work performance.
7   The allegation that he made was the other
8   gentleman was not, and that it was because
9   he was African American, but so was the
10  other gentleman.
11  Q.  You say that the complaint was found not to have
12      any substance. Name me the person who found
13      that the complaint had no substance?
14  A.  I believe it was MDA --
15          MR. FUKUDA: MCAD?
16          THE WITNESS: Yes.
17  Q.  Did you participate in the adjudication of that
18      process in any fashion, sir?
19  A.  No.
20  Q.  The complaint made by Mr. Alphonso Francisco,
21      what happened to that complaint?
22  A.  I believe it was the same outcome by the
23      same agency.
24  Q.  By "the same outcome," what are you referring

1   to, sir?
2   A.  By the MCAD, I believe so.
3   Q.  What did that agency find, sir?
4   A.  That there was -- I believe the term is no
5       probable cause.
6   Q.  What role did you play in the adjudication of
7       the handling of that complaint?
8   A.  None.
9   Q.  Did anybody from your office play a role in the
10      adjudication of that complaint?
11  A.  The gentleman that was alleged to have made the
12      statement, Mr. Young, was interviewed by
13      the city's law department. I think it was
14      Attorney Fabiano.
15  Q.  That was the only involvement of your department
16      in the resolution of this matter?
17  A.  Yes.
18  Q.  As far as you know, did anyone from your
19      department play a role in the resolution of the
20      complaint of Mr. Lincoln Ralph?
21  A.  No.
22  Q.  Are those the only complaints of this
23      discrimination or retaliation or unfair
24      treatment that you are aware of since have you

1   been director of Central Fleet Maintenance, sir?
2   A.  I had a complaint from a female employee
3       about language being used in her office.
4   Q.  What type of language was she complaining about,
5       sir?
6   A.  One of the foreman was shouting and
7       swearing and using profanity.
8   Q.  What happened to her complaint, sir?
9   A.  I investigated the complaint, met with the
10      individual involved.
11  Q.  You met with the foreman?
12  A.  Yes.
13  Q.  Who was the foreman, sir?
14  A.  Ted Meyers.
15  Q.  What happened next, sir?
16  A.  I told him that was an unwelcome, unwanted
17      behavior. And that any further instance
18      would lead to disciplinary action. Then I
19      met with the lady.
20  Q.  What was the lady's name, sir?
21  A.  Donna Haskins.
22  Q.  Where does she work? What department does she
23      work in?
24  A.  She works in the heavy shop.

1   Q.  Is she a mechanic?
2   A.  No, she is a service writer.
3   Q.  What happened next, sir?
4   A.  I informed her of my meeting with Mr. Meyers
5       and told her that if she wanted to pursue
6       it, she had other options. She indicated
7       as long as it stopped, she was satisfied.
8   Q.  Those are the only complaints of retaliation,
9       harassment, discrimination or unfair treatment
10      that you aware of from 1997 to the present?
11  A.  Yes.
12  Q.  What efforts has your office made to determine
13      whether or not there is racial harassment or
14      racial discrimination in the workplace at
15      Central Fleet Maintenance?
16          MR. FUKUDA: Objection.
17  A.  I have -- I maintain an open-door policy.
18      I have zero tolerance for any type of harassment;
19      be it gender based, race based. And I
20      invite any of the folks that I work with,
21      if they have a concern or a problem, to
22      bring it to me.
23  Q.  You say you have an open-door policy?
24  A.  Yes.

Page 70

1   Q.  How is the fact that you have an open-door
2       policy, as you state, communicated to the people
3       that work under you?  That is, individual
4       mechanics at the light and heavy shops.
5   A.  I have told them.
6   Q.  When did you tell them that?
7   A.  Any number of occasions, I couldn't tell you the
8       number of times.
9   Q.  Did you call them into a meeting and tell them
10      that?
11  A.  A number of times.
12  Q.  Is that posted -- is your allegation that you
13      have an open-door policy, is that posted in
14      writing in a conspicuous place within the light
15      or heavy shop, sir?
16  A.  No.
17  Q.  Are affirmative action policies or guidelines
18      posted or written up in conspicuous places
19      around the light or heavy shop, sir?
20  A.  Yes.  There are a number of -- there is a
21      bulletin board in both.  There is a bulletin
22      board upstairs in the office.  There are a
23      number of documents there pertaining to
24      drug-free workplace, safety in the workplace.

Page 71

1       I have not read each and every one of
2       them.  I believe the affirmative action is
3       there as well.
4   Q.  Do you remember what is in the affirmative
5       language action posted, sir?
6   A.  I do not.
7   Q.  When is the last time that you saw such a
8       posting?
9   A.  The last time I looked at a posting that
10      was pinned to the board was probably last
11      week.
12  Q.  How large is the document, sir, that is posted
13      with respect to the affirmative action language?
14      Is it an eight-and-a-half-by-11 page?
15  A.  Yes.  And I believe there are a number of
16      pages there.
17  Q.  Does your office, Central Fleet Maintenance,
18      does it provide preprinted forms on which people
19      can complain of the discrimination or harassment
20      make them available to people in the shops?
21  A.  No.
22  Q.  Have you ever talked to Union Local Council 93,
23      have you ever talked to the union about issues
24      involving employment discrimination on account

Page 72

1       of race, color, sex, harassment or retaliation?
2   A.  When Donna complained, Donna Haskins, complained
3       to me about Teddy, I believe she also told
4       the shop steward.  I informed the shop steward,
5       I believe it was the president, it was
6       Darlene, because it was a lady.  I informed her
7       of what I had done and I had spoken with
8       Donna and she was satisfied with the steps
9       that I had taken.  So the answer to your
10      question is yes.
11  Q.  What is Darlene's last name?
12  A.  Darlene Gregoria.
13  Q.  She is president of Council 93?
14  A.  No.  She was president of the Local that
15      the folks Central Fleet are in or some
16      of the folks Central Fleet are in.
17  Q.  Have you asked, apart from this one instance
18      with Miss Haskins that you mentioned, have you
19      ever asked the union for any advice or
20      assistance or input with regard to issues of
21      racial discrimination or racial harassment or
22      retaliation?
23  A.  No.
24  Q.  Has the union ever discussed with you any issues

Page 73

1       with respect to racial harassment or racial
2       discrimination or retaliation?
3   A.  No.  The union rep complained about Teddy
4       hollering at the guys on the floor.
5   Q.  What did the union rep say?
6   A.  It wasn't a specific charge.  Just that
7       they wanted him to quit him hollering and
8       swearing at people.  A general statement,
9       not that he swore at individual A or B.
10  Q.  What did you do as a result of that complaint by
11      that union rep?
12  A.  That was prior to the complaint that Donna
13      made against Teddy.  And I visited with
14      Mr. Meyers.
15  Q.  Mr. Meyers is a white male; correct?
16              MR. FUKUDA:  Objection.
17  A.  Yes.  Mr. Meyers, yes.
18  Q.  Is there an internal mechanism at Central Fleet
19      Maintenance within the City of Boston for
20      investigating complaints internally of racial
21      discrimination or racial harassment or
22      retaliation?
23  A.  I believe so, yes.
24  Q.  Can you describe this mechanism for me, please,

Page 74

1    sir?
2  A.  No. The gentleman that is in charge of
3      it, is a fellow by the name of Bill Kessler.
4  Q.  How do you spell the last name?
5  A.  K-E-S-S-L-E-R, I believe.
6  Q.  That's as you know about it that Mr. Kessler is
7      in charge of it?
8  A.  He conducts the investigations.  There was
9      a non-public works -- in fact, I'm not
10     sure. I think he came there as a gentleman
11     from the Public Health Commission that was
12     in the driving school that made a complaint
13     about the driving instructor and Mr. Kessler
14     investigated.
15  Q.  Do you know the name of the person who made the
16     complaint?
17  A.  I do not.
18  Q.  That's all you know about this investigative
19     mechanism?
20  A.  It is conducted from City Hall. Kathy can
21     probably tell you how it works.
22  Q.  Are there any documents that describe how it
23     works, sir?
24  A.  I don't know.

Page 75

1  Q.  How is overtime so awarded that Central Fleet
2      Maintenance?  What is the process?
3          MR. FUKUDA: Objection.
4  A.  It's on an as-needed basis. Most of our
5      overtime is consumed seasonally either in
6      prep for or in support of weather-related
7      events.  At the start of the winter season,
8      we go through the employee roster and ask
9      which shift any of the technicians or any
10     of the folks there would like to work on.
11     We can go around the clock in a snow
12     event. And we run a first shift for overtime
13     and a second shift for overtime.  We try
14     to accommodate folks that have
15     baby-sitting issues or a spouse that has a
16     work issue; that type of thing.  The
17     overtime is offered on an as-needed basis
18     based on the workload of the shop.
19  Q.  Are there records kept that would show which
20     employees worked overtime, within the last two,
21     three years?
22  A.  Yes.
23  Q.  Those records are kept by what department?
24  A.  Payroll.

Page 76

1  Q.  How do you insure that there is no racial
2      discrimination in the award of overtime?
3          MR. FUKUDA: Objection.
4  Q.  What steps do you take to guard against that?
5          MR. FUKUDA: Objection.
6  A.  The overtime provision is offered to
7      everyone equally.  There is not -- it's by
8      shift.  There are X number of folks,
9      whatever X equals on that shift.  When the
10     shift works, anybody that is on that shift
11     that can work, works.
12  Q.  Do you do you anything specific to find out one,
13     whether there is a racial discrimination in the
14     award of overtime and do you do anything to
15     prevent or to insure that there is no
16     discrimination in the award of overtime?
17          MR. FUKUDA: Objection.
18  A.  No.
19  Q.  The position for which Mr. Diaz applied in 2000,
20     that is the motor equipment repair foreman, what
21     was the standard salary for that position?
22  A.  I don't know.  I would have to go back and
23     look.
24  Q.  Do you know what the current salary is for motor

Page 77

1      equipment foreman?
2  A.  As of the date of this posting, it started
3      at $750 a week approximately.
4  Q.  What is it today?
5  A.  I do not know.
6  Q.  Are there step increments?
7  A.  Yes.
8  Q.  How often do the increments take place?
9  A.  Once a year.
10  Q.  If that position was posted, would there have
11     been at least three increments?
12  A.  I believe the contract expired in '02.  I
13     don't believe it has been successfully
14     renegotiated.  I believe the last step was
15     3 percent, I think.
16  Q.  Three percent per year?
17  A.  If it follows through, it would be three
18     percent per year, I think.  Kathy could
19     tell you better.
20  Q.  What are the fringe benefits that go with the
21     position of motor equipment repair foreman?
22  A.  The city uses a cafeteria style health
23     benefit plan where the employee can pick
24     and choose from like an HMO to full-blown

20 (Pages 74 to 77)

Page 78

1    Blue Cross/Blue Shield and the City pays
2    some and the employee pays some; depending
3    on which particular thing they pick.
4    There are, I believe, 13 paid holidays.
5    After a six-month probationary period,
6    there is a week's vacation and after 12
7    months there is a second week. Then it
8    progresses in stages from there. Each
9    employee, it depends on their union
10   affiliation receives a number personal
11   days a year to see as they see fit. They
12   accrued a certain number of hours of sick
13   time for every month that they work.
14 Q. How was Mr. Diaz notified that he had not been
15   directed for the position that is the subject of
16   Exhibit 2?
17 A. I met with them personally.
18 Q. Do you remember the date on which you met with
19   him?
20 A. I don't. I have a note in my file.
21 Q. Do you know how long after the interview it was
22   that you met with Mr. Diaz?
23 A. I don't. I have would to refer to the
24   notes in my file.

Page 79

1 Q. Where did you meet with Mr. Diaz?
2 A. In my office.
3 Q. Did you call him to your office?
4 A. I did.
5 Q. What did you tell him?
6 A. That he, as the senior candidate for the
7    position, had not been selected.
8 Q. What else did you tell him?
9 A. That he was deficient in, I believe, it
10   was three areas; job knowledge, communicative
11   skills and leadership; I think. Again, I
12   would have refer to my notes.
13 Q. What else did you tell him?
14 A. That's basically it.
15 Q. Did you give him anything in writing at that
16   time explaining the reasons for your decision?
17 A. I think I gave a copy of the notes. I'm
18   not sure.
19 Q. A copy of which notes?
20 A. The note that I had in my file after the
21   meeting with him.
22 Q. You have the original of this note in your file?
23 A. Yes.
24 Q. Who else was present at that time?

Page 80

1 A. No one; just Rod and I.
2 Q. What did Mr. Diaz say when you told him about
3    it?
4 A. He was disappointed. I can't remember exactly
5    what he said.
6 Q. He said he was disappointed?
7 A. I believe so.
8 Q. Anything else that you can recall him saying?
9 A. No.
10 Q. How long did that meeting last?
11 A. 15 minutes, half hour.
12 Q. Now, you had mentioned that there were three
13   criteria that you looked at in connection with
14   candidates for the positions, the one that Mr.
15   Musto got?
16 A. Yes.
17 Q. Now, apart from the posting that is marked
18   Exhibit 2, what notification was given to Mr.
19   Diaz with respect to what was expected of him in
20   this interview?
21 A. There wasn't any notification given to
22   anybody other than the date and time of
23   their interview.
24 Q. So that's all he knew is that there was an

Page 81

1    interview at a certain time and place?
2 A. Yes.
3 Q. How was he notified of that, sir, in writing or?
4 A. I believe orally.
5 Q. By you?
6 A. By the secretary for the division, which
7    would be a lady by the name of Liz McCalaugh.
8 Q. Did Mr. Diaz have a right to appeal the decision
9    that you made? That is award a position of Mr.
10   Musto internally?
11 A. Yes. The appellate procedure is a grievance.
12 Q. Do you believe that the selection process that
13   was used with respect to Exhibit 2 was
14   discriminatory with respect to Mr. Diaz, sir?
15      MR. FUKUDA: Objection.
16 A. No.
17 Q. Subsequent to Mr. Diaz's filing of the charge of
18   discrimination in employment as a result of
19   denial of the position, have you had any
20   discussion with anyone at the office of human
21   rights with respect to Mr. Diaz's charge and his
22   allegations?
23 A. No.
24 Q. Have you had any discussion with Mr. Casazza

Page 82

1  with regard to Mr. Diaz's allegation, his
2  complaint?
3  A.  No.
4  Q.  Have you had any discussions with any supervisor
5  officials with respect to Mr. Diaz's charges and
6  allegations?
7  A.  Yes.
8  Q.  With whom have you had those discussions, sir?
9  A.  With attorneys in the law department and
10  with Kathleen Kelley.
11  Q.  Anybody else?
12  A.  No.
13      MR. FUKUDA:  Can we take a quick
14  break.
15      (Break in the proceedings.)
16  BY MR. KENDALL (CONT'D):
17  Q.  Sir, since the filing of Mr. Diaz's grievances,
18  his charges with MCAD as a result of the denial
19  of the position of motor equipment repair
20  foreman, have you done any review of the
21  selection procedures used to choose people as
22  foreman?
23      MR. FUKUDA:  Objection.
24  A.  Yes.

Page 83

1  Q.  Could you tell us what review you have you done,
2  sir?
3  A.  I have increased the number of people that
4  are on the interview committee.  I have gone
5  to an oral interview.  The union raised
6  some issues about some of their folks not
7  -- being very nervous during an interview.
8  They were required to write answers to
9  something.  And in attempt to address
10  those concerns, I went to an oral interview
11  giving them a copy of the interview
12  questionnaire so that they could follow
13  along.  And to get more input, the
14  interview contains both objective and
15  subjective points to try to get more input
16  other than just a superintendent or two
17  and myself.
18  Q.  What factors caused you to make these changes or
19  additions, if you will, to the process?
20  A.  As a result of the first interview, Rod,
21  Scott, Arthur and William Caughlin filed a
22  grievance.  And one of the concerns that
23  the union brought up in the grievance
24  procedure was that they were concerned

Page 84

1  that some folks didn't answer written
2  questions as well as others, or they got
3  nervous, but they could verbalize an
4  answer better than they could record it.
5  That the folks involved in the interview
6  could possibly like or dislike any
7  individual more or less than another
8  individual.  That's why we went to the
9  oral interview and expanded the size of
10  the folks that were doing the interview.
11  Q.  When were those changes implemented, sir?
12  A.  I would have to look back at my records.
13  It would be sometime in 2000 or 2001.
14  Sometime between the first and the second
15  position that Rod interviewed for.
16  Q.  These changes came about as a result of the
17  union grievance that was filed by the union?
18  A.  The grievance was filed by the three
19  gentleman that were senior to the individual
20  that was picked.  The changes came about
21  because I wanted to make sure I was addressing
22  the union's concerns in those areas.
23  Q.  Any other reasons for the changes, sir?
24  A.  No.

Page 85

1  Q.  Are you satisfied, sir, that the changes that
2  you have made address any issues, possible
3  issues, of racial discrimination in the
4  selection procedures?
5      MR. FUKUDA:  Objection.
6  A.  Yes, I'm sure.
7  Q.  How do you think the changes that you have made
8  could address any possible issues of racial
9  discrimination or harassment or retaliation?
10      MR. FUKUDA:  Objection.
11  A.  The fact that someone's race or gender or
12  national origin has no bearing whatsoever on
13  either the interview or the position.
14  I don't particularly care what particular
15  race or gender or national origin anyone
16  is.  I'm simply trying to find what I
17  perceive to be the best candidate for the
18  job.  And with help and input from the
19  folks that I have asked to be resources in
20  that area, I think we do a pretty good job.
21  Q.  Why was Mr. Maurice Smith added to the list of
22  interviewers?
23      MR. FUKUDA:  Objection.
24  A.  Maurice is an instructor for finance for

Page 86

1    the army. He teaches finance. He is
2    active in the military reserve. One of
3    the things that we do, one of the issues
4    that we raise are subjective questions
5    where there isn't a right and wrong answer.
6    As an instructor, Maurice has excellent
7    people skill's. And that's the reason why
8    I asked him to assist us in that process.
9    Q.  Did you ever consider any alternatives, sir, to
10    the process that was used to select Mr. Musto
11    and Mr. Monahan for the position that Mr. Diaz
12    had applied?
13        MR. FUKUDA: Objection.
14   A.  Any alternatives to the process?
15   Q.  Yes. You mentioned a process where you had an
16    interview with an interview committee. Did you
17    consider any other means of selecting someone
18    for the foreman position other than what you
19    used with regard to Mr. Diaz?
20   A.  No.
21   Q.  Why not?
22   A.  Because what we utilize, in my opinion,
23    works very well.
24   Q.  You never heard from anyone within the City of

Page 87

1    Boston that the process that they were using or
2    used to select candidates for the foreman
3    position was discriminatory or unfair? No one
4    from the City ever told that you; is that a fair
5    statement?
6        MR. FUKUDA: Objection.
7    A.  No.
8    Q.  Did you participate in the arbitration
9    proceedings in a case involving Mr. Diaz's
10    grievance?
11   A.  Yes.
12   Q.  The one in which Betty Walkman was the hearing
13    officer?
14   A.  I don't recall her name, but it was a lady.
15   Q.  That was sometime in 2002?
16   A.  I believe so. I would have to look at the
17    dates.
18   Q.  You were a witness, were you not?
19   A.  Yes.
20   Q.  You testified under oath?
21   A.  Yes.
22   Q.  And when you testified, you had your lawyer with
23    you? Was there a lawyer from the City with you?
24   A.  There was a city attorney there.

Page 88

1    Q.  Who was the City attorney with you, sir?
2    A.  I think it was a gentleman by the name of
3    Martin Roche. But again, I'm not sure. I
4    would have to look.
5    Q.  Martin Roche?
6    A.  I think that was his name.
7    Q.  Where did you go for these arbitration
8    proceedings, sir? Where were they held?
9    A.  I think that was up by Ashburton Place.
10    I'm not sure. It was not in City Hall.
11   Q.  Do you remember how long you were on the witness
12    stand? For how long a period you testified?
13   A.  I don't know.
14   Q.  Was it a day, a half a day, quarter of a day?
15   A.  I think it took the best part of the day,
16    if I recall.
17   Q.  Did you see Mr. Diaz during those proceedings?
18   A.  Yes, he was there.
19   Q.  Did you hear him testify?
20   A.  I believe so.
21   Q.  You heard what his explanation was as to why he
22    felt he was a victim of discrimination, did you
23    not?
24        MR. FUKUDA: Objection.

Page 89

1    A.  No.
2    Q.  You heard him testify, did you not?
3    A.  Yes.
4    Q.  Did you not hear him testify as to what he
5    believed were discriminatory reasons for the
6    non-appointment to the position?
7    A.  No.
8    Q.  He didn't testify with respect to
9    discrimination?
10   A.  I don't believe so.
11   Q.  Okay. You were asked to testify by your lawyer.
12    Your lawyer examined you, led you through the
13    proceedings?
14   A.  Yes.
15   Q.  Were you cross-examined by any other attorney?
16   A.  The attorney for the union.
17   Q.  Who was the attorney for the union?
18   A.  I don't know.
19   Q.  How many people testified on behalf of the City
20    at that time in those arbitration proceedings?
21   A.  I think that is Kathy Kelley, and I don't
22    remember whether Jerry Caughlin was there
23    or not. I don't think so. I don't know.
24    I think it was Kathy Kelley and I.

23 (Pages 86 to 89)

EYAL COURT REPORTING, INC., BOSTON, MA (800) 322-3925

Page 90

1   Q.   Have you testified or participated in any other
2        proceedings with respect to Mr. Diaz's complaint
3        of racial discrimination apart from the
4        arbitration proceedings?
5   A.   No, the arbitration proceedings had
6        nothing to do with any discriminatory
7        proceeding.
8   Q.   What is your understanding as to what the
9        arbitration proceeding concerned?
10  A.   It was the senior candidate for the
11       position was not picked. That we, the
12       City, had violated the laws of -- the
13       language of the contract. It had nothing
14       to do with the discriminatory practice
15       whatsoever.
16  Q.   It is a fact that Mr. Diaz was the most senior
17       person who applied for the position, correct?
18  A.   That's correct.
19  Q.   The person who got the position how old is he or
20       -- how old was he at the time he got the
21       position?
22  A.   How old was he? I haven't got a clue.
23  Q.   He was younger than Mr. Diaz, was he not?
24            MR. FUKUDA: Objection.

Page 91

1   Q.   You may answer.
2   A.   I don't know.
3   Q.   He is the same age as Mr. Diaz, you think?
4   A.   I don't know that either.
5   Q.   Did he have more seniority than Mr. Diaz?
6   A.   No. The seniority was the question.
7   Q.   By how many years is Mr. Diaz senior to
8        Mr. Musto?
9   A.   Mr. Musto wasn't part of that.
10  Q.   What do you mean "Mr. Musto wasn't part of that"?
11  A.   Mr. Musto wasn't part of the grievance.
12  Q.   Was it Mr. Monahan?
13  A.   Mr. Monahan, again, I would have to look
14       at the records. Mr. Diaz has seniority
15       over Mr. Monahan as did Mr. Caughlin and
16       Arthur. How much, I don't know.
17  Q.   Isn't it also a fair statement that Mr. Diaz was
18       more senior than Mr. Musto?
19  A.   Yes, I believe so. Yes, he does.
20  Q.   Was it not the practice of DPW to award the
21       position, the foreman's position, to the most
22       senior person?
23  A.   No.
24  Q.   Was that the practice?

Page 92

1   A.   Not at Central Fleet.
2   Q.   Never has been?
3   A.   Never has been at Central Fleet.
4   Q.   You are saying that all the people who were
5        appointed as supervisors went through the same
6        process that Mr. Diaz went through to become
7        supervisors from 1997?
8   A.   That's correct.
9   Q.   Every person that was appointed went through the
10       same interview process?
11  A.   Regardless of the position. From parts help to
12       clerical help.
13  Q.   Who was the first person who was appointed as a
14       foreman under your watch from 1997?
15  A.   I believe it was Al Young.
16  Q.   What process did he go through to find the
17       position?
18  A.   Same thing.
19  Q.   Can you tell me about that?
20  A.   The interview process.
21  Q.   Who were the interviewers?
22  A.   Bob Silvey, Jerry Caughlin and myself.
23  Q.   Did Mr. Young have to do a written portion of
24       the interview?

Page 93

1   A.   Yes. At that point, we were still having
2        the candidate. In fact, that was the first one
3        that I did. The candidate was still filling out,
4        fill in the blanks, answer the questions;
5        type of things.
6   Q.   Copies of those results, scores of Mr. Young,
7        are they maintained in the normal course of
8        business by the City of Boston?
9   A.   Not by the City. By me. I believe I have
10       those first two or three.
11  Q.   You have the document that Mr. Al Young completed
12       in connection with the interview?
13  A.   I think so.
14  Q.   Are those in your files at Central Fleet?
15  A.   Yes, I think so.
16  Q.   So you are saying that every person that was
17       ever appointed to a foreman's position --
18  A.   Any position.
19  Q.   -- let me stick to the foreman's position --
20       since 1997 had to go through the same process
21       that Mr. Young went through and Mr. Diaz went
22       through, the very same process?
23  A.   Exactly.
24  Q.   You have all those notes in your files?

24 (Pages 90 to 93)

Page 94

1  A.  I'm not certain about the first couple,
2      but yes, from 2000 on, I have all of them.
3      I'm not sure -- Mr. Young was in the position
4      when Central Fleet was formed for public
5      works. He was acting in the position.
6      The gentleman that had the position prior
7      to that, prior to my coming to the City, I
8      believe, had retired. Mr. Young was acting in a
9      temporary capacity.
10 Q.  Who placed Mr. Young in the temporary capacity?
11 A.  No idea.
12 Q.  Did you ever try to find out?
13 A.  No. Never had a reason to.
14 Q.  How does one get to be placed? How does one
15     come to be placed in a temporary position?
16 A.  By the superintendent of the shop that is
17     involved.
18 Q.  Was Mr. Monahan in a temporary acting position
19     before he was interviewed for the position as
20     foreman?
21 A.  Yes.
22 Q.  Who placed him in that position?
23 A.  Jerry Caughlin.
24 Q.  Do you know what criteria Mr. Caughlin used to

Page 95

1      place Mr. Monahan in a temporary position?
2  A.  His own perception that Jerry could handle
3      the job. There is no formal process.
4  Q.  Was Mr. Musto placed in a temporary acting
5      position before he was interviewed for the
6      foreman's position?
7  A.  Yes.
8  Q.  Who placed Mr. Musto in the position as a
9      temporary acting?
10 A.  Bob Silvey.
11 Q.  What were the criteria used by Mr. Silvey to a
12     place Mr. Musto in a temporary acting position?
13 A.  He thought that he would be the best fit for
14     the job.
15 Q.  Bob Silvey is white, right?
16     MR. FUKUDA: Objection.
17 A.  I'm sorry?
18 Q.  Bob Silvey is a white male?
19 A.  Yes.
20 Q.  Are there any notes or documents that are set
21     forth, as far as you know, the reasons why Mr.
22     Silvey placed Mr. Musto in an acting position?
23 A.  No.
24 Q.  Are there documents, notes or memoranda in

Page 96

1      existence that set forth the reasons why
2      Mr. Caughlin placed Mr. Monahan in an acting
3      position?
4  A.  No.
5  Q.  Did you ever investigate to determine whether any
6      of those placements either Mr. Monahan or Musto
7      in acting position was racially discriminatory?
8      MR. FUKUDA: Objection.
9  A.  No.
10 Q.  Did it ever occur to you that it might have been
11     discriminatory?
12     MR. FUKUDA: Objection.
13 A.  No.
14 Q.  As you sit here today, does it occur to you that
15     they might be discrimination --
16     MR. FUKUDA: Objection.
17 Q.  -- to place those white males in those temporary
18     positions?
19     MR. FUKUDA: Objection.
20 A.  No.
21     MR. KENDALL: I have no further
22     questions of this witness.
23     (Time noted 2:00 p.m.)
24

Page 97

1    COMMONWEALTH OF MASSACHUSETTS
2    COUNTY OF SUFFOLK, SS.
3        I, Lori J. Atkinson,
     Professional Court Reporter and Notary
     Public duly and qualified in and for the
4    State of Massachusetts do hereby certify
     there came before me the deponent herein,
5    namely DAVID HIGGINS, who was by me duly
     sworn to testify to the truth and nothing
6    but the truth concerning the matters in
     this cause.
7        I further certify that the
     foregoing transcript is a true and correct
8    transcript of my original stenographic
     notes.
9        I further certify that I am
     neither an attorney or counsel for, nor
10   related to or employed by any of the
     parties to the action in which this
11   deposition is taken; and furthermore, that
     I am not a relative or employee of any
12   attorney or counsel employed by the
     parties hereto or financially interested
13   in the action.
14
         IN WITNESS WHEREOF, I have
15   hereunto set my hand and affixed my
     Notarial Seal this 5th day of April, 2004.
16
17       LORI J. ATKINSON
         NOTARY PUBLIC
18
     My commission expires:
19   December 8, 2006
20       ***PLEASE NOTE***
     THE FOREGOING CERTIFICATION OF THIS
21   TRANSCRIPT DOES NOT APPLY TO ANY
     REPRODUCTION AND/OR DISTRIBUTION OF THE
22   SAME BY ANY MEANS UNLESS UNDER THE DIRECT
     CONTROL AND/OR SUPERVISION OF THE
23   CERTIFYING COURT REPORTER.
24