UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
C.A. # 05-10154-NG

| | |
|---|---|
| RODERICK DIAZ | MEMORANDUM IN SUPPORT OF OPPOSITION TO SUMMARY |
| v. | JUDGMENT **and in support of** PLAINTIFF'S CROSS-MOTION FOR |
| DAVID HIGGINS et al. | SUMMARY JUDGMENT |

FACTS:

Plaintiff is a black male, who was born in Trinidad. Plaintiff is a citizen of the United States.

In 1986, plaintiff began to work for the City of Boston at the Department of Public Works, as a motor equipment repairman. Prior to his employment with the City, plaintiff had worked as a mechanic in Trinidad and at numerous garages in Massachusetts and had certificates showing his training in the field of auto mechanics. RSOF, 57.1 Plaintiff was qualified for the employment and satisfactorily discharged his duties. Ex.B, #5.

Diaz has served in the capacity of Temporary Foreman of the Shop when Al Young, placed him in that position. Young had told Diaz that he would be the next foreman, that he was right in line because he had the most knowledge and was the most senior-qualified person in the shop. RSOF # 50; 60-61. Higgins knew that Diaz had served as Acting Foreman. RSOF #53.

Complainant applied for a position of "Working Foreman" in the Light Shop in 1999 and was denied the position. Complainant filed a Grievance over the discriminatory denial. Tr.(D) 61-2.

David Higgins, is the white male Director of Central Fleet Maintenance of the DPW.

Higgins has testified at a Rule 30(b)(6) deposition on behalf of defendant City of Boston, that there were eight supervisory positions at

1

CFM, two foremen in each shop; a general foreman in each shop and two superintendents. Six of these individuals are white males. PSOF #2-3.

The current African American Superintendent of the Light Shop, Maurice Smith, was appointed to that position in January or February, '03. PSOF #4.

Higgins testified that in connection with plaintiff's interview for the position of MERF, in 1999, the candidates were asked a number of questions which were designed to test: education, job knowledge and experience. It appears that contrary to this claim, Higgins did not evaluate Diaz on these criteria but rather in other areas. Indeed, Higgins submitted an Affidavit, Ex.H, in which he asserted that Diaz had deficiencies in the areas of: "leadership skills; communication skills and job knowledge". RSOF #16.

Higgins recommended a white male, James Monaghan, for the position as MERF. Monaghan did not possess experience as a mechanic or job knowledge which was comparable to Diaz'. Monaghan had no experience in the Shop and used to come over to CFM from the Boston Traffic Department while overtime was being performed, to learn about the heavy equipment. Diaz, among others, would show Monaghan how the heavy equipment worked. RSOF #21.

All of the persons who served as members of the interview panel in connection with Diaz' 1999 application for promotion, were white: Higgins, Robert Silvey and Jeremiah Coughlin. RSOF #13.

Coughlin was promoted from the position of general foreman to Superintendent in 1998. Even though the defendants have contended that all of the persons who were promoted at CFM after its institution, underwent the same "interview" process, the facts relative to Coughlin's promotion, show otherwise. Coughlin testified that there was an application process which called for an interview by the Director of Operations, Chuck Moralli and that was all that was required. Coughlin testified that his job experience, training, knowledge and education were

also considered. He said that the claimed qualifications were shown by certificates for the classes which he took and which were in his personnel file. Coughlin did no more than respond to "oral questions" which were posed during the interview itself and not during a separate proceeding. RSOF #57.

Higgins' testimony makes it clear that unlike the procedure during Coughlin's interview, there was no consideration of plaintiff's extensive background and experience as a mechanic nor of the certificates which showed all the training he had successfully completed.

The questions which were posed to Diaz were subjective and were not content-validated. The questions, which Higgins prepared, without any input from the Human Resources Department of the City or from Kathy Kelley, Principal Personnel Officer of the DPW, did not meaningfully probe plaintiff's job knowledge and experience as a mechanic and did not show that a person appointed by virtue of provision of the "correct" answers was likely to competently discharge the duties of a MERF. PSOF #6;18-19; 28.

The questions allegedly posed during the interview, did not seek to ascertain plaintiff's record of performance in the position either as a MER or temporary MERF. Coughlin testified that he did not look at Diaz' performance evaluations. RSOF #15. Likewise, Higgins did not speak to Teddy Myers, Diaz' foreman to find out how Diaz had performed in the position. As temporary foreman, Diaz would distribute jobs to the mechanics. Diaz worked for one month, more or less, during 1997 as a temporary foreman but did not receive any additional compensation for such work. RSOF #15.

Prior to Diaz' 1999 application for the position of MERF, it was the custom at the DPW to appoint foremen based on seniority. Ex. Q #11. This practice led to a situation whereby all of the supervisory officials at CFM in 1999, with the exception of Fitzroy Prescott, were white. Ex.Q, #11. In fact, prior to Diaz' 1999, application, there was no interview

3

process for the foreman's position. The City and Higgins invented the interview process only when Diaz, a black male, applied for the position in 1999. RSOF # 33. Prescott was not appointed as a MERF by operation of Higgins' interview process. Rather, Prescott became a MERF by virtue of Ch.282 of the Civil Service Act and his appointment was permanent as of 9/9/98. PSOF #6.

With regard to the plaintiff's applications for the MERF in 1999, and 2001, the purported use of defendants' interview process had never led to the selection of a black person as MERF. PSOF #9.

The superintendent of a shop would decide whom he would place in a temporary position. The white male supervisors were in the habit of placing other white males in Acting or Temporary Positions, as Foremen, whereby they would gain experience not available to black mechanics. Thus, when a vacancy was formally posted, the white Temporary Foreman would have an advantage during the application process in that he would be given credit for his "experience" in the position. SOF #60; Ex.Q, #12.

The City placed Maurice Smith, a black male, on the interview panel in connection with plaintiff's '01 application. At the time of this interview, Smith had not yet been appointed as a Superintendent at CFM. Indeed, the City did not promote Smith to this position until, January or February, '03, well after the date on which plaintiff protested against the denial of his application and raised a grievance with the union and his filing of a Charge at MCAD in June, '00. RSOF # 59; PSOF # 4.

It cannot be disputed that the defendants were aware that plaintiff raised a grievance with the union over his non-selection in 1999 and that he went through the stages with Mr.Casazza (Commissioner of the DPW). Diaz had his union attorney, a certain Attorney Cucuzo, grieve the matter. He met perhaps twice with his attorney and the matter which went to arbitration. RSOF #65.

After the plaintiff's protest against the denial of the promotion in 1999, the defendants never again appointed him to an acting Foreman's

position. Diaz had worked, intermittently over a two year period as Acting Foreman. Defendant Higgins instructed another black male, Fitzroy Prescott to go to the office at which Diaz worked as Acting Foreman to tell him that he (Prescott) would be in charge of that office, until the regular foreman returned. RSOF #62. Al Young had no authority with regard to appointing Diaz to an acting Foreman's position. Diaz did inform Young of his ouster from the temporary Foreman's position. Young, a white male, told plaintiff that the decision was made in the office upstairs. RSOF #59.

      Even before the results of the interview process relative to Diaz' '99 application were officially announced, James Monaghan, the white male successful candidate approached plaintiff and invited him, on two occasions to "shake his hand"- to congratulate him (Monaghan) on the new appointment. Diaz expressed surprise at this tactic since the results of the interviews had not been made known.

      Monaghan also accosted plaintiff on two separate occasions, thereafter, asking plaintiff where was his grievance paper. This made Diaz feel depressed and sick. Diaz felt that Monaghan was being funny and racist. RSOF #88.

      After Diaz had been ejected from the temporary foreman's office, co-workers would harass him telling him that he had been kicked out. Diaz would say nothing and would keep his own company. RSOF #88.

      Starting in January, '00, Diaz began to experience nightmares, loss of appetite, headaches and pain in his stomach and wanted to leave the City. RSOF #88. Diaz told his physician, Dr. Roy Rubin about what was going on. He told him that he was sick about the job. Every time he thought about the job, Diaz would get a headache and his stomach would hurt. He would talk to his wife about the job and would aggravate her. RSOF #88.

      Diaz would arrive at the job site generally 15-20 minutes early, he would go to his area and wait for work. Generally plaintiff would be

alone, reading the newspaper, although there would sometimes be one or two other employees there. Diaz would not discuss his private business and would keep to himself. RSOF #88.

In connection with Diaz' second application for promotion to MERF, in '01, Higgins has testified that Diaz was the most senior applicant and had more seniority than the successful white male applicant, Paul Musto. RSOF #44.

After the denial of this second application, Higgins told Diaz that he lacked communication skills and wanted to "school" him. Diaz viewed these comments as racist and as a pretext for the denial of the promotion. Diaz has testified that he was born in Trinidad (a former British colony and country in which English is the official language) that he had good communication skills and that he had spoken English in Trinidad. RSOF #70. Based on these comments and on the fact that prior to '01, Higgins had not appointed any black person to a permanent supervisory position at CFM, Diaz concluded that Higgins did not like black people and was a racist. RSOF #68-70.

The defendants had not established any written criteria for the award of overtime. Ex.B #30. In connection with overtime, the defendants would call (i.e., telephone at their homes) the white employees first and the black employees, last. The supervisors were supposed to make telephone calls to employees from a list, in alphabetical order. However, Diaz discovered that supervisors would untruthfully claim that they had telephoned him, when, in fact, he had received no calls. It appears that the supervisors may have deliberately dialled the incorrect telephone number. RSOF #80.

Diaz complained to the union over the discriminatory award of overtime. However, the union was no better than the City and did nothing, even though it promised that plaintiff would work on the following overtime. RSOF #83.

Kathleen Kelley, a white female and Principal Personnel Officer of the DPW, appointed to her position in 1985 by Mr.Casazza, testified that the City of Boston ("City") does have Affirmative Action Guidelines and an Affirmative Action Programme. The Affirmative Action Officer is a certain William Kessler, a white male, whose office is situated in Room 612 of City Hall. PSOF # 10- 12. Ms.Kelley did not know what the affirmative action guidelines of the EEOC say nor whether they contain language which addressed "employee selection" and breakdown of employees by race. PSOF # 12. Indeed, Kelly testified that she did not know whether there was an imbalance as between the number of black versus white supervisors and that it was not part of her job to know the racial breakdown of supervisory officials in the various departments. PSOF # 14. As part of her job description, Kelley tracks all racial quotas which are then compiled by the City's office of Human Resources. Kelley would compile a list of names of employees by race and job title and would provide that information to the Department of HR at least once per year. PSOF # 15.

Kelley claimed that the measures which her office takes to ensure that there is no racial discrimination in CFM involves her review of any transactions made by managers in the hiring or disciplinary process. PSOF #16.

Kelley testified that she does not use any documents, guidelines or memoranda to help her in determining whether there is a problem with racial discrimination in decisions made within CFM, she said that she used her own knowledge. PSOF # 17.

The EEOC Guidelines on Employee Selection Procedure apply to municipalities such as the City. The provisions of 29 CFR Part 1607- Uniform Guidelines on Employee Selection Procedures and specifically, the language of S.1607.2, **apply to tests and other selection procedures which are used as a basis for any employment decision.** The strictures of S.1607.4 (a) posit that Each user is required to maintain and have

7

available for inspection, records or other information which will disclose the impact which its tests and other selection procedures have upon employment opportunities of persons of identifiable race, sex or ethnic group. The provisions of S.1607.4(D) are as follows: **A selection rate for any race or ethnic group which is less than four-fifths (4/5) (or eighty percent) of the rate for the group with the highest rate, will generally be regarded by the Federal enforcement agencies as evidence of adverse impact. ..."** PSOF # 27, 28.

No black person had ever been appointed as a supervisor at CFM through the use of the selection procedure involving the "interview" format, as of '01. There was a less than eighty percent success rate of black applicants (as compared to white applicants) for supervisory positions at CFM as of the date of Diaz' '01 interview for the MERF. PSOF #9; 22-23. The City did not perform any job validation exercise with regard to this selection procedure. PSOF #29.

Higgins did not consider any changes to the selection process because he felt that it worked very well. PSOF # 24.

The regulations contain a "Definitions" section which set forth the meaning of the terms used therein. The explication of the concepts show that employers may be held liable for disparate impact of promotional policies which are implemented in subjective and/or arbitrary fashion. The term "Selection Procedure" is described as "Any measure , combination of measures or procedure used as a basis for any employment decision". S.1607.16.(Q).

**ISSUES: (1) HAS THE PLAINTIFF MADE OUT A PRIMA FACIE CASE OF DISCRIMINATION AND RETALIATION and (2) DO THE UNDISPUTABLE FACTS PROVE DISPARATE IMPACT AND DISPARATE TREATMENT**

**ARGUMENT: THE RECORD EVIDENCE SHOWS THAT THE DEFENDANTS SUBJECTED PLAINTIFF TO DISCRIMINATION AND RETALIATION and THAT THERE WAS DISPARATE IMPACT**

**Claim of Disparate Treatment:**

A party makes out a claim of disparate treatment by showing that : He is a member of the protected class; he was qualified for the position; he was subjected to adverse action and that such adverse action was taken under circumstances which give rise to an inference of unlawful discrimination. Whiting v Jackson State Univ., 616 F.2d 116 (5th.Cir., 1979). It is not necessary that plaintiff prove that he was similarly situated in relevant ways to white co-workers and was treated less favourably than they. It is legally sufficient if plaintiff proves that he was treated worse than all potential comparators. Trustees of Health & Hospitals of City of Boston v. MCAD, 65 Mass. App. Ct. 329, 334-336 ('06).

Direct evidence of discrimination will fasten liability. Fernandez v. Costa Bros.Masonry, 199 F.3d 572, 581-3 (1st.Cir., '99). In the instant case, there is direct evidence of racism on the part of Higgins, who told plaintiff that he lacked "communicative skills" and wanted to "school" him. There is no evidence that anyone at CFM ever claimed that s/he had difficulty in "communicating" with plaintiff or he with her/him. The comments which came from a white "authority figure" were intended to belittle and demean the black plaintiff and betray an attitude of racial supremacy, conscious or not. In the implementation of employment decisions, the law tolerates no racial discrimination, subtle or otherwise. Dow v. Donovan, 150 F.Supp.2d 249, 263 (D.Mass., '01)

The employer's general policy and practice relative to employment of blacks is relevant to the consideration of the question of pretext.

The facts show that the decision making process which culminated in the denial of the promotion sought by the complainant, was subjective, arbitrary and enabled supervisory officials, all of whom (with the exception of Maurice Smith, who sat on the interviewing panel) were white, to engage in the commission of discriminatory acts under the cover of their discretionary authority.

A court will carefully examine subjective and ad hoc criteria and inconsistencies in the explanation offered by the employer for the adverse decision. Howard v. B.P. Oil Co., 32 F.3d 520 (11th.Cir., 1994).

The circumstances surrounding the creation and utilization of the interview and test procedure raise suspicions as to its bona fides. First, the facts show that prior to the Complainant's application, the foreman's position had been awarded according to seniority and that there was no interview process or test. Indeed, Jeremiah Coughlin, in connection with his promotion to superintendent in 1998, did not have to undergo the same "interview" process as did Diaz. Coughlin was interviewed by a single white male, Chuck Moralli, Director of Administrative Services and apparently relied on the certificates which he had received upon completion of some courses.

Higgins has stated that all appointments at CFM, after 1997, featured the same interview process with the same type of questions. Second, the practice had been for white supervisors to place other white males in "temporary acting" foremen's positions and then, after a period of time when they **learned on the job** and obtained supervisory skills, confirm them in the position. Third, Higgins' own testimony belies his claim that subsequent to 1997 when CFM **was created,** that all supervisors had to undergo the same testing and interview procedure as did the Complainant.

In Cook v. Billington, 59 F.E.P. 1193 (M.D.N.C., 1982) the court relied on expert testimony in ruling that in highly subjective decision making, racial bias is **almost guaranteed.** That court found a causal link between subjective decision making and racial disparities.

The general rule is that the use of subjective procedures will be carefully scrutinized, particularly if the evaluations are being made by persons who are not of the same race as the complainant. Bennett v. Veterans Admin. Med. Ctr., 721 F.Supp. 723 (E.D. Pa., 1988); Walls v. Mississippi Dept. of Public Welfare, 730 F.2d 306 (5th.Cir., 1984).

10

The fact that the selection process may have been contaminated by racial basis is a sufficient legal basis to buttress a finding for the complainant on liability for invidious racial discrimination. See, Colon v. Sorensen, 668 F.Supp. 1319 (D.Neb., 1987).

It is beyond dispute that in order to prevail, the Complainant does not have to show that he is "the most qualified" for the position. Mitchell v. Baldridge, 759 F.2d 80 (D.C. Cir., 1985). In that case the court held:

" .. that it was error for the district court to have required that plaintiff prove that he was as well or better qualified than the person chosen to establish a prima facie case .."

The employer's general policy and practice, relative to the employment of blacks, is relevant to the consideration of pretext. Conway v. Electroswitch Corp., 825 F.2d 593 (1st.Cir, 1987). Unlawful prejudice may be inferred from the employer's failure to follow its own policies or guidelines in making the employment decisions as well as any deviation from established practice. Martin v. Envelope Div. of Westvaco Corp., 850 F.Supp. 83, 92 (D.Mass., '94); Darrt v. Browning-Ferris Indus., Inc. 427 Mass.1, 17 ('98).

Even if one were to credit Higgins' allegation that the questions were designed to test for: education, job knowledge and experience, his testimony showed that he allegedly found plaintiff to be deficient in communicative skills, leadership skills and job knowledge. Therefore, it could not have been that Higgins examined Diaz in the areas in which he claimed that he had done. Nor did Higgins speak to Diaz' supervisor, Ted Myers to ascertain how he had performed in the position. This evidence clearly shows that Higgins was being dishonest in his claim as to Diaz' alleged shortcomings.

Higgins was overtly racist toward Diaz and exhibited stereotypical thinking when he told him that he lacked communication skills. Diaz was born in Trinidad, a country with a majority black population. Lipchitz v. Raytheon Co., 434 Mass. 493 ('01).

11

Furthermore, Coughlin testified that the interviewers did not look at Diaz' performance evaluations in connection with the interview. By way of contrast, when Moralli, Director of Operations, interviewed Coughlin for the position as superintendent, he apparently considered his certificates which showed his experience and job knowledge.

Higgins' testimony with regard to the weight accorded to the alleged selection criteria is at best confusing and rather farcical. He claimed that he did not weigh the criteria equally but rather as a whole. The statement is deliberately obscure in an effort to diminish or obliterate the discriminatory features of the selection process. The truth is either that the defendants weighed the claimed criteria, equally or unequally. They cannot have it both ways by contending that they weighed them "…as a whole".

The successful candidate for the '99 position, James Monaghan, a white male, certainly did not have experience, as a mechanic, which was comparable to that of the plaintiff. In fact, Monaghan would come over to CFM during overtime periods, to learn the operation of the heavy equipment. Diaz was one of those who had to show Monaghan how the equipment worked.

The defendants conveniently placed a single black male, Maurice Smith on the interview panel in '01. The timing of this placement is quite interesting. Smith did not at that time work at CFM. Diaz had already filed a grievance with his union over the discriminatory denial of 1999 and the matter went to an arbitration hearing. The defendants were attempting to insulate themselves from racial discrimination in connection with the '01 application by inserting a black person into the process. Smith was promoted to superintendent, in '03.

With regard to the '01 interview, plaintiff was the most senior qualified applicant. Higgins testified that Diaz had more seniority than the successful candidate Paul Musto, a white male.

Thus, the court may take into consideration, the fact that there is evidence that the DPW discriminates against blacks in the award of overtime, along with the claim that it discriminates in the granting of promotions. The defendants have admitted that there are no criteria for the award of overtime.

The evidence shows that white supervisors, would telephone white employees first when it came to the awarding of overtime. The employees were supposed to receive telephone calls according to an alphabetical listing of their names. The reality, according to Diaz, was that the supervisors would call the white employees first, and later untruthfully claim that they had tried to call him. Diaz testified that even though he did receive some overtime, he did not obtain as much as white co-workers and that this situation had been in effect since 1986.

Proof of the falsity of the employer's rationale for the adverse action, puts it in the same position as if it had offered no explanation at all and the presumption established by the prima facie case compels judgment for the complainant. Connell v. Bank of Boston, 924 F.2d 1169 (1st.Cir.) Plaintiff may also prevail under a mixed-motives theory. The adverse employment actions violate the law even if the illegitimate criterion was only one of a number of bases for the decision. Scott v. Sulzer Carbomedics, Inc., 141 F.Supp. 2d 154 (D.Mass.,'01).

The employer is required to use standardized scoring procedures on its tests. Brito v. Zia Co., 48 F.2d 1200 (10th.Cir., 1973) and to provide careful job analyses. Rogers v. International Paper Co., 510 F. 2d 1340 (8th.Cir.), vacated for further consideration in light of Albemarle v. Moody, 423 U.S. 8980 (1975).

Where, as here, the very system of promotion was discriminatory, the Complainant could not be legally required to show his entitlement to promotion under the discriminatory system. Hung Ping v. Hoffman, 694 F.2d 1146 (1982). In the instant case, Higgins, sua sponte, and without any input from the Commissioner or the Department of Human Resources,

concocted an interview and test procedure whose components were not job validated. There has been no showing by defendants that a successful candidate had to possess the qualities sought during the test and interview, in order to successfully fulfill the requirements of the position of foreman. This by itself, made the procedure discriminatory.

Additionally, the provisions of 29 CFR, S.1607.4 (D) show that the test or "selection procedure" has had an adverse impact on black persons. It is therefore discriminatory. See, Wards Cove v. Atonio, 490 U.S. 642, 657-8 (1989) in which the Supreme Court indicated that the EEOC Guidelines on Employee Selection are **mandatory** and Boston Police Sup. Officers Fed. v. City of Boston, 147 F.3d 13, 20-22 (1st.Cir., 1998)

Since the plaintiff has set forth a prima facie case of disparate impact, the defendants are legally obligated to consider "selection procedures" which would alleviate the discriminatory results which affect black employees. This, defendants have failed to do. Indeed, the position of both Higgins and Kathleen Kelley, Chief Personnel Officer, was that there is no imbalance in the supervisory ranks. Higgins testified that he did not consider any alternative to the selection procedures which he, on his **ipse dixit,** put in place. In Hung Ping, supra, the court ruled that in order to prevail on a disparate impact theory, the plaintiff **need only demonstrate the lack of objective criteria and a disparity in job promotions.** Once the plaintiff establishes a prima facie case of disparate impact, the burden shifts to the employer to prove either that the plaintiff's statistics are inaccurate and no disparity exists or that the practice is necessary to efficient operation of the business. Id., at 1148.

The respondent DPW is liable because: First, the statistics showing the imbalance in the ranks of supervisors, come from the testimony of defendants. Second, Higgins testified that he did not consider any alternative to use of the arbitrarily created and illegal selection device, for promotion. As a matter of law, the employer cannot show "business necessity" for the selection procedures.

The fact that there was a single person of colour, Maurice Smith, on the interview panel, does not prevent a finding of liability against the respondents. Courts have recognized that it is possible for members of the protected group to "discriminate", one against the other. In Danzer v. Norden Systems, Inc., 151 F.3d 50, 55 (2nd.Cir. 1998), the court, in reversing a grant of summary judgment for the defendant, rejected the defendants' argument that the age-based remarks of the plaintiff's supervisor, were irrelevant because he himself was old. The court said "The proposition that people in a protected category cannot discriminate against their fellow class members is patently untenable".

Under all the circumstances, a finding is justified that the use of the unvalidated, unscientific and discriminatory selection procedures, i.e., interview process and "test", was a pretext for unlawful discrimination. Rivers-Frisson v. S.E. Missouri Comm. Ctr., 133 F.3d 616, 620 (8th.Cir.).

### THE EVIDENCE SHOWS THAT COMPLAINANT WAS SUBJECTED TO RETALIATION

The evidence is that Diaz had worked, intermittently, over a period of two years as a "temporary acting" foreman. However, after he pressed his grievance with his union over the discriminatory denial of the permanent foreman's position in 1999, Higgins and the DPW removed him from that "temporary" position and never again assigned him to work in that capacity. Diaz spoke to the union's attorney about the grievance and the grievance went to arbitration. The facts show that it was Higgins who instructed Fitzroy Prescott, a black male, to notify Diaz that he was being ejected from the temporary foreman's office. In addition, the defendants never paid Diaz additional compensation for his service as temporary foreman. These facts are sufficient to warrant a finding on liability for retaliation. In addition, the defendants denied the Complainant a promotional opportunity, as part of the continuing scheme of retaliation. Diaz suffered adverse employment action in that he was

denied the opportunity to again work as a foreman and to obtain further experience in a supervisory capacity and the additional compensation which should have accompanied work in the higher category. It is not necessary to impose liability that Diaz prove that he requested assignment as a temporary foreman. The record shows that Diaz complained to Al Young, superintendent over the fact of the ouster from the temporary foreman's office and that thereby he placed the employer was placed on notice both of his protest against discrimination and of his desire to continue working as a temporary foreman. A complainant makes out a prima facie case of retaliation by showing that: He participated in statutorily protected activity; the employer was aware of such participation; he was subjected to adverse employment action; the adverse action was taken shortly after the protected activity as to warrant the inference of retaliatory animus. Clifton v. MBTA, 445 Mass. 611, 616 ('05); Bain v. City of Springfield, 424 Mass. 758, 764-5 ('97); Randlett v. Shalala, 118 F.3d 857, 862 (1st.Cir., '97).

The factual allegations of the complaint, protest or opposition, are not controlling. Parker v. B & O. R.R. Co., 658 F.2d 1012 (D.D.C., 1981). The retaliatory action may not be defended on the ground that the alleged discriminatory practices were not, in fact, discriminatory. Liability will be imposed on the respondents if retaliatory motives, contributed in any fashion, toward the taking of the adverse action.

Defendant Higgins may be held personally liable, under G.L.c.151B and C.151B(4)(4) for discrimination and retaliation against plaintiff.

Diaz became sick of the job and began to experience nightmares, headaches and stomach pain after he was denied the position in '99. These symptoms became quite noticeable around the Dr.M.L. King holiday in '00. Diaz reported these symptoms to his physician, Dr. Roy Rubin.

James Monaghan, even before the decision was announced, approached Diaz and invited him to shake his hand. Diaz was surprised as the results had not yet been published. The same Monaghan twice approached Diaz, asking him where was his grievance paper. Diaz thought Monaghan was attempting to be funny and that he was a racist.

Similarly, co-workers approached Diaz and harassed him about being kicked out of the temporary foreman's position.

This treatment made plaintiff sick. Plaintiff would go home and complain to his wife about the job and would aggravate her. Plaintiff did not immediately seek employment elsewhere because he wanted to give it another try and to see how it would work out. However, every time plaintiff would think of the way he was rejected, he would feel sick in his stomach. Plaintiff lost weight as well as sleep over the mistreatment.

Even if the evidence had shown that the defendants treated Diaz in a civil or gentlemanly fashion it would be insufficient to insulate the City from a claim of constructive termination. EEOC v. Hay Associates, 545 F.Supp. 1064 (E.D.Pa.); College Div. of Interco, Inc. v. MCAD, 400 Mass.156, 162 ('87); Ramsdell v. Western Mass. Bus Lines, Inc., 415 Mass. 673, 677-9 ('93). Here, not only did Higgins, a supervisor, act in an overtly racist fashion toward Diaz, but another white male, who was promoted over plaintiff because of racial discrimination, had the temerity to accost plaintiff and "rubbing salt into the wound", invite Diaz to shake his hand, as if he (Monaghan) had accomplished some momentous feat, based on his superior qualifications and intelligence. It was enough to make any self-respecting black male sick and annoyed. The law is that with regard to a claim for hostile environment, the factual situation must be analyzed in the light of a reasonable person (i.e. a black person) in plaintiff's position. Gnerre v. MCAD, 402 Mass. 502, 507-8 ('88); Muzzy v. Cahillane Motors, Inc., 434 Mass. 409 ('01).

An employee does not have to remain on a job and face additional harassment until he suffers a nervous breakdown. The employee is

entitled to leave the position to avoid further mental and physical harm. The employer is liable for a hostile environment where as here, it failed to take adequate steps to remedy the situation (after the plaintiff had complained, by filing a grievance through the union and complaining to Al Young) to adequate steps to halt the discrimination and retaliation. **College-Town, supra,** at 164, 167-8.

Defendant Higgins may be held personally liable, under G.L.c.151B and C.151B(4)(4) for discrimination and retaliation against Diaz. See, Raffurty v. Keyland Corp., 22 MDLR 125, 127 (Commissioner Walker held that the president of the corporate employer had engaged in unlawful sexual harassment and was individually liable); Doucimo v. S & S Corp., 22 MDLR 82, 87 ('00). The individual agent, who makes his employer, the principal, vicariously liable by his conduct, may be held liable for aiding and abetting.

Claims for discrimination in employment may be brought against parties who were not named at the MCAD, as long as their conduct was put in issue in the MCAD charge, they had notice of the charge and had an opportunity to participate in the defense of the charge. See, Weston v. Town of Middleborough et al. Civil Action #01-941 B-Decision of Hon. Raymond Brassard, Justice of the Superior Court-Dated: February, '02 (fn.2, citing, Chatman v. Gentle Dental Ctr. Of Waltham, 973 F.Supp.228, 234-235 (D.Mass.1997); Smiley v. Acme Wholesale, Inc. 7 Mass. L. Rptr. No.24, 549 (allowing corporate officer and part owner not named at MCAD to be sued in civil action).

The fact that the actions of a supervisory official, such as Higgins, are alleged to be outside of the scope of his employment is not a defense to a claim of individual liability for discrimination in employment, especially where the acts occurred at the employer's place of business, were committed in the discharge of the supervisor's duties and the employer had knowledge of such acts. Melnychenko v. 84 Lumber Co., 424 Mass 285 (1997); College Town Div. of Interco, Inc. v. MCAD, 400

Mass. 164, 165 n.5. In the instant case, Higgins himself committed acts of discrimination when he on two separate occasions, denied promotions to plaintiff; recommended white males who were not as qualified as plaintiff and retaliated against plaintiff when plaintiff filed a grievance which went all the way up to arbitration. Higgins also aided and abetted the City of Boston in its acts of discrimination and retaliation against Diaz and is therefore also liable on that basis. Lemire v. Silva, 104 F.Supp.2d 80, 92-3 (D.Mass.,'00); Ruffino v. State Street Bank & Trust Co., 908 F.Supp. 1019, 1047-9 (D.Mass., 1995).

   Higgins is also liable for interference with contract. In the context of employment, the plaintiff must show that: he had an advantageous relationship with the employer; the defendant induced the employer to break such relationship; the defendant's interference was improper in motive or means and the plaintiff was harmed. Higgins' racist statement to Diaz that he lacked communication skills, even though Diaz spoke English and was born in a country with an English speaking majority black population and his order ousting Diaz from the temporary foreman's office after Diaz filed a grievance with his union and engaged the union's attorney, are sufficient to show that he was motivated by a spiteful and malignant purpose, unrelated to the legitimate interest of the City. Sklar v. Beth Israel Deaconess Medical Center, 59 Mass. App. Ct. 550, 797 N.E. 2d 381 ('03) citing, Weber v. Community Teamwork, Inc., 434 Mass. 761, 752 N.E. 2d 700 ('01). Plaintiff suffered harm in that he was embarrassed and humiliated by being ejected from the temporary foreman's office. Degrading treatment in the course of employment, because of one's race, will state a claim for the violation of the terms and conditions of employment. Trustees of Health & Hospitals of the City of Boston v. MCAD, 65 Mass. App. Ct. 329, 334 (2005), citing, Randlett v. Shalala, 118 F.3d 857, 862 (1st.Cir., '97).

CONCLUSION:

For the reasons set forth above, and especially because, as a matter of public policy, a municipality and its supervisory officials should not be permitted to engage in acts of racial discrimination and retaliation, with impunity, the court should deny the defendants' motion for summary judgment on account of discrimination and retaliation and grant plaintiff's motion for summary judgment on liability. .

By his Attorney,

_____
W.Kendall
136 Warren Street
Roxbury, Ma.02119
(617) 442-6130

CERTIFICATE OF SERVICE

I, W.Kendall, hereby certify that on 20th.February, '07, I made service, first class mail postage pre-paid, of the foregoing Memorandum, upon N.Murati Ferrer, esq., Asst.Corporation Counsel, City of Boston Law Dept., Room 615, Boston City Hall, Boston, Ma.02201.

_____
W.Kendall