UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____ )
RODERICK DIAZ )
 )
v. )          Civil Action No. 05-10154-NG
 )
DAVID HIGGINS )
and )
CITY OF BOSTON )
_____ )

REPORT AND RECOMMENDATIONS ON
CROSS MOTIONS FOR SUMMARY JUDGMENT

July 19, 2007

SOROKIN, M.J.

On December 17, 2004, Roderick Diaz ("Diaz") filed suit against the City of Boston (the "City") and David Higgins ("Higgins"), the Director of Central Fleet Maintenance for the City's Public Works Department ("PWD"). Before the Court are the parties' cross motions for summary judgment. For the reasons set forth below, I recommend that defendants' joint motion be ALLOWED in part and DENIED in part, and that Diaz' motion be DENIED.

BACKGROUND

Diaz is a black male who was born in the Republic of Trinidad and Tobago. He has been a United States citizen since 1978. Diaz began his employment with the City in December of 1986, when he was hired as a Motor Equipment Repairman. At some point after his initial hire, Diaz became a Heavy Motor Equipment Repairman. Although Diaz' position was originally classified as a temporary provisional position, it became a permanent position on September 9, 1998.

Diaz applied for the position of Motor Equipment Repair Foreman in November of 1999

and was interviewed by Higgins, Robert Silvey ("Silvey"), and Jeremiah Coughlin ("Coughlin"), all of whom are white men. James Monaghan ("Monaghan"), a white man, was hired. Diaz filed a grievance through his union, and in July of 2000, he filed a complaint at the Massachusetts Commission Against Discrimination ("MCAD"), wherein he alleged that the City discriminated against him on the basis of race, age, and national origin. MCAD dismissed the matter for lack of probable cause, and subsequently affirmed that finding after Diaz filed an appeal. No lawsuit ensued.

On July 17, 2001, a notice for an open Motor Equipment Repair Foreman position was posted at Central Fleet Maintenance. Diaz applied for this position at some point in July of 2001, and he was interviewed on December 11, 2001. In addition to defendant Higgins, the panel of interviewers consisted of Silvey, Coughlin and two people not on the last panel, Kathy Kelly ("Kelly") and Maurice Smith ("Smith"). Diaz was one of four candidates interviewed. All of the candidates were asked the same set of questions, and their answers were written down by Higgins. The set of questions was developed by Higgins for the purpose of illuminating a candidate's education, experience, and job knowledge. Diaz did not prepare for the interview, as he felt he would have no trouble answering questions about issues relating to mechanics. See Diaz Depo. I, 67:6-19. During his deposition, Diaz testified that he felt that the questions were "fair." Id. at 71:1-4. In his motion papers, Diaz challenges the interview questions as a selection device or test that has not been content validated.

After the interviews were completed, the panel members were asked to rank each candidate. Following a discussion, Higgins asked the panel members to rank the candidates once more. Diaz answered only six and one-half questions correctly; the other 21.5 questions were

2

answered incorrectly. Diaz was ranked as the least qualified candidate by all of the panel members, and it was decided that the panel would not recommend him for the foreman position. One week later, on December 18, 2001, Higgins met with Diaz to inform him that he was not recommended for the job. Higgins told Diaz that the decision not to recommend him was due to the fact that he was deficient in the areas of job knowledge, leadership skills, and communication skills. Higgins informed Diaz that he was unsure how to handle a role in which people would have to report to him, and that he lacked understanding of the rules related to placing a vehicle out of service. Higgins also told Diaz that he would be willing to coach or school him. According to Diaz, Higgins said:

> Rod Diaz, what happened in the past, don't take it personally. And I want you to know I'm not racist. And you've been here a long time, and you need to move up. And Al Young is going to retire and there will be more position hiring. But I want you to know that you're lacking of communication skill[s], and I want to school you. And I want to school you, and I want you to know that you was [sic] one of the candidate[s] that did not get the job.

> Diaz Depo. I, 72:6-17.

The panel chose to recommend a white male, Paul Musto ("Musto"), for the position. Musto answered 25 questions correctly, and only three questions incorrectly.

Diaz alleges that he was not recommended to the position because he is black, and in retaliation for filing his previous complaint with the MCAD in 2000. On December 19, 2001, the day after he was informed that he was not recommended for the position, Diaz filed a complaint with MCAD.[1] On December 17, 2004, prior to receiving a decision from MCAD, Diaz filed a

---

[1]In his 2001 MCAD complaint, Diaz wrote: "On 7/19/00 I filed a complaint with the MCAD, on the basis of my race/color black, national origin (Carribean) and age 58, against Respondent City of Boston Dept. of Public Works. On 7/01 I submitted an application for the position of working foreman, on 12/11/01 we were interviewed for the position. I was told by

complaint in Suffolk Superior Court.[2]   Defendants removed the matter to this Court on January

17, 2005. The present complaint is comprised of two counts, each of which contains numerous

sub-parts. Against both parties, Diaz alleges racial discrimination arising out of the second

promotion denial in violation of  G.L. c. 151B(4), retaliation in violation of G.L. c. 151B(4)(4);

and violation of 42 U.S.C. § 1981.[3]  In addition, Diaz alleges that the City violated his rights under

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*.  Finally, Diaz alleges that

Higgins interfered with his contract of employment with the City.

## DISCUSSION

_____Summary judgment will be granted only where "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law."  Fed. R. Civ. P. 56(c); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248

(1986) ("The mere existence of *some* alleged factual dispute between the parties will not defeat an

otherwise properly supported motion for summary judgment; the requirement is that there be no

*genuine* issue of *material* fact.")(emphasis in original).   "Neither conclusory allegations nor

---

Respondent that the position wasn't given to me, based on lack of communications skills.  I
believe this was just an excused [sic], I believe I was well qualified for the position, but instead
Respondent gave the position to a white male employee with less seniority who can not read or
write properly, and who I believe is under the age of 40 (or at least much younger than I).  This is
the second time I was past [sic] over for a promotion, and I believe Respondent denied me the
promotion, in  retaliation for filing a complaint with the MCAD.  This is in violation of MGL
Chapter 151B Section 4 Paragraph 4 and Title VII."   In the box reserved for a complainant to
identify the cause of discrimination,  Diaz wrote "Other - Paragraph 4 Retaliation."

   [2] On March 19, 2004, Diaz left his employment with the City for a job at Massport.

   [3] Pursuant to the Court's Order of September 29, 2005, the preceding claims against
Higgins are asserted against him in his individual capacity only.

improbable inferences are sufficient to defeat summary judgment.  Rather, to withstand a properly

supported motion for summary judgment, the opposing party must present enough competent

evidence to enable a factfinder to decide in its favor on the disputed claim." Carroll v. Xerox

Corp., 294 F.3d 231, 236-237 (1st Cir. 2002).

    1. Defendants' Joint Motion

        A. Failure to Exhaust Administrative Remedies For Discrimination Claims

    At the outset, defendants renew the argument (first made in their motions to dismiss,

Docket Nos. 5 and 7) that they are entitled to summary judgment as to the state racial

discrimination claims[4] due to plaintiff's failure to exhaust his administrative remedies.  According

to the defendants, these claims must be dismissed because they were not asserted in Diaz' MCAD

complaint.  Diaz, for his part, contends that defendants have waived this argument by failing to

raise it as a defense in their answers to the complaint.  There is no need to decide this issue

because, in any event, as discussed below, both the state and federal claims for discrimination

should be dismissed.[5]  Moreover, the District Judge denied the motions to dismiss (to the extent

---

    [4] These claims are asserted against the City and Higgins in Count I, ¶ 32(a) and Count II, ¶ 34(a), respectively.

    [5] For the sake of completeness, this Court recognizes the general rule that "[a]ffirmative defenses not so pleaded are waived." Knapp Shoes v. Sylvania Shoe Mfg. Corp., 15 F.3d 1222, 1226 (1st Cir. 1994).  See also McKinnon v. Kwong Wah Restaurant, 83 F.3d 498, 505 (1st Cir. 1996). ("To avoid waiver, a defendant must assert all affirmative defenses in the answer."). Fed. R. Civ. P. 8(c) provides that "[i]n pleading to a preceding pleading, a party shall set forth . . . [any] affirmative defense."  However, this rule has been relaxed in circumstances wherein plaintiffs have been given notice of the defense through some other means.  See Honey Dew Associates, Inc. v. M&K Food Corp., 241 F.3d 23, 26 (1st Cir. 2001); see also  Boston Hides & Furs, Ltd. v. Sumitomo Bank, Ltd., 870 F. Supp. 1153, (D.Mass. 1994)(Tauro, J.) ("The purpose of Fed.R.Civ.P. 8(c) is to give the opposing party notice of the affirmative defense and a chance to rebut it); Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation, 402 U.S. 313, 350, 91 S.Ct. 1434, 1453, 28 L.Ed.2d 788 (1971).  If the plaintiff receives notice of an affirmative

that they pertained to this issue) on September 29, 2005.  There have been no changes in the

record with regard to this issue since that ruling.  Accordingly, this Court declines to revisit the

District Judge's Order.

     B.  <u>The Merits</u>

       1.  <u>Discrimination Claims</u>

     In analyzing Diaz' claims for racial discrimination, the Court applies the burden-shifting

framework of <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).  Under this framework,

Diaz first must establish a prima facie case of discrimination.  The burden of making out a prima

facie case is "not onerous." <u>Texas Dep't of Community Affairs v. Burdine</u>, 450 U.S. 248, 253

(1981).  To establish a prima facie case of discrimination under both state and federal law, Diaz

must show (1) that he is a member of a protected class, (2) that he applied, and was qualified, for

the motor equipment repairman position,  and that the City (3) rejected him and (4) hired someone

with similar or lesser qualifications. <u>See</u> <u>Moron-Barradas v. Dept. of Ed. of the Commonwealth of</u>

<u>Puerto Rico</u>, – F.3d –, 2007 WL 1501738 (1st Cir. 2007), citing <u>McDonnell Douglas Corp. v.</u>

<u>Green</u>, 411 U.S. at 802; <u>Sinai v. New Eng. Tel. & Tel. Co.</u>, 3 F.3d 471, 474 (1st Cir.1993). A

prima facie showing gives rise to an inference that defendants discriminated against Diaz due to his

race.  The burden next shifts to the defendants to articulate a legitimate, non-discriminatory reason

for declining to promote Diaz.  It is important to note that "[t]his entails only a burden of

_____

defense other than through the pleadings, the defendants' failure to comply with Fed.R.Civ.P. (c)
does not cause the plaintiff any prejudice. <u>Moore, Owen, Thomas & Co. v. Coffey</u>, 992 F.2d
1439, 1445 (6th Cir.1993)."). Here, plaintiff was given notice of the defense when the defendants
filed their motions to dismiss, which they did <u>prior</u> to filing their answers. Plaintiff is therefore
hardpressed to argue that he would be prejudiced by the assertion of the defense at this stage in
the proceedings.

production, not a burden of persuasion; the task of proving discrimination remains the claimant's at

all times." Mesnick v. General Electric Co., 950 F2d 816, 823 (1ˢᵗ Cir. 1991). If defendants offer a

non-discriminatory reason, the presumption of discrimination is removed, and Diaz is required to

show that defendants' proffered reason is merely a pretext for racial discrimination. See id. at 824.

"It is not enough for a plaintiff merely to impugn the veracity of the employer's justification; he

must elucidate *specific facts* which would enable a jury to find that the reason given is not only a

sham, but a sham intended to cover up the employer's real motive." Id. (internal citation and

quotation marks omitted)(emphasis added).

　　With these parameters in mind, the Court turns to Diaz' claims.  It must be noted that there

is a question as to whether Diaz has established a prima facie case of discrimination because the

parties hotly dispute two of the factors: (1) whether Diaz was indeed qualified for the foreman

position, and (2) whether Musto was similarly or less qualified than Diaz.  However, for present

purposes the Court will assume *arguendo* that Diaz has established his prima facie case.[6]  Having

made this assumption in Diaz' favor, the Court must determine whether defendants have

articulated a legitimate, non-discriminatory reason for their adverse employment action.

Defendants argue that they are entitled to summary judgment on the discrimination claims because

of Diaz' poor performance during the interview process, and because Musto, who was appointed

---

　　[6] The Court recognizes that defendants' contention that Diaz was not qualified for the
position arguably undermines a finding that Diaz has established a prima facie case of
discrimination.  If the plaintiff has failed to establish a prima facie case, the inference of
discrimination never arises, and the employer's motion for summary judgment shall be granted.
See Menard v. First Sec. Servs. Corp., 848 F.2d 281, 285-87 (1ˢᵗ Cir.1988). However, following
the First Circuit's method in Benoit v. Technical Mfg. Corp., 331 F.3d 166 (1ˢᵗ Cir. 2003), this
Court will make the assumption in Diaz' favor, and then analyze the argument about lack of
qualification when determining whether a jury could find the defendants' reason a pretext.  See id.
at 173, n. 2.

to the position, was more qualified for the job than Diaz. According to the defendants, that Musto was the better candidate for the position is evidenced by his performance in the interview process, as compared to Diaz. Both men were interviewed by the same panel of people, and they were asked identical questions. As previously noted, while Diaz only answered six and one-half out of 28 questions correctly, Musto answered 25 questions correctly. The defendants' explanation satisfies their burden of providing a non-discriminatory reason for their conduct, especially when Diaz does dispute defendants' contention that he answered 21.5 questions incorrectly. See Benoit v. Technical Mfg. Corp., 331 F.3d at 173.

Accordingly, the burden shifts back to Diaz to show that defendants' proffered reason was merely a pretext. In this evaluation, the Court must consider "the total package of proof offered by the plaintiff." Id. To assist the Court, "the full panoply of circumstantial evidence is available, including but not limited to statistical evidence showing disparate treatment by the employer of members of the protected class, comments by decisionmakers which denigrate [persons in the protected group], the incidence of differential treatment in the workplace, and the deployment of . . . replacements." Fernandes v. Costa Brothers Masonry, Inc., 199 F.3d 572, 581 (1st Cir. 1999)(citation and quotation marks omitted.)   In addition, Courts have held that the most probative means of establishing that the defendants' reason is a pretext is to show that similarly situated, non-black, employees were treated differently. See Matthews v. Ocean Spray Cranberries, 426 Mass. 122, 129 (1997). To make such a showing under both Title VII and G.L. c. 151B, the plaintiff must "identify and relate specific instances where persons similarly situated in 'all relevant aspects' were treated differently. To meet the 'all relevant aspects' test, the plaintiff must identify other employees to whom he is similarly situated 'in terms of [1] performance, [2]

qualifications, and [3] conduct…without such differentiating or mitigating circumstances that would distinguish their situations." Id.[7]

To support his contention that defendants' reason is merely a pretext for discrimination, Diaz testified that he arrived at the conclusion that Higgins does not like black people after he (Diaz) was twice up for a foreman position, and twice rejected.  Diaz Depo. II, 45:1-5.  In addition, Diaz argues that Higgins' comments to the effect that Diaz lacked communication skills and that Higgins wanted to school Diaz betray an attitude of racial supremacy, conscious or not.  There is no indication, however, that either of these comments had racial undertones.  Diaz testified that Higgins never made a racist comment to him, or to anyone else.  Id., 45:11-15.  He further testified that he never heard any racist jokes, comments, or slurs during his tenure at the City.  Id., 61:13-21.  Diaz assumes that Higgins is a racist merely because he did not promote Diaz.[8]  The comment regarding Diaz' lack of communication skills is not racist; a supervisor's

---

[7] Up until this point in the analysis, Diaz' burden is the same under both state and federal law.  However, I note that if Diaz can demonstrate that defendants' proffered reason is a pretext, he then has a lesser burden under Chapter 151B than he does under federal law.  Under Massachusetts law, once a plaintiff has shown pretext, summary judgment for the employer is inappropriate, even if the plaintiff has no direct evidence of discrimination.  See Blare v. Husky Injection Molding Sys. Boston, Inc., 419 Mass. 437, 444 (1995) ("[o]nce a plaintiff has established a prima facie case and further shows either that the employer's articulated reasons are a pretext or by direct evidence that the actual motivation was discrimination, the plaintiff is entitled to recovery for illegal discrimination under G.L. c. 151B.").  Federal law, on the other hand, requires a showing of pretext "plus" a discriminatory animus.  Mullin v. Raytheon Co., 164 F.3d 696, 699 (1st Cir. 1999).  That is, Title VII requires a plaintiff to demonstrate not only that defendants' proffered reason is pretextual, but also that discriminatory animus was a motivating factor behind the adverse employment decision.  See id.

[8] Q: Has Mr. Higgins ever said a racist comment to you?
 A: He never said no racist comment to me.
 Q: Have you ever head him say a racist comment to someone else?
 A: No.
 Q: Has he ever said anything to you that would make you [sic] that he thinks less of you

criticism of an employee (especially one seeking promotion to a managerial position) for his lack of communication skills is perfectly appropriate.  That leaves the comment to the effect of, "I want to school you."  In light of all of the foregoing, as well as the context of the statement as reported by Diaz,[9] the comment is not reasonably interpreted as racist.

Diaz points to at least five other factors, none of which find support in the record.  First, Diaz argues that his background and experiences as a mechanic were not considered as part of the hiring process.  Specifically, Diaz complains that Coughlin did not look at Diaz' performance evaluations, nor did Higgins consult with Diaz' foreman, Teddy Myers ("Myers") to determine Diaz' capabilities.  Assuming that those contentions are true does not assist Diaz' argument.  Coughlin was on a panel of three other members, and Diaz has not shown that careful consideration was not given to his overall application.

Second, Diaz argues that he was more qualified for the foreman position than was Musto.  However, when asked to justify this claim, Diaz stated that he in fact did not know Musto's qualifications or experiences.  See Diaz Depo. I, 74:5-7.[10]

---

because you're a black person?
>A: He did not mention anything about black color, but I just know he was a racist.
>Q: Tell me about that though. What makes you know that?
>A: Because he didn't give me the job.

Diaz Depo II, 45:9-22.

[9]Diaz reported that Higgins offered to help Diaz improve his communication skills so that he could advance.

[10] While defendants argue that Diaz had the same seniority date as Musto, Diaz notes that Higgins testified that he believed that Diaz was more senior to Musto.  Higgins Depo. II, 91:17-19.  However, on the City's Applicant Listing Form dated July 30, 2001, Musto and Diaz were both listed as having the seniority date of September 9, 1998.  See Docket # 39.

Third, Diaz argues that proof of racial discrimination lies in the fact that white employees received more overtime than black employees. According to Diaz, supervisors were supposed to offer overtime work to employees by making telephone calls in alphabetical order according to employees' last names. However, Diaz argues that in reality, white supervisors called white employees, out of order, with the aim of awarding them more overtime. Diaz provides only one anecdote in support of this claim. He contends that on one occasion, his supervisor told him that he telephoned Diaz to offer him overtime. However, according to Diaz, he never received that call. When Diaz asked his supervisor what number he dialed, the supervisor recited Diaz' telephone number. Diaz looked at the supervisor's telephone, and saw that the number dialed out had an additional digit added, making the telephone number incorrect.[11] See Diaz Depo. II, 87:24-88:4. Moreover, when asked how many hours he did not get in overtime due to the allegedly discriminatory practice, Diaz stated, "A whole lot hours. I cannot recall. A whole lot . . . I don't know." Diaz Depo. II, 95:21- 96:1. Diaz has not offered any statistics or any other evidence to support his claim that white employees received more overtime hours than did black employees.[12]

Fourth, Diaz alleges that white male supervisors were in the habit of placing other white males in acting or temporary foreman positions. Therefore, white males who had been serving in the temporary or acting capacity would have an advantage over black employees by virtue of the

---

[11] The last four digits of Diaz' number were 8893. However, the supervisor dialed 88893.

[12] Defendants argue that Diaz admitted to turning down offers of overtime, and that he received overtime during snow emergencies. Neither of these points effectively counter Diaz' claim. That Diaz may have turned down certain offers of overtime when his schedule did not permit him to take on extra work does not indicate that overtime was offered to white and black employees on an equal basis. Moreover, as defendants note, overtime was divided equally in the winter. See Defendants' Statement of Facts, ¶ 80. That is because all employees were required to work overtime during snow emergencies. See Diaz Depo II, 87:4-5.

temporary experience that they received.   Diaz has not offered any evidence to show that white employees were placed into acting positions with greater frequency than were black employees. Evidence to support (or refute) these claims is potentially discoverable from the City, yet Diaz evidently did not undertake any effort to establish a factual record to support his claims.  He can not rest on his allegations alone. "A plaintiff [claiming discrimination] may not prevail simply by asserting an inequity and tacking on the self-serving conclusion that the defendant was motivated by a discriminatory animus. " Coyne v. City of Somerville, 972 F.2d 440, 444 (1st Cir.1992).

Fifth, Diaz alleges that it was the long-practiced custom at Central Fleet Maintenance that the most senior person in the shop would be appointed to the position of Foreman when a vacancy arose.   Yet, he offers no evidence, beyond his own assertion, to establish this custom such as positions filled on this basis prior to his application.  Defendants argue that there was no such practice.  The union contract with the City specifically provides that seniority is only a consideration if the qualifications and abilities of the top candidates are substantially the same.  See Defendants' Memorandum, at 14.  Here, Diaz was ranked fourth out of four candidates. Even if he were senior to Musto, Diaz was clearly not considered to have substantially the same qualifications and abilities.

Finally, Diaz alleges that the interview process created by Higgins has produced a disparate impact on black employees, in violation of Title VII.[13]  Diaz argues that the interview process is

---

[13]  This claim is the subject of Diaz' motion for summary judgment.  Title VII provides, in pertinent part:

An unlawful employment practice based on disparate impact is established under this subchapter only if--(i) a complaining party demonstrates that a respondent uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin and the respondent fails to demonstrate that the challenged practice is job related for the position in question and consistent with business necessity; or (ii) the complaining party

inconsistent with the mandates of the City's affirmative action program, that the questions do not elucidate job qualifications, and that the process was not approved by the City's office of Human Resources.   Higgins testified that as of February 2004, there were eight supervisory positions at Central Fleet Maintenance, six of which were held by white males.  See Plaintiffs' Statement of Facts, at ¶ 3. According to Diaz, as of the date of his interview in December of 2001, no black person had been appointed to a supervisory position by operation of the interview process.[14] Therefore, he argues, the interview procedure implemented by Higgins has resulted in a less than 80% success rate for black applicants.  Id., at ¶ 23.  However, Diaz has not offered even an iota of evidence to support this contention.  When asked whether any Heavy Motor Equipment Repairmen of color had applied for any promotions during 1986 to 2004, the time period that Diaz worked at the City, he responded, "I cannot recall.  There's some - - couple guys in the light shop. I don't know if they apply [sic] for the job. I don't know."  Diaz Depo. II, 106:13-15.   Moreover, although Diaz complains that Kathy Kelly, the principal personnel officer of the PWD, does not know whether there is an imbalance between white and black supervisors, he does not offer any evidence that there is indeed an unacceptable imbalance.  Two out of eight supervisors, or 25%, are black males.  Diaz does not offer any suggestion of what an acceptable percentage rate is, nor does he show that black (or non-white) employees were negatively impacted by the interview process.  Absent any hard numbers to support his claims, Diaz can not get over the summary

_____

makes the demonstration described in subparagraph (C) with respect to an alternative employment practice and the respondent refuses to adopt such alternative employment practice.  42 U.S.C. § 2000e-2(k)(1)(A).

[14]Of the two black supervisors, Maurice Smith was appointed in early 2003, while Fitzroy Prescott was appointed by operation of the Civil Service Act in 1998.

judgment hurdle.

Simply put, Diaz has not "provided sufficient evidence for a jury to disbelieve [defendants']
stated reasons for [their adverse decision], let alone that those reasons masked racial
discrimination." Benoit v. Technical Mfg. Corp., 331 F.3d at 173.   The plaintiff does not carry his
burden of demonstrating pretext on a motion for summary judgment where he provides merely
"sketchy evidence lacking a sufficient foundation for a legally relevant comparison" of allegedly
similarly situated employees. Matthews v. Ocean Spray Cranberries, 426 Mass. at 131, citing
Smith v. Straus Computer, Inc., 40 F.3d 11, 17 (1st Cir. 1994).   "Even in employment
discrimination concepts where elusive concepts such as motive or intent are at issue, summary
judgment is appropriate if the non-moving party rests merely upon conclusory allegations,
improbable references, and unsupported speculation." Benoit v. Technical Mfg. Corp.., 331 F.3d
at 173.[15]   Accordingly, I recommend that the Court ALLOW defendants' motion with regard to
the claims for racial discrimination.[16]

### 2. Retaliation Claims

---

[15] Diaz also argues that he was subjected to a hostile work environment.  A plaintiff can
prevail on a hostile work environment theory when "the workplace is permeated with
discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the
conditions of the victim's employment and create an abusive working environment." Noviello v.
City of Boston, 398 F.3d 76, 91 (1st Cir. 2005), quoting Harris v. Forklift Sys., Inc., 510 U.S. 17,
21 (1993).  Diaz is hard pressed to argue that he was subjected to a hostile work environment
when he testified that he never heard any racist comments, jokes, or slurs while in the City's
employ.

[16] Because Diaz has not demonstrated that defendants' reasons are pretextual, the
difference between the Massachusetts "pretext-only" standard and the federal "pretext-plus"
standard is irrelevant.

Even in the absence of a viable claim for discrimination, Diaz may still be able to maintain a claim for retaliation under state and federal law. To do so, Diaz must show (1) that he engaged in protected conduct; (2) that he was subject to an adverse employment action; and (3) that there was a causal connection between the protected conduct and the adverse action. See Valentin-Almeyda v. Municipality of Aguadetta, 447 F.3d 85 (1ˢᵗ Cir. 2006). To be "adverse," an employment action "must materially change the conditions" of a plaintiff's employment. Gu v. Boston Police Dep't, 312 F.3d 6, 14 (1ˢᵗ Cir. 2002). That is, something of consequence must be taken from the employee (discharge, demotion, or reduction of salary), or an accouterment of the job (e.g., a scheduled promotion) must be withheld. See Blackie v. Maine, 75 F.3d 716, 725 (1ˢᵗ Cir. 1996). Diaz must show a causal link between the protected activity and the adverse employment action, particularly where the events are widely separated in time. Lewis v. Gillette Co., 22 F.3d 22, 24 (1ˢᵗ Cir. 1994).

Diaz alleges that he was retaliated against in a number of ways. First, he argues that he was retaliated against when Higgins did not recommend him, and the City did not appoint him, to the 2001 foreman position. Defendants restate their earlier arguments on this point, made in response to the discrimination claim. They argue that Diaz was subjected to the same oral interview as the three other candidates, and that he scored the lowest out of all of the candidates. In addition, defendants argue that Musto had the same seniority date as Diaz, and that the seniority was only a consideration if the qualification and abilities of the candidates were essentially the same. For the reasons discussed above, defendants have carried their burden to show that they had legitimate, non-discriminatory reasons for not promoting Diaz. Accordingly, defendants' motion with regard to retaliation for failure to promote Diaz should be ALLOWED.

15

Next, Diaz claims that defendants failed to provide him with overtime opportunities in retaliation for filing the initial MCAD complaint. As discussed above, Diaz has not sustained his burden with regard to overtime. Accordingly, defendants' motion with regard to retaliation in the form of denied overtime should be ALLOWED.

Finally, Diaz claims that as of April or May of 2000, when he hired an attorney to grieve his initial rejection in 1999, Higgins discontinued his practice of asking Diaz how he was doing each morning that he saw him. See Diaz Depo II, 46:1-24. It is questionable whether this is sufficient to constitute an adverse employment action. However, it is of significance that Diaz claims that as of that same time, he was no longer appointed to the acting foreman position. According to Diaz, he had served intermittently as acting foreman over a two year period. He testified that he generally worked for two to three days at a time, while the foreman was out sick or on vacation. However, in April of May of 2000, after Diaz hired an attorney, Fitzroy Prescott came into the temporary foreman's office and told Diaz that he was no longer acting foreman. From that time on until he left the City in 2004, Diaz was never again appointed acting foreman. Defendants argue that Diaz can not prevail on this claim, because he never served for more than three consecutive days in an acting foreman position (Diaz does not dispute this contention). Defendants argue that this is of significance because pursuant to the union contract, an acting foreman is not compensated unless he serves in that capacity for six days or more. Therefore, defendants argue, Diaz did not lose wages. Finally, defendants note that Diaz admits that he never informed anyone of his disappointment in no longer obtaining the appointment.

Defendants' arguments are unconvincing. That Diaz had never been paid for serving as acting foreman is of no consequence to his claim for retaliation. Lost wages are but one potential

16

injury in the employment context.  It is significant that Diaz was never appointed to the position of

acting foreman after he hired an attorney to grieve his initial rejection.  Diaz has argued that

employees who had been serving in the temporary or acting foreman capacity would typically have

an advantage over other employees by virtue of the temporary experience that they received.  To

deny Diaz of the opportunity to gain more experience, and thereby become more qualified for a

permanent foreman position, is to materially alter the conditions of his employment.  Defendants

do not deny that Diaz was no longer appointed as temporary foreman after he hired counsel, nor

do they offer any reason for this change.  The temporal proximity between Diaz' hiring counsel

and his apparent ban from the position of acting foreman is "very close" and sufficient to establish

a question for a jury.  Bishop v. Bell Atlantic Corp., 299 F.3d 53, 60 (1st Cir. 2002), quoting Clark

County Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001) (per curiam).  Accordingly, Diaz is

entitled to pursue this claim and I recommend that defendants' motion with regard to retaliation

through failure to appoint as acting foreman be DENIED.

### 3.  Tortious Interference with Contract

Diaz alleges that Higgins tortiously interfered with his contract with the City by failing to

recommend Diaz for the position in 2001.  To state a claim against Higgins, Diaz must

demonstrate (1) that he had a business relationship, (2) that Higgins knew of this relationship, (3)

that Higgins intentionally and maliciously interfered with the relationship, and (4) that he was

harmed by Higgins' actions.  See Zimmerman v. Direct Federal Credit Union, 262 F.3d 70, 76 (1st

Cir. 2001)(citation omitted).  Under Massachusetts law, a "defendant-supervisor is entitled to a

qualified privilege in an employment-based tortious interference case (and, thus, will not be liable

for employment decisions that are within the scope of his supervisory duties).  The court adopted

17

this limitation to allay a supervisor's fear of personal liability when the occasion arises for that supervisor to make an adverse employment decision on behalf of the employer." Id. (internal citation omitted). Accordingly, Higgins can only be held liable if Diaz proves that it was Higgins' actual malice for him was the controlling factor in his decision to not recommend Diaz for the position. A "showing of mere hostility" is insufficient. Id. Because "[a]ny reasonable inference of malice must . . . be based on probabilities rather than possibilities . . . and requires an affirmative showing that the actions taken by the supervisor were not derived from a desire to advance the employer's legitimate business interests," id. at 76-77, Diaz' claim must fail. First, Diaz remained employed with the City until 2004, when he left to take a job at Massport. In addition, defendants note that Diaz admitted during his deposition that Higgins never made any derogatory comments to him. Moreover, defendants persuasively argue that Higgins' decision to recommend Musto for the position was in the City's best interests, as Musto performed better during the interview process. Accordingly, I recommend that the Court ALLOW defendants' motion with regard to the claim for tortious interference.

    2. Plaintiff's Motion

       Diaz has filed a cross-motion for summary judgment as to his claim under Title VII for disparate treatment and impact. This claim was fully briefed by the parties in relation to defendants' joint motion for summary judgment. For the reasons discussed on pages 12 to 13, I recommend that the Court DENY plaintiff's motion.

CONCLUSION

For the foregoing reasons, I recommend that the Court ALLOW in part and DENY in part defendants' joint motion.  Defendants are entitled to summary judgment as to the discrimination and tortious interference claims, but not as to the retaliation claims.  In addition, I recommend that the Court  DENY plaintiff's motion.[17]

/s/ Leo T. Sorokin

_____
UNITED STATES MAGISTRATE JUDGE

_____

[17] The parties are hereby advised that any party who objects to these proposed findings and recommendations must file a written objection thereto within 10 days of receipt of this Report and Recommendation.  The written objections must identify with specificity the portion of the proposed findings, recommendations, or report to which objection is made, and the basis for such objections. See Fed. R. Civ. P. 72 and Habeas Corpus Rule 8(b). The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation. See Keating v. Secretary of Health and Human Services, 848 F.2d 271 (1st Cir.1988); United States v. Emiliano Valencia-Copete, 792 F.2d 4 (1st Cir.1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603 (1st Cir.1980); United States v. Vega, 678 F.2d 376, 378-379 (1st Cir.1982); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir.1983); see also, Thomas v. Arn, 474 U.S. 140, 106 S.Ct. 466 (1985).