UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
C.A. # 05-10154-NG

RODERICK DIAZ

v.

DAVID HIGGINS ET AL.

PLAINTIFF'S OBJECTIONS TO REPORT AND RECOMMENDATIONS ON CROSS MOTIONS FOR SUMMARY JUDGMENT

Roderick Diaz, the plaintiff in this action, objects to the Report And Recommendations On Cross-Motions For Summary Judgment of Magistrate-Judge Sorokin.

Plaintiff's Objections are as follows:

1. **First Objection.** Relative to the claims of disparate treatment, on account of race, the Report at page 8, asserts that ". ..the most probative means of establishing that the defendants' reasons is a pretext is to show that similarly situated, non-black, employees were treated differently. (citing, **Matthews v. Ocean Spray Cranberries, Inc.,** 426 Mass. 122, 129 (1997)". The court's reliance on this standard was erroneous and placed an unfair burden on the plaintiff. In **Trustees of Health & Hospitals of the City of Boston v. MCAD,** 65 Mass.App.Ct. 329, 334-336, the court said that " …. Although providing a similarly situated comparator is usually the most probative means of proving that an adverse action was taken for discriminatory reasons, it is not absolutely necessary. ….Massachusetts courts do not appear to ever have squarely said that comparator evidence is required". The court said that the record showed that the complainants were treated worse than all potential comparators and that it was sufficient to meet the complainants' burden. The plaintiff,

1

under the teaching of **Trustees, supra,** may show that he was subjected to discrimination in the terms and conditions of his employment, in violation of both Title VII and G.L.c.151B(4), by demonstrating that the **manner** in which the employer effected an employment procedure, was different from that in which it enforced the same procedure relative to white employees.

The record indicates that the black plaintiff was treated worse than all of the white male applicants, especially since he had the most seniority of all the applicants. The Plaintiff's Response To Defendants' Statement of Facts (hereinafter referred to as "RSOF") at paragraphs 50, 55, shows that Al Young, a supervisory official, had told plaintiff that he would be the next foreman, that he was right in line because he had the most knowledge and was the most senior-qualified person in the shop. Likewise, Higgins himself testified that Diaz was the most senior person who had applied for the position and that he had more seniority than Paul Musto. RSOF, para.44.

2. **Second Objection.** The court misread the evidence to conclude that plaintiff had testified that Higgins had never made a racist comment to him or anyone else and that plaintiff assumed that Higgins was a racist merely because he did not promote him. First, even if the plaintiff never heard a senior official, such as Higgins, make a racist remark, it does not end the inquiry as to racial animus. Employment decisions which are made because of stereotypical thinking about people because of race, colour, national origin, whether conscious or unconscious, violate the law prohibiting discrimination. **Lipchitz v. Raytheon Co.**, 434 Mass. 493 (2001). The record reflects that plaintiff did testify that he viewed Higgins' comments to be racist. The court concluded that "… There is no indication that either of these comments had racial undertones". The court chose to credit the defendants' claim that Higgins' remarks were innocuous and to disbelieve plaintiff's statement. The court is not permitted to engage in this type of weighing of the evidence on summary

judgment and invaded the province of the jury.  In **Waller v. Consolidated Freightways Corp.,** 767 F.Supp. 1548 (D.Kan., 1991) the court stated that the black male plaintiff presented a genuine issue of material fact as to whether the rejection of his request for promotion was racially motivated where he presented evidence that one of the interviewers had stated that Wichita was "not ready" for a black account manager and that the same interviewer had told plaintiff that he was not selected for the position because he "talked too black".  It is to be noted that the court in **Waller, supra,** did not engage in any further analysis of the above cited remarks.  This circuit has addressed the issue of "unconscious racism" in **Dow v. Donovan.,** 150 F.Supp. 2d. 249, 263 (D.Mass., 2001).  That court said ".. In the implementation of such decisions, it is abundantly clear that Title VII tolerates no discrimination, subtle or otherwise".  **Id.,** at 264.  It follows that statements such as the one made by Higgins must be evaluated by a jury, for the determination as to whether or not they were racially motivated.

In the instant case, there was no evidence offered by the defendants that throughout the many years of plaintiff's service at the DPW, that any employee or manager had experienced difficulty in "communicating" with plaintiff.  Plaintiff had good English skills and spoke English in Trinidad. RSOF, para. 68.  The jury could find that Higgins had racially stereotypical views of the plaintiff, that he could not effectively communicate with co-workers because of the manner of his speech, or/and that Higgins used the pretext of "lack of communication skills" to mask his racist motivation for the adverse decision.

3. **Third Objection.**  The court's discounting and disbelief of the plaintiff's proof of pretext, constitutes, impermissible weighing of the evidence in favour of the movants.  The record shows that when Jeremiah Coughlin, a white male supervisor, was promoted from general foreman to Superintendent, his job experience, training, knowledge and education were also considered.  Coughlin did not have to undergo the same

3

interview process as the plaintiff. RSOF, para. 57.  The court makes no mention of, in its description of the fact pattern, and apparently overlooked, the evidence showing that Higgins had testified that all appointments to CFM, after 1997, featured the same interview process with the same type of questions.  The promotion process for Coughlin, was markedly different from that to which Diaz was subjected and is strong evidence that Higgins was untruthful on the claim of its universal applicability.   The differential manner in which the applications of Coughlin and the plaintiff were handled, provides evidence that the defendants' use of the interview process was pretext for discrimination.  The general rule is that the use of subjective procedures will be carefully scrutinized, particularly if the evaluations are being made by persons who are not of the same race as the complainant.  **Bennett v. Veterans Admin. Med. Ctr.,** 721 F.Supp. 723 (E.D. Pa., 1988).

The fact that the selection  process may have been contaminated by racial discrimination is a sufficient legal basis on which to posit a finding for the plaintiff on liability for invidious discrimination.  **Colon v. Sorensen,** 668 F.Supp. 1319 (D.Neb., 1987).  The law also holds that unlawful prejudice may be inferred from the employer's failure to follow its own policies or guidelines in making the employment decisions as well as any deviation from established practice.  **Martin v. Envelope Div. of Westvaco Corp.,** 850 F.Supp. 83, 92 (D.Mass., 1994).  The record would permit the jury to find, relying on the testimony and experience of Jeremiah Coughlin,  that prior to Diaz' applications for the foreman's position, that the employer promoted applicants based on seniority and that the defendants declined to follow the well-established practice in order to defeat Diaz' applications and to  promote a white male.  It is for a jury to make the determination as to whether careful consideration was given to plaintiff's application.  The court invades the province of the jury when it states that the plaintiff has not shown that his application was not carefully considered.

The court discounted plaintiff's testimony relative to the existence of a "seniority system" as regards promotion and asserted that Diaz had not shown that white employees were placed in acting positions more frequently than black employees. The court further observed that evidence to support or refute these claims is discoverable from the City but that plaintiff did not undertake any effort to establish a factual record to support this claim. The court's rejection of plaintiff's proof on the existence of a seniority system with regard to promotion was erroneous for at least two reasons.

First, the plaintiff testified credibly to the existence of a custom of promoting the most senior person in the job. The court impermissibly rejected this evidence, out of hand. In **Baron v. Suffolk County Sheriff's Dept.,** 402 F.3d 225 (1st.Cir., 2005), one of the issues raised was whether the plaintiff had presented sufficient evidence of the existence of a **custom** "of condoning the use of harassment to enforce the code of silence against "rats". The plaintiff testified about his own experience. There was also testimony from Dep. Supt. Feeney that there was a code of silence and that the plaintiff had violated it. The court gave scant weight to the fact that defense witnesses (other correction officials) claimed that there was no such custom, stating "That other Department employees denied at trial the existence of a code of silence would not preclude a reasonable trier of fact from crediting Feeney's statement as evidence of a custom. The jury could have found that Feeney's statements, together with Baron's testimony… demonstrated a custom of retaliation to enforce a code of silence". **Id.**, at 238. In the instant case, not only did the plaintiff testify that there was a seniority system, relative to promotions, but he also publicly relied on information given to him in that regard by Al Young, a senior supervisor at the DPW. Personal knowledge may be shown by affidavit, which could include specific statements of individuals whose utterances constitute exceptions to the hearsay rule. **Schroeder v. McDonald,** 41 F.3d 1272, 1278 (9th.Cir., 1994). It was open to the

5

defendant to obtain a statement from Al Young refuting the plaintiff's statement. It did not. A jury may properly consider Diaz' testimony, based on information provided to him, gratuitously, as to the existence of a seniority system.

Second, the defendant employer, had and has, obligations under F.R.C.P. 26(a)(1)(B), as part of its initial disclosure to provide "a copy of or description by category and location of, all documents … and tangible things that are in the possession, custody or control of the party and that the disclosing party may use to support its claim or defenses". The notes of the advisory committee relative to R.26(a)(1) recommend that a party produce or describe documents which it anticipates it will use in motion practice, including dispositive motions such as those under R.56 and in support of a denial or rebuttal of an allegation, claim or defenses of another party. In the instant case, the complaint alleges with particularity that there was a seniority system relative to promotion and that white supervisors were in the habit of placing white employees in temporary positions, in order that they would obtain experience and an unfair advantage over black employees. Thus, when the vacancy in the position was "officially" posted, the white 'temporary supervisor" would have gained experience in the position-an experience discriminatorily denied to black employees.

The defendant has not disclosed to the plaintiff, the existence of any documents which bear on the existence of a seniority system relative to promotion. Since these allegations were pleaded with specificity by the plaintiff, and the defendant is certainly aware of its obligations under the "automatic disclosure" mandates of R.26, plaintiff had every right to assume that no such documents- i.e. documents tending to show a "custom" or "practice" of promoting the most senior individual, were/are extant. The court was therefore in error in basing its finding of the non-existence of a "custom" relative to seniority promotion, on the lack of plaintiff's diligence of obtaining records "potentially discoverable" which,

6

if they exist, are solely in the employer's possession and which should have been produced in accordance with the mandates of "automatic discovery". Indeed, the party which fails to produce information, as required by the "automatic disclosure" rules, is subject to sanctions. **Taydus v. Cisneros,** 902 F.Supp. 288 (D.Mass.,1995)(Defendant's automatic disclosure letter fails to describe any documents concerning job applications of unsuccessful candidates and candidates who declined offered positions. …. Absent "substantial justification for the nondisclosure, Rule 37© allows this court to impose the sanctions listed in Rule 37(b)(2)A0, (B) and (C) for a party's failure to disclose information required under Rule 26(a)) **Id.**, at 297.

4.  **Fourth Objection.** The court erroneously read the record and made a finding that Diaz did not know Musto's qualifications. The court, in effect, improperly concluded that the burden was on plaintiff to prove that he was more qualified than Musto. The plaintiff is not required to prove that he was the most qualified for the position or that he was as well qualified than the person selected. **Mitchell v. Baldridge,** 759 F.2d 80 (D.C.Cir., 1985). The plaintiff may show unlawful prejudice by demonstrating that the employer refused to adhere to its own policies in making its employment decisions. Furthermore , the announced policy of the employer was that it would adhere to fair employment practices in the making of all employment decisions. The employer is a recipient of federal funds and as a condition precedent for the acceptance of such funds, it pledged, pursuant to the provisions of Title VI and its regulations, that it would not engage in discriminatory practices. The provisions of the EEOC Guidelines on Employee Selection, 29 CFR 1601 et seq., mandate that the employer conduct validation studies relative to employee selection criteria. The regulations, 29 CFR S.1607.2, posit that they **apply to tests and other selection procedures which are used as a basis for any employment decision.** The failure of the employer to conduct validation studies relative to the procedure used to evaluate

7

candidates for promotion, violated the provisions of the regulations and provides evidence which the court omitted from its consideration of the issue of racial animus motivating the adverse decisions relative to promotions for the plaintiff. Indeed, at no point in its report, did the court even mention the above regulations and its impact on the calculus of pretextuality. **Caulfield v. Bd. Of Ed. Of City of N.Y.,** 632 F.2d 999 (1980). In the instant case, the well-established policy of making promotions based on seniority, was ignored when the black male applied for the position. **Darrt v. Browning-Ferris Indus., Inc.** 427 Mass.1, 17 (1998); **Ayash v. Dana Farber Cancer Institute,** 443 Mass. 367, 386-388 (2005). It is significant that the defendants have not demonstrated Musto's qualifications, on this record.

5.  **Fifth Objection.** The court accorded little weight to the claim of discriminatory award of overtime because plaintiff could offer no statistics showing that white employees received more overtime than black employees. The plaintiff is entitled to rely on his experience and that of other black employees. The court ignored the evidence that plaintiff complained to the union about black employees being denied overtime but that the union did nothing. Since the defendants had the payroll records in their custody, it was incumbent on them to produce the records to refute this claim. Indeed, the defendants had an obligation to make such records available to plaintiff as part of their compliance automatic discovery. Rule 26 (a)(1)(A).and (B). Plaintiff relies on the discussion of this discrete issue as set forth in the **Third Objection, supra.**

6.  **Sixth Objection.** The court ignored the record when it asserted that plaintiff offered no evidence, beyond his **ipse dixit**, that there was a seniority system for appointment of foremen. Al Young did tell plaintiff that he would be the next foreman, that he was right in line because he was the most senior-qualified person in the shop. RSOF, para.50, 55. The court chose to credit the allegations made by the defendants that there was no seniority system, in the face of evidence to the contrary.

The court's reliance on the rankings produced by a non-validated selection procedure, was error. The selection process, supposedly used, violated the provisions of 29 CFR S.1607.3(A) which states that the use of any selection procedure which has an adverse impact on the hiring, promotion of members of any race, **will** be considered **discriminatory** and inconsistent with the guidelines unless the procedure has been **validated** in accordance with the guidelines. The employer could not show that the criteria used for the selection as foreman, was a reasonable predictor that the successful candidate would be able to competently perform the duties of the position. The questions posed during the interview process were wholly unfair. RSOF, para. 15, 33. A plaintiff may cite as evidence of discriminatory animus, the fact that an employer violated the pledges it made to the federal government, as a condition precedent for the receipt of federal funds under Title VI. The plaintiff may point to evidence such as transgression of the provisions of the Affirmative Action Plan and EEOC Guidelines, even if he does not raise a claim for damages under Title VI. **Alexander v. Choate,** 469 U.S. 287, 293 n.9 (1985); **Caulfield v. Bd. Of Educ. Of City of N.Y.,** 632 F.2d 999 (1980).

7. **Seventh Objection.** The court refused to consider direct evidence of discrimination, i.e., Higgins' statement to plaintiff that he lacked communications skills. In **Wright v. Southland Corp.,** 187 F.3d 1287 (11th.Cir., 1999), the court suggested that the term "preponderance of the evidence" be used as a substitute for "direct evidence". It is evidence from which a reasonable factfinder could find, by a preponderance of the evidence, a causal link between the adverse action and a protected personal characteristic, such as race. **Id.,** at 1284. The evidence that Higgins told plaintiff that he lacked communication skills is direct evidence of discrimination- a factfinder could find from "the preponderance of the evidence" that there was a causal link between the rejection and plaintiff's race. It was error for the court to refuse to consider this glaring and direct evidence of discriminatory animus. Direct

evidence of discrimination will impose liability on the defendants. **Fernandez v. Costa Brothers Masonry,** 199 F.3d 572, 581-3 (1st.Cir., 1999).

8. **Eighth Objection.** The court dismissed the claim for discrimination on account of disparate impact.  The court observed that plaintiff did not offer any evidence that there was an unacceptable imbalance as between black and white persons in the supervisory ranks.  The court overlooked and misstated the facts clearly set forth in the record.  The facts which should have been pertinent to the court's decision are as follows: First; the City of Boston is a recipient of federal funds and is required, as a condition precedent for their receipt, to maintain an Affirmative Action Plan/Program, including the implementation of procedures to monitor adherence by supervisory officials and managers to its provisions, in the enforcement of personnel procedures.  The defendant City of Boston did not perform any job validation exercise with regard to the selection procedure used to fill the position of foreman in 1999 for which plaintiff applied.  PSOF #'s 29, 30; Second, Kathy Kelley, Principal Personnel Officer of the DPW, testified that she did not know whether there was an imbalance as between black and white supervisors-PSOF #14; Third, no black  person had ever been appointed as a supervisor at CFM through the use of the selection procedure, devised by Higgins, as of the date of the plaintiff's second interview-2001;-PSOF #9,22; Fourth,  all of the supervisors at CFM, as of 2001, with the exception of Fitzroy Prescott, were white males; Fifth, S.1607.4 obligates Each User to maintain and have available for inspection, records which will disclose the impact which its tests and other selection procedures have upon employment opportunities of persons of identifiable racial group; Sixth, A selection rate for any race or ethnic group which is less than four-fifths (4/5) (or eighty percent) of the rate for the group with the highest rate, will generally be regarded by the Federal enforcement agencies as evidence of adverse impact.  PSOF #27, 28.    The court "found" two sets of facts

which were irrelevant to the claim of disparate impact: First: that two out of eight supervisors, or 25%, **are** black males, and Second: that plaintiff did not suggest an acceptable percentage rate nor did he show that black employees "were negatively impacted by the interview process". The crucial inquiry on the claim of disparate impact is and should have been, whether, **as of 2001**, the **selection rate**, for black employees was less than 80% of the rate for whites.  If the court accepts the claim made by the defendants that Coughlin, James Monaghan and Paul Musto were selected for their positions based on the same "interview process" to which Diaz was subjected, then it is clear that the selection rate for blacks was less than 80%.  The court adverted to the fact that "Two out of eight supervisors **are black males**". However, one of the two black supervisors, Fitzroy Prescott, was not appointed to that position by virtue of the discriminatory interview process, but rather through the civil service procedure.  The other black supervisor, Maurice Smith, was not appointed as a supervisor at CFM, until well after the plaintiff's interviews. Therefore, the court was in error when it considered these two black males in reaching its decision that Diaz had not shown an acceptable percentage rate and that blacks were negatively impacted by the interview process. The conclusion is inescapable, based on the record, that as of 2001, no black person had ever been appointed as a supervisor at CFM based on the unilaterally devised interview process-brainchild of David Higgins. PSOF # 23. The EEOC Guidelines are mandatory.  Once the plaintiff makes out a prima facie case of disparate impact, the employer must show that it considered other selection procedures which would alleviate the discriminatory results. **Boston Police Sup. Officers Fed. v. City of Boston,** 147 F.3d 13, 20-22 (1st.Cir., 1998). The record indicates that senior officials at the DPW, such as Kelley-PSOF #12,14, and Higgins were unaware of their obligations under the EEOC Guidelines and contended that there was no imbalance in the supervisory ranks. Higgins testified that he did not consider any alternative to the discriminatory

11

selection procedures, because he felt that they worked very well.  PSOF #24. As a matter of law, the defendants cannot show "business necessity" for the discriminatory selection procedures.

The court committed error in denying the plaintiff's Cross-Motion For Summary Judgment on Liability, on the claim for disparate impact discrimination.

9. **Ninth Objection.** Dismissal of the Claim for retaliation, based on denial of Diaz' application for promotion in 2001.  Plaintiff relies upon and incorporates by reference, his arguments in support of his Objections, supra, that the court erred in finding that he had not shown that the rationale offered by the defendants was pretext for discrimination.  The record shows, that after the denial of his application for promotion in 1999, that Diaz went to the union and that they went through the stages with Mr.Casazza.  Diaz testified that he had his union attorney, a certain Attorney Cucuzo, grieve the matter, that he met with his attorney perhaps twice and that the matter went to arbitration. RSOF, para. 65.  The scope of G.L.c.151(b)(4)'s prohibition against retaliatory conduct is not limited to adverse employment actions taken in response to the filing of a complaint at MCAD, but includes "discrimination against any person because he has protested against or opposed any practices forbidden under this chapter".  **Clifton v. MBTA,** 445 Mass. 611, 616 (2005).  The plaintiff establishes "adverse employment action" by showing that he has been materially disadvantaged in respect to salary, grade or other objective terms and conditions of employment. **Bain v. City of Springfield,** 424 Mass. 758, 764-5(1997); **Randlett v. Shalala,** 118 F.3d 857, 862 (1st.Cir., 1997).  The record shows that subsequent to his complaint to the union, the defendants refused to give him any more assignments as an Acting Foreman, RSOF, para.59, 62.  It is for the factfinder to determine whether retaliatory motives played any part in the decision to deny the promotion to the plaintiff and to refuse to grant him any more Acting Foreman assignments.  Dismissal of this claim was error.

10. **Tenth Objection.** The court dismissed the claim for Interference With Contract, on the ground that the plaintiff failed to show that "actual malice" was the controlling factor in Higgins' decision to not recommend plaintiff for the promotions. The court committed error in finding that there was no showing of actual malice on the part of Higgins. Massachusetts law posits that the term "actual malice" encompasses " a spiteful, malignant purpose, unrelated to the legitimate corporate interest of the employer". **Sklar v. Beth Israel Deaconess Medical Ctr.,** 59 Mass. App. Ct. 550 (2003). The plaintiff makes out a prima facie case by showing that: he had an advantageous relationship with the employer; the defendant induced the employer to breach the relationship; the interference was improper in motive or means; and, plaintiff suffered harm. The record shows that the employer had an official policy which forbade racial discrimination in employment as well as an Affirmative Action Policy. It is abundantly clear from Higgins' own testimony that he was unaware of the provisions of the Affirmative Action Policy and the EEOC Guidelines on Employee Selection and did nothing to implement their provisions. As the Director of CFM, Higgins had an obligation to know the law with regard to employee selection and to faithfully apply it. Ignorance of the law, lay persons are often told, provides no excuse. Higgins must accept responsibility for the violation of Diaz' right to be free from discrimination. The wholesale ignoring of the Guidelines and of the Affirmative Action Plan must be considered in conjunction with Higgins' racist remarks that plaintiff lacked communication skills-words which indicate racist beliefs. Higgins and the employer have provided no evidence, on the record, that Diaz had difficulty in communicating with supervisors or co-workers. A jury could believe either that Higgins had a stereotypical view of foreign born black males or/and, that he used Diaz' alleged lack of communication skills as a mask to cover up the reason for the denial of Diaz' application-the fact that Diaz is a black male. The

court invaded the province of the jury when it found that plaintiff had not proved "actual malice".

Higgins is also liable under G.L.c.151B(4) in that he aided and abetted the City of Boston in its acts of discrimination and retaliation against Diaz. **Lemire v. Silva,** 104 F.Supp. 2d 80, 92-93 (D.Mass., '00).

A decision by a high level, white male Director, to discriminate against a black male, on account of race, cannot be in the legitimate corporate interest of the employer, City of Boston. One of the possible repercussions of racist conduct by supervisory officials, is that the federal government, pursuant to the Regulations of Title VI, could terminate federal assistance to the City of Boston. **State v. Dept. of H.E.W.,** 480 F. Supp. 929 (E.D. N.C., 1979). Higgins' action were inimical to the interests of the City and its residents and should expose Higgins to liability. Dismissal of the claim for tortious interference with contract was error.

**CONCLUSION:**

For the reasons set forth above, the plaintiff urges that the court reject the recommendation of the Report that: plaintiff's claims on account of disparate treatment, including failure to promote and omission to award overtime non-discriminatorily, retaliation (on account of denial of promotion in 2001), interference with contract and disparate impact, be dismissed. Plaintiff further urges that the court grant summary judgment on liability on the claim for discrimination caused by disparate impact.

                    Respectfully Submitted,

                    /s/W. Kendall
                    W.Kendall, BB0 # 267480
                    136 Warren Street
                    Roxbury, Ma. 02119
                    (617) 442-6130

## CERTIFICATE OF SERVICE

    I, W.Kendall, hereby certify that on 26th.July, '07, I made service of the foregoing Plaintiff's Objections, first class mail, postage pre-paid on Attorney Murati-Ferrer, Asst.Corporation Counsel, City of Boston Law Dept., Room 615, City Hall, Boston, Ma. 02201.

                    /s/ W.Kendall
                    W.Kendall